Robert W. Dickerson, Jr. (SBN 89367)
E-mail: rdickerson@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
444 South Flower Street, Suite 2400
Los Angeles, CA 90071-2953
Tel: 213.236.0600    Fax: 213.236.2700

Patricia L. Peden (SBN 206440)
E-mail: ppeden@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
1901 Harrison Street, Suite 900
Oakland, CA 94612-3501
Tel: 510-273-8780    Fax: 510-839-9104

Lenny Huang (SBN 264386)
E-mail: lhuang@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 S. Market St., Suite 1000
San Jose, CA 95113-2336
Tel:408-606-6300    Fax: 408-606-6333

Attorneys for Plaintiff
RUMBLE, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| RUMBLE, INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>GOOGLE LLC and DOES 1-10,<br>inclusive,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF DUE TO ANTITRUST VIOLATIONS** |

For its complaint against defendant Google LLC ("Google" or "Defendant"),

plaintiff Rumble, Inc. ("Rumble") alleges as follows:

///

**INTRODUCTION**

1.      Rumble brings this action under Sections 1 and 2 of the Sherman Act, (15 U.S.C. §§ 1 and 2), and Sections 4 and 15 of the Clayton Act (15 U.S.C. §§ 4 and 15), against Google for monetary damages well in excess of $2,000,000,000 that Rumble has sustained and continues to sustain as a proximate result of Google's antitrust violations, and for injunctive relief to prevent Google from continuing unlawfully to maintain its monopoly in the relevant market – online video-sharing platforms – through anticompetitive and exclusionary practices.

2.      These practices include Google rigging its search algorithms purposefully and unlawfully to always give preference to Google's YouTube video-sharing platform over Rumble (and other platforms) in Google search results, such that the Google search page result for online videos lists links to the YouTube site as the first search results, even if the search specified Rumble, such as "dog videos on rumble."

3.      By unfairly rigging its search algorithms such that YouTube is the first-listed links "above the fold" on its search results page, Google, through its search engine, was able to wrongfully divert massive traffic to YouTube, depriving Rumble of the additional traffic, users, uploads, brand awareness and revenue it would have otherwise received.

4.      Google has also forced Android-based smartphone manufacturers to include YouTube as a preinstalled app on their phones in order to acquire the right to use the Android operating system, which constitutes an illegal tying arrangement.  This also has damaged and continues to damage Rumble by further self-preferencing YouTube over Rumble (and other platforms, which harms competition in addition to Rumble).  Because much of the online searching for videos is done on smartphones, this further ensures that Google's YouTube platform receives unfair preferential treatment.  Google thus wrongfully acquired and maintains a monopoly over the market for online video-sharing platforms.

5.     Rumble is unique among video-sharing platforms in that it has an extensive catalog of exclusively-assigned original content videos, thus differentiating itself from other video-sharing platforms.  Rumble receives between $10 and $30 per thousand views of its exclusive videos on its platform, but when that search traffic has been diverted to YouTube through Google's wrongful conduct, Rumble has received only forty-eight cents ($0.48) on average per thousand views of its videos from YouTube.  It is Google's unlawfully acquired monopoly power in the relevant market that has allowed it to pay so little, and keep so much, of the advertising revenue.

6.     Unlike other websites or video-sharing platforms, Rumble, with its thousands of high value exclusive video assets which it has syndicated to YouTube (which have generated billions of views on YouTube), has the unique ability to discover, track and determine its damages both on its exclusive and on its non-exclusive catalog, which have been proximately caused by Google's unlawful conduct.  Notably, this conduct is also in violation of Google's own duplicate content and original sourced reporting best practices which it purports to follow, but evidently does not.

7.     Set forth below are screenshots (Figures 1 and 2) showing a recent example of this unlawful self-preferencing by Google of its own video platform, YouTube.  The searched-for video is entitled "Baby preciously cuddles cat for nap time."  It is a Rumble exclusive video, so Rumble is the original source for that video.  That title – "Baby preciously cuddles cat for nap time" – is verbatim how it is listed on the Rumble platform.  Because Rumble is the original source, it was able to release the video to whom and when it chose.  In this instance, to test whether the Google search algorithms were rigged to give unfair preference to YouTube, Rumble "handicapped" YouTube by releasing the video to Google/YouTube last.

8.     Figure 1 demonstrates how Rumble provided the video to MSN and

1   Yahoo prior to YouTube.  Yahoo is listed first, followed by MSN and then
2   followed by multiple miscellaneous unrelated YouTube videos that do not contain
3   the title searched for.  Significantly, MSN even provides a canonical URL referring
4   to Rumble's original page, yet Google still lists its unrelated YouTube videos ahead
5   of Rumble.com's listing.  In fact, Rumble.com's listing is nowhere to be found
6   despite all the credit, linkbacks, canonicals and submission to Google Webmaster
7   Tools that identified Rumble as the original source for this video.



Figure 1

9.    Prior to the search shown in Figure 1, Google was made aware that this "Baby preciously cuddles" video was a Rumble exclusive and original asset by multiple means; for example, no webpages prior to Rumble had duplicate metadata, MSN's canonical URL pointed to Rumble.com as the original source; Yahoo also references Rumble; there is even a linkback to the Rumble's URL on the YouTube video; and by an automatic sitemap submission to Google Webmaster Tools. Pursuant to Google's multiple different publicly stated policies, Rumble should have been elevated in the search results (actually should have been listed first), and even though the search was for the exact title for the video as on Rumble's platform, the Rumble platform is not even listed at all on the Google search page for this specific video.

10.    Once the Rumble URL was documented to be indexed in Google according to Webmaster Tools, and both Yahoo and MSN took the lead on the search results, Rumble decided to provide YouTube the video with credit and linkbacks to the Rumble.com website.  As shown in Figure 2 below, which is a screen shot of the Google search and search page results for the search on November 24, 2020, about 2 hours after Figure 1 was taken, Google immediately

///
///
///
///
///
///
///
///
///
//
///

gives the top listing to YouTube, de-ranks both Yahoo and MSN, lists a different YouTube video in the 4th spot, and <u>still</u> avoids listing Rumble:



Figure 2

11.     Amazingly, even though Rumble is the original source for this video, even though Google was aware of that fact, even though the search term was verbatim the title for the video as on Rumble's platform, even though all sources point back to Rumble as the original content source, and even though the video was released to Google/YouTube last in time, the Google search results still listed YouTube's platform first, and doesn't list Rumble at all on its first page of search results.

**RUMBLE AND THE SERVICE IT PROVIDES**
**FOR INDIVIDUAL CONTENT CREATORS**

12.     Since 2013, Rumble has operated an online video-sharing platform. Today, Rumble is one of the most respected independent and privately owned companies in the online video-sharing platform industry and market, and its business model is premised upon helping the "little guy/gal" video content creators monetize their videos.

13.     Video content creators upload their copyright-protected videos to the Rumble platform (rumble.com or app), many of whom exclusively assign to Rumble the licensing and enforcement rights in the uploaded video.  Rumble in turn makes the videos ("Rumble Videos") available under license to other companies who have websites or other social media sites, and who want to make those videos available to visitors to their sites in order to generate advertising revenue.

14.      Since its launch in 2013, Rumble Videos have received approximately 9.3 billion views worldwide just on YouTube alone according to YouTube's Analytics.

15.     The original author (the content-creator) of the video should be compensated for the publication of his or her video.  More often than not in the past, however, he or she was not.  This is where Rumble came and comes into the picture.

16.     Rumble provides an important service to the untold number of "little guy/gal" videographers who create the video content that is uploaded to the internet, enjoyed by millions, and monetized by only a few.  By themselves, these individual content-creators cannot effectively monetize their videos, even those that go "viral" and obtain millions of views within the first few days of being available online.

17.     Rumble provides a platform for those individual content-creators to monetize their copyrighted videos.  By simply appointing Rumble as their exclusive

1  licensee to their copyrighted video(s), and then uploading their video(s) to

2  Rumble's platform, Rumble takes over and does all the rest.  Rumble makes its

3  portfolio of exclusively-licensed videos available to others to use for a fee (and a

4  portion of the downstream revenue collected by the user), monitors that use,

5  collects the fee (and revenue), and shares it with the content-creator.  There are

6  some individual content-creators who are receiving royalties in the 6-figures

7  annually, and many that are receiving annual 5-figure royalties from Rumble.

8      18.    Rumble's platform and proprietary software sources, validates,

9  provides clearance management, distribution and monetization for video content.

10  It is a content-creator-centric platform, whose main goal and core business model

11  has always been to help video creators increase distribution and monetize their

12  videos.  Rumble allows video creators to create channels, host, share, monetize and

13  distribute their video content from one centralized account on the Rumble platform.

14      19.    Rumble has working relationships with some of the most respected

15  video creators and Rumble licenses video content through its revenue-share video

16  player and, if licenses permit, through other video players to many very well-known

17  websites, including some of the largest and most well-known companies and

18  websites in the world.

19      20.    Rumble currently has more than 2 million amateur and professional

20  video content-creators that now contribute to more than 100 million streams per

21  month.  Some of the top video content-creators use Rumble's platform.  Rumble's

22  creator-centric platform has enabled more of these amateur and professional video

23  content-creators, media companies, and celebrities to distribute and monetize their

24  social videos more than ever before.

25      21.    Rumble's success, however, has been far less than it could and should

26  have been as a direct result of Google's unlawful anticompetitive and monopolistic

27  behavior, and coincided with Google's unlawful rise to monopoly prominence in

28  the search engine market as detailed in the recently filed case *United States of*

*America et. al. v. Google LLC*, Case 1:20-cv-03010, Document No. 1, 10/20/2020 (D.D.C.) ("the DOJ Complaint").  Using that ill-gotten prominence, Google promoted YouTube to the exclusion of other online video-sharing platforms, including specifically Rumble, to obtain and maintain an unlawfully-achieved monopoly in that market as well.

22.    When video content creators upload their videos to Rumble's platform, those videos are then available for viewing on Rumble's website, generating advertising revenue.  Unlike most video-sharing platforms, Rumble obtains an exclusive license for many of the uploaded videos.  Even though Rumble has the exclusive license to these videos, because of the monopoly Google has obtained for its YouTube platform through its unlawful anti-competitive conduct, Rumble must syndicate its exclusive videos to YouTube in order to survive.  Notably, other video-sharing platforms do not have a large exclusive catalog to syndicate.  Rather, their revenue depends on non-exclusive licenses for the videos uploaded by their creators – the same way YouTube operates.  Those other video-sharing platforms solely depend on growth from search traffic to their non-exclusively uploaded videos, which they will monetize.

23.    The information and evidence now available to Rumble also exposes how Google's conduct in this regard has not only harmed Rumble, but also other similarly situated online video-sharing platforms throughout the world, who have been deprived of the views, users, uploads, traffic and brand awareness needed to survive and prosper.  As testament to this fact, since Google purchased YouTube in 2006 the number of competitive video-sharing platforms has dwindled dramatically as other platforms were not able to survive as a direct result of Googles' unlawful and exclusionary conduct.

24.    Indeed, the extensive unlawful and exclusionary tactics and willful misconduct as meticulously detailed in the DOJ Complaint expose the many ways in which Google illegally achieved and now maintains monopoly power in the

internet search engine relevant market, and equally expose Google's game plan,
mindset and goal that have motivated it to do so across the entire expanse of its
empire, including the relevant market here – online video-sharing platforms –
which illegal game plan Google has executed to near perfect to actually achieve and
maintain a monopoly in that market, and thereby to achieve a monopolist's profits
and to drive out meaningful competition, to Rumble's great disadvantage and
damages.

## GOOGLE'S UNLAWFUL ANTICOMPETITIVE CONDUCT

25.    Google has willfully and unlawfully created and maintained a
monopoly in the online video-sharing platform market in at least two ways.  First,
by manipulating the algorithms by which searched-for-video results are listed,
Google insures that the videos on YouTube are listed first, and that those of its
competitors, such as Rumble, are listed way down the list on the first page of the
search results, or not on the first page at all; and second, by pre-installation of the
YouTube app as the default online video-sharing app on Google smart phones, and
by entering into anti-competitive, illegal tying agreements with other smartphone
manufacturers to do the same.

26.    This first way has been recently confirmed and reported in the Wall
Street Journal:

> When choosing the best video clips to promote from
> around the web, Alphabet Inc.'s Google gives a secret
> advantage to one source in particular: itself.
>
> Or, more specifically, its giant online-video service,
> YouTube.
>
> Take a clip of basketball star Zion Williamson that the
> National Basketball Association posted online in January,
> when he made his highly anticipated pro debut. The clip

was popular on Facebook Inc., drawing more than one million views and nearly 900 comments as of March. A nearly identical YouTube version of the clip with the same title was seen about 182,000 times and garnered fewer than 400 comments.

But when The Wall Street Journal's automated bots searched Google for the clip's title, the YouTube version featured much more prominently than the Facebook version.

The Journal conducted Google searches for a selection of other videos and channels that are available on YouTube as well as on competitors' platforms. The YouTube versions were significantly more prominent in the results in the vast majority of cases.

This isn't by accident.

Engineers at Google have made changes that effectively preference YouTube over other video sources, according to people familiar with the matter. Google executives in recent years made decisions to prioritize YouTube on the first page of search results, in part to drive traffic to YouTube rather than to competitors, and also to give YouTube more leverage in business deals with content providers seeking traffic for their videos, one of those people said.

"All else being equal, YouTube will be first," the person said.

Reprinted from article entitled "*Searching for Videos? Google Pushes YouTube Over Rivals*", The Wall Street Journal, by Sam Schechner, Kirsten Grind and John

West, posted online July 14, 2020 at 12:47 pm EDT ("the WSJ Article").[1]

27.     Similarly, this reprint from the recently released Report by the House of Representatives also found that Google has engaged in the unlawful anti-competitive self-preferencing activity:

> Although these four corporations [including Google] differ in important ways, studying their business practices has revealed common problems. First, each platform now serves as a gatekeeper over a key channel of distribution. By controlling access to markets, these giants can pick winners and losers throughout our economy. They not only wield tremendous power, but they also abuse it by charging exorbitant fees, imposing oppressive contract terms, and extracting valuable data from the people and businesses that rely on them. Second, each platform uses its gatekeeper position to maintain its market power. By controlling the infrastructure of the digital age, they have surveilled other businesses to identify potential rivals, and have ultimately bought out, copied, or cut off their competitive threats. **And, finally, these firms have abused their role as intermediaries to further entrench and expand their dominance. Whether through self-preferencing, predatory pricing, or exclusionary conduct, the dominant platforms have exploited their power in order to become even more dominant.**
>
> **To put it simply, companies that once were scrappy, underdog startups that challenged the status quo have become the kinds of monopolies we last saw in the era of oil barons and railroad tycoons.** Although these firms have delivered clear benefits

---

[1]   https://www.wsj.com/articles/google-steers-users-to-youtube-over-rivals-11594745232.

to society, the dominance of Amazon, Apple, Facebook, and Google has come at a price. **These firms typically run the marketplace while also competing in it—a position that enables them to write one set of rules for others, while they play by another, or to engage in a form of their own private quasi regulation that is unaccountable to anyone but themselves.**[2]

28.     The House Report also included a section that was especially damning as to Google's conduct at issue here:

In July, the Wall Street Journal reported that Google also gives preferential treatment to YouTube.  Tests conducted by the Journal found that searching Google for videos delivered YouTube in results much more prominently than competing video providers, even when competitor videos had more engagement. Reflecting interviews with those familiar with the matter, the piece stated that **Google engineers:**

**[M]ade changes that effectively preference YouTube over other video sources. Google executives in recent years made decisions to prioritize YouTube on the first page of search results, in part to drive traffic to YouTube rather than to competitors, and also to give YouTube more leverage in business deals with content providers seeking traffic for their videos**."

In response to Questions for the Record from Subcommittee

_____

[2]  Report entitled *Investigation of Competition in Digital Markets*, *Majority Staff Report and Recommendations*, released on October 6, 2020, by the United States Congress, House of Representatives, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary ("the House Report"), pages 6-7 (emphasis added).

1    Chairman David N. Cicilline (D-RI), the company denied that Google

2    Search is designed to favor YouTube. **Although Google stated that it**

3    **disagreed with the methodology used by the Journal, Google did**

4    **not provide the Subcommittee with any data or internal reports**

5    **that would support its claim.**[3]

6        29.    Google did not provide the Subcommittee with any such refuting data

7    or internal reports because it could not do so – the statements made in the WSJ

8    Article are true, which Rumble has confirmed through its own tests as detailed in

9    this Complaint.  Significantly, it appears that Google's denials were part and parcel

10   of its ongoing attempt fraudulently to conceal its unlawful antitrust behavior.

11       30.    Google has engaged and continues to engage in this unlawful conduct

12   which has proximately caused and continues to cause tremendous damage to

13   Rumble (and to other online video-sharing platforms as well), to competition and to

14   consumers.

15       31.    In this regard, the House Report also included this relevant section,

16   which addresses one of the ways that Google's unlawful anti-competitive conduct

17   injures its competitors:

18           Numerous market participants noted that Google's favoring

19       of its own sites and demoting those of third parties has

20       effectively increased their cost of distribution. Since demoted

21       sites can generally only recover traffic through advertising on

22       Google, the platform "essentially requires competitors to pay for

23       their websites to appear above Google's own links," according

24       to one market participant. Another business recalled that in 2016

25       Google demoted one of its vertical offerings, citing a policy of

26       diversifying content. The firm stated that once it was penalized

27

28   _____

[3]  The House Report, page 191 (emphasis added) (footnotes omitted).

1 in organic rankings, it "could not get an appropriate customer

2 service response for months" and ultimately "had to increase

3 [marketing spend on Google] to regain lost traffic—a win-win

4 for Google but a loss for [our business] and its users.

5 **Meanwhile, Google's own competing vertical "is always**

6 **listed at the top" of search results. The incident highlights**

7 **how demoting rivals can enrich Google in two ways: first,**

8 **through diverting greater traffic and business to its own**

9 **products; and second, through earning ad revenues from the**

10 **penalized sites that are subsequently scrambling to recover**

11 **their search placement**. When demoting firms that Google

12 views as actual or potential competitive threats, Google is

13 effectively raising rivals' costs.[4]

14 32.     The second way Google has unlawfully achieved, expanded,

15 maintained and continues to maintain its monopoly in the online video-sharing

16 platform market is to ensure that its YouTube app is preinstalled on as many new

17 smartphones as possible.  This anticompetitive conduct has also been recently

18 reported:

19 Google's apps are front-and-center on newer Android phones

20 for a reason: Google wants you to use its services on Android,

21 and it has contracts in place to that end.

22 According to confidential contracts obtained by The

23 Information, phonemakers like Samsung and HTC need to

24 include a whole lot of Google-branded widgets and icons to be

25 allowed to include Google's Play Store. The requirements in the

26 contracts show that Google is demanding cushier placement for

27

28 [4]  The House Report, pages 191-192 (emphasis added) (footnotes omitted).

its apps and services than it used to.

One requirement: Phones need to show a "Google" icon that opens to a collection of 13 apps.  Some are genuinely useful, like YouTube, Google Maps, Google Drive, Gmail, and Google Chrome.[5]

33.     This unlawful anticompetitive conduct has also been detailed in the DOJ Complaint, paragraphs 133 to 135 (emphasis added):

133.     **Google uses preinstallation agreements—MADAs—to ensure that its entire suite of search-related products is given premium placement on Android GMS devices. Consumers naturally and regularly turn to these prominently placed search access points to conduct searches.**  Preinstallation agreements also reinforce Google's anti-forking requirements, either by including an anti-forking clause of their own or, more commonly, requiring device manufacturers to be signatories to an anti-forking agreement.

134.     If a manufacturer wants even one of Google's key apps and APIs, the device must be preloaded with a bundle of other Google apps selected by Google. The six "core" apps are Google Play, Chrome, Google's search app, Gmail, Maps, **and YouTube**. Manufacturers must preinstall the core apps in a manner that prevents the consumer from deleting them, regardless of whether the consumer wants them.  **These preinstallation agreements cover almost all Android devices sold in the United States.**

---

[5] Article entitled *Why Android Phones Now Come With So Many More Google Apps* - (Kate Knibbs, published 9-26-2014) (https://gizmodo.com/why-android-phones-now-come-with-so-many-more-google-ap-1639529342).

135.    Google's preinstallation agreements effectuate a tie, that is, they condition the distribution of Google Play and GPS to the distribution of these other apps. This tie reinforces Google's monopolies.  The preinstallation agreements provide Android device manufacturers an all-or-nothing choice: if a manufacturer wants Google Play or GPS, then the manufacturer must also preinstall, and in some cases give premium placement to, an entire suite of Google apps, including Google's search products.  **The forced preinstallation of Google's apps deters manufacturers from preinstalling those of competitors.** This forecloses distribution opportunities to rival general search engines, protecting Google's monopolies.

34.    This conduct by Google also injures consumers as well as competition and its competitors such as Rumble.  The affected consumers here are the people who search for and view videos on video sharing platforms such as YouTube and Rumble; and more specifically those who upload their own videos to these platforms.   By uploading to Rumble's platform, the users can receive a portion of the revenue that Rumble obtains my monetizing the content creator's video.  A video viewed on Rumble's platform generates much more revenue per CPM (1000 views) than if viewed on the YouTube platform.  Because of its unlawfully achieved monopoly in the video-sharing market, Google has been able to force competitors, such as Rumble, to post their videos to YouTube in order to survive. Google's monopoly and monopoly power, however, have allowed Google to pay to Rumble (and content owners) a small portion of the ad revenue generated on videos on YouTube (on average $.048 per 1000 views of Rumble Videos), and to allow Google to retain the large majority of that revenue for itself.

35.    In contrast, on average, Rumble receives $20 or more per CPM of one of its videos if viewed on the Rumble platform.  Therefore, if the Google search

1   page diverts traffic to the YouTube platform instead of Rumble's, Rumble and the

2   content creator receive much less revenue.  This has also caused and is causing

3   direct injury to competition (many video-sharing platforms who were active online

4   before Google purchased YouTube no longer exist), to competitors (such as

5   Rumble), and to consumers, who upload their original content videos to Rumble's

6   platform in return for a portion of the ad revenue Rumble receives from views of

7   that video.

8       36.    The loss on initial views is only a part of the damages caused to

9   Rumble and consumers.  Rumble also has evidence that a percentage of users who

10  find Rumble through online searching for videos subsequently become uploaders of

11  their own videos to the Rumble platform, and thereafter receive revenue.  By

12  rigging its search algorithms to remove Rumble from the first page search results,

13  by forcing smart phone manufacturers to preinstall the YouTube app on their

14  phones, and thereby directing users away from Rumble, not only is Rumble

15  deprived of the added revenue, but the many diverted users are deprived of that

16  revenue.  This is also direct injury to the consumer.

17      37.    Rumble (and in turn its content creators) have been tremendously

18  damaged and continues to be damaged by Google's willfully unlawful conduct.

19  Indeed, Rumble believes that at trial it will seek and obtain an award well in excess

20  of $2,000,000,000 (Two Billion Dollars) before trebling, and that it will also

21  receive an award of its attorney fees and expenses.

22          **THE PARTIES, JURISDICTION, VENUE, AND COMMERCE**

23      38.    Plaintiff Rumble is a Canadian corporation, with its principal place of

24  business at 218 Adelaide Street West, Suite 400, Toronto, Ontario, M5H1W7.

25      39.    Google LLC is a limited liability company organized and existing

26  under the laws of the State of Delaware, and is headquartered in Mountain View,

27  California.  The sole member of Google LLC is believed to be XXVI Holdings,

28  Inc., a Delaware corporation with its principal place of business in Mountain View,

California.  Google wholly owns YouTube LLC, a limited liability company organized and existing under the laws of the State of Delaware, and is also headquartered in Mountain View, California.  Google LLC is wholly owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California.

40.     Google engages in, and its activities substantially affect, interstate trade and commerce.  Google provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally.  It is thus engaged in interstate commerce.

41.     This Court has personal jurisdiction over Google LLC as it is headquartered in this District.

42.     Rumble brings this action pursuant to Sections 4 and 16 the Clayton Act, 15 U.S.C. §§ 4 and 16, to prevent and restrain Google's violations of Section 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and to obtain damages and other relief.

43.     This Court has subject matter jurisdiction over Plaintiff's federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1337(a), and 1345, and pursuant to 28 U.S.C. § 1332.

44.     Venue is proper in this District under Section 22 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391 because Google transacts business and is found within this District.

45.     Rumble is ignorant of all of the corporate relationships, responsibilities and decision-making processes within, between and among Google, Alphabet and YouTube, and is informed and believed that from time to time there have been corporate realignments among and between them.  Rumble therefore reserves the right to add defendants or to substitute the current correct name of a defendant herein as that information is obtained through discovery.

///

1

**YOUTUBE**

2     46.     YouTube was the brain child of three former PayPal employees, who,

3 according to published reports, were motivated by their inability to find certain

4 videos online.  According to some reports, one of the sought-but-not-found videos

5 was of the infamous "wardrobe malfunction" involving Justin Timberlake and Janet

6 Jackson during their 2004 NFL Super Bowl half-time performance.

7     47.     The website www.youtube.com became active on February 14, 2005.

8 It was not, however, the only online video-sharing platform at that time.  Vimeo,

9 for example, (www.vimeo.com) was active then (having launched in November

10 2004), and many more became active soon thereafter.  It has been estimated that

11 soon there were 100's if not 1000's of active online video-sharing platforms such as

12 zippyvideos.com, break.com, dailymotion.com, Google Video, and metacafe.com,

13 to name a few.  All of that was about to change, however, and that change began

14 with Google's acquisition of YouTube in November, 2006.

15     **GOOGLE'S GAME-CHANGING ACQUISITION OF YOUTUBE**

16     48.     Google saw the rapidly rising popularity of online video-sharing

17 platforms, and quickly realized that there could be a synergistic relationship

18 between Google's search engine dominance and the growing potential for a linked

19 video-sharing platform.

20     49.     Google paid a whopping $1.65 Billion for YouTube, even though

21 YouTube had been active for less than two years and had yet to come close to

22 turning a profit.[6]

23     50.     Google, in its pursuit of global internet dominance and the vast riches

24 that would produce, realized that people would use its search engine to search for

25

26 ───────────────
[6]  As reported by, among others, NBC News, Oct. 9, 2006, 8:54 AM PDT, Source:

27 The Associated Press (https://www.nbcnews.com/id/wbna15196982).

28

online videos.  Google also knew that online searchers pay most attention and most often click on the first or second listing/link on a Google search result page, so it would be important that any Google search result for online videos list and link to YouTube at the very top of the search results page, and push competitive platforms to the bottom of the page ("below the fold") or even onto the rarely-visited second page.  Google also realized that by making the YouTube app the default video-sharing app on its smartphone, and requiring other smartphone manufacturers to do the same, it could literally corner the market through its unlawful conduct.

51.    And Google has realized a monopolist's profits for it YouTube subsidiary.  Indeed, YouTube reported $15.1 Billion in revenue for 2019, of which $4.7 Billion was earned in the 4th quarter of 2019.[7]

## THE RELEVANT MARKETS

52.    The market for online video-sharing platforms that are accessible in the United States and globally is a relevant antitrust market.  These platforms allow content creators and other consumers to upload, view and download video content.

53.    Such platforms are unique in that there is no other viable way for video creators to host, share, create channels, monetize, and distribute their content across the Internet from a single centralized video platform.  Consumers use these platforms for all of these purposes in addition to simple enjoyment.

54.    The fact that Google paid $1.65 Billion for YouTube within 2 years after its launch attests to the unique service provided by these platforms in this relevant market.

55.    Other sources of this video content are not reasonable substitutes. Offline and other online resources, such as books, publisher websites, social media

---

[7] Article entitled *YouTube Reveals Revenue for First Time: $15.1 B in 2019* (Alex Weprin, posted 2/3/2020) (https://www.hollywoodreporter.com/news/youtube-revenue-revealed-video-site-did-151b-2019-ad-revenue-1276004).

platforms, and other internet service providers, such as Amazon Prime Video, Netflix, or Hulu, do not and cannot offer users and content creators the same service or convenience.  Although Netflix, Hulu and Amazon Prime Video contain video content, they are not video-sharing platforms where users share videos or where users can upload videos.  They are not a reasonable or acceptable substitute. Apps like TikTok, Instagram and Facebook do not provide the same type of video sharing services, and do not have nearly the same consumption size as YouTube, which is evidenced by bandwidth consumption.  Thus, there are no reasonable substitutes for online video-sharing platforms such as Rumble and YouTube.

56.    The United States is a separate relevant geographic market for online video-sharing platforms and services.  Google offers users in the United States and globally a locally-hosted domain website to search for and with a click on the search results link, to view online video content.  Therefore, the United States is a separate relevant antitrust geographic market.

57.    There are significant barriers to entry in the online video-sharing platform business.  The creation, maintenance, and growth of such a platform requires a significant capital investment, highly complex technology, access to effective distribution, and, of vital importance, adequate scale, traffic, brand awareness, monetization and visibility.

58.    Thus, the market for consumers in the United States and globally for online video-sharing platforms are the relevant markets for antitrust purposes and for purposes of this lawsuit.  This is confirmed by the fact that third parties routinely refer to online video-sharing platforms for the purposes of measuring and reporting size of and market share in that market.

///

///

///

///

1  *See, e.g.*:

2      https://markets.businessinsider.com/news/stocks/online-video-

3      platforms-market-size-worth-18-7-billion-by-2027-grand-view-

4      research-inc-1029703313

5      https://www.alliedmarketresearch.com/online-video-platform-market

6

7      https://www.globenewswire.com/news-release/2020/09/23/

8      2097738/0/en/Online-Video-Platform-Market-to-hit-USD-3-Bn-by-

9      2026-Global-Market-Insights-Inc.html

10     https://www.valuemarketresearch.com/report/online-video-platform-

11     market

12     59.   Scale is also a significant barrier to entry in the relevant market. Scale

13  affects a video-sharing platform's ability to attract subscribers, content creators and

14  advertising and licensing revenue. The scale needed to successfully compete today

15  is greater than ever.  Google's anticompetitive conduct effectively eliminates rivals'

16  ability to build the scale necessary to compete.  This is evident from the fact that

17  there were 100's if not 1000's of video platforms before Google's purchase of

18  YouTube and its anti-competitive conduct began to bear fruit, and approximately

19  10 or less today of any significance.

20     60.   It has been reported that Google's (*i.e.*, YouTube's) share of the

21  relevant market is now greater than 75%.  This has been acquired by Google's

22  unlawful conduct as described above, and that same conduct is being used to

23  maintain that monopoly share, and to reap a monopolist's profits by harming,

24  competition, competitors and consumers.  Google/YouTube's large and durable

25  market share and the significant barriers to entry in online video-sharing platforms

26  demonstrate Google's unlawfully obtained and maintained monopoly power the

27  relevant market.

28  ///

**IMPORTANCE OF SCALE IN ONLINE VIDEO-SHARING**

61.    Just as scale is of critical importance to competition among general search engines for consumers and search advertisers, scale is equally important to online video-sharing platforms. Google has long recognized that without adequate scale its rivals cannot compete with its online business, and applied that same logic, game plan and goal with respect to its YouTube business.

62.    Greater scale expands the audience reach of an online video-sharing platform, and generates more users who register with the platform, which in turn generates more uploaded videos, which in turn generates more views, which in turn generates greater revenue and profits.

63.    Google's unlawful and anticompetitive conduct as described in this complaint has greatly enlarged and continues to enlarge YouTube's scale and greatly diminished and continues to diminish Rumble's scale, which has had an ongoing and increasing adverse effect on competition and on Rumble's revenue.

**GRAPHIC EVIDENCE OF HOW GOOGLE**

**UNFAIRLY STACKS THE DECK IN YOUTUBE'S FAVOR**

64.    Paragraphs 2 to 10 above are incorporated herein by reference.

65.    In addition to what is shown in those paragraphs, shown below in Figure 3 are the Google Search results for the search term "funny dogs," in which, as will be noted, every single one of the listings is a YouTube listing (all nine of the listings/links are to YouTube, including one that is **four years old**), even though Rumble has a tremendous number of "funny dog" videos available on its platform. Clearly, Google is giving preference to its own YouTube videos over those of Rumble (and other platforms), and making sure that Rumble is listed "below the fold" (actually, here, not at all) to ensure that the YouTube versions of the video are

///

///

///

selected by the vast majority (if not all) of the people looking for "funny dog" videos.



Figure 3

66.     As shown in Figure 4 below, even when the Google search term entered was "funny dogs on rumble," the Google search results were all YouTube videos in the all-important "above the fold" top portion of the Google search results:[8]

---

[8] It is well known and an accepted fact in the industry that online searchers will pay most attention to the first or second-listed search results (the portion "above the fold" to use the newspaper term) and will rarely click on links that are "below the fold." This was also confirmed in the House Report at page 188: "However, Google continues to give its service top placement, occupying close to 100% of the above-the-fold mobile search results page and around 25% of desktops."

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figure 4

67.    There is, and can be, no valid business purpose, and no benefit to online searchers, for Google to rig its search algorithms to avoid listing on its search page a link to the Rumble platform, and instead listing only YouTube links. For example, if a video-searcher is searching for "funny dogs <u>on rumble</u>" (emphasis added), listing links to "funny dogs on rumble" would be most beneficial to that searcher and most consistent with the search.  But, as shown, Google does not do that, and lists only links to YouTube.   The clear business purpose here is not only

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-2442-4662 v1

- 26 -

COMPLAINT

invalid, it is unlawful – to divert as much traffic as possible to YouTube so that it maintains its monopoly in the relevant market, and to secure for YouTube (and thus for Google) the vast majority of the advertising revenue from views of that video.

68.    Rumble has conducted tests to determine if the Google algorithms for video searches in fact self-preference YouTube, even when Rumble is the exclusive holder and originator of the Rumble Video, as described below:

a.    When Rumble is the original source of a Rumble Video and is also first reported source, once that video is "live" on the Rumble platform, Rumble can decide and control when and to whom to syndicate that video, and in what order.

b.    Rumble also inserts its own metadata into the video that identifies it as a Rumble Video for which Rumble is the originating source.

c.    Once the Rumble Video is "live" on the Rumble platform with the Rumble-inserted metadata, Rumble alerts Google's search engine as to the existence of the video, that it is an original-content Rumble Video, and that is it available to be viewed on the Rumble.com website.

d.    At that point, Rumble syndicates that Rumble Video to its syndication partners.

e.    Suspecting, as a result of the WSJ Article, that Google's search algorithms for online videos give unfair preference to YouTube, Rumble has conducted several tests where for some tests, it syndicates the video to its partners simultaneously, and for other tests, it has syndicated the Rumble Video at different times, with YouTube receiving it last.

f.    What Rumble discovered was that when the Rumble Video was simultaneously syndicated to all partners, YouTube was preferenced by Google's search engine such that YouTube was the first result, usually followed by MSN, Yahoo, and then Rumble.  This occurred despite the fact that Google management and Google itself has gone on record emphasizing

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

that original sourced reporting and content will always receive preferential treatment by its search engine algorithms.[9]  Once again, Google's statements are belied by its action. This preferential treatment for YouTube occurred despite all online locations referencing Rumble as the source for the video, linking back to Rumble's official content URL, and in some instances (such as the MSN listing), actually providing a canonical URL back to Rumble. This proves that Google's listing first of the YouTube version of the video was intentional, and not some inadvertent mistake.

h.      In order to further rule out the possibility that YouTube somehow believed it received the URL for the Rumble Video first before anyone else and that was why the Google search engine listed the YouTube first due to its integration with YouTube, for other tests, Rumble made sure that the URL for the video was first released to MSN and Yahoo, and only released to YouTube several hours after the video was released to MSN and Yahoo.

i.      Even in this timed release situation, YouTube was again listed first by the Google search engine, followed by MSN, then Yahoo, and only then is Rumble listed – usually below the fold.  There is no way, other than through Google's manipulation of the search results to favor YouTube, for Rumble, as the original source of the content and owner of the exclusive rights to the video, not to be listed first, and YouTube not listed last.  No matter how hard Rumble tried to release the videos in these tests in a way to ensure that YouTube would not be listed before Rumble and the other video-sharing platforms who received the video before YouTube, YouTube was

---

[9]  *See*, Article entitled *Elevating original reporting in Search*, by Richard Gingras, Google VP News, published September 12, 2019, on "Google The Keyword" - https://www.blog.google/products/search/original-reporting/.

1    always first.

2            j.      Figure 5 below shows such a result in which Rumble is the

3    original source of the released Video, and Rumble released it first to MSN

4    and Yahoo, and then later to YouTube.  According to Google's own

5    duplicate content and original sourced reporting best practices which it

6    purports to follow, the Rumble video should have been listed first.  But as

7    shown below in Figure 5, YouTube is listed first, even though all of the other

8    sites received the video before YouTube, and all of the sites, including

9    YouTube, acknowledge Rumble as the original source of the video:



Figure 5

69.     As the House Report and the DOJ Complaint explain in detail, this unfair, unlawful anticompetitive behavior by Google greatly benefits Google/YouTube, and greatly damages and continues to damage Rumble, competition (*e.g.,* other online video-sharing platforms), as well as consumers (*e.g.,* those who upload or might want to upload their videos to Rumble's platform).

70.     The search examples set forth above illustrate how Google's rigged search algorithms favor the YouTube platform over Rumble involving specific videos and specific searches that relate to those videos, even to the point when a search is looking specifically for videos "on rumble."  Google also advantages YouTube over Rumble or other competitors as a consistent and conscious practice, no matter the video or the search terms.  And this is true even if a Rumble video is not uploaded to YouTube.  Rumble and consumers (*e.g.,* content creators) are disadvantaged, and competition is harmed, in the defined market because Google provides self-preferencing search advantages to its wholly-owned YouTube platform as a part of its scheme to maintain its monopoly power, and to reap a monopolist's financial rewards.

## RUMBLE'S DAMAGES

71.     Figure 6 below is a reprint of information that Google has provided to Rumble as part of Rumble's account with YouTube:



Figure 6

72.     This shows that Rumble Videos for which Rumble is the original source and exclusive rights holder have received more than 9.3 Billion views globally through YouTube, for which Rumble has received revenue from Google in the amount of $4,345,883.76.

73.     The usual metrics for determining revenue for online viewing of videos is Revenue Per Mille (RPM - or revenue per 1000 views), and Cost Per Mille (CPM - cost per 1000 views).  Using either metric, Rumble's average revenue received per 1000 views through Google is about $0.48 (forty-eight cents).

74.     For views on Rumble's website, the Gross CPM is approximately $20/CPM, globally.  Had Rumble received its average global CPM on those 9.3 billion views instead of receiving revenue of $4.3 million, Rumble would have received additional revenue of $180 million.  But this is just a portion of the damages proximately caused and continuing to be caused to Rumble and its content creators by Google's unlawful anticompetitive conduct.

75.     According to industry reports, on average every visitor to YouTube views 11 videos during that single visit.   Had Rumble received those 9.3 billion views on Rumble.com, Rumble would have had an additional 93 billion video views, on top of the 9.3 billion views, which translates to damages of $1.98 billion at a CPM of $20.

76.     Rumble posts videos to YouTube because it must in order to survive. This is a direct result of Google's unlawfully self-preferencing YouTube, and rigging its search algorithms to push links to Rumble's platform "below the fold" or off the "front page" altogether.  Because of the Google/YouTube monopoly, Rumble has had not viable option but to "play ball" with Google/YouTube.

77.     A significant source of users and hence revenue for Rumble's platform comes from those consumers who "find" Rumble's platform and video

///

///

content through online searching, primarily through Google, as these graphics (Figures 7 and 8 from the DOJ Complaint) clearly show Google's dominance and monopoly power in online searching:



78.    Those consumers who "find" Rumble through an online Google search are much more likely to sign up (or register) with Rumble than those who "find" Rumble through a social media site, such as Facebook.  Many of those users who register with Rumble will also begin to upload videos to the Rumble platform, thereby increasing Rumble's scale, video content, brand awareness, value and revenue.

79.    Since 2013 when Rumble first launched, approximately 375 million users visited Rumble's website, according to Google Analytics.

80.    Of those, the largest majority, however, approximately 215 million of them, "found" Rumble through the social media site Facebook, not Google. According to Google Analytics, these Facebook users generated approximately, 37,000 uploaded videos to rumble.com.

81.    Since 2013, Google search traffic accounted for only roughly 12 million users on Rumble out of the 375 million reported by Google Analytics.  This search traffic in turn accounted for roughly 238,000 uploaded videos to rumble.com, yielding a performance of roughly 115 times better than did the traffic from Facebook.  For every 12 million users that Rumble lost to YouTube due to

Google's anticompetitive and monopolist behavior, Rumble would have realized roughly 238,000 new video uploads to rumble.com for Rumble to monetize and generate revenue for Rumble and its content creators.

82.     But for the unlawful and anticompetitive, monopolistic conduct of Google, many more potential Rumble users would have "found" Rumble through a Google search, potentially as many as 9.3 billion according to YouTube analytics. However, by always giving preference to YouTube and relegating Rumble to below-the-fold locations in any search result for online videos, Google effectively and purposefully directed that traffic away from Rumble to YouTube, thereby depriving Rumble of those additional users, video content and revenue.  This unlawful conduct regarding Google's search results has been exacerbated by its tying arrangements with Android-based smart phone manufacturers, who are required to include the YouTube app on their phones.  Given that much online searching for videos is done on the searcher's smartphone, this unlawful conduct is a significant factor in Google's achieving and maintaining monopoly power in the online video-sharing market.

83.     Rumble had roughly 1.4 million video uploads to its platform, which generated 9.3 billion views on YouTube, and roughly $200 million of lost ad revenue.   If all 9.3 billion viewers had landed on Rumble's website instead of YouTube's, then Rumble would have generated an additional 184 million more video uploads.

84.     Based upon Google and YouTube analytics, Rumble incurred damages on its 9.3 billion views that Google instead directed to YouTube with its unfair YouTube-preferencing algorithms and tying arrangements.  Rumble lost a huge amount of revenue on the 9.3 billion views that Google wrongfully directed to YouTube with its unfair YouTube-preferencing algorithms.  If even a portion of those 9.3 billion views had occurred on Rumble's website instead of YouTube, that would have generated well in excess of 100 million additional video uploads to the

Rumble platform, which in turn would have generated billions of more views on the Rumble platform, and massive amounts of additional revenue for Rumble and its content creators.  If those 9.3 billion views had all occurred on Rumble's website, it would have generated an additional 184 million video uploads. Those additional 184 million videos would have generated roughly 1.2 trillion additional views on Rumble's platform.  Those additional uploads and views would have produced tremendous additional revenue to Rumble, and in turn to the video content creators.

85.    In addition to Rumble's exclusive catalog of video content, Rumble also incurred damages on its non-exclusive catalog, which is far larger than its exclusive catalog.

86.    Rumble reasonably believes that its damages as will be proven at trial will greatly exceed $2,000,000,000, before trebling or attorney fees and costs.

## CLAIMS FOR RELIEF

### COUNT ONE: *Maintaining Monopoly of Online Video-Sharing Platform Services in Violation of Sherman Act § 2*

87.    Rumble incorporates the allegations of the foregoing paragraphs as though fully set forth here.

88.    Google's conduct violates § 2 of the Sherman Act, which prohibits the "monopoliz[ation of] any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2.

89.    Online video-sharing platforms in the United States and globally is a relevant antitrust market and Google has obtained and maintains monopoly power in that market, and has done so by leveraging its monopoly power in the search engine market.

90.    Google has willfully maintained and abused its monopoly power in the relevant market here through anticompetitive and exclusionary conduct as set forth above, which include rigging its search engine algorithms such that YouTube videos will always be listed first in the search results, and by providing pre-

installation and prominent placement of Google's YouTube apps on its own and requiring other smart phone manufacturers to do the same.

91.    Google's exclusionary conduct has foreclosed a substantial share of the online video-sharing platform market.

92.    Google's anticompetitive acts have had harmful effects on competition and consumers as set forth above.

93.    The anticompetitive effects of Google's exclusionary conduct and agreements outweigh any procompetitive benefits in this market, or that can be achieved through less restrictive means.

94.    Google's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

95.    Rumble (and its content creators) have been and continue to be damaged by Google's anticompetitive and exclusionary practices, and that damage has been proximately caused by Google's anticompetitive and exclusionary practices.

96.    Rumble is therefore entitled to compensatory damages, trebled, and Rumble should also be awarded its attorney fees and costs, pursuant to Section 15 of the Clayton Act.

### COUNT TWO:  *Maintaining Tying Arrangements*
### *in Violation of Sherman Act § 1*

97.    Rumble incorporates the allegations of the foregoing paragraphs as though fully set forth here

98.    Google's conduct violates §1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1.

99.    The YouTube platform app is a service that is separate from and not reliant on the Android operating system that Google licenses to various smartphone

and tablet manufacturers.   Hence the YouTube platform app and the Android operating system comprise separate goods and service.

100.   On information and belief, Google forces certain smartphone and tablet manufacturers to pre-install the YouTube app on their smartphones and tablets in order also to obtain a license to use the Android operating system, such that acquisition and use of the one is conditioned upon acquisition and use of the other.

101.   Google has more than sufficient power in the market for the Android operating system in order to impose the illegal tying arrangement upon customers for that operating system.  Upon information and belief, more than 80% of all smart phones sold in the United States, year in and year out, use the Android operating system.

102.   A not insubstantial amount of interstate commerce in the tied product market is affected in that sales of smart phone and tablets in the United States using the Android operating system are massive.  Upon information and belief, sales of smartphones in the U.S. in 2019 amount to approximately 80 Billion dollars.

103.   Google's anticompetitive and exclusionary practices violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

104.   Rumble (and consumer; *e.g.*, its content creators) have been and continue to be damaged by Google's anticompetitive and exclusionary practices, and that damage has been proximately caused by Google's anticompetitive and exclusionary practices.

105.   Rumble is therefore entitled to compensatory damage, trebled, and Rumble should also be awarded its attorney fees and costs, pursuant to Section 15 of the Clayton Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Rumble prays for judgment against Google as follows:

1.      for compensatory damages according to proof, and that those damages

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

LA #4847-2442-4662 v1

- 36 -

COMPLAINT

1    be trebled;

2         2.      that Rumble be awarded its attorneys' fees and costs;

3         3.      that Google and its subsidiaries, dba's, divisions, affiliates, parents,

4    successors, assigns, officers, agents, representatives, servants, and employees, and

5    all persons in active concert or participation with them or any of them, be

6    preliminarily and permanently enjoined from the unlawful anticompetitive conduct

7    as set forth above; and

8         4.      that Rumble have such other and further relief as this Court deems just

9    and proper.

10                                    Respectfully submitted,

11   Dated:  January 11, 2021              BURKE, WILLIAMS & SORENSEN, LLP

12

13                                    By: /s/ Robert W. Dickerson Jr.
                                          Robert W. Dickerson, Jr.
14

15                                    Attorneys for Plaintiff
                                      RUMBLE, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEMAND FOR JURY**

Plaintiff Rumble hereby requests a trial by jury for all issues properly submitted to a jury.

Respectfully submitted,

Dated:  January 11, 2021                    BURKE, WILLIAMS & SORENSEN, LLP


By:   /s/ Robert W. Dickerson, Jr.
          Robert W. Dickerson, Jr.

Attorneys for Plaintiff
RUMBLE, INC.