Robert W. Dickerson, Jr. (SBN 089367)
E-mail: rdickerson@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
444 South Flower Street, Suite 2400
Los Angeles, CA 90071-2953
Tel: 213.236.0600
Fax: 213.236.2700

Patricia L. Peden (SBN 206440)
E-mail: ppeden@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
1901 Harrison Street, Suite 900
Oakland, California 94612-3501
Tel: 510-273-8780
Fax: 510-839-9104

Lenny Huang (SBN 264386)
E-mail: lhuang@bwslaw.com
BURKE, WILLIAMS & SORENSEN, LLP
60 South Market Street, Suite 1000
San Jose, California 95113-2336
Tel: 408-606-6300
Fax: 408-606-6333

Attorneys for Plaintiff
RUMBLE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| RUMBLE, INC.,<br><br>            Plaintiff,<br><br>v.<br><br>GOOGLE LLC and DOES 1-10, inclusive,<br><br>            Defendants. | Case No. 4:21-cv-00229-HSG<br><br>**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF DUE TO ANTITRUST VIOLATIONS**<br><br>Judge:     Hon. Haywood S. Gilliam, Jr. |

For its first amended complaint against defendant Google LLC ("Google" or "Defendant"), plaintiff Rumble, Inc. ("Rumble") alleges as follows:

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 1 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

**INTRODUCTION**

1.      Rumble brings this action under Section 2 of the Sherman Act, (15 U.S.C. §2), and Sections 4 and 15 of the Clayton Act (15 U.S.C. §§ 4 and 15), against Google for monetary damages well in excess of $2,000,000,000 that Rumble has sustained and continues to sustain as a proximate result of Google's antitrust violations, and for injunctive relief to prevent Google from monopolizing, attempting to monopolize, and continuing unlawfully to maintain its monopoly in the relevant market – online video sharing and viewing services or platforms (the "online video platform market") – through anticompetitive and exclusionary practices.

2.      These practices include Google rigging searches purposefully and unlawfully to always give preference to Google's YouTube video platform over Rumble (and other platforms) in Google search results, such that the Google search page result for online videos lists links to the YouTube site as the first search results, even if the search specified Rumble, such as "dog videos on rumble."

3.      By unfairly rigging its search algorithms (or through other means or mechanisms) such that YouTube is the first-listed links "above the fold" on its search results page, Google, through its search engine, was able to wrongfully divert massive traffic to YouTube, depriving Rumble of the additional traffic, users, uploads, brand awareness and revenue it would have otherwise received.

4.      Google has also engaged in exclusionary conduct by which it has wrongfully achieved and has maintained its dominance and monopoly power in search in the increasingly mobile ecosystem and has also thereby attempted to monopolize and has monopolized the online video platform market.  Google's conduct in this regard is similar to a "bait and switch" scheme, whereby Google acquired the Android operating system, and made it "open source," meaning that it was free for anyone to use.  That was the "bait."   Otherwise skeptical manufacturers of smart devices such as mobile phones were lured by that bait, and

Burke, Williams & Sorensen, LLP
Attorneys At Law
Los Angeles

assuming they could adopt the now-open-source Android operating system for their devices without having to pay a licensing fee, develop their own system, or relinquish control over their own devices, did so, such that all but Apple adopted the Android operating system.  This in turn caused independent, third party app developers, who of course wanted their apps to have the largest possible potential consumer pool, to develop their apps to be compatible with the Android system. Google then created apps (such as Google Play, which is an online app superstore) and other functionalities (that will be described in detail below) that became gotta-have items for manufacturers and distributors of smart devices if they wanted to be able to compete in the marketplace.  This allowed Google to do what had generally been thought to be impossible – control that which it had given away to all for free (*i.e.*, the basic Android operating system).

5.    Now came the "switch."  These manufacturers and distributors found themselves in a position that in order to obtain these gotta-have items which could only be obtained from Google, they had to agree to various Google-imposed agreements.  For example, one such agreement forced Android-based smartphone manufacturers to include, among others, YouTube as a preinstalled app on their phones (and to give it a preferred location on the phone's default opening page, and make it undeletable by the user).

6.    This conduct has damaged and continues to damage Rumble by further self-preferencing YouTube over Rumble (and other platforms, which harms competition generally in the online video platform market, damages Rumble specifically, and harms consumers).  Because much of the online searching for videos is now done on smartphones, this further ensures that Google's YouTube platform receives unfair preferential treatment.  Google thus engaged in exclusionary conduct to wrongfully acquire and maintain a monopoly over the online video platform market.  Google's exclusionary conduct has included contractual and other vertical restrictions that limit competitors' access to, and

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 3 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

1    ability to compete in, the online vide platform market.

2        7.    Rumble is unique among companies attempting to compete in the

3    online video platform market in that it has an extensive catalog of exclusively-

4    assigned original content videos, thus differentiating itself from other online video

5    platforms.  Rumble receives between $10 and $30 per thousand views of its

6    exclusive videos on its platform, but when that search traffic has been diverted to

7    YouTube through Google's wrongful conduct, Rumble has received only forty-

8    eight cents ($0.48) on average per thousand views of its videos from

9    Google/YouTube.  It is Google's unlawfully acquired monopoly power in the

10   relevant market that has allowed it to pay so little, and keep so much, of the

11   advertising revenue.

12       8.    Unlike other websites or video platforms, Rumble, with its thousands

13   of high value exclusive video assets which it has syndicated to YouTube (which

14   have generated billions of views on YouTube), has the unique ability to discover,

15   track and determine its damages both on its exclusive and on its non-exclusive

16   catalog, which have been proximately caused by Google's unlawful conduct.

17   Notably, this conduct is also in violation of Google's own duplicate content and

18   original sourced reporting best practices which it purports to follow, but evidently

19   does not.

20       9.    Set forth below are screenshots (Figures 1 and 2) showing a recent

21   example of this unlawful self-preferencing by Google of its own video platform,

22   YouTube.  The searched-for video is entitled "Baby preciously cuddles cat for nap

23   time."  It is a Rumble exclusive video, so Rumble is the original source for that

24   video.  That title – "Baby preciously cuddles cat for nap time" – is verbatim how it

25   is listed on the Rumble platform.  Because Rumble is the original source, it was

26   able to syndicate (*i.e.*, release) the video to whom and when it chose.  In this

27   instance, to test whether the Google search algorithms were rigged (and/or Google

28   was otherwise manipulating the search results) to give unfair preference to

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 4 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

YouTube, Rumble "handicapped" YouTube by releasing the video to
Google/YouTube last.



Figure 1

10.    Figure 1 depicts the Google search results page for a search for "Baby
preciously cuddles cat for nap time."  This search was made after Rumble released
this video only to MSN and Yahoo, and before Rumble released it to YouTube.  As
seen, Yahoo is listed first, followed by MSN and then followed by multiple
miscellaneous unrelated YouTube videos that do not contain, in fact, are not even

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 5 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

close to, the searched-for title, and are quite dated; for example, a YouTube video from 2016 entitled "5 ways to make your cat more affectionate."  Significantly, a link to this exclusive Rumble video is not even listed on the Google search page results, even though the MSN listing provides a canonical URL referring to Rumble's original page and identifying Rumble as the original source.  Google even lists its dated and unrelated YouTube videos ahead of Rumble.com's listing. In fact, Rumble.com's listing is nowhere to be found despite all the credit, linkbacks, canonicals and submission to Google Webmaster Tools that identified Rumble as the original source for this video prior to the Google search, the results of which are shown in Figure 1.

11.    Prior to the search shown in Figure 1, Google was made aware that this "Baby preciously cuddles" video was a Rumble exclusive and original asset by multiple means; for example, no webpages prior to Rumble had duplicate metadata; MSN's canonical URL pointed to Rumble.com as the original source; Yahoo also references Rumble; there is even a linkback to Rumble's URL on the YouTube video; and by an automatic sitemap submission to Google Webmaster Tools. Pursuant to Google's publicly stated policies, Rumble should have been elevated in the search results (actually should have been listed first), and even though the search was for the exact title for the video as on Rumble's platform, the Rumble platform is not even listed at all on the Google search page for this specific Rumble video.

12.    Once the Rumble URL was documented to be indexed in Google according to Webmaster Tools, and both Yahoo and MSN took the lead on the search results, Rumble decided to provide the video to YouTube with credit and linkbacks to the Rumble.com website.  As shown in Figure 2 below, which is a screen shot of the Google search and search page results for the search on November 24, 2020, about 2 hours after Figure 1 was taken (and after Rumble released the video to YouTube), Google immediately gives the top listing to

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 6 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

YouTube, de-ranks both Yahoo and MSN, lists a very different and very dated YouTube video with dissimilar title in the 4th spot, and <u>still</u> avoids listing Rumble:



<u>Figure 2</u>

13.     Amazingly, even though Rumble is the original source for this video, even though Google was aware of that fact, even though the search term was verbatim the title for the video as on Rumble's platform, even though all sources point back to Rumble as the original content source, and even though the video was released to Google/YouTube last in time, the Google search results still listed YouTube's platform first, and doesn't list Rumble at all on its first page of search results, clearly evidencing Google's self-preference of  YouTube over competitors.

## RUMBLE AND THE SERVICE IT PROVIDES
## FOR INDIVIDUAL CONTENT CREATORS

14.     Since 2013, Rumble has operated an online video platform.  Today, Rumble is one of the most respected independent and privately owned companies in the online video platform industry and market, and its business model is premised upon helping the "little guy/gal" video content creators monetize their videos.

15.     Video content creators upload their copyright-protected videos to the Rumble platform (rumble.com or app), many of whom exclusively assign to Rumble the licensing and enforcement rights in the uploaded video.  Rumble in turn makes these videos ("Rumble Videos") available under license to other companies who have websites or other social media sites, and who want to make those videos available to visitors to their sites in order to generate advertising revenue.

16.     Since its launch in 2013, Rumble Videos have received approximately 9.3 billion views worldwide just on YouTube alone according to YouTube's Analytics.

17.     The original author (the content-creator) of the video should be compensated for the publication of his or her video.  More often than not in the past, however, he or she was not.  This is where Rumble came and comes into the picture.

18.     Rumble provides an important service to the untold number of "little guy/gal" videographers who create the video content that is uploaded to the internet, enjoyed by millions, and monetized by only a few.  By themselves, these individual content-creators cannot effectively monetize their videos, even those that go "viral" and obtain millions of views within the first few days of being available online.

19.     Rumble provides a platform for those individual content-creators to monetize their copyrighted videos.  By simply appointing Rumble as their exclusive licensee to their copyrighted video(s), and then uploading their video(s) to

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

Rumble's platform, Rumble takes over and does all the rest. Rumble makes its portfolio of exclusively-licensed videos available to others to use for a fee (and a portion of the downstream revenue collected by the user), monitors that use, collects the fee (and revenue), and shares it with the content-creator. There are some individual content-creators who are receiving royalties in the 6-figures annually, and many that are receiving annual 5-figure royalties from Rumble.

20. Rumble's platform and proprietary software sources, validates, provides clearance management, distribution and monetization for video content. It is a content-creator-centric platform, whose main goal and core business model has always been to help video creators increase distribution and monetize their videos. Rumble allows video creators to create channels, host, share, monetize and distribute their video content from one centralized account on the Rumble platform.

21. Rumble has working relationships with some of the most respected video creators, and Rumble licenses video content through its revenue-share video player and, if licenses permit, through other video players to many very well-known websites, including some of the largest and most well-known companies and websites in the world.

22. Rumble currently has more than 2 million amateur and professional video content-creators that now contribute to more than 100 million streams per month. Some of the top video content-creators use Rumble's platform. Rumble's creator-centric platform has enabled more of these amateur and professional video content-creators, media companies, and celebrities to distribute and monetize their social videos more than ever before.

23. Rumble's success, however, has been far less than it could and should have been as a direct result of Google's unlawful anticompetitive, exclusionary and monopolistic behavior, and coincided with Google's unlawful rise to monopoly prominence in the search engine market as detailed in the recently filed case *United States of America et. al. v. Google LLC*, Case 1:20-cv-03010, Document No. 1,

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 9 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

10/20/2020 (D.D.C.) ("the DOJ Complaint").  Using that ill-gotten prominence, Google promoted YouTube to the exclusion of other online video platforms, including specifically Rumble, to obtain and maintain an unlawfully-achieved monopoly in that market as well.

24.     When video content creators upload their videos to Rumble's platform, those videos are then available for viewing on Rumble's website, generating advertising revenue.  Unlike most video platforms, Rumble obtains an exclusive license for many of the uploaded videos.  Even though Rumble has the exclusive license to these videos, because of the monopoly Google has obtained for its YouTube platform through its unlawful anti-competitive conduct, Rumble must syndicate its exclusive videos to YouTube in order to survive.  Notably, other video platforms do not have a large exclusive catalog to syndicate.  Rather, their revenue depends on non-exclusive licenses for the videos uploaded by their creators – the same way YouTube operates.  Those other video platforms solely depend on growth from search traffic to their non-exclusively uploaded videos, which they will monetize.

25.     Google's conduct in this regard has not only harmed Rumble, but also other similarly situated online video platforms throughout the world, who have been deprived of the views, users, uploads, traffic and brand awareness needed to survive and prosper.  As testament to this fact, since Google purchased YouTube in 2006, the number of competitive video platforms has dwindled dramatically as other platforms were not able to survive as a direct result of Googles' unlawful and exclusionary conduct.

26.     Indeed, the extensive unlawful and exclusionary tactics and willful misconduct as meticulously detailed in the DOJ Complaint (and also herein) expose the many ways in which Google illegally achieved and now maintains monopoly power in the internet search engine market, and equally expose Google's game plan, mindset and goal that have motivated it to do so across the entire expanse of

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

its empire, including the relevant market here.  Google has executed that illegal game plan to near perfection to achieve and maintain a monopoly in the online video platform market, and thereby to achieve a monopolist's profits and to drive out meaningful competition, to the great disadvantage and damage to Rumble (and the content creators for its exclusive videos) and to competition in the online video platform market.

## GOOGLE'S UNLAWFUL ANTICOMPETITIVE CONDUCT

27.     Google has willfully and unlawfully created and maintained a monopoly in the online video platform market by pursuing at least two anticompetitive and exclusionary strategies.  First, by manipulating the algorithms (and/or other means and mechanisms) by which searched-for-video results are listed, Google insures that the videos on YouTube are listed first, and that those of its competitors, such as Rumble, are listed way down the list on the first page of the search results, or not on the first page at all.  Second, by pre-installation of the YouTube app (which deters smart phone manufacturers from pre-installing any competitive video platform apps) as the default online video app on Google smart phones, and by entering into anti-competitive, illegal tying agreements with other smartphone manufacturers to do the same (in addition to requiring them to give the YouTube app a prime location on their phones' opening page and making it not-deletable by the user), Google assures the dominance of YouTube and forecloses competition in the video platform market.

28.     Google's first anticompetitive and exclusionary strategy has been recently confirmed and reported in the Wall Street Journal:

> When choosing the best video clips to promote from around the web, Alphabet Inc.'s Google gives a secret advantage to one source in particular: itself.

> Or, more specifically, its giant online-video service, YouTube.

1    Take a clip of basketball star Zion Williamson that the National

2    Basketball Association posted online in January, when he made his

3    highly anticipated pro debut. The clip was popular on Facebook Inc.,

4    drawing more than one million views and nearly 900 comments as of

5    March. A nearly identical YouTube version of the clip with the same

6    title was seen about 182,000 times and garnered fewer than 400

7    comments.

8    But when The Wall Street Journal's automated bots searched Google

9    for the clip's title, the YouTube version featured much more

10   prominently than the Facebook version.

11   The Journal conducted Google searches for a selection of other videos

12   and channels that are available on YouTube as well as on competitors'

13   platforms. The YouTube versions were significantly more prominent

14   in the results in the vast majority of cases.

15   This isn't by accident.

16   Engineers at Google have made changes that effectively preference

17   YouTube over other video sources, according to people familiar with

18   the matter. Google executives in recent years made decisions to

19   prioritize YouTube on the first page of search results, in part to drive

20   traffic to YouTube rather than to competitors, and also to give

21   YouTube more leverage in business deals with content providers

22   seeking traffic for their videos, one of those people said.

23   "All else being equal, YouTube will be first," the person said.

24   Reprinted from article entitled "*Searching for Videos? Google Pushes YouTube*

25   *Over Rivals*", The Wall Street Journal, by Sam Schechner, Kirsten Grind and John

26   ///

27   ///

28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

West, posted online July 14, 2020 at 12:47 pm EDT ("the WSJ Article").[1]

29.     Similarly, a Report issued by the House of Representatives also found that Google has engaged in the unlawful anti-competitive self-preferencing activity:

> Although these four corporations [including Google] differ in important ways, studying their business practices has revealed common problems. First, each platform now serves as a gatekeeper over a key channel of distribution. By controlling access to markets, these giants can pick winners and losers throughout our economy. They not only wield tremendous power, but they also abuse it by charging exorbitant fees, imposing oppressive contract terms, and extracting valuable data from the people and businesses that rely on them. Second, each platform uses its gatekeeper position to maintain its market power. By controlling the infrastructure of the digital age, they have surveilled other businesses to identify potential rivals, and have ultimately bought out, copied, or cut off their competitive threats. **And, finally, these firms have abused their role as intermediaries to further entrench and expand their dominance. Whether through self- preferencing, predatory pricing, or exclusionary conduct, the dominant platforms have exploited their power in order to become even more dominant.**
>
> **To put it simply, companies that once were scrappy, underdog startups that challenged the status quo have become the kinds of monopolies we last saw in the era of oil barons and railroad tycoons.** Although these firms have delivered clear benefits to society, the dominance of Amazon, Apple, Facebook, and Google

---

[1]   https://www.wsj.com/articles/google-steers-users-to-youtube-over-rivals-11594745232.

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

has come at a price. **These firms typically run the marketplace while also competing in it—a position that enables them to write one set of rules for others, while they play by another, or to engage in a form of their own private quasi regulation that is unaccountable to anyone but themselves.**[2]

30.     The House Report also included a section that was especially damning as to Google's conduct at issue here:

In July, the Wall Street Journal reported that Google also gives preferential treatment to YouTube.  Tests conducted by the Journal found that searching Google for videos delivered YouTube in results much more prominently than competing video providers, even when competitor videos had more engagement. Reflecting interviews with those familiar with the matter, the piece stated that **Google engineers:**

**[M]ade changes that effectively preference YouTube over other video sources. Google executives in recent years made decisions to prioritize YouTube on the first page of search results, in part to drive traffic to YouTube rather than to competitors, and also to give YouTube more leverage in business deals with content providers seeking traffic for their videos**."

In response to Questions for the Record from Subcommittee Chairman David N. Cicilline (D-RI), the company denied that Google

---

[2]  Report entitled *Investigation of Competition in Digital Markets*, *Majority Staff Report and Recommendations*, released on October 6, 2020, by the United States Congress, House of Representatives, Subcommittee on Antitrust, Commercial and Administrative Law of the Committee on the Judiciary ("the House Report"), pages 6-7 (emphasis added).

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

1    Search is designed to favor YouTube. **Although Google stated that it**
2    **disagreed with the methodology used by the Journal, Google did**
3    **not provide the Subcommittee with any data or internal reports**
4    **that would support its claim.**[3]

5        31.    Google did not provide the Subcommittee with any such refuting data
6    or internal reports because it could not do so – the statements made in the WSJ
7    Article are true, which Rumble has confirmed through its own tests as detailed in
8    this First Amended Complaint.  Significantly, it appears that Google's denials were
9    part and parcel of its ongoing attempt to conceal its unlawful anticompetitive and
10   exclusionary behavior.

11       32.    Google has engaged and continues to engage in this unlawful conduct
12   which has proximately caused and continues to cause tremendous damage to
13   Rumble (and to others seeking to compete in the online video platform market), to
14   competition and to consumers.

15       33.    In this regard, the House Report also includes this relevant section,
16   which addresses one of the ways that Google's unlawful anti-competitive conduct
17   injures its competitors:

18           Numerous market participants noted that Google's favoring
19       of its own sites and demoting those of third parties has
20       effectively increased their cost of distribution. Since demoted
21       sites can generally only recover traffic through advertising on
22       Google, the platform "essentially requires competitors to pay for
23       their websites to appear above Google's own links," according
24       to one market participant. Another business recalled that in 2016
25       Google demoted one of its vertical offerings, citing a policy of
26       diversifying content. The firm stated that once it was penalized

27

28   ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[3]  The House Report, page 191 (emphasis added) (footnotes omitted).

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES
- 15 -
4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

in organic rankings, it "could not get an appropriate customer service response for months" and ultimately "had to increase [marketing spend on Google] to regain lost traffic—a win-win for Google but a loss for [our business] and its users.

**Meanwhile, Google's own competing vertical "is always listed at the top" of search results. The incident highlights how demoting rivals can enrich Google in two ways: first, through diverting greater traffic and business to its own products; and second, through earning ad revenues from the penalized sites that are subsequently scrambling to recover their search placement**. When demoting firms that Google views as actual or potential competitive threats, Google is effectively raising rivals' costs.[4]

34.     The second way Google has unlawfully achieved, expanded, maintained and continues to maintain its monopoly in the online video platform market is to ensure that its YouTube app is preinstalled on as many new smartphones as possible.  This anticompetitive and exclusionary conduct has also been recently reported:

Google's apps are front-and-center on newer Android phones for a reason: Google wants you to use its services on Android, and it has contracts in place to that end.

According to confidential contracts obtained by The Information, phonemakers like Samsung and HTC need to include a whole lot of Google-branded widgets and icons to be allowed to include Google's Play Store. The requirements in the

---

[4]  The House Report, pages 191-192 (emphasis added) (footnotes omitted).

contracts show that Google is demanding cushier placement for its apps and services than it used to.

One requirement: Phones need to show a "Google" icon that opens to a collection of 13 apps. Some are genuinely useful, like YouTube, Google Maps, Google Drive, Gmail, and Google Chrome.[5]

35.     This unlawful anticompetitive and exclusionary conduct has also been detailed in the DOJ Complaint; *see, e.g.,* paragraphs 133 to 135 (emphasis added):

> 133.   **Google uses preinstallation agreements—MADAs—to ensure that its entire suite of search-related products is given premium placement on Android GMS devices. Consumers naturally and regularly turn to these prominently placed search access points to conduct searches.** Preinstallation agreements also reinforce Google's anti-forking requirements, either by including an anti-forking clause of their own or, more commonly, requiring device manufacturers to be signatories to an anti-forking agreement.
>
> 134.   If a manufacturer wants even one of Google's key apps and APIs, the device must be preloaded with a bundle of other Google apps selected by Google. The six "core" apps are Google Play, Chrome, Google's search app, Gmail, Maps, **and YouTube**. Manufacturers must preinstall the core apps in a manner that prevents the consumer from deleting them, regardless of whether the consumer wants them. **These preinstallation agreements cover**

---

[5] Article entitled *Why Android Phones Now Come With So Many More Google Apps* - (Kate Knibbs, published 9-26-2014) (https://gizmodo.com/why-android-phones-now-come-with-so-many-more-google-ap-1639529342).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**almost all Android devices sold in the United States.**

135. Google's preinstallation agreements effectuate a tie, that is, they condition the distribution of Google Play and GPS to the distribution of these other apps. This tie reinforces Google's monopolies. The preinstallation agreements provide Android device manufacturers an all-or-nothing choice: if a manufacturer wants Google Play or GPS, then the manufacturer must also preinstall, and in some cases give premium placement to, an entire suite of Google apps, including Google's search products. **The forced preinstallation of Google's apps deters manufacturers from preinstalling those of competitors.** This forecloses distribution opportunities to rival general search engines, protecting Google's monopolies.

Additional detailed allegations of Google's exclusionary conduct are included below.

36. This conduct by Google also injures consumers as well as competition and its competitors such as Rumble. The affected consumers here include the people who search for and view videos on video sharing and viewing platforms such as YouTube and Rumble; and more specifically those who upload their own videos to these platforms. By uploading to Rumble's platform and exclusively licensing the video to Rumble, the content creators can receive a portion of the revenue that Rumble obtains my monetizing the content creator's video.

37. A video viewed on Rumble's platform generates much more revenue per CPM (1000 views) than if viewed on the YouTube platform. Because of its unlawfully achieved monopoly in the online video platform market, and its unlawful, exclusionary and anti-competitive acts that, among others, pushes links to Rumble Videos on the Rumble Platform to "below the fold" on a Google search

results first page (or off the first page altogether), Google has been able to force competitors, such as Rumble, to post their videos to YouTube in order to survive. Google's monopoly and monopoly power, however, have allowed Google to pay to Rumble (and hence to its content owners) a small portion of the ad revenue generated on videos on YouTube (on average $0.48 per CPM of Rumble Videos), and to allow Google to retain the large majority of that revenue for itself.

38.     In contrast, on average, Rumble receives $20 or more per CPM of one of its Rumble Videos if viewed on the Rumble platform.  Therefore, if the Google search page diverts traffic to the YouTube platform instead of Rumble's, Rumble and the affected content creators receive much less revenue.  This has also caused and is causing direct injury to competition (many video platforms who were active online before Google purchased YouTube no longer exist), to competitors (such as Rumble), and to consumers, who upload their original content videos exclusively to Rumble's platform in return for a portion of the ad revenue Rumble receives from views of that video.

39.     The loss on initial views is only a part of the damages caused to Rumble and consumers.  Rumble also has evidence that a percentage of users who find Rumble through online searching for videos subsequently become uploaders of their own videos exclusively to the Rumble platform, and thereafter both Rumble and the content creator receive revenue.  By rigging its search algorithms (and/or through other means) to remove Rumble from the first page search results, by forcing smart phone manufacturers to preinstall the YouTube app on the first "page" of their phones (which app cannot be deleted or moved off the first page by users), and thereby directing users away from Rumble, not only is Rumble deprived of the added revenue, but the many diverted users who would have become uploaders to Rumble's platform are deprived of a portion of that revenue as well. This is also direct injury to the consumer.

40.     Rumble (and in turn its content creators) have been tremendously

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 19 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

damaged and continue to be damaged by Google's willfully unlawful conduct. Indeed, Rumble believes that at trial it will seek and obtain an award well in excess of $2,000,000,000 (Two Billion Dollars) before trebling, and that it will also receive an award of its attorney fees and expenses.

## THE PARTIES, JURISDICTION, VENUE, AND COMMERCE

41.     Plaintiff Rumble is a Canadian corporation, with its principal place of business at 218 Adelaide Street West, Suite 400, Toronto, Ontario, M5H1W7.

42.     Google LLC is a limited liability company organized and existing under the laws of the State of Delaware, and is headquartered in Mountain View, California.  The sole member of Google LLC is believed to be XXVI Holdings, Inc., a Delaware corporation with its principal place of business in Mountain View, California.  Google wholly owns YouTube LLC, a limited liability company organized and existing under the laws of the State of Delaware, and also headquartered in Mountain View, California.  Google LLC is wholly owned by Alphabet Inc., a publicly traded company incorporated and existing under the laws of the State of Delaware and headquartered in Mountain View, California.

43.     Google engages in, and its activities substantially affect, interstate trade and commerce.  Google provides a range of products and services that are marketed, distributed, and offered to consumers throughout the United States, across state lines, and internationally.  It is thus engaged in interstate commerce.

44.     This Court has personal jurisdiction over Google LLC as it is headquartered in this District.

45.     Rumble brings this action pursuant to Sections 4 and 16 the Clayton Act (15 U.S.C. §§ 4 and16), to prevent and restrain Google's violations of Section 2 of the Sherman Act (15 U.S.C. § 2), and to obtain damages and other relief.

46.     This Court has subject matter jurisdiction over Rumble's federal antitrust claims pursuant to the Clayton Antitrust Act, 15 U.S.C. § 26, and 28

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 20 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

U.S.C. §§ 1331, 1337(a), and 1345, and pursuant to 28 U.S.C. § 1332.

47.     Venue is proper in this District under Section 22 of the Clayton Act, (15 U.S.C. § 22), and under 28 U.S.C. § 1391 because Google transacts business and is found within this District.

48.     Rumble does not have access to information concerning all of the corporate relationships, responsibilities and decision-making processes within, between and among Google, Alphabet and YouTube, but is informed and believed that from time to time there have been corporate realignments among and between them.  Rumble therefore reserves the right to add defendants or to substitute the current correct name of a defendant as that information is obtained through discovery.

## YOUTUBE

49.     YouTube was conceived of by three former PayPal employees.

50.     The website www.youtube.com became active on February 14, 2005. It was not, however, the only online video platform at that time.  Vimeo, for example (www.vimeo.com), was active then (having launched in November 2004), and many more became active soon thereafter.  It has been estimated that soon there were hundreds if not thousands of active online video platforms such as zippyvideos.com, break.com, dailymotion.com, Google Video, and metacafe.com, to name a few.  All of that was about to change, however, and that change began with Google's acquisition of YouTube in November, 2006.

## GOOGLE'S GAME-CHANGING ACQUISITION OF YOUTUBE

51.     Google saw the rapidly rising popularity of online video platforms, and quickly realized that there could be a synergistic relationship between Google's search engine dominance and the growing potential for a linked video platform.

52.     Google paid a whopping $1.65 Billion for YouTube, even though YouTube had been active for less than two years and had yet to come close to

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 21 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

turning a profit.[6]

53.    Google, in its pursuit of global internet dominance and the vast riches that would produce, realized that people would use its search engine to search for online videos.  Google also knew that online searchers pay most attention and most often click on the first or second listing/link on a Google search result page, so it would be important that any Google search result for online videos list and link to YouTube at the very top of the search results page, and push competitive platforms to the bottom of the page ("below the fold") or even onto the rarely-visited second page.  Google also realized that by making the YouTube app the default video platform app on the first "page" of its smartphone, and requiring other smartphone manufacturers to do the same, it could literally corner the market through its unlawful conduct.

54.    And Google has realized a monopolist's profits for its YouTube subsidiary.  Indeed, YouTube LLC reported $15.1 Billion in revenue for 2019, of which $4.7 Billion was earned in the 4th quarter of 2019.[7]  It has been reported that YouTube's revenue for 3rd quarter of 2020 was $5.0 Billion (notwithstanding the adverse impact on advertising spends due to the pandemic).[8]

///

---

[6]  As reported by, among others, NBC News, Oct. 9, 2006, 8:54 AM PDT, Source: The Associated Press (https://www.nbcnews.com/id/wbna15196982).

[7] Article entitled *YouTube Reveals Revenue for First Time: $15.1 B in 2019* (Alex Weprin, posted 2/3/2020) (https://www.hollywoodreporter.com/news/youtube-revenue-revealed-video-site-did-151b-2019-ad-revenue-1276004).

[8] https://www.theverge.com/2020/10/29/21531711/google-alphabet-ad-revenue-youtube-waymo-cloud-search

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 22 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

# THE RELEVANT MARKETS

55.     The market for online video platforms that are accessible in the United States and globally – the online video platform market – is a relevant antitrust market.  Online video platforms allow content creators and other consumers to upload, view, share and download video content.

56.     Such platforms are unique in that there is no other viable way for video creators to host, share, create channels, monetize, and distribute their content across the Internet from a single centralized video platform.  Consumers use these platforms for all of these purposes in addition to simple enjoyment.

57.     The fact that Google paid $1.65 Billion for YouTube within two years after its launch (and before it had turned a profit) attests to the unique service provided by these platforms in this relevant market.

58.     Other sources of this video content are not reasonable substitutes. Offline and other online resources, such as books, publisher websites, social media platforms, and other internet service providers, such as Amazon Prime Video, Netflix, or Hulu, do not and cannot offer users and content creators the same service or convenience.  Although Netflix, Hulu and Amazon Prime Video contain video content, they are not video platforms where users share videos or where users can upload and monetize their videos.  They are not a reasonable or acceptable substitute.  Apps like TikTok, Instagram and Facebook do not provide the same type of video sharing and viewing services, do not share revenue with the content creators (Facebook's offer to share revenue is extremely limited, and is available only to a very small percentage of content creators, and not at all to the vast majority of content creators who upload to Rumble's platform).  They also do not have nearly the same consumption size as YouTube, which is evidenced by bandwidth consumption.  It has also recently been reported that in 2018 Google and Facebook entered into an agreement referred to as "Jedi Blue" which, as reported,

restricts Facebook's ability to complete with Google.  Thus, there are no reasonable substitutes for online video platforms such as Rumble and YouTube.

59.     The United States is a separate relevant geographic market for online video platforms.  Google offers users in the United States and globally a locally-hosted domain website to search for and with a click on the search results link, to view online video content.  Therefore, the United States is a separate relevant antitrust geographic market.

60.     There are significant barriers to entry in the online video platform business.  The creation, maintenance, and growth of such a platform requires a significant capital investment, highly complex technology, access to effective distribution, and, of vital importance, adequate scale, traffic, brand awareness, monetization and visibility.

61.     Thus, the market for consumers in the United States and globally for online video platforms are the relevant markets for antitrust purposes and for purposes of this lawsuit.  This is confirmed by the fact that third parties routinely refer to online video platforms for the purposes of measuring and reporting size of and market share in that market.  *See, e.g.*:

https://markets.businessinsider.com/news/stocks/online-video-platforms-market-size-worth-18-7-billion-by-2027-grand-view-research-inc-1029703313

https://www.alliedmarketresearch.com/online-video-platform-market

https://www.globenewswire.com/news-release/2020/09/23/2097738/0/en/Online-Video-Platform-Market-to-hit-USD-3-Bn-by-2026-Global-Market-Insights-Inc.html

https://www.valuemarketresearch.com/report/online-video-platform-market

62.     Scale is also a significant barrier to entry in the relevant market.  Scale

affects a video platform's ability to attract subscribers, content creators and advertising and licensing revenue. The scale needed to successfully compete today is greater than ever. Google's anticompetitive and exclusionary conduct effectively eliminates rivals' ability to build the scale necessary to compete successfully. This is evident from the fact that there were hundreds if not thousands of video platforms before Google's purchase of YouTube and its anticompetitive and exclusionary conduct began to bear fruit, and approximately ten or less today of any significance.

63.    It has been reported that Google has achieved dominance globally in several online markets. As the *Wall Street Journal* reported on April 27, 2021, the Google search engine has a lock on 92% of world-wide traffic, Google Maps has an 89% share of online navigation, and Google's YouTube controls 73% of global online video activity (a term that the WSJ article does not define). On information and belief, YouTube's share of the online video platform market in the United States is now greater than 75% and, as a result of Google's exclusionary practices, is growing at the expense of what would otherwise be natural competitive forces.

64.    This dominance and monopoly power have been acquired by Google's unlawful conduct as described herein, and that same conduct is being used to maintain that monopoly share, and to reap a monopolist's profits by harming, competition, competitors and consumers.

## IMPORTANCE OF SCALE FOR ONLINE VIDEO PLATFORMS

65.    Just as scale is of critical importance to competition among general search engines for consumers and search advertisers, scale is equally important to online video platforms. Google has long recognized that without adequate scale its rivals cannot compete with its online business, and applied that same logic, game plan and goal with respect to its YouTube business.

66.    Greater scale expands the audience reach of an online video platform, and generates more users who register with the platform, which in turn generates

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 25 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

more uploaded videos, which in turn generates more views, which in turn generates greater revenue and profits.

67.     Google's unlawful, anticompetitive and exclusionary conduct as described in this First Amended Complaint has greatly enlarged and continues to enlarge YouTube's scale and greatly diminished and continues to diminish Rumble's scale, which has had an ongoing and increasing adverse effect on competition and on Rumble's revenue (and in turn, that of its content creators).

## GRAPHIC EVIDENCE OF HOW GOOGLE
## UNFAIRLY STACKS THE DECK IN YOUTUBE'S FAVOR

68.     Paragraphs 2 to 13 above are incorporated herein by reference.

69.     In addition to what is shown in those paragraphs, shown below in Figure 3 are the Google Search results for the search term "funny dogs," in which, as will be noted, every single one of the listings is a YouTube listing (all nine of the listings/links are to YouTube, including one that is **four years old**), even though Rumble has a tremendous number of "funny dog" videos available on its platform. Clearly, Google is giving preference to its own YouTube videos over those of Rumble (and other platforms), and making sure that Rumble is listed "below the fold" (actually, here, not at all) to ensure that the YouTube versions of the video

///
///
///
///
///
///
///
///
///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

are selected by the vast majority (if not all) of the people looking for "funny dogs" videos.



Figure 3

70.   As shown in Figure 4 below, even when the Google search term entered was "funny dogs on rumble," the Google search results were still <u>all</u>

///

///

///

///

///

///

///

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

1   YouTube videos in the all-important "above the fold" top portion of the Google

2   search results page:[9]



Figure 4

_____

[9] It is well known and an accepted fact in the industry that online searchers will pay

most attention to the first- or second-listed search results (the portion "above the

fold," to use the newspaper term) and will rarely click on links that are "below the

fold."  This was also confirmed in the House Report at page 188:  "However,

Google continues to give its service top placement, occupying close to 100% of the

above-the-fold mobile search results page and around 25% of desktops."

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 28 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

71.     There is, and can be, no valid business purpose, and no benefit to online searchers for Google to rig its search algorithms (and/or to otherwise manipulate its search results via other means or mechanisms) to avoid listing on its search results page a link to the Rumble platform, and instead listing only YouTube links.  For example, if a video-searcher is searching for "funny dogs on rumble" (emphasis added), listing links that are actually "funny dog" videos on the Rumble platform would be most beneficial to that searcher and most consistent with the search.  But, as shown, Google does not do that, and instead lists only links to its YouTube platform.  The clear business purpose here is not only invalid, it is unlawful – to divert as much traffic as possible to YouTube so that it maintains its monopoly in the relevant market, and to secure for YouTube (and thus for Google) the vast majority of the advertising revenue from views of that video.  Google set out to obtain, and has unlawfully obtained, a monopolist's profits, and has done so at the expense of Rumble (its content creators and other online video platforms).

72.     Rumble has conducted tests specifically to determine if the Google algorithms for video searches (or Google's other result-determining means and mechanisms) in fact self-preference YouTube, even when Rumble is the exclusive holder and originator of the Rumble Video, as described below:

a.     When Rumble is the original source of a Rumble Video and is also first reported source, once that video is "live" on the Rumble platform, Rumble can decide and control when and to whom to syndicate that video, and in what order.

b.     Rumble also inserts its own metadata into the video that identifies it as a Rumble Video for which Rumble is the originating source.

c.     Once the Rumble Video is "live" on the Rumble platform with the Rumble-inserted metadata, Rumble alerts Google's search engine as to the existence of the video, that it is an original-content Rumble Video, and that is it available to be viewed on the Rumble.com website.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

d.    At that point, Rumble syndicates that Rumble Video to its syndication partners.

e.    Suspecting, as a result of the WSJ Article, that Google's search algorithms for online videos give unfair preference to YouTube, Rumble has conducted several tests where for some tests, it syndicates the video to its partners simultaneously, and for other tests, it has syndicated the Rumble Video at different times, with YouTube receiving it last.

f.    What Rumble discovered was that when the Rumble Video was simultaneously syndicated to all partners, YouTube was preferenced by Google's search engine such that YouTube was the first result, usually followed by MSN, Yahoo, and then Rumble.  This occurred despite the fact that Google management and Google itself has gone on record emphasizing that original sourced reporting and content will always receive preferential treatment by its search engine algorithms.[10]  Once again, Google's statements are belied by its action. This preferential treatment for YouTube occurred despite all online locations referencing Rumble as the source for the video, linking back to Rumble's official content URL, and in some instances (such as the MSN listing), actually providing a canonical URL back to Rumble. This proves that Google's listing first of the YouTube version of the video was intentional, and not some inadvertent mistake.

g.    In order to further rule out the possibility that YouTube somehow believed it received the URL for the Rumble Video first before anyone else and that was why the Google search engine listed the YouTube first due to its integration with YouTube, for other tests, Rumble made sure

---

[10]   *See*, Article entitled *Elevating original reporting in Search*, by Richard Gingras, Google VP News, published September 12, 2019, on "Google The Keyword" - https://www.blog.google/products/search/original-reporting/.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

1    that the URL for the video was first released to MSN and Yahoo, and only

2    released to YouTube several hours after the video was released to MSN and

3    Yahoo.

4            h.      Even in this timed release situation, YouTube was again listed

5    first by the Google search engine, followed by MSN, then Yahoo, and only

6    then is Rumble listed – usually below the fold.  There is no way, other than

7    through Google's manipulation of the search results to favor YouTube, for

8    Rumble, as the original source of the content and owner of the exclusive

9    rights to the video, not to be listed first, and YouTube not listed last.  No

10   matter how hard Rumble tried to release the videos in these tests in a way to

11   ensure that YouTube would not be listed above Rumble and the other video

12   platforms who received the video before YouTube, YouTube was always

13   listed first.

14           i.      Figure 5 below shows such a result in which Rumble is the

15   original source of the released Video, and Rumble released it first to MSN

16   and Yahoo, and then later to YouTube.  According to Google's own

17   duplicate content and original sourced reporting best practices which it

18   purports to follow, the Rumble video should have been listed first.  But as

19   shown below in Figure 5, YouTube is listed first, even though all of the other

20   sites received the video before YouTube, and all of the sites, including

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 31 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

sites received the video before YouTube, and all of the sites, including

YouTube, acknowledge Rumble as the original source of the video:



<u>Figure 5</u>

73.     As the House Report and the DOJ Complaint explain in detail, this

unfair, unlawful anticompetitive and exclusionary behavior by Google greatly

benefits Google/YouTube, and greatly damages and continues to damage Rumble,

competition (*e.g.,* other online video platforms), as well as consumers (*e.g.*, those

who upload or might want to upload their videos exclusively to Rumble's

platform).

74.     The search examples set forth above illustrate how Google's rigged

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 32 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

search algorithms (and/or other means or mechanisms) favor the YouTube platform over Rumble involving specific videos and specific searches that relate to those videos, even to the point when a search is looking specifically for videos "on rumble." Google also advantages YouTube over Rumble or other competitors as a consistent and conscious practice, no matter the video or the search term(s). And this is true even if a Rumble video is not uploaded to YouTube. Rumble and consumers (*e.g.*, content creators) are disadvantaged, and competition is harmed, in the defined market because Google provides self-preferencing search advantages to its wholly-owned YouTube platform as a part of its scheme to maintain its monopoly power, and to reap a monopolist's financial rewards.

## HOW GOOGLE USES ITS EXCLUSIONARY AND ANTI-COMPETITIVE AGREEMENTS WITH ANDROID-BASED MOBILE SMART DEVICE MANUFACTURERS AND DISTRIBUTORS TO ENSURE THAT THE YOUTUBE APP AND PLATFORM ARE DOMINANT

### AND ABLE TO BE SELF-PREFERENCED

75.     As online searching (including searches for video content) has gravitated more and more from laptop and desktop computers to mobile smart devices (such as smart phones), it became important for Google to ensure that its ability to self-preference its YouTube video platform unfairly would not be adversely affected.

76.     One way to do so was to have Google's YouTube app pre-installed on as many mobile smart devices as possible to the exclusion of other video platform apps, such Rumble's, and to have the YouTube app preinstalled on the first "page" (*i.e.,* the default home or opening screen) of that smart device. Google knew that users would be much more likely to use a preinstalled YouTube app on the first page of the device to search for videos rather than go to the trouble of downloading a competing platform's app, such as Rumble's. Google's acquisition of the

Burke, Williams & Sorensen, LLP
Attorneys At Law
Los Angeles

Android operating system provided it with the means to do so.

77.   Although portions of the Android operating system are "open source," using only the open source portions without also entering into related agreements with Google is not a commercial reasonable or viable alternative for mobile smart device manufacturers, as is evidenced by the fact that all Android-based mobile smart phone manufacturers are believed not to have used the "open source" option without doing business with Google, and have instead entered into the anti-competitive, exclusionary, tying and other agreements demanded by Google.

78.   In order to understand how this was and is being done, understanding Google's several agreements with manufacturers and carriers provides important context and background.

79.   General search services providers such as Google typically enter into licensing and distribution agreements with manufacturers and carriers that manufacture and distribute mobile smart devices with search access points.

80.   In the United States, roughly 60% of all search queries are covered by Google's exclusionary agreements.  On mobile smart devices, Google's exclusionary agreements cover more than 80% of all U.S. search queries.

81.   Of the remaining search queries not covered by Google's exclusionary agreements, almost half take place on search access points owned by Google. Google is a vertically integrated search provider and distributes search in part through several of its own properties, including for example its browser (Chrome) and phone (Pixel).

82.   Between its exclusionary contracts and owned-and-operated properties, Google effectively owns or controls search distribution channels accounting for roughly 80% or more of the general search queries in the United States.

83.   Google's agreements come in three basic types, with the specific terms of each agreement depending upon the other contracting party and the search access

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 34 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

points at issue.

84.     First, Google requires Android device manufacturers that want to preinstall certain of Google's proprietary apps to sign an anti-forking agreement. More detail as this type agreement will be provided below, but in general an anti-forking agreement sets strict limits on the manufacturers' ability to make and sell Android-based devices that do not comply with Google's technical and design standards.

85.     Second, for Android device manufacturers that sign an anti-forking agreement, Google provides access to its vital proprietary apps and application program interfaces (APIs) for preinstallation, but only if the manufacturers contractually agree: (1) to take (that is, pre-install) a bundle of other Google apps (such as its YouTube app); (2) to make certain apps undeletable (including its YouTube app); and (3) to give Google the most valuable and important location on the device's default home screen (including for its YouTube app).

86.     Third, Google provides a share of its search advertising revenue to Android device manufacturers, mobile phone carriers, competing browsers, and Apple; in exchange, Google becomes the preset default general search engine for the most important search access points on a computer or mobile device.   And, by becoming the default general search engine, Google is able to continue its manipulation of video search results using its search engine to self-preference its YouTube platform, making sure that links to videos on the YouTube platform are listed above the fold on the search results page.

87.     As a practical matter, mobile smart device users rarely switch the preset default general search engine or preinstalled apps (such as the YouTube app), and, as Google has ensured, users cannot delete the preinstalled YouTube app even if they wanted to do so.  In many cases, the agreements relating to mobile smart devices go even farther:   (1) expressly prohibiting the preinstallation of any rival general search services and apps (which would include the Rumble app); and

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 35 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

(2) expressly prohibiting the setting of other defaults to rival general search engines. This means that Google is the only preset default search provider and YouTube the only online video platform preinstalled on the device

88.    It has also been reported on April 26, 2021 that Google is threatening Roku with the removal of YouTube TV from Roku's platform to force Roku to grant preferential access to its consumer data moving forward; including that Google has asked Roku to do things that it does not see replicated on other streaming competitors' platforms, like creating a dedicated search results row for YouTube within the Roku smart TV interface and giving YouTube search results more prominent placement.[11]

89.    These agreements work exactly as Google designed and intended them to work — to foreclose distribution to and use of Google's rivals for search and online video platform services, weakening them as competitive alternatives for consumers and advertisers by denying them the all-important scale required to grow and prosper.

## BACKGROUND ON GOOGLE'S MOBILE SMART DEVICE STRATEGY AND DOMINANCE OF THE ANDROID ECOSYSTEM

90.    Understanding Google's overall business strategy and how Google's anticompetitive agreements fit into and promote that strategy is helpful to place Google's anticompetitive and exclusionary conduct with respect to online video platforms into context and clearer focus.  It was and is a classic "carrot and stick" approach that has worked to perfection.

91.    When Google was formed and achieved initial success in the late

---

[11]  https://www.axios.com/roku-google-youtube-tv-dispute-525316c1-4d66-44e3-a96a-40db7b10e05b.html?utm_source=twitter&utm_medium=social&utm_campaign=editorial&utm_content=technology-google

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 36 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

1990s and early 2000s, internet searches were almost exclusively performed through browsers on desktop computers.  But as Google told investors in its 2007 Form 10-K: "More individuals are using non-desktop devices to access the internet. If users of these devices do not widely adopt versions of our web search technology, products or operating systems developed for these devices, our business could be adversely affected."

92.    In this increasingly mobile world, Google was concerned about and had to contend with serious competitive threats from mobile device manufacturers (such as LG, Motorola, and Samsung), and wireless carriers (such as AT&T, T-Mobile/Sprint, and Verizon) that would increasingly hold sway over distribution of search and search ads (including those associated with online video platforms), and thus divert from Google the revenue generated thereby.  In order to maintain dominance and monopoly power and profits in this increasingly mobile market place, Google thus faced the task of "How can we conquer the world's major wireless markets simultaneously?"

93.    The solution pursued by Google started with its acquisition of Android, a mobile operating system that Google purchased in 2005.  This acquisition was key not only for Google to maintain its monopoly in search but also in online video platforms.  In 2007, Google publicly released the Android code under an open-source license.  Being "open source" means that anyone can access the source code and use it as is, or use it as the building block on which to make their own, modified operating system.  Such an add-on is known in the industry as a "fork."  The "open-source" nature of the Android system was key to the widespread adoption and use of Android such that it became the dominant system.

94.    At first, Google's apparent lack of control over an open-source operating system was attractive to otherwise skeptical smart device manufacturers and carriers of mobile phones, who, notwithstanding their skepticism, chose to use the "open source" Android system instead of the other choices then available.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 37 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

Being "open-source" initially appeared to mean that it was and would remain free for all to use, without being controlled by Google. As the Android team leader observed to Google's board of directors at the time, "Google was historically seen as a threat" to these distributors. But an open-source model suggested that they [the distributors]—and not Google—would ultimately retain control over their devices and the app ecosystem on those devices. Just how wrong they were would become apparent only later.

95.     Just as Google clearly knew would happen by its making Android open source, once enough major manufacturers and distributors agreed to use Android believing it was and would remain a no-strings-attached-free-to-use operating system, the use of the Android operating system became more and more widespread as the Android operating system attracted developers looking for wide distribution, adoption and use of their own apps. So these developers adapted their apps for use with the Android operating system. As more app developers focused their efforts on designing Android apps, Android-based apps in turn became more attractive to consumers, which in turn caused even more app developers to design for Android. The result was the creation of a must-have ecosystem of Android apps.

96.     Next, to ensure that the Android ecosystem achieved critical mass and to advance the network effects to its monopolist's goal, Google offered to "share" its search advertising and app store revenues with distributors as a further inducement for them to give up the desired "control" that had attracted them to use the Android system in the first place. As one senior executive explained about Android Market (an earlier name for Google's app store), "Android Market is a bitter pill for carriers, and a generous revenue share is the sugar that makes it go down smoother." In a nutshell, beginning over ten years ago, Google used its "open source" gambit and revenue sharing to attract "partners" to Android and to maintain control over those "partners," and as discussed below, Google continues to use revenue sharing as part of its playbook to keep them locked in today.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 38 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

97.     By 2010, the Android team leader noted that "Android is poised for world domination—the success story of the decade."  He was right; Google's strategy to first lure manufacturers and distributors into using the Android operating system by making it appear to be free and beyond Google's control only to lock them into having to do business with Google down the road on Google's terms, worked and worked well.

98.     As a result of the foregoing, the "Google Play" app store (FKA the Android Market) attracted and obtained a massive library of Android-based apps, making it essential for manufacturers of Android-based mobile smart devices to have on their devices.

99.     As for the Android operating system itself, it quickly became the dominant licensable mobile operating system in the United States.  In the four years between 2009 and 2012, Android's share of licensable mobile operating systems on smartphones in the United States more than tripled, reaching about 80%.  Today, Android represents over 95% of licensable mobile operating systems for smartphones and tablets in the United States and accounts for over 70% of all mobile device usage worldwide.  The only other mobile operating system with significant market share in the United States is Apple's iOS, which is not fully open source and is not licensable.  Therefore, there is no viable alternative.

100.    Control over Android has always been a critical issue and of critical importance to Google.  As Google's Android team leader asked at the time: "How do we retain control of something we gave away?"  Google's answer is the set of contractual "carrots" and "sticks" discussed above and in more detail below that empower Google to "[o]wn the ecosystem" and help thwart the development and adoption of any alternative mobile ecosystem that could support a different search provider (who undoubtedly would not self-preference YouTube and the YouTube

///

///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 39 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

app as Google has done and continues to do), which are shown in this Figure 6:

## Google's Exclusionary Android Agreements

**Anti-Forking Agreements**

**AFA (Anti-Fragmentation Agreement)**
Anti-forking agreements with Android device manufacturers

**CDD (Compatibility Definition Document)**
Technical standards required for both ACC and AFA

**ACC (Android Compatibility Commitment)**
Anti-forking agreements with Android device manufacturers (new as of 2017)

**Preinstallation Agreements**
Anti-Forking Agreement Required

**MADA (Mobile Application Distribution Agreement)**
GMS preinstallation agreements with Android device manufacturers

**GMS (Google Mobile Services)**
A bundle of **APIs** and **Google Apps**

**GPS (Google Play Services)**
APIs (application program interfaces) that allow for features not included with open-source Android (e.g., push notifications)

**Core Apps**
Play Store, Google Search App, Chrome browser, YouTube, Gmail, Google Maps

**Revenue Sharing Agreements**
Device Must Be Covered by Preinstallation Agreement
Device Must Be Covered by Anti-Forking Agreement

**RSA (Revenue Sharing Agreement)**
Search ads revenue sharing agreements with carriers and manufacturers

**MIA (Mobile Incentive Agreement)**
Replacement for some manufacturer revenue sharing agreements

<u>Figure 6</u>

101.   By unlawfully maintaining its monopoly power in search, including in the mobile world, Google was able to and did unlawfully retain its ability to unfairly preference and promote its YouTube video platform and app, and thereby to harm competition in the online video platform market, hobble competitors in the online video platform market (such as Rumble) and harm consumers of online video platforms (such as the content creators who have exclusively licensed their videos to Rumble for monetization).

**GOOGLE'S ANTI-FRAGMENTATION AGREEMENTS**

**AND COMPATIBILITY COMMITMENTS**

**FOR ANDROID MOBILE DEVICES**

102.   Any suggestion that the available open-source version of the Android operating system is a viable alternative for mobile smart device manufacturers and distributors, devoid of the need for any involvement, interaction or agreements with Google, is specious.

103.   While the Google-owned Android operating system is open source (including Google's periodic updates to the code), Google takes a number of very effective anti-competitive steps to minimize the risk that a developer will create an Android fork to compete with the Android ecosystem controlled by Google, or that a manufacturer or distributor would be willing to use any such forked system. By limiting the existence of devices running Android forks, Google limits possible distribution channels available to its search rivals, and in turn preserves its ability unlawfully to self-preference its YouTube platform and YouTube app.

104.   As mentioned and shown above in Figure 6, one way Google retains control of the Android ecosystem is through anti-forking agreements. These agreements broadly prohibit manufacturers from taking "any actions that may cause or result in the fragmentation of Android." Notably, "fragmentation" is left undefined, giving Google wide latitude in practice to assert the anti-fragmentation provision against a wide (and undefined) array of modifications, and puts those who have signed these agreements at risk of inadvertently running afoul of the provision.

105.   In addition, Google's anti-forking/fragmentation agreements specifically forbid manufacturers from developing or distributing versions of Android that do not comply with Google-controlled technical standards, as defined in its Android Compatibility Definition Document (Android CDD).

106.   Two types of anti-forking agreements exist. Before 2017, Google required distributors to sign Anti-Fragmentation Agreements (AFAs). In 2017, while (and undoubtedly as a result of) being investigated by the European Commission for anti-competitive behavior (and long after Google had locked up its monopoly status), Google began shifting its anti-forking restrictions from AFAs to new Android Compatibility Commitments (ACCs). As of today, Google has an AFA or ACC with the leading Android device manufacturers, including LG, Motorola, and Samsung.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 41 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

107.   ACCs are marginally less onerous than AFAs because they allow manufacturers to build devices or components for third parties to sell to consumers, even if those devices or components do not comply with Google's technical standards.  But ACCs, like AFAs, prohibit signatories from manufacturing Android forks of their own, distributing devices with Android forks, or using their powerful brands to market forks on behalf of third parties.  Most well-known Android-based manufacturers of mobile smart devices are bound by AFAs or ACCs.

108.   The AFAs and ACCs do not just restrict manufacturers' ability to build and distribute innovative versions of mobile phones.  Over time, Google has extended the Android CDD such that its specifications apply to tablets and emerging technologies such as smart TVs, watches, and automotive devices. Manufacturers that hope to release Android-based versions of these products must comply with Google's standards as well.   The beat goes on.

## GOOGLE'S MOBILE APPLICATION
## DISTRIBUTION AGREEMENTS (MADAS)
## FOR ANDROID MOBILE DEVICES

109.   Notwithstanding the "free" façade as to the open source Android system, mobile smart device manufacturers in actuality have no viable choice but to agree to AFA's with Google in part because such agreements are a precondition to receiving a license to distribute devices with must-have proprietary Google apps and APIs (the set of technical specifications that enable software applications to communicate with each other, operating systems, and hardware).  These are gotta-have items, without which no manufacturer's product could effectively compete in the marketplace.  This Google app & API license is provided only through the preinstallation agreements mentioned above, which are called Mobile Application Distribution Agreements, or MADAS.  Leading Android device manufacturers, such as LG, Motorola, and Samsung, are all MADA licensees.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

110.   Over time, Google has included important features and functionality in its own ecosystem of proprietary apps and APIs (which are not made open-source by Google), rather than include them in the open-source Android code (thereby effectively eliminating reliance solely on the open-source code as a viable option). Google refers to this proprietary layer of app and API's as "Google Mobile Services" (GMS).  GMS includes many of Google's apps, such as Google's search app, Chrome, YouTube, and Google Maps.

111.   Perhaps most importantly in terms of how Google is able to effectively control and dictate to manufacturers who are ostensibly using the open-source Android system, GMS also includes Google Play, the Google's app store that was once known as the Android Market.  An app store such as Google Play is one of the most valuable features on a mobile device because it offers access to a huge selection of compatible apps.  Google Play offers about three million apps, more than any other app store (including Apple's App Store, which is compatible only with Apple devices).  More than 90% of the apps on Android devices are downloaded through Google Play.  For years, Google Play has been the only commercially significant app store option for Android manufacturers.  Getting access to Google Play is key to the Android manufacturers, and Google of course solely controls that access.

112.   Another key part of GMS is the set of APIs that allow developers to access certain important features.  The APIs available within GMS are part of "Google Play Services" (GPS).  GPS allows apps, including third-party apps, to perform functions that are not possible using just the open-source version of Android.  For example, using the open-source Android system, third-party apps cannot provide basic "push notifications," enable in-app purchases through Google Play, or use data from Google Maps.  To have these functionalities, third-party apps must use GPS, and without those functionalities, the app in reality has little to no chance of being successful in the marketplace.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 43 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

113.   The integration of key functions with GPS makes it more difficult, if not effectively and competitively impossible, for third-party Android developers to port their apps to Android forks because the apps are designed to interact with Google's proprietary APIs.  And as the functionality gap between open-source Android apps and Google's proprietary apps grows, developers are more dependent on GPS, and thus on Google.  In retrospect, it is clear that the seemingly benevolent act of Google's making the Android system open source was in reality the first step by a monopolist to maintain and expand its monopoly by devious and unlawful means.

114.   Signing a preinstallation agreement is the only way for an Android device manufacturer to preinstall any Google app, including Google Play.  And in order to be able to include Google Play, the manufacturer must also agree to preinstall the YouTube app (among others), and give it a prime location on the device's opening page.  This is an important aspect of Google's strategy to continue to divert search traffic from other online video platforms (such as Rumble) to its YouTube platform though its unlawful and unfair activities.  Signing the preinstallation agreement is also the only way an Android device manufacturer can gain access to GPS and the APIs many developers need for their apps to work properly, at least without expensive and time-consuming reprogramming.

115.   And any manufacturer installing Google Play or GPS must preinstall a full suite of apps identified by Google; including the search access points most frequently used by consumers: Chrome, Googlesearch app, Google search widget, and Google Assistant.  Google's search engine is the default on all these search access points.  Indeed, Google even uses the MADAs to control the appearance of Android devices, requiring the manufacturer to place the Google search widget on the home screen, and to preinstall Chrome, the Google search app, and other apps (including the YouTube app) in a way that makes them most readily accessible, and undeletable, by the user.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 44 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

116. Moreover, before 2017, most MADAs also required manufacturers to set Google as the default general search engine for all key search access points on any device with preinstalled Google apps—these requirements are now found in the revenue sharing agreements discussed below.

117. All of this had the intended collateral effect (and benefit to Google) of its being able to continue to unfairly promote and divert traffic to YouTube and away from other online video platforms (including specifically Rumble) in the increasingly mobile smart device world.

## GOOGLE'S REVENUE SHARING AGREEMENTS
## FOR ANDROID MOBILE DEVICES

118. As also alleged above, another way Google maintains its absolute control of the use of its so-called "open source" Android operating system is by entering into search revenue sharing agreements (RSAs) with Android manufacturers and carriers. Google generally requires exclusive distribution as the sole preset default general search service on an ever-expanding list of search access points; in exchange, Google remits to these companies a percentage of search advertising revenue. Google offers revenue sharing to Android device manufacturers only if they are MADA licensees, and Google offers revenue sharing to carriers only for devices built by manufacturers that are MADA licensees. The leading U.S. carriers (AT&T, T-Mobile, and Verizon) and the leading Android-based device manufacturer (Samsung) all have RSAs with Google.

119. Some of Google's RSAs require blanket coverage for all Android devices sold by the other party to the RSA. Under this version of the RSAs, the distributor receives a payment from Google only if all of the distributor's Android devices comply with the exclusivity requirements imposed by Google. Other RSAs provide for a model-by-model choice. Under this version of the RSAs, for the distributor to receive a share of the advertising revenue from any units of a model,

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

every unit of that model must comply with the Google-imposed exclusivity requirements.

120.   As innovation has led to an increase in the number of search access points on mobile devices—including smart keyboards and voice assistants—Google has also expanded its RSAs to close off these avenues to search rivals.  In doing so, Google is able, among other things, to continue to self-preference its YouTube app and platform, and to harm competition, competitors (such as Rumble) and consumers in the online video platform market.

## MOBILE INCENTIVE AGREEMENTS (MIAs)
## FOR ANDROID MOBILE DEVICES

121.   In Google's most recent round of negotiations with some Android manufacturers, Google has replaced RSAs with mobile incentive agreements (MIAs), under which Google pays manufacturers: (1) to forego preinstalling rival general search services on their Android devices; and (2) to comply with a significant number of "incentive implementation requirements"— including preinstalling up to fourteen additional Google apps (including the YouTube app). LG and Motorola have MIAs with Google.

122.   To maximize payments under the MIAs, the manufacturers must also set Google as the default for all search access points on nearly all of their devices. Moreover, Google generally retains "sole discretion" to determine what constitutes a "search access point," and thus controls and can dictate the scope of coverage of its exclusive contracts.  Although the MIAs change the payment structure for certain manufacturers, the agreements achieve the same end result as their predecessors: search exclusivity for Google; which in turn allows Google to continue through unfair and unlawful means to divert video search traffic to its YouTube platform, which in turn harms competition, competitors (such as Rumble) and consumers (including the content creators of Rumble Videos).

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 46 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

123.   Today, Google has RSAs or MIAs with all major U.S. carriers and Android device manufacturers, as well as a number of smaller carriers and manufacturers.

**REVENUE SHARING AGREEMENTS WITH APPLE ENHANCE, REINFORCE AND PROTECT GOOGLE'S MONOPOLY POWER IN BOTH THE GENERAL SEARCH MARKET AND THE ONLINE VIDEO PLATFORM MARKET**

124.   Google's revenue sharing agreements are not limited to its Android "partners."  Google has entered into revenue sharing agreements with rival browsers and other device manufactures, further blocking off search access points from competition, which in turn preserves its ability through search dominance to unfairly and unlawfully self-preference YouTube.

125.   Google has had a series of search distribution agreements with Apple, effectively locking up one of the most significant distribution channels for general search engines.  As is well known, Apple operates a tightly controlled ecosystem and produces both the hardware and the operating system for its popular products. Apple does not license its operating systems to third-party manufacturers and controls preinstallation of all apps on its products.  The Safari browser is the preinstalled default browser on Apple computer and mobile devices.  Apple devices account for roughly 60% of mobile device usage in the United States.  Currently, Apple's Mac OS accounts for approximately 25% of the computer usage in the United States.

126.   In 2005, Apple began using Google as the preset default general search engine for Apple's Safari browser.  In return, Google gave Apple a significant percentage of Google's advertising revenue derived from the search queries on Apple devices.  Two years later, Google extended this agreement to cover Apple's iPhones (as part and parcel of Google's plan and goal to continue to dominate search in the mobile world, which in turn would allow it to continue to self-

preference its YouTube platform and app in order to monopolize the online video platform market).  In 2016, the agreement expanded further to cover additional search access points—Siri (Apple's voice-activated assistant) and Spotlight (Apple's system-wide search feature)—making Google the preset default general search engine for both services.  Today, Google's distribution agreement with Apple gives Google the coveted preset default position on all significant search access points for Apple computers and mobile devices.

127.   Maintaining this dominance in search in the increasingly mobile smart device world was and is critical to Google's acquiring and maintaining the ability to unfairly and unlawfully self-preference its subsidiary companies and platforms, including YouTube.

128.   Today, Google has RSAs with nearly every significant, non-Google browser other than those distributed by Microsoft, including Mozilla's Firefox, Opera, and UCWeb.  These agreements generally require the browsers to make Google the preset default general search engine for each search access point on both the web and mobile versions of their browsers.  By controlling search, Google can and does control search results, including what research results are listed in the top spots and above the fold on the first page, including searches for video content, in which, as shown above, Google promotes and self-presences it YouTube platform.

## GOOGLE'S AGREEMENTS ALSO LOCK UP
## MOBILE DISTRIBUTION OF SEARCH

129.   As mentioned above, early on Google recognized that the evolving transition to an ecosystem in which users were using mobile smart devices more than computers posed a serious threat to its ill-gotten monopoly power and monopolist's profits, and it therefore conceived, adopted and implemented a strategy to neutralize that threat.  Google's strategy to ward off competition for mobile search distribution had two parts.  First, recognizing that Apple's iPhone

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

was being widely used, Google expanded its existing search deal with Apple to cover mobile.  Second, for other mobile distributors, Google continued to offer its Android operating system for "free" but with a series of interlocking distribution agreements to ensure it search-engine dominance in the mobile Android ecosystem.

130.   Google's strategy again worked to near perfection.  Google has almost completely shut out its competitors from mobile distribution.  As one executive for a competing search product recognized in frustration recently: "Google essentially [has] locked up ALL DISTRIBUTION" with its Apple deal and restrictive Android licensing terms, leaving the competitor's product with "no mobile volume."

## GOOGLE'S DISTRIBUTION ON APPLE IOS DEVICES

131.   Apple has not developed and does not offer its own general search engine.  Under the current agreement between Apple and Google, which has a multi-year term, Apple must make Google's search engine the default for Safari, and use Google's search engine for Siri and Spotlight in response to general search queries.  In exchange for this privileged access to Apple's massive consumer base, Google pays Apple billions of dollars in advertising revenue each year, with public estimates ranging around $8–12 billion.  The revenues Google pays to Apple make up approximately 15–20% of Apple's worldwide net income.

132.   Although it is possible to change the search default on Safari from Google to a competing general search engine, few people do, making Google the *de facto* exclusive general search engine.  That is why Google pays Apple billions of dollars every year in return for default status.  Indeed, Google's documents recognize that "Safari default is a significant revenue channel" and that losing the deal would fundamentally harm Google's bottom line.  Thus, Google views the prospect of losing default status on Apple devices as a "Code Red" scenario.  In short, Google pays Apple billions of dollars to be the default search provider, in part, because Google knows the agreement increases the company's valuable scale;

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

and equally important, this also simultaneously denies that scale to rivals.  And concomitantly, by maintaining its position as the default search provider, Google retains its ability to control (through its search algorithms and/or other means and mechanisms) how the research results are displayed on the search page, which as to searches for video content, allows Google to continue to unlawfully and unfairly self-preference its YouTube online video platform to the detriment and damage of Rumble (and its content creators) and to monopolize the online video platform market.

133.   Apple's RSA incentivizes Apple to push more and more search traffic to Google and accommodate Google's strategy of denying scale to rivals (including scale for rival online video platforms, such as Rumble).  For example, in 2018, Apple's and Google's CEOs met to discuss how the companies could work together to drive search revenue growth.  After the 2018 meeting, a senior Apple employee wrote to a Google counterpart: "Our vision is that we work as if we are one company."

134.   The current version of the Google–Apple agreement substantially forecloses Google's search rivals from an important distribution channel for a significant, multi-year term.  This agreement covers roughly 36% of all general search queries in the United States, including mobile devices and computers. Google estimates that, in 2019, almost 50% of its search traffic originated on Apple devices.

135.   Particularly when considered with the other exclusionary distribution agreements alleged herein, Google's hold on Apple's distribution channel is self-reinforcing, impairing rival general search engines' ability to offer competitive products and making Google's monopolies impenetrable to competitive discipline. By paying Apple a portion of the monopoly rents extracted from advertisers, Google has aligned Apple's financial incentives with its own and set the price of bidding for distribution extraordinarily high—in the billions.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 50 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

136.   Even if a rival was willing to make no money from a distribution relationship or could afford to lose money indefinitely, the rival would likely still fall short because the existing distribution agreements have for more than a decade denied rivals the benefits of scale, thus limiting: (1) the quality of their general search and search advertising products; as well as (2) the audience to attract advertisers.  In other words, because of the longtime deprivation of scale, no other search engine can offer Apple (or any other partner) the mix of quality, brand recognition, and economics that market-dominant Google can; a dominance that Google has unlawfully obtained and continues unlawfully to maintain.  And by cornering the search market, Google retains the ability to unfairly self-preference its own assets, include its YouTube platform and thereby monopolize the online video platform market.

## HOW GOOGLE CONTROLS MOBILE DISTRIBUTION
## ON ANDROID DEVICES

137.   Google controls the Android mobile distribution channel with its distributor agreements and owned-and-operated distribution properties.

138.   Even though Android is open source, Google has used Android to protect Google's lucrative general search and search advertising monopolies.  As discussed above, Google sets the rules and controls the Android ecosystem through anti-forking agreements, preinstallation agreements, and revenue sharing agreements.  Notably, each of these agreements builds on the others to preserve control.  Thus, Google will not pay a revenue share or financial incentive payment on a mobile device unless it is covered by the agreements discussed above: (1) an anti-forking agreement; (2) a preinstallation agreement ensuring that Google's search access points are preinstalled and given prominent placement; and (3) a revenue sharing or mobile incentive agreement that entitles Google to preset default status and, in most cases, prohibits preinstallation of search access points with rival

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 51 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

general search providers.  By locking up search and YouTube app preinstallation and placement (among others), Google retains control over search for video content and can self-preference and direct traffic to YouTube, and away from Rumble, thereby monopolizing the online video platform market.

139.   Through these interlocking, anticompetitive agreements, Google insulates and protects its monopoly profits, including those achieved from YouTube.  One internal Google analysis of these restrictive agreements concluded that <u>only one percent</u> of Google's worldwide Android search revenue was currently at risk to competitors.  This analysis noted that the growth in Google's search advertising revenue from Android distribution was "driven by increased platform protection efforts and agreements."  This extended and extends to the ad revenue Google derives from YouTube through the massive traffic Google has wrongfully diverted to YouTube, taken away from competitors such as Rumble.

140.   An alternative operating system could serve as a pathway for distribution of general search services other than Google, and would imperil the free-flow of massive amounts of revenue that Google receives, including from YouTube.  However, Google's anti-forking/fragmentation agreements inhibit the development of an operating system based on an Android fork that could serve as a viable path to market for a search competitor.

141.   Developing an operating system from scratch is extremely expensive and time-consuming, but a manufacturer could start with existing Android open-source code for a fraction of the cost and of the required development effort and time.  Moreover, the costs to app developers of "porting" GMS-compatible Android apps to an Android fork are substantially less than developing apps for an entirely new operating system.

142.   Google's anti-forking/fragmentation agreements, however, have inhibited operating system innovation through forking, ensuring that manufacturers and distributors are beholden to Google's version of Android.  Distributors know

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 52 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

that any violation of an anti-forking/fragmentation agreement could mean excommunication from Google's Android ecosystem, loss of access to Google's must-have GPS and Google Play, and millions or even billions of dollars in lost revenue (including revenue sharing from Google). Thus, distributors avoid anything that Google might deem "fragmentation"—a term that Google "purposely leave[s] . . . very vague" and interprets broadly.

143. Pursuant to the preinstallation agreements discussed above, and further discussed below, Google also has final say over whether a device is found to be compatible with the technical specifications Google requires manufacturers to meet before they can preinstall GMS. As a Google engineer noted, it must be "obvious to the [manufacturers] that we are using compatibility as a club to make them do things we want." Google views its anti-fragmentation mandate, and its final approval of devices before they launch, as a "poison pill" to prevent deviation from the Google-controlled Android ecosystem. Clearly, what started out as a "carrot" (open-sourced Android) led to the "stick" (such as required compatibility and unacceptable risk of "forking" or "fragmenting").

144. Google's broad interpretation of the anti-forking and fragmentation agreements, and the reluctance it creates among Android distributors to support alternative versions of Android, presents barriers to entry; indeed even as to a behemoth such as Amazon.

145. Amazon dared to develop its Fire OS operating system, a competing fork of Android. Rather than preinstall Google's search engine, GPS, Google Play, or other Google apps on Fire devices, Amazon preinstalled its own proprietary apps and agreed to make Microsoft's Bing the preset default general search engine. Amazon originally sold only Fire OS tablets, but in 2014 it launched a phone that ran on Fire OS. The phone was not a commercial success and Amazon quickly exited the phone business. Amazon continues to sell Fire tablets, which account for less than 2% of mobile device usage in the United States.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 53 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

146.   Google's anti-forking/fragmentation provisions and policies limited the growth of Amazon's mobile phone, and of Fire OS, because major manufacturers declined to support Amazon's phone out of fear doing so would risk their lucrative deals with Google.  The few manufacturers willing to work with Amazon did not have the same marketing and logistics capabilities as top manufacturers.  Despite hundreds of millions of dollars in investment over nearly ten years across tablets and phones, Fire OS still has not reached sufficient critical mass to challenge Google's version of Android and provide a significant alternative path to market for search rivals.  If even a company such as Amazon could not breech the Google-created barrier to entry, what company could?  The answer is none.  Google's chokehold on search is impenetrable, and that chokehold allows it to continue unfairly and unlawfully to self-preference YouTube over its rivals, including Rumble, and to monopolize the online video platform market.

147.   No Android fork has made significant inroads to challenge Google for mobile devices, and there is no meaningful operating system alternative for manufacturers and carriers to license.  Using only the open-source version of Android, or trying to develop a standalone system based upon the open-source Android system, are simply not practical or commercially viable alternatives (as Amazon discovered to its chagrin).  These manufacturers and carriers are beholden to Google's Android ecosystem, which Google uses to preserve its monopolies in general search, search advertising, general search text advertising and the online video platform market.

148.   Google's anti-forking/fragmentation agreements further inhibit the development of alternative Android operating systems for the next generation of search distribution channels, such as smart watches, smart speakers, smart TVs, and connected automobiles.

///

///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 54 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

1

2

3

4

## GOOGLE'S PREINSTALLATION AGREEMENTS
## EFFECT AN ILLEGAL TYING ARRANGEMENT THAT EXCLUDES
## COMPETITION IN BOTH THE GENERAL SEARCH MARKET AND THE
## ONLINE VIDEO PLATFORM MARKET

5    149.   As alleged above, Google uses preinstallation agreements—MADAs—

6  to ensure that its entire suite of search-related products (including YouTube) is

7  given premium placement on Android GMS devices.  Consumers naturally and

8  regularly turn to these prominently placed search access points to conduct searches.

9  Google's MADA preinstallation agreements also reinforce Google's anti-forking

10 requirements, either by including an anti-forking clause of their own or, more

11 commonly, requiring device manufacturers to be signatories to an anti-

12 forking/fragmentation agreement.

13   150.   If a manufacturer wants even one of Google's key apps and APIs, the

14 device must be preloaded with a bundle of other Google apps selected by Google.

15 The six "core" apps are Google Play, Chrome, Google's search app, Gmail, Maps,

16 and, as is most relevant here, the YouTube app.  Manufacturers must preinstall

17 these core apps in a manner that prevents the consumer from deleting them,

18 regardless of whether the consumer wants them. These preinstallation agreements

19 cover almost all Android devices sold in the United States.

20   151.   Google's preinstallation agreements effectuate a tie: that is, they

21 condition the distribution of Google Play and GPS on the distribution, preferred

22 placement and non-deletion of these other apps.  This tie reinforces Google's

23 monopolies.  The preinstallation agreements provide Android device manufacturers

24 an all-or-nothing choice: if a manufacturer wants Google Play or GPS, then the

25 manufacturer must also preinstall, and in some cases give premium placement to,

26 an entire suite of Google apps, including Google's search products and Google's

27 YouTube app.  The forced preinstallation of Google's apps (including the YouTube

28 app) deters manufacturers from preinstalling those of competitors, including

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 55 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

Rumble's app.  This forecloses distribution opportunities to rival general search engines and video platforms, protecting Google's monopolies.

152.   Google recognizes it could "make [the] phone experience better for user[s] by ensuring . . . preloaded apps are deletable."  In large part, this is because "[u]sers can free up space by deleting apps they don't want."  Consumers desiring to use non-Google search access points and non-pre-installed apps (including the Rumble app) thus suffer because they cannot save storage space on their devices by deleting unwanted Google apps.  In this way, manufacturers must agree to make their phones less attractive to consumers to accommodate Google's efforts to lock up search distribution (which in turn allows Google to continue to self-preference YouTube unfairly and unlawfully  There is no reasonable or commercial benefit to the consumer by preventing a consumer from deleting a Google app (including the YouTube app).

153.   Once the manufacturer adopts the necessary suite of Google apps, the search access points of those apps are preset to default to Google's search engine. For example, the preinstalled version of Chrome is preset to default to Google search. A senior executive at Google referred to changing Chrome's preset search default as "totally off the table" and insisted that if a manufacturer "values their MADA, they cannot modify Chrome's settings."  The result is that Google locks up

///
///
///
///
///
///
///
///
///

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 56 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

the access points to general search on Android phones, as shown here in Figure 7:



Figure 7

154.   The preinstallation agreements are even more pernicious than basic ties because these agreements force distributors to configure the appearance of their phones to Google's specifications.  For example, they require manufacturers to put the Google search widget on the device's default home screen.  Google considers the search widget "an essential part of the Google brand" and rejects requests by manufacturers to waive the preinstallation agreement's search-widget requirement.

155.   This locks up another search access point, as it would be impractical for a manufacturer to preinstall two search widgets on the same home screen.  The same applies to preinstallation of a video platform app.  Once the manufacturer is forced to preinstall the YouTube app and give it a prime-real-estate location, the manufacturer has no incentive to waste space on another video platform app, and as proof of that, no major manufacturer does so.  Google controls search which in turn allows it to control video searches, which in turn allows it to continue to self-preference YouTube.

156.   Google's preinstallation agreements also impose voice-search

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 57 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

preferencing on manufacturers and distributors.  In addition to requiring the preinstallation of Google Assistant, preinstallation agreements require manufacturers to implement a Google hotword, which activates Google Assistant, and ensure certain touch actions on the device's home button directly access Google Assistant or Google.  Google's agreements with most manufacturers also set Google Assistant as the default assistant app.  All of these promote and protect Google's ability to unlawfully and unfairly self-preference its YouTube platform over competitors, such as Rumble.

157.   Rivals to Google Assistant are deprived of the same opportunities to have similar installation and application of smart phones. Most of Google's preinstallation agreements prevent rival assistants from being the preset default or using a home button.  Google also handicaps rival assistants by limiting the APIs that non-Google apps can use, ensuring that the useful features, such as "always on" microphone access that would enable the use of a hotword or the initiation of phone calls, are available only to Google Assistant.  Even Google Assistant's chief rival— Amazon's Alexa—is unable to navigate these disincentives to get significant preinstallation or functional integration on Android devices. Again, even behemoth Amazon is boxed out.

158.   Voice search is an important, emerging access point. Internal Google documents have recognized that the "[v]oice platform will become the future of search" and financial projections for the assistant category recognize "search defensive value."

159.   Partners that depart from the preinstallation agreements risk discipline from Google. For example, in 2011, one major electronics manufacturer considered giving a group of consumers outside the United States a choice between two home screen experiences for their device: one home screen with the Google search widget and a second home screen with a rival search widget.  Discussing this proposal with colleagues, one Google employee noted "[a]llowing a mode that does not have

Google as the default search provider and completely changes the home screen" would violate Google's terms and risk breach (in addition to threatening Gog Goog.

160.    In 2015, Google was concerned that a major United States carrier would ask manufacturers to install a search widget powered by the carrier's in-house search engine. Google's Vice President of Partnerships wrote to a colleague that Google needed to make clear to manufacturers that "[these] customization requests will not go far" and replacing the Google search widget with a different search box would violate the preinstallation agreement.  Termination of this default agreement would, in turn, prohibit access to the entire GMS suite, including Google Play and GPS, and forfeit any potential share of Google's search advertising revenue under a revenue sharing agreement.  In short, as the above examples illustrate, Google's documents show its successful efforts to discipline its counterparties, including major electronics companies and carriers.

## GOOGLE'S REVENUE SHARING AGREEMENTS ARE A KEY COMPONENT IN MAINTAINING GOOGLE'S MONOPOLY IN BOTH THE GENERAL SEARCH MARKET AND THE ONLINE VIDEO PLATFORM MARKET

161.    In exchange for a substantial portion of Google's search advertising revenues, Android distributors agree to make Google the preset default general search engine for all significant search access points on their device.  In addition, these agreements typically contain an exclusivity provision prohibiting the preinstallation of a competing general search service.  These agreements are thus both offensive and defensive; a sword and a shield.

162.    Google has recognized for some time that its revenue sharing agreements with Android device manufacturers and carriers provide exclusivity for its general search service on those devices.  As stated explicitly in a draft 2014 Google strategy deck (depicted in Figures 8 and 9 below), Google's revenue

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 59 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

sharing arrangements with Android manufacturers or OEMs "provide exclusivity of Search" and its deals with carriers similarly "prevent[] the pre-installation of other Search engines or browsers," thus enabling Google "to protect Search exclusivity on the device as it makes its way to the user."  And this protected "search exclusivity is key to allowing and protecting Google's ability to self-preference its YouTube platform and direct massive traffic to it that would otherwise have gone to its competitors, including Rumble.



Figure 8   (Android manufacturers)



Figure 9 (Android carriers)

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

163.   Similarly, one Google executive acknowledged that exclusivity is "the general philosophy of the RSA or one of the tenets of the value exchanged in the RSA." Another Google executive noted, "our philosophy is that we are paying revenue share *in return for* exclusivity."  These agreements are, as that executive further explained, "really important" because "otherwise Bing or Yahoo can come and steal away our Android search distribution at any time."  And if Bing or Yahoo did in fact steal away a portion of Google's Android search distribution, then it would also lose its ability to unfairly and unlawfully direct video search traffic to its YouTube platform.

164.   As Google's documents recognize, the preinstallation agreements and revenue sharing agreements work together as a belt-and-suspenders strategy for driving searches to Google (and therefore away from competitors) on Android devices, and likewise, to drive video search traffic to YouTube, and away from competitors, such as Rumble.

165.   As one Google executive explained in 2017, Google uses revenue sharing agreements "as a lever for motivating partner behavior that is consistent with our goals for Google and the ecosystem," and to "drive incremental revenue (securing search defaults not covered by MADA)."  By using its monopoly profits and monopoly power, Google is able to impose even "more stringent requirements" on manufacturers and carriers to obtain the preset default position on search access points not covered by the preinstallation agreements. The combined result of Google's preinstallation and revenue sharing agreements is to lock up all the main pathways through which consumers access search on Android devices, thus foreclosing rivals and protecting Google's monopoly positions.

166.   The size of Google's payments to Android distributors demonstrates the enormous value of default status and exclusivity provided by the agreements. Last year, Google paid major U.S. carriers, collectively, more than a billion dollars.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 61 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

167.   Other channels of distribution left for competitors are far inferior to those paid for by Google and protected by its agreements. For example, a consumer can in theory download a competing search app on his or her own. But as one of Google's executives bluntly put it, "most users just use what comes on the device" and do not attempt to download or use other general search services.  Google's revenue-sharing partners turn down opportunities to preinstall or otherwise enable innovative, search-related apps (such as Rumble's) because that could violate Google's demand for exclusivity.

168.   Google also uses its agreements to ensure that new search access points are not available to competitors.  For example, Google developed a smart keyboard—a mobile app that can be used as an alternative for the standard-issued keyboards on smart phones—with the recognition that such keyboards might be "the next big search access point." Google relies on its preinstallation and default restrictions in its revenue sharing agreements as a "strategic defense" against rival keyboards that might provide a "[b]ridge" to rival general search engines.

169.   Google likewise structures its agreements to penalize any distributor that might walk away, tying them to Google.  The typical term of the carrier and manufacturer revenue sharing agreement is two to three years.  If a carrier or manufacturer does not renew its revenue sharing agreement with Google, the distributor loses out on revenue share not only for new mobile devices but also for the phones and tablets previously sold under and subject to its prior agreements with Google, and which are already in the hands of consumers. This provision is punitive to the carrier or manufacturer and helps to ensure that carriers and manufacturers will not stray from Google.

170.   To be attractive to a carrier or manufacturer, a rival search provider's offer for preset default status would need to cover not only the revenue the carrier or manufacturer would have earned from Google for new devices, but also the revenue that the carrier or manufacturer would have earned on all the devices that

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 62 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

are currently in the hands of consumers.  Google will continue to benefit from those devices with defaults previously set to Google.  A rival search provider is left with no practical way to ensure that it will generate revenues from those devices, regardless of how competitive its general search service might otherwise be.

171.   In roughly a decade, no other general search provider has secured preset default search status on any preinstalled search access point on GMS Android devices.  As with the Apple distribution agreements, the Android distribution agreements—taken together—are self- reinforcing, depriving rivals of the quality, audience, and financial benefits of scale that would allow them to mount an effective challenge to Google.

172.   Particularly for newer entrants, the revenue sharing agreements present a substantial barrier to entry.  These entrants cannot pay the billions of dollars that Google does for the most effective forms of distribution—premium placement and default status.  Instead, they are relegated to inferior forms of distribution that do not allow them to build scale, gain brand recognition, and generate momentum to challenge Google.

## GOOGLE'S AGREEMENTS EVEN LOCK UP
## BROWSER DISTRIBUTION

173.   Beyond its agreements locking up distribution on Android and Apple devices, Google also has entered into exclusive revenue sharing agreements with browsers.  Google has recognized it is "crucial to retain web browser partnerships." Google's agreements with browsers generally require the browsers to make Google the preset default general search engine for search access points in both the browser's computer and mobile versions.

174.   In exchange for being the preset default general search engine, Google shares up to 40 % of the advertising revenue it generates from these search access points with Google's browser rivals.  Browser revenue sharing agreements typically

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

last at least two years and are routinely extended.  Browsers are one of the most important distribution channels for general search services because they are the gateway to the internet for many if not most consumers.  Many search queries on mobile devices and computers are performed through the device's browser.  Today, Google has revenue sharing agreements with the most widely used browsers in the United States, such as Apple's Safari browser and Mozilla's Firefox browser; Microsoft's browsers are the only notable exceptions.  Over 85% of all browser usage in the United States occurs on Google's own Chrome browser or on one of the browsers covered by these revenue sharing agreements.

175.   In a competitive market, rivals could compete to be the preset default general search engine on a browser.  The general search services market has not, however, been competitive for many years.  When considered with Google's other exclusionary agreements and its monopoly power, Google's conduct forecloses a critical avenue for search competitors to enter the market or increase distribution. In the absence of these agreements, rival browsers would have the ability to consider making other general search engines the preset default for some or all search access points, spurring greater competition in the general search services market and offering additional choices to consumers.  As a Google employee once noted, Google's browser agreements can be "a good way to keep [a browser] away from Bing."

## GOOGLE'S MONOPOLIZATION OF THE ONLINE VIDEO
## PLATFORM MARKET HAS HARMED RUMBLE
## AND COMPETITION GENERALLY

176.   Google's monopolist's stranglehold on search, obtained and maintained through anticompetitive conduct, including tying agreements in violation of antitrust laws, has allowed Google to unfairly and wrongfully direct massive video search traffic to its wholly-owned YouTube platform, and thereby to

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 64 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

secure for itself monopoly profits from ad revenue generated by views of video contents on the YouTube platform.   A very large chunk of that video search traffic that was unfairly and wrongfully (mis)directed by Google to its YouTube platform should have rightfully been directly to Rumble's platform.  Because it was not, Rumble (and in turn, the content creators who have exclusively licensed their videos to Rumble) have lost a massive amount of ad revenue they would otherwise have received but for Google's unfair, unlawful, exclusionary and anticompetitive conduct.

## RUMBLE'S DAMAGES

177.   Figure 10 below is a reprint of information that Google has provided to Rumble as part of Rumble's account with YouTube:



Figure 10

178.   This Figure 10 shows that Rumble Videos for which Rumble is the original source and exclusive rights holder have received more than 9.3 Billion views globally through YouTube through September 2020, for which Rumble has received revenue from Google in the amount of $4,345,883.76.

179.   The usual metrics for determining revenue for online viewing of videos is Revenue Per Mille (RPM - or revenue per 1000 views), and Cost Per

Burke, Williams &
Sorensen, LLP
Attorneys At Law
Los Angeles

- 65 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

Mille (CPM - cost per 1000 views).  Using either metric, Rumble's average revenue received per 1000 views through Google is about $0.48 (forty-eight cents).

180.   In stark contrast, for views of a Rumble video on Rumble's website, the Gross CPM is approximately $20/CPM, globally, conservatively speaking.  Had Rumble received its average global CPM on those 9.3 billion views instead of receiving revenue of $4.3 million, Rumble would have received additional revenue of $180 million.  But this is just a portion of the damages proximately caused and continuing to be caused to Rumble and its content creators by Google's unlawful anticompetitive conduct.

181.   According to industry reports, on average every visitor to YouTube views 11 videos during that single visit.   Had Rumble received those 9.3 billion views on Rumble.com, Rumble would have had an additional 93 billion video views, on top of the 9.3 billion views, which translates to damages of $1.98 billion at a CPM of $20.

182.   Rumble posts videos to YouTube because it must in order to survive. This is a direct result of Google's unlawfully self-preferencing YouTube, and rigging its search algorithms to push links to Rumble's platform "below the fold" or off the "front page" altogether.  Because of the Google/YouTube monopoly, Rumble has had not viable option but to "play ball" with Google/YouTube.

183.   A significant source of users and hence revenue for Rumble's platform comes from those consumers who "find" Rumble's platform and video content through online searching, primarily through Google, as these graphics (Figures 7 and 8 from the DOJ Complaint) clearly show Google's dominance and

///

///

///

///

///

BURKE, WILLIAMS & SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

monopoly power in online searching:






184.   Those consumers who "find" Rumble through an online Google search are much more likely to sign up (or register) with Rumble than those who "find" Rumble through a social media site, such as Facebook.  Many of those users who register with Rumble will also begin to upload videos to the Rumble platform, thereby increasing Rumble's scale, video content, brand awareness, value and revenue.

185.   Since 2013, Google search traffic accounted for only roughly 12 million users on Rumble out of the 520 million reported by Google Analytics through December 31, 2020.  Based upon Google Analytics data, this search traffic in turn accounted for roughly 238,000 uploaded videos to Rumble, yielding a performance of roughly 115 times better than did the traffic from Facebook.  For every 12 million users that Rumble lost to YouTube due to Google's anticompetitive and monopolist behavior and self-preferencing, Rumble would have realized roughly 238,000 new video uploads to rumble.com for Rumble to monetize and generate revenue for Rumble and its content creators.

186.   But for the unlawful and anticompetitive, monopolistic conduct of Google, many more potential Rumble users would have "found" Rumble through a Google search, potentially as many as 9.3 billion according to YouTube analytics.

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 67 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

However, by always giving preference to YouTube and relegating Rumble to below-the-fold locations in any search result for online videos, Google effectively and purposefully directed that traffic away from Rumble to YouTube, thereby depriving Rumble of those additional users, video content and revenue. This unlawful conduct regarding Google's search results has been exacerbated by its tying arrangements with Android-based smart phone manufacturers, who are required to include the YouTube app on their phones. Given that much online searching for videos is done on the searcher's smartphone, this unlawful conduct is a significant factor in Google's achieving and maintaining monopoly power in the online video market.

187.   Rumble had roughly 1.4 million video uploads to its platform, which generated 9.3 billion views on YouTube, and roughly $200 million of lost ad revenue. If all 9.3 billion viewers had landed on Rumble's website instead of YouTube's, then Rumble would have generated an additional 184 million more video uploads.

188.   Based upon Google and YouTube analytics, Rumble incurred damages on its 9.3 billion views that Google instead directed to YouTube with its unfair YouTube-preferencing algorithms and tying arrangements. Rumble lost a huge amount of revenue on the 9.3 billion views that Google wrongfully directed to YouTube with its unfair YouTube-preferencing algorithms. If even a portion of those 9.3 billion views had occurred on Rumble's website instead of YouTube that would have generated well in excess of 100 million additional video uploads to the Rumble platform, which in turn would have generated billions of more views on the Rumble platform, and massive amounts of additional revenue for Rumble and its content creators. If those 9.3 billion views had all occurred on Rumble's website, it would have generated an additional 184 million video uploads. Those additional 184 million videos would have generated roughly 1.2 trillion additional views on

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

Rumble's platform.  Those additional uploads and views would have produced tremendous additional revenue to Rumble, and in turn to the video content creators.

189.   In addition to Rumble's exclusive catalog of video content, Rumble also incurred damages on its non-exclusive catalog, which is far larger than its exclusive catalog.

190.   Rumble reasonably believes that its damages as will be proven at trial will greatly exceed $2,000,000,000, before trebling or attorney fees and costs.  The impact on Rumble is only one example of how Google's exclusionary conduct has blocked competition in the online video platform market.

## CLAIM FOR RELIEF

*Monopolization and Attempted Monopolization of the*

*U.S. Online Video Platform Market in Violation of Sherman Act § 2*

191.   Rumble incorporates the allegations of the foregoing paragraphs as though fully set forth here.

192.   Google's conduct violates Section 2 of the Sherman Act, which makes it unlawful for any person to "monopolize, or attempt to monopolize any part of the trade or commerce among the several States, or with foreign nations…." 15 U.S.C. § 2.

193.   The online video platform market in the United States is a relevant antitrust market.  Google has obtained and maintains monopoly power in that market and has done so by, among other things, leveraging its monopoly power in the search engine market as alleged above.

194.   Google has attempted to monopolize the U.S. video platform market and has monopolized that market.  Google has willfully maintained and abused its monopoly power in the U.S. video platform market by the anticompetitive and exclusionary conduct alleged above, which has included rigging its search engine algorithms such that YouTube videos will always be listed first in search results

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

and requiring pre-installation and prominent placement of Google's YouTube apps on all Android smartphones in the United States.

195.    Google's exclusionary conduct has foreclosed a substantial share of the U.S. online video platform market.

196.    Google's anticompetitive acts have had harmful effects on competition and consumers as alleged above.

197.    The anticompetitive effects of Google's exclusionary conduct and agreements outweigh any procompetitive benefits in this market, or that can be achieved through less restrictive means.

198.    Google's anticompetitive and exclusionary practices violate Section 2 of the Sherman Act, 15 U.S.C. § 2.

199.    Rumble (and its content creators) have been and continue to be damaged by Google's anticompetitive and exclusionary practices, and that damage has been proximately caused by Google's anticompetitive and exclusionary practices.

200.    Rumble is therefore entitled to compensatory damages, trebled, and Rumble should also be awarded its attorney fees and costs, pursuant to Section 15 of the Clayton Act.

## **PRAYER FOR RELIEF**

WHEREFORE, Rumble prays for judgment against Google as follows:

1.    that Rumble be awarded compensatory damages according to proof, and that those damages be trebled;

2.    that Rumble be awarded its attorneys' fees and costs;

3.    that Google and its subsidiaries, dba's, divisions, affiliates, parents, successors, assigns, officers, agents, representatives, servants, and employees, and all persons in active concert or participation with them or any of them, be preliminarily and permanently enjoined from the unlawful anticompetitive conduct alleged above; and

BURKE, WILLIAMS &
SORENSEN, LLP
ATTORNEYS AT LAW
LOS ANGELES

- 70 -

4:21-CV-00229-HSG
FIRST AMENDED COMPLAINT

4. that Rumble have such other and further relief as this Court deems just and proper.

Dated: April 30, 2021

Respectfully Submitted,

BURKE, WILLIAMS & SORENSEN, LLP

By:  /s/ Robert W. Dickerson, Jr.
　　　　Robert W. Dickerson, Jr.

Attorneys for Plaintiff
RUMBLE, INC.

## DEMAND FOR JURY

Plaintiff Rumble hereby requests a trial by jury for all issues properly submitted to a jury.

Respectfully submitted,

Dated: April 30, 2021

BURKE, WILLIAMS & SORENSEN, LLP

By:  /s/ Robert W. Dickerson, Jr.
　　　　Robert W. Dickerson, Jr.

Attorneys for Plaintiff
RUMBLE, INC.

**CERTIFICATE OF SERVICE**

I, the undersigned, certify and declare as follows:

      1.     I am over the age of 18 and not a party to the within action.

      2.     My business address is 444 South Flower Street, Suite 2400, Los Angeles, California 90071-2953, which is located in the city, county and state where the mailing described below took place.

      3.     On April 30, 2021, I caused to have deposited by United States Mail at Los Angeles, California in Los Angeles County, a copy of the following document(s):

**FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF DUE TO ANTITRUST VIOLATIONS**

      4.     I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postage cancellation date or postage meter date is more than one day after date of deposit for mailing this affidavit.

      5.     These documents were addressed to the following parties:

John E. Schmidtlein
Benjamin Greenblum
Andrew Trask
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 30, 2021, at Los Angeles, California.

|  |  |
|---|---|
| _____ | By:_/s/ Olga Valadez_____ |
| Olga Valadez | |
| Print Name | Signature |

PROOF OF SERVICE