Robert W. Dickerson, Jr. (SBN 89367)
E-mail:  rdickerson@comp-techlaw.com
Allen W. Jansen (SBN 81992)
ajansen@comp-techlaw.com
COMPETITION & TECHNOLOGY LAW
GROUP LLP
11400 West Olympic Blvd., Suite 200
Los Angeles, CA 90064
Tel: 310.774.2337      Fax: 213.799-3642

Nicholas A. Gravante, Jr.
*Admitted Pro Hac Vice*
nicholas.gravante@cwt.com
Philip J. Iovieno
*Admitted Pro Hac Vice*
philip.iovieno@cwt.com
Jack G. Stern
*Admitted Pro Hac Vice*
jack.stern@cwt.com
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Tel: (212) 504-6000      Fax: (212) 504-6666

Attorneys for Plaintiff
RUMBLE INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| RUMBLE INC., | Case No.  4:21-cv-00229-HSG (LJC) |
| Plaintiff, | **SECOND JOINT LETTER TO COURT REGARDING DOJ CASE DISCOVERY DISPUTE** |
| v. | |
| GOOGLE LLC, | |
| Defendant. | |

On May 24, 2024, the parties filed a joint letter (ECF #108) concerning

Plaintiff's motion to compel Google to produce documents from the case *United*

COMPETITION &
TECHNOLOGY LAW
GROUP, LLP

4:21-CV-00229-HSG(LJC)
2ND JOINT LETTER TO COURT REGARDING
DOJ CASE DISCOVERY DISPUTES

*States of America, et. al., v. Google LLC*, Case No. 1:20-cv-03010-APM ("the DOJ Case").

On June 1, 2024, the Magistrate Judge denied without prejudice Plaintiff's motion to compel.  (ECF #109).

In accord with the Order, the parties now submit a second joint letter attached hereto.

Dated:  June 7, 2024          Respectfully Submitted,

                                           COMPETITION & TECHNOLOGY LAW GROUP, LLP

                                           By:  */Robert W. Dickerson, Jr./*

                                                   Robert W. Dickerson, Jr.

                                           Attorneys for Plaintiff RUMBLE INC.

Dated:  June 7, 2024          WILLIAMS & CONNOLLY LLP

                                           By: */John E Schmidtlein/*

                                               John E. Schmidtlein

                                           Attorneys for Defendant GOOGLE LLC

## <u>ATTESTATION</u>

I, Robert W. Dickerson, Jr., am the ECF User whose ID and password are being used to file this document.  In compliance with Civil L.R. 5-1(i)(3), I hereby attest that counsel for Google have concurred in this filing.

                                   */s/ Robert W. Dickerson, Jr.*

Competition &
Technology Law
Group LLP

- 2 -

4:21-CV-00229-HSG (LJC)
2ND JOINT LETTER TO COURT REGARDING
DOG DISCOVERY DISPUTE

Close of Fact Discovery:    June 7, 2024
Exchange of Opening Expert Reports:  June 14, 2024
Exchange of Rebuttal Expert Reports:  August 2, 2024
Close of Expert Discovery:    October 4, 2024
Deadline to file Dispositive and/or
Daubert Motions:      October 11, 2024
Dispositive and/or Daubert Motion
Hearing Deadline:      January 23, 2025
Pretrial Conference:     April 29, 2025
Trial date:        May 19, 2025

Counsel for the parties certify that the following issue has been the subject of letters, a meet & confer teleconference, and a video conference meet & confer.

## I. Plaintiff's Position

On May 24, 2024, the parties filed a joint letter (ECF #108) concerning Plaintiff's motion to compel Google to produce documents from the case *United States of America, et. al., v. Google LLC*, Case No. 1:20-cv-03010-APM ("the DOJ Case").  The Requests at issue seek:

> Request for Production No. 121:
>
> All Transcripts of the proceedings (including fact and expert witness testimony, oral argument by counsel, opening statements and closing arguments), in the trial in the case entitled "United States of America, et. al., v. Google LLC, Case No. 1:20-cv-03010-APM.".
>
> Request for Production No. 122:
>
> All Exhibits admitted into evidence by any party during the trial in the case entitled "United States of America, et. al., v. Google LLC, Case No. 1:20-cv-03010- APM."
>
> Request for Production No. 123:
>
> All demonstratives, for example, Power Point Presentations, used by Counsel for any party during the trial, including opening statements, fact and expert witness examination (direct and cross), and closing arguments, in the case entitled "United States of America, et. al., v. Google LLC, Case No. 1:20-cv-03010-APM."
>
> Request for Production No. 124:
>
> All Expert Reports (opening, rebuttal and reply) produced by any party during the trial in the case entitled "United States of America, et. al., v. Google LLC, Case No. 1:20-cv-03010-APM."

On June 1, 2024, Your Honor denied without prejudice Plaintiff's motion to compel. (ECF #109).  Consistent with Your Honor's prior order on documents that Google produced to DOJ about Google's pre-installation of the YouTube app on Android mobile devices (ECF #93), Your Honor noted that the Requests seek relevant information. However, the Order stated that the Requests, without further refinement or explanation, were overbroad and that Plaintiff should identify with more specificity the relevant material that it seeks. (ECF #109). The Order allowed

Plaintiff to file a "new request for a narrower set of trial transcripts, trial exhibits, demonstratives, and/or expert reports exchanged during the course of the DOJ case" by June 7, 2024.  Id.

Accordingly, Plaintiff Rumble substantially limited the scope of the Requests to  more narrowly seek only those materials that bear on testimony of witnesses testifying in both the DOJ case and this case and to the Android default placement agreements that are at issue in both cases. Plaintiff now seeks more specifically:

(1) The deposition and trial transcripts and associated exhibits of those Google fact and expert witnesses who testified in the DOJ case and who can be expected to testify in the Rumble case, such as Dr. Nayak and Dr. Murphy.  Rumble also requests the deposition and trial transcripts and associated exhibits of any witnesses Google in the future discloses as an expert in this case and who also testified in the DOJ case and asks that they be submitted no later than the time of the expert's report.

(2) Testimony, exhibits and any other material relating to the Android default placement agreements and the effect of those agreements, including any fact and expert witness deposition and trial transcripts and/or demonstratives relating to Google's negotiation of and internal planning concerning those agreements and the effect of those agreements and their default requirements on users, as well as portions of post-trial submissions relating to those matters and citing or describing that evidence.

Rumble does not ask that Google produce confidential technological or similarly confidential information of third-parties sealed by the Court in the DOJ case.

As to category (2) above, Rumble has provided additional specificity by referencing material cited in the U.S. Department of Justice's public but redacted post-trial Proposed Findings of Fact (DOJ PFOF) the existence of non-public revelation highly relevant to its claims (**Exhibit A).** The cited material is directly relevant to Rumble's allegations in this case concerning the Android default placement agreements. The DOJ PFOF identifies the existence of redacted material concerning Google's conduct and its effect on competitors and competition that bears directly on the allegations in this case, but which are not available from any other source.

Plaintiff has limited its Requests to evidence cited in certain paragraphs of the DOJ PFOF concerning the Android default placement agreements and Google's conduct in relation to those agreements, including Google's coercion of certain Android phone manufacturers and service providers, statistical and other information on installation rates and other measures of how Google's conduct on consumers and competition, as follows:

1.  The documents and transcripts referenced in the DOJ PFOF ¶¶779-964 under the headings "B. Google's Android Contracts are Exclusive," "C. Google's Browser Contracts are Exclusive," "D. Defaults Have a Powerful Effect on User's Search Behavior, Particularly on Mobile Devices," and a portion of "VII. Google's Rivals Are Foreclosed From Distribution."

2. The documents and transcripts referenced in the DOJ PFOF at ¶1089 (discusses Google's internal worries regarding the decline in search volume as a result of limitations on preinstallation on Android devices in the EU); ¶1312 (discusses the revenue generated by Google apps that come preinstalled on Android devices, including YouTube);¶1319 (Google is unconcerned with Apple strengthening as an Android rival); ¶1324 (discusses the percentage of users that would delete the Google widget on Android devices within 3 months of device activation if it were removable); ¶1326 (Google's OEM and carrier partners discuss how they would prefer different placement of Google apps on their devices).

3. The transcripts and associated exhibits for the testimony of Michael Whinston, identified as a DOJ expert witness in connection with the above topics and whose publicly available demonstrative indicates that much of his testimony relevant to the Android agreements was redacted. (**Exhibit B).**

In response, Google indicated it would be willing to provide only the unredacted trial transcripts, any Google produced exhibits, and any demonstratives used during the examinations of the overlapping witnesses Pandu Nayak, Kevin Murphy (a disclosed expert) and Jim Kolotouros, as well as the transcript for Adrienne McCallister, with third-party confidential information redacted. Upon inquiry, Google's counsel summarily explained that in its view the transcripts of Kolotouros and McCallister were sufficient to meet Rumble's needs due to their involvement in the negotiation of Google's agreements with OEMs and carriers.

Google's proposal is plainly inadequate and designed to favor Google, carefully avoiding production of the evidence that DOJ presented in support of its allegations against Google concerning the Android agreements (the same allegations that Rumble makes in this case—allegations that expressly reference and are based on the DOJ allegations concerning the same agreements). Limited testimony about the "negotiation" of the agreements falls dramatically short of the extensive evidence cited by the DOJ concerning the intent, scope, and effect of the agreements addressed by numerous witnesses other than Kolotouros and McCallister, such as Whinston, *See* Ex. B at 17 (redacted slide titled: "Google estimated it would lose significant traffic on Android without the default"); and at 19 ("Google's USA RSA Payments [to Apple] are Enormous."). That limited offer by Google does not include the testimony of witnesses who addressed Google's motives and rationales for seeking pre-installation agreements. *See, e.g.,* DOJ PFOF ¶922 (discussing the redacted number of query search through defaults). Nor does it include for example the testimony from Google fact and expert witnesses concerning the impact of Google's Android agreements as assessed by Google's Finance Team. Id. ¶915.

Google has repeatedly argued that the DOJ case is not relevant to this case because the DOJ allegations do not involve self-preferencing. Judge Gilliam rejected Google's effort to dismiss or strike the allegations in this case that are expressly based on the DOJ allegations. (ECF #57). And, as noted above, Your Honor has also recognized the relevance of material produced by Google to the DOJ concerning the Android agreements at issue in both cases. (ECF #93). Rumble has narrowed its requests and identified specific non-public material directly relevant to issues common to both this case and the DOJ case. The DOJ PFOF specifically cites and describes the relevance of the non-public evidence. Google's counsel in this case was lead trial counsel in

that case and has knowledge of the record that is not available to the public.  Google can readily identify the material based on Rumble's showing and it should be produced.

Plaintiff respectfully requests an Order compelling Google to produce the requested documents and will submit a Word version of a proposed Order in compliance with the Court's Standing Order.

## II.    Defendant's Position

As Google explained in the Parties' prior submission, the *U.S. v. Google* case concerns the impact of Google Search distribution agreements with various third parties on purported markets (general search services and search advertising) wholly distinct from the alleged market (online video platforms) and product (YouTube) that Plaintiff's single claim here puts at issue.  *See* ECF No. 108 at 3.  Despite that, in an effort to compromise and to resolve Rumble RFPs 121-124, Google offered to produce: unredacted trial transcripts from the *U.S. v. Google* case reflecting the testimony of Dr. Pandu Nayak, Dr. Kevin Murphy, Jim Kolotouros, and Adrienne McCallister (the four witnesses who testified in the *U.S. v. Google* trial and are also on Google's initial disclosures or have been disclosed by Google as an expert in this case); unredacted trial exhibits used during the trial examinations of these four witnesses, to the extent the exhibits are documents originally produced by Google and redacted trial exhibits if produced by "third parties; and demonstratives used during the trial examinations of these four witnesses, with third-party confidential information subject to the *U.S. v. Google* Protective Order redacted.[1]  This proposal is more than sufficient to address any need for information from the *U.S. v. Google* trial that potentially overlaps with this case.  Indeed, as previously noted, Google *already produced* to Rumble all documents from Google's productions in the *U.S. v. Google* that hit on ESI search terms agreed to by Rumble and that were responsive to Rumble's discovery requests.  *See* ECF No. 93.

Rumble's remaining requests—what it calls "category (2)" above—remain incredibly broad, unduly burdensome, and not proportional to the needs of this case because they go far beyond the particular alleged anticompetitive conduct asserted in this case.  In particular, Rumble has failed to explain how these materials "are relevant and proportional to the needs of the case, considering the factors set forth under Rule 26(b)(1) of the Federal Rules of Civil Procedure" and whether these materials "are already publicly available, the extent to which third-party confidential information is contained in the discoverable materials and what redactions will be necessary, and the particular requirements as to third-party confidential information set forth in the protective order in the DOJ Case."  ECF No. 109 at 2-3.

All told, Rumble's category (2) requests seek trial transcripts reflecting the testimony of

---

[1] To the extent Rumble now seeks deposition, in addition to trial, transcripts, that is improper. None of Rumble RFPs 121-124 seek deposition transcripts, nor does any other Rumble RFP.  And the Court's May 28, 2024 Order permitted Rumble only to "bring a new request for a narrower set of trial transcripts," not a broader request for deposition transcripts.  ECF No. 109 at 2.  Rumble cannot raise a new request for previously unsought deposition transcripts—the deadline to do so has passed.  *See Hahn. v. Massage Envy Franchising, LLC*, 2014 WL 12899290 at *5 (S.D. Cal. July 24, 2014) (RFPs propounded "less than 30 days before the deadline to complete all fact discovery" are untimely under Rule 34); *see also Vallimont v. Chevron Res. & Tech.*, 2009 WL 960347, at *2 (N.D. Cal. Apr. 8, 2009) (discovery requests are untimely when the deadline to respond provided by the Federal Rules is after the close of fact discovery).

36 different witnesses.  Despite Rumble's claim that it is not seeking third-party information, 19 of these 36 witnesses were employed by third-parties such as Apple, DuckDuckGo, Microsoft, Mozilla, Neeva, and Branch Metrics—none of whom offered testimony having anything to do with Plaintiff's YouTube allegations.  Ten of these witnesses did not testify live during the *U.S. v. Google* trial, rather their deposition transcripts were designated by the Parties and submitted to the Court.  And none of this deposition testimony, either, relates to Plaintiff's YouTube allegations.  For the 26 witnesses who testified live at trial, Rumble again fails to explain why the publicly available transcripts are insufficient.[2]  Rumble fails to explain how Google could even produce unredacted versions of transcripts reflecting the testimony of third-party witnesses without violating the Protective Order in the *U.S. v. Google* case.  As Google has previously explained, the Protective Order in that case prohibits Google from disclosing any non-Google information designated as "Confidential" or "Highly Confidential" to any person, except for a narrow class of persons provided access in the Protective Order itself—plaintiffs in separate litigation are not among that excepted class.  *See* Stipulated Protective Order ¶ 14, *United States v. Google LLC*, No. Case 1:20-cv-03010-APM (D.D.C. Dec. 21, 2020), ECF No. 84.  Rumble does not dispute this.

Rumble's category (2) requests additionally seek 147 trial exhibits and 5 trial demonstratives, which together span thousands of pages.  Public versions of these exhibits and demonstrative are available, to the extent they were used live with a witness at trial.[3]  *See* https://www.justice.gov/atr/us-and-plaintiff-states-v-google-llc-2020-trial-exhibits.  Yet, again, Rumble does not explain why these public versions are insufficient, or how any redacted information from these materials is even relevant to its claim.  36 of the 147 trial exhibits Rumble seeks are documents originally produced by third-parties.  All of the trial demonstratives Rumble seeks were either used with third-party witnesses or with DOJ's experts, and are thus rife with third-party confidential information.  Rumble does not explain how Google could produce unredacted versions of these demonstratives and third-party trial exhibits given the Protective Order in the *U.S. v. Google* case—or, in the alternative, how the burden imposed on Google to review the trial demonstratives to redact third-party confidential information is proportional to the needs of the case, especially given that Plaintiff has not even attempted to explain the relevance of the redacted information.

In fact, *none* of the materials Rumble seeks in category (2) are relevant to its claim.  First, the materials cited in paragraphs 863 to 866 of the DOJ Proposed Findings of Fact relate to Google's contracts with browser developers such as Mozilla and Opera to make Google Search the default search engine for certain browsers.  *See, e.g.*, Plaintiffs' Proposed Findings of Fact ¶ 863, *United States v. Google LLC*, No. 1:20-cv-03010-APM (D.D.C. Feb. 23, 2024), ECF No. 839

---

[2] In particular, Rumble fails to explain how the redacted information in these transcripts is even relevant to its claim.

[3] Additionally, four of these trial exhibits are agreements that Google has already produced to Rumble.  More of these trial exhibits are likely documents that Google has already produced to Rumble as well, either during the course of responding to Rumble's RFPs or in producing documents pursuant to the Court's May 31, 2023 Order (ECF No. 93).  Rumble only made its category (2) proposal to Google late in the afternoon on June 3, 2024, and Google has not had adequate time to determine precisely how many of the 147 trial exhibits that Rumble requests are documents that Google has already produced to Rumble during the course of this case.

(DOJ PFoF).  Rumble does not argue that Google's agreements with browser developers are relevant to its claim, citing only what it calls the "Android default placement agreements."

Second, the remaining paragraphs of the DOJ Plaintiffs' Proposed Findings of Fact for which Rumble seeks cited materials all relate to the distribution of Google Search—a product entirely separate from YouTube.[4]  Paragraphs 779 to 797 discuss the "*search* preinstallation, placement, and default requirements" in Google's Mobile Application Distribution Agreement. *See, e.g.*, DOJ PFoF ¶ 782 (emphasis added).  Paragraphs 798 to 817 discuss the DOJ Plaintiffs' argument that Google's Android revenue sharing agreements amount to "*[s]earch* default exclusivity." *See, e.g.*, DOJ PFoF ¶ 798 (emphasis added).  Paragraphs 818 to 821 come under a header that lists the DOJ Plaintiffs' argument that Google's Android agreements "exclude rivals from accessing *search* distribution." *See, e.g.*, DOJ PFoF ¶ 818 (emphasis added).  Paragraphs 822 to 831 discuss preinstallation of "the Yahoo *search* app." *See, e.g.*, DOJ PFoF ¶ 822 (emphasis added).  Paragraphs 832 to 862 discuss an "app-*search* tool" developed by a company called Branch Metrics. *See, e.g.*, DOJ PFoF ¶ 832 (emphasis added).  Paragraphs 867 to 943 discuss the DOJ Plaintiffs' arguments about the purported effects of Google's *Search* Defaults on "users' *search* behavior." *See, e.g.*, DOJ PFoF ¶ 867 (emphasis added).[5]  And, finally, paragraphs 944 to 964 discuss the DOJ Plaintiffs' argument that Google's alleged conduct "foreclose[s] rivals from a substantial share of the general *search* services market"—which, again, is a market that Rumble has not alleged is relevant to its claim. *See, e.g.*, DOJ PFoF ¶ 945 (emphasis added).  These paragraphs all relate to Google's distribution of Google Search.  Remarkably, the word "YouTube" does not appear anywhere in paragraphs 779 to 964 of the DOJ Plaintiffs' Proposed Findings of Fact.  Rumble does not—and cannot—explain how the large number of trial exhibits and trial demonstratives relating to the distribution of Google Search are somehow relevant to Rumble's claim for monopolization of a purported market for online video platforms.  It is not proportional to the needs of the case to force Google to comb through the requested trial exhibits and trial demonstratives to determine which materials it could produce and which it must redact.  This is especially true when, again, public versions are available for the trial transcripts and most of the

---

[4] While some of these paragraphs relate to the same contracts Rumble challenges here, the DOJ Plaintiffs did not challenge the distribution of YouTube and therefore the testimony about the distribution of Google Search on mobile devices is not relevant here.  And, in any event, Rumble has long had the contracts at issue and Google has produced documents and witnesses for depositions relating to the distribution of YouTube.

[5] This section also confirms, as Google made clear in the Parties' prior submission, that there is no corollary in the context of YouTube and Rumble's claim here to the search defaults at issue in the *U.S. v. Google* case.  *See* ECF No. 108 at 6.  The DOJ Plaintiffs contend that "[a] default is an option pre-selected for a consumer by a third-party, such as a smartphone manufacturer, that requires an affirmative action by a consumer to change" and that "[a] default search engine is the search engine that comes pre-selected on a search access point when a user first begins using the access point."  DOJ PFoF ¶ 868.  Rumble does not dispute that there is no setting for a default online video platform on Android devices that manufacturers pre-select or that a default video platform can even exist technologically.  Instead, Rumble argues that the fact that manufacturers preinstall YouTube on certain devices and place it in a "prime location" has an effect "such that the YouTube mobile app becomes the 'default' application."  ECF No. 108 at 3-4.  This is a clear attempt by Rumble to manufacture similarities between the cases where they do not exist.

trial exhibits and trial demonstratives.

The remaining materials Rumble seeks fare no better. Paragraph 1089 relates to an effort by Google "to launch new *search* features in certain European countries." DOJ PFoF ¶ 1089. This information is again not relevant because it relates purely to Google Search, and for the additional reason that it relates exclusively to Europe, whereas Rumble's alleged market includes only the United States. *See* ECF No. 21 ¶ 193 ("The online video platform market in the United States is a relevant antitrust market."). Paragraph 1312 relates to Google's "incentive to invest in Android" irrespective of distribution of Google Search on Android devices. DOJ PFoF ¶ 1312. The specific reference to YouTube that Rumble mentions is merely a citation of Google's publicly available 2021 10-K. Paragraph 1319 discusses "Google's revenue-share payments to Apple," which of course is not an Android device manufacturer, is not a party to the Android agreements that Rumble claims provide the basis for this motion, and, again, relates to Google Search—not YouTube. DOJ PFoF ¶ 1319. Paragraph 1324 relates to "the placement of the Google Search Widget" on Android devices, which has nothing to do with the placement of the YouTube app on Android devices. DOJ PFoF ¶ 1324. And paragraph 1326 cites exclusively third-party materials which are either publicly available or have been sealed by the trial court. Similar to above, none of these materials are relevant to Rumble's claim and Rumble has not explained how the burden on Google to review and produce them is proportional to the needs of the case.

Last, the trial transcripts reflecting the testimony of Michael Whinston are available publicly in fully unredacted form. As to the trial exhibits used with Whinston, the first two days of his testimony relate exclusively to the alleged relevant markets in the *U.S. v. Google* case— neither of which Rumble alleges is relevant to its claim here. And his remaining testimony all related to the distribution of Google Search. For the same reasons discussed above, exhibits relating to the distribution of Google Search are not relevant to Rumble's claim about a purported online video platform market here. In any event, rather than going through the publicly available transcripts of Whinston's testimony and identifying which trial exhibits Rumble claims are relevant to this case, it simply requests them all. Rumble cites only two slides from Whinston's trial demonstratives as supporting this request. The first is a slide concerning the Google Chrome Browser, Samsung's S-Browser, and Google Search Application on Android devices—none of which has anything to do with Google's distribution of YouTube on Android devices. *See* Ex. B at 17. And the second, by Rumble's own admission above, concerns Apple, which is not an Android device manufacturer or a party to the Android agreements. *See* Ex. B at 19. Plaintiff cites nothing to support its claim that trial exhibits used with Whinston are relevant to Google's distribution of the YouTube app on Android devices or its claim for monopolization of a purported online video platform market. Nor does Rumble explain how the burden on Google to review and produce these materials is proportional to the needs of this case, given the lack of any relevance.

In sum, Google has already agreed to produce to Rumble transcripts, trial exhibits, and trial demonstratives relating to witnesses that testified in the *U.S. v. Google* case and also have been disclosed by Google in this case. Materials beyond that are not relevant to this case, and Rumble has made no showing that the burden associated with reviewing and producing them is proportional to the needs of this case. That is especially true given that large amounts of the materials Rumble seeks are publicly available, and many others contain third-party confidential information that Google is barred from producing under the Protective Order in the *U.S. v. Google* case. The Court should accordingly deny Rumble's motion to compel the production of anything beyond what Google has agreed to produce.

**Rumble Request for Production No. 121**

All Transcripts of the proceedings (including fact and expert witness testimony, oral argument by counsel, opening statements and closing arguments), in the trial in the case entitled "*United States of America, et. al., v. Google LLC, Case No. 1:20-cv-03010-APM.*"

**Google Response to Request No. 121**

Google objects to Request No. 121 on the ground that it seeks documents irrelevant to Rumble's allegations, as the *U.S. v. Google* lawsuit does not involve YouTube or any allegations regarding an alleged online video platform market. Google also objects to Request No. 121 to the extent that the requested documents contain confidential, and potentially competitively sensitive, information belonging to third parties that may only be disclosed pursuant to the protective order in the *U.S. v. Google* lawsuit. Google further objects to Request No. 121 on the grounds that it is overbroad and unduly burdensome to the extent it seeks "[a]ll Transcripts of the proceedings." Such information's probativeness (if any) is far outweighed by the burden posed by its collection and potential redaction to remove third-party confidential materials. Google further objects to Request No. 121 to the extent that it requests information that is publicly available and accessible to Plaintiff. Google will not be producing any documents pursuant to this Request.

**Rumble Request for Production No. 122**

All Exhibits admitted into evidence by any party during the trial in the case entitled "*United States of America, et. al., v. Google LLC, Case No. 1:20-cv-03010-APM.*"

**Google Response to Request No. 122**

Google objects to Request No. 122 on the ground that it seeks documents irrelevant to Rumble's allegations, as the *U.S. v. Google* lawsuit does not involve YouTube or any allegations regarding an alleged online video platform market. Google also objects to Request No. 122 to the extent that

the requested documents contain confidential, and potentially competitively sensitive, information belonging to third parties that may only be disclosed pursuant to the protective order in the *U.S. v. Google* lawsuit. Google further objects to Request No. 122 on the grounds that it is overbroad and unduly burdensome to the extent it seeks "[a]ll Exhibits admitted into evidence by any party." Such information's probativeness (if any) is far outweighed by the burden posed by its collection and potential redaction to remove third-party confidential materials. Google further objects to Request No. 122 to the extent that it requests information that is publicly available and accessible to Plaintiff. Google will not be producing any documents pursuant to this Request.

### Rumble Request for Production No. 123

All demonstratives, for example, Power Point Presentations, used by Counsel for any party during the trial, including opening statements, fact and expert witness examination (direct and cross), and closing arguments, in the case entitled "*United States of America, et. al., v. Google LLC, Case No. 1:20-cv-03010-APM.*"

### Google Response to Request No. 123

Google objects to Request No. 123 on the ground that it seeks documents irrelevant to Rumble's allegations, as the *U.S. v. Google* lawsuit does not involve YouTube or any allegations regarding an alleged online video platform market. Google also objects to Request No. 123 to the extent that the requested documents contain confidential, and potentially competitively sensitive, information belonging to third parties that may only be disclosed pursuant to the protective order in the *U.S. v. Google* lawsuit. Google further objects to Request No. 123 on the grounds that it is overbroad and unduly burdensome to the extent it seeks "[a]ll demonstratives . . . used by Counsel for any party." Such information's probativeness (if any) is far outweighed by the burden posed by its collection and potential redaction to remove third-party confidential materials. Google further objects to

Request No. 123 to the extent that it requests information that is publicly available and accessible to Plaintiff. Google will not be producing any documents pursuant to this Request.

**Rumble Request for Production No. 124**

All Expert Reports (opening, rebuttal and reply) produced by any party during the trial in the case entitled "*United States of America, et. al., v. Google LLC, Case No. 1:20-cv-03010-APM.*"

**Google Response to Request No. 124**

Google objects to Request No. 124 on the ground that the phrase "Expert Reports . . . produced . . . during the trial" is vague and ambiguous. Google further objects to Request No. 124 on the ground that it seeks documents irrelevant to Rumble's allegations, as the *U.S. v. Google* lawsuit does not involve YouTube or any allegations regarding an alleged online video platform market. Google also objects to Request No. 124 to the extent that the requested documents contain confidential, and potentially competitively sensitive, information belonging to third parties that may only be disclosed pursuant to the protective order in the *U.S. v. Google* lawsuit. Google further objects to Request No. 124 on the grounds that it is overbroad and unduly burdensome to the extent it seeks "[a]ll demonstratives . . . used by Counsel for any party." Such information's probativeness (if any) is far outweighed by the burden posed by its collection and potential redaction to remove third-party confidential materials. Google will not be producing any documents pursuant to this Request.

**EXHIBIT A**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *et al.*, | |
| Plaintiffs, | Case No. 1:20-cv-03010-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ▮▮▮▮▮▮▮▮▮▮ |
| Defendant. | |
| STATE OF COLORADO, *et al.* | |
| Plaintiffs, | Case No. 1:20-cv-03715-APM |
| v. | HON. AMIT P. MEHTA |
| GOOGLE LLC, | ▮▮▮▮▮▮▮▮▮▮ |
| Defendant. | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT**

February 9, 2024

not providing a recommendation that users select DuckDuckGo. Tr. 2174:11–2175:23

(Giannandrea (Apple)) (the switching process for the private browsing mode search default is the

same as for the standard browsing mode search default). Pursuant to the ISA, both Safari search

defaults are pre-set to Google. Tr. 2173:6–24, 2174:20–2175:3, 2203:20–2204:3 (Giannandrea

(Apple)).

### B.     Google's Android Contracts Are Exclusive

### 1.     MADAs Contribute To Exclusivity

779.    MADAs are the only way for OEMs to distribute GMS, including the Play Store,

on their Android mobile devices. Tr. 779:10–13 (Kolotouros (Google)) (without a MADA, an

Android OEM cannot distribute any GMS apps); Tr. 9516:5–7 (Rosenberg (Google)); UPX0557

at -436–37 ███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████.

780.    Although MADAs technically give OEMs the option to preinstall GMS on a

device-by-device basis, the must-have nature of the Play Store makes this an illusory choice—

OEMs need the Play Store to have a viable Android device in the United States, which means

OEMs must preinstall GMS and adhere to the MADA's requirements. *Supra* ¶¶ 238–244

(§ III.F.2.a.i); Tr. 781:7–11 (Kolotouros (Google)) (OEMs may elect whether to preinstall GMS

on a device-by-device basis); UPX0312 at -154 ("I will say that there is value in the leverage that

Play provides to get some of the non-critical GMS apps on a phone. What I mean by that, is that

OEMs want the Play store on their phone, and in return we are able to get other apps like Google

search and [C]hrome . . . on the phone as a result."); UPX0316 at -906 ("The worst risk to come

of [not aligning incentives on the Play store] is that Chinese OEMs and Samsung will no longer

need the Play Store for Apps on their phones, which would then weaken the leverage the MADA

provides."); *id.* at -907 ████████████████████████████████████████████████



; UPX0325

at -850

; Tr. 3118:22–3121:21 (Tinter (Microsoft)) (When Microsoft launched the Duo, Microsoft "had to have the Google Play Store on it"—there was no viable alternative Android app store—which meant Microsoft had to sign a MADA.); Tr. 3517:6–25 (Nadella (Microsoft)) ("Google has carrots and it has massive sticks, like one big stick is that we'll remove Google Play if you sort of don't have us as the primary browser."); UPX0163 at -236

; Tr. 5727:5–5728:11 (Whinston (Pls. Expert)) (Google "give[s] away the must-have Play Store for free in order to get the MADA signed." The Play Store is necessary "to have a marketable Android device.").

781.    Thus, virtually every Android smartphone in the United States has GMS preinstalled and therefore is subject to Google's MADA requirements when sold to consumers, e.g., Google Search widget on the default home screen, GSA preinstalled, and Chrome (defaulting to Google search) preinstalled. Tr. 791:25–792:2 (Kolotouros (Google)) (has not seen any Android OEM smartphone in the United States that does not have GMS preinstalled); *id.* 815:16–816:1 (is not aware of any Android-compatible Samsung or Motorola devices without the Google Search widget on the default home screen); Tr. 1527:5–9 (Yoo (Google)) (nearly all Android phones sold in the U.S. are subject to both a MADA and an RSA).

782.     Through the MADA, Google imposes search preinstallation, placement, and default requirements on all Android devices with GMS sold to U.S. consumers. *Supra* ¶¶ 235–252 (§ III.F.2.a).

783.     MADAs ensure that valuable home screen space is devoted to Google services (e.g., Search Widget, Play, and Google folder). Des. Tr. 98:1–3, 98:6–10 (E. Christensen (Motorola) Dep.) ████████████████████████████████████████; Des. Tr. 59:18–24 (Ezell (AT&T) Dep.) (the home screen is valuable real estate for apps because it is the first screen users see); UPX0141 at -819 (MADA requires the Google Search Widget, the Play Store, and the Google folder ("[c]ollection of apps") on the default home screen).

784.     Google does not allow OEMs to deviate from the most important MADA obligations, e.g., placing the Google Search widget on the default home screen, or preinstalling Chrome. UPX0608 at -769 ("[W]e never deviate from MADA obligations and Chrome distribution via GMS. No exceptions."); UPX0318 at -199 ████████████████████████████ ████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████; UPX0554 at -915 ("[W]e should preemptively let Verizon and OEM's [*sic*] know that if they endeavor to snap the MADA by pivoting search away, we will reject the request."); UPX0555 at -931 ("[T]the 'ask' of the OEM is a reminder or notification that if Verizon comes to them (the OEM) and tells them to ditch the Google search widget and replace it [with] the Bing/AOL search box, the request to not adhere to MADA placement obligations will be denied."); Des. Tr. 149:2–4, 149:8–10 (Christensen (Motorola) Dep.) (Although Motorola has not requested an exception to the MADA's preinstallation requirements, the witness did not believe Google would grant such a request if it was made.).

785.     The Google Search widget is a manifestation of Google search, *supra* ¶¶ 153,
155; Tr. 791:3–7, 794:3–9 (Kolotouros (Google)) (explaining that the Google Search widget is
part of GSA and that it is a search box users can enter questions in), and ▮▮▮▮▮▮▮
▮▮▮▮▮▮ UPX1031 at -512.

786.     The risk of violating the MADA—and losing the Play Store—protects Google's
exclusivity. T-Mobile had concerns that if it switched search defaults from Google, its devices
would not be able to distribute the Google Play Store. Des. Tr. 112:19–113:2, 113:4–16 (Giard
(T-Mobile) Dep.). ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮ Des. Tr. 113:17–115:19, 115:21–116:2 (Giard (T-Mobile) Dep.).
T-Mobile has never gotten an answer from Google on whether a device could be GMS-certified
if its search provider was not Google. Des. Tr. 116:4–8, 116:10–12 (Giard (T-Mobile) Dep.).

787.     The placement requirements for Google's Search widget and Play Store are non-
negotiable for all OEMs. Tr. 793:24–794:2 (Kolotouros (Google)) (discussing UPX0741 at
-799); *id.* 815:9–22 ("We had, without exception, not granted waivers with respect to the widget
or the Play Store, that is correct."); UPX0741 at -799 ("[L]et me state it more stringently. The
widget and Play Store icon are staying.").

788.     Google refused to grant the Duo, Microsoft's dual-screen Android smartphone, a
waiver from the MADA's requirement that the Google Search widget be preloaded on the home
screen. Tr. 9505:20–25 (Rosenberg (Google)). Microsoft, of course, wanted the Duo's search
access points to default to Bing, but to get the Play Store, Microsoft had to sign a MADA and
had to put the Google Search widget on the Duo's homescreen. Tr. 3119:02–3121:2, 3121:25–
3122:25, 3125:16–22 (Tinter (Microsoft)).

789.     Although the MADA does not prohibit OEMs from preinstalling a second search widget, Google knows that OEMs are unlikely to do so, at least in part, because it would be a poor user experience. Tr. 1527:24–1528:20 (Yoo (Google)) (discussing UPX0141 at -819 and explaining that a second widget is described as "[a]llowed but not likely" because "OEMs want to sell devices, they want to be competitive[] [a]nd we thought that having two widgets was a little too much, so that OEMs are not likely to put two widgets on a device"); UPX0131 at -250 (2017 deck stating "[a]dditional search widget allowed but unlikely" (emphasis omitted)).

790.     Microsoft did not place the Bing search widget on the Duo's homescreen next to Google's Search widget because, in part, having two search widgets "would be really confusing" and "wouldn't be a good product for the user." Tr. 3126:3–10 (Tinter (Microsoft)).

791.     There are no Android smartphones sold in the United States with more than one search widget preinstalled on the default home screen. Tr. 2877:2–2877:7 (Kartasheva (Google)) (agreeing that she has never seen an Android device with two search widgets); Tr. 803:17–20 (Kolotouros (Google)) (not aware of any Samsung or Motorola smartphone sold in the United States at any time that had more than one search widget preinstalled); Tr. 1528:12–20 (Yoo (Google)) (discussing UPX0141 at -819 and stating that he is not aware of any Android smartphone sold in the United States that has two widgets side-by-side on the default home screen). Even when Google agreed to MADA amendments that allow Samsung to remove the Google folder from the default home screen, Google continued to require that the Google Search Widget and Play Store are placed on the default home screen. Tr. 807:22–808:3, 813:2–25, 815:9–22 (Kolotouros (Google)).

792.     Samsung's MADA requires the company to ███████████  JX0037 at -053 ██████████████████████████████████, -055 ███████████████



(Samsung MADA (2017)). Samsung also preinstalls S Browser, its first-party browser, on Android devices. Tr. 858:7–12, 939:12–16 (Kolotouros (Google)).

UPX0133 at -811.

*Id.* at -811

; UPX0301 at -646

793.    The MADA access points—GSA/widget and Chrome—account for most of the search queries and search revenue generated by Android devices. Tr. 16:19–17:3 (Sept. 19, 2023 sealed PM session) (Yoo (Google)) (emphasizing the leverage to secure GSA and Chrome because those were Google's highest revenue-generating apps and therefore very important in the context of a finance organization); UPX0146 at -388 (for the major U.S. carriers (AT&T, Verizon, T-Mobile, and Sprint) ____ of search revenue comes through GSA and ____ of search revenue comes through Chrome); UPX0660 at -369

███████████████

███████████████████████████████████; UPX1105 at -208 ███

██████████████████████████████████████████████████████████████

███████████████████████████████████; UPX0563 at -135 (native

spreadsheet at Summary tab, columns E-G, K-M; indicating that between 2014 and 2016 the vast

majority of search revenue and queries for each Android partner came through MADA access

points).

794.     At various times, Google has estimated that ████████ of search revenue on

Android devices comes through GSA and Chrome. UPX0146 at -388 (for AT&T, Verizon,

T-Mobile, and Sprint, Chrome and GSA account for between ████ and ████ of search revenue);

UPX0567 at -918 ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████; UPX1108 at -924 ("MADA access points (GSA

and Chrome) contribute vast majority of search revenue on Samsung devices"; estimating ███

of search revenue on Samsung comes from Chrome and GSA).

795.     In recent years, GSA "became a very prominent destination for users to search on

an Android device." Tr. 19:3–20:14 (Sept. 19, 2023 sealed PM session) (Yoo (Google));

UPX1107 at -732 ██████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████ (emphasis omitted)); Tr. 23:4–17 (Sept. 19, 2023 sealed PM

session) (Yoo (Google)) (approximately ████████ of revenue on Verizon Android devices and

even more on other carrier Android devices came through GSA, including the search widget).

796.     The Google Search Widget alone accounts for 50% or more of search revenue

from Android devices. UPX0316 at -906 ("Without MADA, we would not be able to incentivize

when you're the default 95 percent of people will stick with the default. Maybe 5 percent of people will opt out. And that kind of realization was very clear." Tr. 5282:25–5283:4, 5283:11–24 (Dijk (Booking.com)); *id.* 5329:21–5330:6 ("I [ran] a growth marketing team, together with behavioral scientists, that we would look at, you know, the power of defaults and what we could do to really make sure that Google would be preferred.").

800. ████████████████████████████████████

████████████████████████████████ UPX0088 at -356.

801. For distributors to maximize RSA payments, Google requires that the distributors set Google as the default on *all* search access points and prohibits distributors from preinstalling any general search rival. *Supra* ¶¶ 253, 259.

802. Through the RSAs, Google gets "[o]ut-of-the-box search defaults and exclusivity," which prevents rivals from accessing default distribution on Android devices covered by RSAs. UPX0129 at -906; Tr. 837:5–25 (Kolotouros (Google)) (In the RSA's device-by-device tier, OEM RSAs require Google to be set as the default on all search access points and "out of the box exclusivity with respect to pre-loading."); Des. Tr. 79:10–13, 80:7–81:3, 81:5–8, 81:11–13 (Levine (Google) Dep.) ████████████████████████████

████████████████████████████████████████

████████████████ ; UPX0317 at -176 ████████████████████████

████████████████ ; UPX0574 at -945 (having "Mobile Rev Share Partners" with OEMs like Samsung means "[a]ll devices have search exclusivity (for pre-install and default search)"); *id.* at -952 ("A[n] ██████ OEM rev share can be offered to gain search & output-based exclusivity, along with expanded default settings with strategic partners[.]");

UPX0580 at -945 (The "[r]ationale in support of the [Samsung RSA] proposal" includes "Google as default search/exclusive search.")).

803.    RSAs allow Google to protect search access points not covered by the MADA, such as secondary browsers (i.e., browsers other than Chrome). All the major RSAs require the partner to set Google as the default on all browsers if the partner wants to maximize revenue share percentage. *Supra* ¶¶ 253–309 (§ III.F.2.b). Securing the defaults on secondary browsers on Android devices is important to Google. In a 2019 exchange regarding the Samsung RSA, Mr. Kolotouros and Mr. Yoo analyzed the implications if they viewed all of Google's payments to Samsung under its RSA as being made in exchange for the default on Samsung's S Browser. UPX0165 at -226. ████████████████████████████████████

████████████████████████████████████████████████████ *Id.* ("For a while now, we have been ████████████████████████████████████

██████████    *Id.*

804.    The exclusive defaults secured through Google's MADAs and RSAs cover roughly ████ percent of all general search queries in the United States. Tr. 5763:14–22 (Whinston (Pls. Expert)) (explaining UPXD104 at 36, which attributes ████ share to Android).

805.    ████████████████████████████████████████████

████    UPX1026 at -080 ██████████████████████████████████

████████████████████ ; UPX0558 at -045 ("Samsung pushed back strongly on proposed terms for revenue share agreements," including asking for "no exclusivity requirements."); UPX0321 at -915 ██████████████████████████

█████████████████████████████████████████████

████████████ ; *infra* ¶¶ 822–831 (§ VI.B.4).

806.    In 2008, Google was negotiating an early RSA with Sprint. In an email discussing

Sprint's edits to the draft terms, Mr. Barton identified as a "key issue" the threat of removal of

exclusive default commitments, noting that without these commitments, Sprint could give rival

GSEs the "same level of prominence" as Google. UPX0544 at -628 ("Sprint appears to have

removed commitments that Google will be the ONLY default search wherever it is placed. In

other words, they could put Yahoo [and] MSN at the same level of prominence (despite the fact

that we are paying out revenue share)."); UPX0288 at -765–68 ██████████████████████

████████████████████████; UPX1081 at -066–70 ██████████████████████

████████████████████████████.

807.    Sprint's attempt to remove the exclusive default commitments was a "key issue"

for Google because being the exclusive default was the RSA's "primary goal." Tr. 333:20–334:1

(Barton (Google)). Ultimately, the 2008 Sprint RSA included default exclusivity. UPX5533 at

-124–25 (Sprint RSA (2008)) (§ 5) ("Default Exclusivity" terms); UPX1080 at -183 ████████

████████████████████████████████████████████████

████.

808.    Google monitors OEMs and carriers to ensure they comply with the RSA

prohibitions, including that partners do not make it too easy for users to change their search

defaults. █████████████████████████████████████████

███████████████████████████████ UPX0149 at -003. ██████

████████████████████████████████████████

██████████████████████████████ *Id.* at .001.

Complying with Google's demand, Samsung changed the functionality on its Android devices to

ensure a simple drop-down menu would not change the S Browser's search default. Tr. 856:2–

858:4 (Kolotouros (Google)); *id.* 885:19–888:2 (The RSA prohibited Samsung from permitting its users to change the default using the drop-down menu.); UPX0853 at -652 ("We also need to make sure that by January 31st, they OTA an update so that it does not make the drop-down search default selection permanent.").

809. 

UPX0308 at -852–53

; UPX0135 at -670–71

810. By obtaining default exclusivity on Android devices, Google excludes rivals from accessing an important search distribution channel. Tr. 899:6–900:1 (Kolotouros (Google)) (discussing UPX0569 and explaining that Google wanted Motorola to enroll as many devices in the RSA's Premier Tier as possible); UPX0569 at -691 ("[C]ritical to the Moto/Lenovo deal is knowing that we are buttoned up so that high-value devices/countries cannot be carved-off and we don't lose tablet volume as well."); Tr. 340:24–341:21 (Barton (Google)) (discussing UPX0134 and explaining that Google sought exclusivity for Android devices because otherwise Google "would have created an ecosystem that basically would just lead to a bunch of searches on competing services"); *id.* 324:11–21 (Google asked for exclusivity because "[it] wanted to be the partner that [carriers and OEMs] would select as opposed to our key search competitors with regards to being the default search exclusive partner."); UPX1077 at -001, -004 ("Microsoft and

Amazon pursuing distribution deals on devices not covered by RSA," e.g., "Bing is a default search on Xiaomi & Vivo in India").

811.    Google has long recognized that its RSAs excluded competitors from gaining a foothold on Android devices and it has sought to use its RSAs for that purpose. Tr. 324:11–21 (Barton (Google)). ██████████████████████████████████████████████████

███████████████████████ UPX0541 at .005.

812.    In 2011, Mr. Barton recognized that "Android is by far the greatest opportunity for Search monetization in mobile over the next years and is very strategic to Google." UPX0134 at -865; Tr. 339:4–340:19 (Barton (Google)) (discussing UPX0134 and explaining that Android combined with other Google products "would create an opportunity that would be orders of magnitude, lead some orders of magnitude, more searches, and more search ad monetization per device, more than predecessor devices").

813.    Mr. Barton told his colleagues that Google seeks to make RSAs "exclusive across all Android devices," so that Android devices "will come with Google as the only search engine out-of-the-box." UPX0134 at -869. He explained the importance and purpose of exclusivity: "Without the exclusivity, we are not 'getting' anything. Without an exclusive search deal, a large carrier can and will ship alternatives to Google (as seen with Verizon, AT&T, and America Movil)." *Id.* at -865. He further explained: "[Without exclusivity,] Bing or Yahoo Can come and steal away our Android search distribution at any time, thus removing the value of entering into contracts with them. Our philosophy is that we are paying revenue share *in return for* exclusivity." *Id.* at -869.

814.    In 2020, when Google was negotiating new RSAs with U.S. carriers, Jamie Rosenberg, then VP of Business and Operations for Android, posited that if Google lowered the

her analysis to be accurate at the time she sent it to her boss. Tr. 2865:15–23 (analysis accurate)

(Kartasheva (Google)); *id.* 2874:14–17, 2875:5–2876:17 (similar contemporaneous figures in

UPX0131 at -250); UPX0131 at -250 (MADA "secure[s]" 60% of search revenue).

### 3. MADAs And RSAs Are A Belt-And-Suspenders Strategy To Exclude Rivals From Accessing Search Distribution

818.    MADAs and RSAs work together as a belt-and-suspenders strategy for excluding

search rivals from distribution on Android devices. UPX0573 at -244 ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████; UPX0645 at -303

████████████████████████████████████████████████;

UPX0158 at -115 █████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████; Tr. 321:18–322:1 (Barton

(Google)) (Google negotiated search distribution contracts with both carriers and OEMs because

sometimes the carrier decides whether Google search goes onto a mobile device, and sometimes

the OEM decides.).

819.    Google's economic expert Prof. Murphy agreed that (1) Google buys protections

on Android devices through a combination of the MADA and RSA, and (2) OEMs and carriers

both consider the agreements that the other has with Google when entering into its own

agreements. Tr. 10173:12–10175:11 (Murphy (Def. Expert)) (Google buys protections on

Android devices "in two chunks"—"some through the MADA" and "the rest through the

RSA."); *id.* 10175:14–19 (conceding expectation that when Google sets the RSA percentage for

carriers, it considers the prior agreement and what they've already got in the MADA);

*id.* 10184:25–10185:19 (OEMs consider the add-on net benefits of signing the RSA when they

consider signing the MADA.).

820.     When carriers decide whether to sign an RSA with Google, they do so against the

backdrop of the OEM's MADA, which ensures that GSA and Chrome will be on the device

regardless of what the carrier decides. Tr. 1516:24–1517:10 (Yoo (Google)) (discussing

UPX0141 and agreeing that although carriers do not sign MADAs, the devices sold by carriers

are subject to the MADAs of the OEMs that manufactured them); UPX0326 at -850 ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

821.     In the case of Android devices sold by U.S. carriers, no one party (carrier or

OEM) can unilaterally decide to move away from Google search defaults, i.e., "if a carrier

decided it wanted to just completely ditch Google, it can't because the OEM has agreed to a

MADA." Tr. 5714:15–5715:17 (Whinston (Pls. Expert)). Similarly, if the OEM wanted to

replace Google, it can't because the carrier has agreed to an RSA. Tr. 5714:15–5715:17

(Whinston (Pls. Expert)).

### 4.     Google's Agreements Prevented Verizon From Preinstalling The Yahoo Search App On Its Android Devices

822.     During negotiations leading up to Verizon's 2021 RSA, Google refused Verizon's

request to preinstall the Yahoo search app and still qualify for the top (Preferred) RSA tier.

*Supra* ¶ 276; UPX0495 at -003–04 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Tr. 1065:2–

6 (Higgins (Verizon)); 1075:14–21 (Higgins (Verizon)) (Google refused to provide a carveout in

the 2021 RSA that covered Yahoo's general search functionality with no impact to the revenue

share.). Verizon bought Yahoo in June 2017. Tr. 1043:14–18 (Higgins (Verizon)).

823.    In Verizon's 2014 RSA, the prohibition on preinstalling alternative search

services had been inadvertently removed from the executed agreement. Tr. 9356:3–14, 9356:24–

9357:12 (McCallister (Google)); UPX2093 at -398 ("[I]n previous amendments . . . the

exclusivity provision was removed (!!) so we are paying Verizon ▇▇▇ for basically nothing right

now. . . [T]he highest priority is re-securing exclusivity.").



824.    ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ UPX0642 at -198; UPX1026 at -080 ▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇. Google

refused. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇ *Supra* ¶¶ 276, 278.

825.    Verizon secured a limited carveout in the Preferred Tier that allowed Verizon to

preinstall the Yahoo Mobile App with web search functionality as long as Verizon owned

Yahoo, placed the app on the plus one screen or device app tray (not the home screen), and made

sure the app "didn't allow a punch-out into general search." Tr. 1094:19–1095:15 (Higgins

(Verizon)); JX0093 at -500 (§ 5.2(a)(i)) (Verizon RSA (2021)); UPX0293 at -425 (Google's

rationale for allowing Verizon to preinstall the Yahoo home app on the plus one screen included

that "[s]earch usage [was] not expected to be materially impacted as long as Google retain[ed]

placement on DHS [default home screen].").

826.     Google noted the benefits of giving Verizon a patina of control by "[r]elaxing configuration requirements to allow preloads of alternative Search apps helps ease regulatory risk and reinforces Google's principle to provide options to users." UPX0293 at -425.

827.     ██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████

██████  UPX0304 at -606; UPX0290 at -608. ██████████████

████████████ *Id.* ██████████████████████

██████████████████████████████████

██████████████████████████████████████

████████████████████████████████

██████ *Id.*

828.     ██████████████████████████████████████████████

██████████████████████████████████████████

██████  UPX0495 at -003; Tr. 1065:2–13 (Higgins (Verizon)) ██████████

██████████████████████████████████████

██████████████████████████  ; UPX0305 at -781 ██████

██████████████████████████████████████████

██████ .

829.     ██████████████████████████████████████

██████████████████  UPX1130 at -531 ██████████

██████████████████████████████████████████

██████████████████████████████

███████████████████

837.    In the months before the S10's release, Samsung grew concerned that distributing Branch's app-search tool, without changes to its functionality, might conflict with Samsung's search distribution agreements with Google. *Id.* 2905:1–19, 2908:6–13, 2919:8–21 (describing Samsung's concerns and UPX1064 as representative of Branch's communications with Samsung) ; UPX1064 at -543 ██████████████████████████████

████████████████████████████████████

██████████████████████████████████████ ;

UPX0687 at -078 (2020 chat message from Patrick Chang, asking rhetorically, ████████

█████████████████████████████████████████████████ ).

838.    To avoid conflict with the Google agreement, Samsung requested Branch reduce or eliminate functionality on its app-search tool. Tr. 2905:1–19 (Austin (Branch)). Those restrictions drastically limited the usefulness of Branch's tool and Branch's ability to monetize it. *Id.* 2911:12–2912:11; Tr. 4497:20–23, 4498:23–4499:4 (Chang (Samsung Next)) (Branch's full functionality was not integrated on the S10); UPX0658 at -586 ("OEMs/Carriers are afraid of Google's influence[.] . . . [Samsung has] [p]laced significant restrictions on Branch functionality (only installed apps, no linking to web)"). For example, although Branch had indexed thousands of apps, Samsung directed Branch to hide results from all but 20 or 25 pre-determined apps; Samsung manually checked each approved app to ensure it was not sending users to websites. Tr. 2910:16–2911:11 (Austin (Branch)); UPX1038 at -753–54 (listing 20 to 25 pre-determined apps permitted by Samsung on S10 launch). As a result, users did not see results from new and popular apps if they were not included in those Samsung pre-selected. Tr. 2954:3–14 (Austin (Branch)).

839. Also, Branch's app-search tool was not permitted to direct users to websites. *Id.* 2908:15–2909:2. Although Branch's default experience was to send users to app pages, companies or users could configure their search results to go to a mobile website instead of an app page if the user had not installed the app. *Id.* 2909:16–2010:14. For some users, this was preferable to being directed to the Play Store to download an app before using it. *Id.*; Tr. 4499:5– 15 (Chang (Samsung Next)) (Branch, as implemented through the S-Finder, was limited to a "select number of applications").

840. 

UPX1064 at -543

; UPX0690 at -427

841. In response to Samsung's concerns, Branch developed a feature called "Deepview" to work around Google's restrictions. Tr. 2915:25–2916:20, 2918:2–11 (Austin (Branch)) (discussing the "Deepview" feature).

██████████ UPX1064 at -543; Tr. 2921:2–16, 2921:21–2922:9 (Austin (Branch)) (discussing UPX1064).

842.    Like Samsung, other OEMs and U.S. carriers expressed concern that Branch's app-search tool (even with limited functionality) would violate Google's distribution agreements. Tr. 2922:12–25, 2926:16–2928:12 (Austin (Branch)) (describing discussions with OEMs related to concerns over Google RSAs); UPX0656 at -451 ████████████████

████████████████████████

██████████; Des. Tr. 278:18–279:3 (Christensen (Motorola) Dep.) ██████

██████████████████████

██████████; UPX0692 at -4000 ██████████

██████████████.

843.    Branch spoke to every major Android OEM and U.S. carrier but repeatedly heard that RSAs required Google to be the only GSE preloaded on their devices. Tr. 2926:14–2928:12 (Austin (Branch)); *id.* 2932:5–9 (Branch "talked to every OEM," after Samsung about integrating its app-search tool.); Des. Tr. 139:21–140:4 (Giard (T-Mobile) Dep.) (T-Mobile was interested in Branch because of its potential to "further improv[e] the customer experience on devices" and "develop[e] a new revenue stream"); Tr. 1112:15–21 (Higgins (Verizon)) (Verizon discussed with Branch "ways in which we could potentially improve the device experience" by incorporating Branch technology onto Verizon's Android devices); UPX0967 at -778 (email from Comcast executive to Gary Wolfson at Branch, stating Branch's app-search tool "would create conflict with [Comcast's] rev share from Google").

844.    Branch was not able to reach a deal with any OEM to distribute the "broad app search" functionality that Branch envisioned could "help a user find information across apps."

Tr. 2932:10–19 (Austin (Branch)). Branch was only able to distribute its local search version, with greatly restricted functionality and monetization, because partners deemed this lower functionality compatible with Google's RSAs. *Id.* 2932:10–19 (discussing OEM outreach generally); *id.* 2933:4–24 (Branch's deal with Xiaomi permitted Branch's service to be preloaded on devices that were more than a year old. This still "limited [Branch's] ability to monetize greatly, "because usually a device a year old is a lot less valuable from an advertising perspective than a fresh device.").

845.     Similarly, Branch was not able to reach a deal with U.S. carriers to distribute tools with the broad app-search functionality, even though the U.S. carriers saw value in Branch's product. Tr. 2934:6–13 (Austin (Branch)); Des. Tr. 238:9–239:7, 247:1–3 (Ezell (AT&T) Dep.) (before walking away, AT&T discussed "expand[ing] and monetize[ing] Branch's service already available on Samsung devices); Des. Tr. 139:21–140:4 (Giard (T-Mobile) Dep.) (discussing T-Mobile's interested in Branch's technology).

846.      Again, Branch understood from carriers that concerns over violating Google RSA terms was a significant roadblock. Tr. 2935:14–20 (Austin (Branch)).

847.      Branch spoke repeatedly with AT&T executives who expressed concerns that distributing Branch's app-search tool would violate AT&T's RSA. Tr. 2936:1–4 (Austin (Branch)) ("We spend a lot of time talking with AT&T."); UPX0656 at -451 ██████████

████████████████████████████████████████████████████████

████████████. Branch was never able to move AT&T past those concerns. Tr. 2940:10– 2941:9 (Austin (Branch)) (discussing AT&T's concerns as expressed in UPX0656); Des. Tr. 247:1–3 (Ezell (AT&T) Dep.) (confirming that ultimately, AT&T did not pursue a partnership with Branch).

848.    Although Branch eventually reached distribution deals with Verizon and T-Mobile, those deals only distributed Branch's app-search tool with reduced functionality. Tr. 2942:14–2943:23 (Austin (Branch)).

849.    Google's RSAs blocked distribution of Branch's tools, and Google sought to prevent distribution of Branch's app-search tool, even with its reduced functionality. *Infra* ¶¶ 850–858. By Spring 2020, Branch and AT&T's discussions regarding a potential distribution partnership had advanced substantially. As Jeffrey Ezell, Vice President of business development for AT&T's mobility business unit, explained, AT&T believed there was ambiguity regarding whether Branch's app-search tool would be considered a competitive search service under the RSA. Des. Tr. 239:8–9, 239:11–240:5 (Ezell (AT&T) Dep.). AT&T tried to ascertain if Branch's app-search tool was supplemental to or overlapping with general web search; if Google considered Branch's app-search tool a competing or alternative search service, AT&T could be in breach of its RSA and lose search revenue from Google. *Id.* 239:8–9, 239:11–240:5, 242:22–243:18; UPX0656 at -451 ██████████████████████████████████████████████ ████████████████████████████████.

850.    ████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████ *Id.* at -693–95. Mr. Patel passed the information to his colleagues, including Ms. Kartasheva. Tr. 2790:25–2791:12 (Kartasheva (Google)) (discussing UPX0664 and explaining that her colleagues had relayed a question from AT&T about whether distributing a Branch-powered S-Finder was consistent with the RSA).

851.    Upon learning of Branch's integration into Samsung's S Finder, Ms. Kartasheva ran on-device searches using the Galaxy S10's S Finder which, at the time, was powered by Branch's app-search tool. Tr. 2801:11–2802:2, 2802:15–17 (Kartasheva (Google)). She compared search results on S Finder when the device was connected to the internet with search results when the phone was on airplane mode and determined that, even with the limitations Samsung placed on Branch's app-search tool, the search results were more robust when the service was connected to the internet. *Id.* 2801:11–2802:2, 2803:2–2804:12. Ms. Kartasheva concluded that Branch technology conflicted with Google's definition of the Alternative Search in AT&T's RSA because Branch conducted off-device searches that returned results across multiple apps. *Id.* 2802:3–2804:12; UPX0664 at -453–54 ("We have discovered that Samsung Finder in its current implementation (incorporating Branch io API) does appear to conduct off-device (web) search across multiple apps, which conflicts with our definition of the Alternative Search . . . .").

852.    Led by Ms. Kartasheva, Google sought to prevent OEMs and carriers from distributing Branch's app-search tool. UPX0664 at -453–54. After meeting with Google colleagues, Ms. Kartasheva shared a set of next steps for the business development teams. *Id.* at -453–54. First, they would confirm that other major U.S. carriers had language in their RSAs, like AT&T's, that would allow Google to ask them to discontinue their distribution of Branch's app-search tool. *Id.* at -454. Second, they would determine (1) if Samsung had enabled Branch's app-search tool on Samsung devices globally, and (2) whether Samsung doing so was a breach of its RSA. *Id.*

*Id.*; UPX0982 at -686–87.

███████

853.  ████████████████████████████

██████████████████████ UPX0694 at -599–600 ("We believe [the S Finder implementation

with Branch's technology] goes beyond the scope of what we originally allowed Samsung (and

US carriers) and have started pushing back on them . . . ."); UPX0982 at -686–87.

854.  ████████████████████████████████

████████████████████████████████

████████████████████████ AT&T understood Google's position that

preinstalling Branch's app-search tool on AT&T's devices, using an internet connection as

intended, would be violating AT&T's RSA. Tr. 340:1–341:6 (Ezell (AT&T) Dep.) ("[T]he way

it was reported back to me was that Google indicated they felt that it was inconsistent with the

RSA.").

855.  After deciding that Branch's functionality was a threat to Google, Ms. Kartasheva

reached out to others at Google, including Adrienne McCallister, then the Managing Director of

Global Partnerships, to organize outreach to Samsung and the other U.S. carriers concerning S

Finder and Branch technology. UPX0664 at -454; UPX1067 at -799–801.

856.  Ms. Kartasheva created and circulated a PowerPoint presentation that explained

the Branch "situation," stating that "Samsung's partnership with Branch expands the search

experience via deep linking, violating their contracts." UPX0694 at -202; Tr. 2886:3–2887:2

(Kartasheva (Google)).

857.  Ms. Kartasheva sought to placate partners dissatisfied by Google's rejection of

Branch. On June 10, 2020, Ms. Kartasheva reached out to a colleague on the Search product

team asking if "Google Search [could] do something similar to this" so Google could "pivot the

conversation with Samsung and carriers from asking them to take it down, to seeing if Google

could power this experience." UPX0694 at -599–600.

858.    Ms. Kartasheva also took steps to ensure that subsequent Samsung RSAs clearly

prohibited Samsung from preinstalling Branch's app-search tool. On a draft RSA term sheet

being prepared by Google's Samsung Business Development team, Ms. Kartasheva commented,

"[P]er discussion today on Branch, ███████████████████████████████████████

███████████████████████" UPX0609 at -629. Google's Business Development

team took Ms. Kartasheva's comment to heart. ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████ UPX2003 at -990, -992; UPX0654 at

-795, -798 ███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████. To Samsung, Google's position suggested that it

was afraid that Samsung would use Branch to create a product that would "cannibalize Google's

main business" and Google wanted to "kill all of Branch's attempts" to preinstall its app-search

tool on Android devices. UPX0690 ("Google is afraid of Samsung creating an Apple Spotlight

type of search, Vertical Search will cannibalize Google's main business").

859.    Branch tried to salvage its distribution deal with Samsung by, among other things,

developing a completely offline version of its search product. This version lacked core

functionality and was a degraded user experience, but only periodically required a connection to

the internet. Tr. 2927:2–2930:6 (Austin (Branch)) (describing development of offline search and

its further limitations on the functionality of its app-search tool); PSX00075 at -500; UPX0689 at -271–73 (Branch presentation describing offline search).

860.    Google's actions successfully dissuaded AT&T and Samsung from working with Branch. After Google indicated to AT&T that preinstalling Branch's app-search tool was inconsistent with the RSA, AT&T chose not to pursue a partnership with Branch because it did not believe that the economic upside from Branch was significant enough to justify the risk to Google revenue share. Tr. 242:22–244:9, 340:1–341:6 (Ezell (AT&T) Dep.) (explaining Google's opinion of Branch's app-search tool, as communicated back to him, and the decision to walk away); *id.* 247:1–249:12 ("It didn't appear that the economic upside from Branch was significant enough to, you know, potentially put at risk a device not being eligible for our Google Search revenue.").

861.



JX0071 at -394 (§ 1.5) (Samsung RSA (2020))

. Samsung understood these terms to substantially constrain its ability to distribute Branch's tools, let alone increase the functionality of Branch's original vision of an app-search tool. UPX0663 at -469

. Based on conversations with Samsung, Branch held a similar understanding. Tr. 3069:21–3072:6 (Austin (Branch)) (explaining conversations with Samsung employee and feedback Branch received about Samsung's decision making).

862.    Samsung ultimately terminated discussions with Branch about an expanded partnership. Branch's understanding, informed by communications it had with Samsung executives, was that Samsung did not move forward with "Offline Search" because of its Google agreement. Tr. 2930:17–2931:11 (Austin (Branch)).

### C.    Google's Browser Contracts Are Exclusive

863.    Google has default search agreements with Firefox and Opera, as well as other smaller browsers. *Supra* ¶¶ 310–318 (§ III.F.3).

864.    The exclusive defaults secured by Google's RSAs with third-party browsers cover roughly ███ of all U.S. general search queries. Tr. 5763:14–22 (Whinston (Pls. Expert)) (discussing UPXD104 at 36).

865.    Google's exclusive default position on browsers has excluded rivals from search shares they could get absent Google's contracts. For example, Google has projected that a rival GSE would receive a significant share of the queries on third-party browsers if the rival won the default. *Infra* ¶¶ 914–926.

866.    Similar to its conversations with Apple, *supra* ¶¶ 762–778 (§ VI.A.2.e), DuckDuckGo has pitched private browsing mode integration with browsers but has been unsuccessful; these browsers' contracts with Google were "the common theme." Tr. 2048:9– 2050:1 (Weinberg (DuckDuckGo)) (listing Samsung's S Browser, Mozilla's Firefox browser, and Opera's browser); UPX0787 ███████████████

### D.    Defaults Have A Powerful Effect On Users' Search Behavior, Particularly On Mobile Devices

867.    Defaults are powerful in virtually all contexts. Tr. 526:22–25 (Rangel (Pls. Expert)) (discussing consensus in the field of behavioral economics about default effects). Search is no different. In search, this is demonstrated by the massive sums Google pays each

year to ensure it maintains its search defaults status. *Infra* ¶¶ 932–943 (§ VI.D.6). In fact,

Google spends more money securing exclusive defaults than on all other search-related expenses

combined. Tr. 7576:9–7577:6 (Raghavan (Google)) (discussing UPX7002.A at 1). Many

general-search queries are controlled by the power of defaults, and that is especially true on

mobile devices.

### 1. The "Power Of Defaults"

868.    A default is an option pre-selected for a consumer by a third-party, such as a

smartphone manufacturer, that requires an affirmative action by a consumer to change.

Tr. 520:7–25 (Rangel (Pls. Expert)) (defining defaults from the perspective of behavioral

economics); Tr. 154:3–7 (Varian (Google)) (describing a default as a "capability that's available

before the user takes any action"). A default search engine is the search engine that comes pre-

selected on a search access point when a user first begins using the access point. Des. Tr. 68:19–

25 (Ramalingam (Yahoo) Dep.) ███████████████████████████;

Tr. 322:19–323:4 (Barton (Google)) (the default search is "the one that comes out of the box" on

a browser, desktop, or mobile phone).

869.    Across a range of domains, defaults have a powerful impact on consumer

decisions. Tr. 520: 7–25, 526:22–529:16 (Rangel (Pls. Expert)) (discussing impact of defaults on

consumer decision-making and various real-world default biases including coffee-shop tipping,

401(k) plans, and organ donation).

870.    In its own businesses, Google has long understood and embraced the "power of

defaults," a term first evangelized by Dr. Varian in 2007. UPX1001 at -465 (referencing

Dr. Varian's "'power of defaults' idea"). As one Google employee explained, "the default

options presented (in anything from finance to gaming) are very powerful, and will probably end

Internet Explorer browser. Tr. 7677:5–7681:6 (Pichai (Google)) (contextualizing UPX0172). Google wrote, "As you know, most end users do not change defaults," and only "a tiny fraction of end users . . . try to change the default." UPX0172 at -731; *supra* ¶ 742. Google accused Microsoft of "put[ting] its own interests above those of end users." UPX0172 at -731. Because users do not change defaults, Google was "deeply concerned" that Microsoft's decision to preset its own search engine as the default in Internet Explorer could harm the competitive process. Tr. 7693:5–8 (Pichai (Google)) (confirming concerns written in UPX0172).

873.    Google proposed that Microsoft implement, instead of a preset default, a choice screen that would allow the end user to select their default engine the first time he or she used the Internet Explorer search box. UPX0172 at -731. A choice screen would place "control in the hands of the end user, where it belongs." *Id*. Giving the user choice of search engine and a straightforward means of changing it was "indispensable both to preserve competition on the merits in search and to avoid distortion of competition in related markets." *Id.* at -732; Tr. 7685:9–15, 7686:1–6 (Pichai (Google)) (Google proposed a choice screen to benefit users by aligning with user preference).

874.    Other industry participants recognize the power of defaults on consumer behavior as well. ███████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████ UPX0094 at -029. Apple recently demonstrated the power of defaults in a public way; the company changed from a default to a choice screen for cross-app tracking on iPhones, which resulted in 80% of users forbidding cross-app tracking even though they had previously acceded to tracking by default. Tr. 635:15–637:8 (Rangel (Pls. Expert)) (discussing UPXD101 at 55).

## 2. Search Engine Defaults Are The Most Efficient Method Of Distribution

875.    Defaults can generate a bias in favor of the default option even when the default is easy to change, when the stakes of the decision are high, such as with end-of-life care, and when the person making the decision is an expert, such as in medication prescriptions. Tr. 529:17–531:21, 532:18–535:12 (Rangel (Pls. Expert)).

876.    By comparison, using a GSE is a low-stakes and low-expertise activity, so default bias is especially strong. *Id.* 530:10–531:21, 532:18–535:12. Default effects in search are "sizeable and robust." *Id.* 523:14–24, 541:2–22; Tr. 5749:17–5750:22 (Whinston (Pls. Expert)) ("[T]he power of defaults is very significant."). Even Google's expert, Prof. Murphy, agreed that empirical evidence suggests that having a default generates "additional search volume." Tr. 9941:9–11 (Murphy (Def. Expert)).

877.    Dr. Ramaswamy testified that "being the default on the browser is the most efficient way to get [a search engine] into the hands of your users" because of the "convenience of easy accessibility and" tapping into . . . engrained default behaviors are deciding factors when it comes to whether a search engine gets lots of usage." Tr. 3689:15–24 (Ramaswamy (Neeva)); Tr. 1961:20–1962:5 (Weinberg (DuckDuckGo)) (being a search access point's default search engine is the most successful method of distributing a search engine).

878.    In a 2007 study, Google examined the effect of browser home page defaults and query share. UPX0123; UPX0093 at -904. In the study, Google found that, when considering the factors that might influence a user's choice of search engines—such as results quality, search features, user experience, and brand strength—"one factor surprisingly trumps them all: the default home page setting." UPX0093 at -904 (Abstract for 2007 Google study "On the Strategic Value of the Default Home Page to Google"); UPX0124 at -036 (Aug. 10, 2007 presentation for Mr. Pichai (Google) and Ms. Braddi (Google) showing the ███████████████████████

███████████). Google further found that defaults were "directly correlated" with query

share. UPX0093 at -904. Google showed that "users who have home page set to Google do 50%

more searches on Google compared to those who don't." UPX0093 at -904. At the time,

Dr. Varian concluded that the study was "great stuff" and "a very convincing case." UPX1001 at

-465.

879.    Dr. Varian also agreed with (and liked) the study's conclusion that a default home

page—a form of default distribution popular at the time—"can be a powerful strategic weapon in

the Search battle." Tr. 170:15–24 (Varian (Google)) (reviewing UPX0123 at -485); UPX0123 at

-487; UPX2049 (Executive Management Group (EMG) representatives "agreed that [it] is

important" to "focus[] on homepage market share" because it is "one of the most effective things

we can do to make gains in search market share"). In response to the study's findings, Google

began "taking these defaults very, very seriously." Tr. 3710:15–3712:20, 3714:12–20

(Ramaswamy (Neeva)) (discussing UPX0093); UPX0093 at -904 (email from Dr. Ramaswamy,

while working at Google: "This study is very cool! We should definitely put some marketing

push behind it").

880.    In contrast to defaults, app downloads and marketing are ineffective methods of

distribution; the availability of search apps in mobile application stores—such as the Play Store

or Apple's App Store—do not erode the effectiveness of default distribution. Tr. 617:23–618:17

(Rangel (Pls. Expert)). ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ UPX0139 at

-149. Mozilla has found it "exceedingly difficult" to convince mobile users to download its

browser application because "people have to find and install and you have to struggle if you can

make them your default." Des. Tr. 135:3–5, 135:8–22 (Baker (Mozilla) Dep.). "[M]erely having

an app in the app store is a very difficult way to compete with the preloaded defaults . . .

[b]ecause each person who gets that phone has to make a conscious decision to go through a lot

of work to get to your product." *Id.* 139:20–23, 140:1–24. ███████████████

███████████████████████████████████

███████████████████████ Tr. 2493:18–2495:23, 2496:6–10

(Cue (Apple)). ███████████████████████████████

█████████████████████████████████████

█████████████████████ UPX0139 at -150.

881.    Paid marketing for GSEs, browsers, and search apps is also an ineffective

distribution method. UPX0122 at -960 (illustrating various distribution methods for Google

services and calling pre-installation the "highest value way to acquire users"). In 2016, Emily

Moxley, a Google vice president, ████████████████████████

████████████████████ PSX00216 at -216 ██████████

███████████). A January 2015 Google "Post-Mortem" on Firefox's 2014 default switch to

Yahoo found that marketing efforts were immaterial. UPX0145 at -441, -450 ████████

████████████████████████████); UPX0169 at -180 ██████

████████████████████████████████████

██████. DuckDuckGo has found marketing to be unhelpful in generating traffic because

teaching people to change the default search engines is difficult. Tr. 1957:15–1958:5 (Weinberg

(DuckDuckGo)).

882.    Ultimately, a default search engine garners "enormous usage simply by the power

of the default." Tr. 3710:7–3712:20 (Ramaswamy (Neeva)) ("[W]hoever controls that search box

gets a lot of usage independent of the merits of the search engine. And so you get enormous usage simply by the power of the default."). According to Microsoft CEO Satya Nadella: "The entire notion that users have choice and they go from one website to one website or one search into one search and it's complete bogus. There's defaults. The only thing that matter in terms of changing search behavior." Tr. 3497:13–3498:4 (Nadella (Microsoft)). "Whoever owns [the] default will gain share no matter what the quality." Tr. 2722:2–10 (Parakhin (Microsoft)) ("It is, I believe well-documented fact that people very rarely switch defaults.").

883.     Indeed, most search traffic arrives through defaults rather than through non-default querying. UPX0083 at -967 █████████████████████████████████████████████████████████████████████████████████████████ ; UPX1050 at -894 ███████████████████████████ █████████████████████████ ; Tr. 23:25–25:2 (Sept. 19, 2023 sealed PM session (Yoo (Google)) (Android "organic" queries have declined over time.); *id.* 25:16–27:3 (less than ████ of Android revenue comes from "organic" queries); Tr. 3102:11–3104:25 (Tinter (Microsoft)) (discussing greater use of search defaults than non-default querying); UPX0080 at -509 (Email from Ms. Braddi (Google) █████████████████████ ███████████████████████████████████████████████ ).

### 3.     Behavioral Economics Explains The Power Of Defaults

884.     The behavioral economics concepts of habit, choice friction, and user confusion and awareness explain the preeminence of default distribution. Tr. 541:2–22, 542:25–543:18, 547:16–549:3 (Rangel (Pls. Expert)).

#### a)     Habit

885.     Habit is when consumers make decisions automatically based on prior outcomes rather than expending cognitive capacity to make an explicit choice. Tr. 541:23–542:24 (Rangel

(Pls. Expert)) (consumers use habit to preserve limited cognitive capacity by, for example, requesting the same order at a coffee shop rather than considering every possible option on each visit). Because search is an activity carried out repetitively, on a familiar interface, and with immediate feedback in the form of a search result, search "[h]abits develop very strongly." *Id.* 542:25–543:9.

886.  ████████████████████████████████████

████████████████████████████████████ UPX0090 at -940–

41 ████████████████████████████████████

████████████████████████████████████

887.   Google itself recognizes the impact of habit on consumer behavior in search. To address the threat of competition from Microsoft's search product in 2003, Dr. Varian recommended that Google "[g]et users addicted to our interface and tools." UPX0151 at -158–59; Tr. 140:22–142:9, 144:13–19 (Varian (Google)) (discussing context of UPX0151); Tr. 545:12–546:8 (Rangel (Pls. Expert)) (discussing UPX0151 at -158–59 as reflecting what behavioral economists would consider "an extreme habit"). The 2007 Google study examining the effect of browser home page defaults and query share, *supra* ¶ 878, attributed increased searching when Google was the default homepage to the fact that "[u]sers do not always make a deliberate choice of search engine." UPX0123 at -485 ("Most users stay with pre-configured home page settings"); Tr. 551:10–552:13 (Rangel (Pls. Expert)) (habit is the opposite of a consumers' deliberate choice). And Google pursued default exclusivity in its search distribution contracts precisely because it afforded Google "an opportunity to be discovered and used on a repeating basis." Tr. 338:13–17 (Barton (Google)).

892.     Google's internal behavioral economics team has taught the company that even

████████████████████████████████████████████████████████████████████████████

██████████████████████████ UPX0103 at -214; UPX0848 at -612 █████████████████

██████████████████████████████████████████████ A June 2019 presentation

about private searching on Google, prepared for Google's product counsel, observed that Google

was failing to "fully address user needs" because ████████████████████████

████████████████████████████████████████████████████████████████████

UPX0811 at -413.

893.     In search, Dr. Rangel found that bias towards Google's defaults arises from at

least four sources of choice friction faced by users changing the pre-set default search engine.

*First*, a user must become aware that there is a default search engine and that it can be changed.

Tr. 552:15–553:25 (Rangel (Pls. Expert)); Tr. 2636:3–9 (Cue (Apple)) (before changing the

default search engine on an iPhone, a user must know that a search engine is pre-selected as the

default). *Second*, the user must discover what alternative options to the default search engine

exist. Tr. 552:15–553:25 (Rangel (Pls. Expert)). *Third*, the consumer must learn the steps

necessary to change the default. *Id.*; Tr. 2636:10–2637:8 (Cue (Apple)) (an iPhone user must

understand how to change the default search engine on iPhone, which may require going to

Apple, Google, or Bing's support websites to learn the steps). *Fourth*, the consumer must

actually take the steps necessary to implement the change. Tr. 552:15–553:25 (Rangel (Pls.

Expert)).

894.     On Apple's iPhone, the steps to change the default search engine require

overcoming "substantial" choice friction. Tr. 562:21–563:8 (Rangel (Pls. Expert)); Tr. 2169:23–

2170:20 (Giannandrea (Apple)) (reviewing the four steps to change the default search engine on

iPhone in UPXD004); Tr. 2630:7–16 (Cue (Apple)) (describing four steps to change the default

search engine on iPhone); Des. Tr. 55:20–56:14 (Ribas (Microsoft) Dep.) ██████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

895.    An Android user who has already overcome the choice frictions of understanding

that there is a default, discovering the alternatives, and learning the steps to change the Google

default search widget must still execute ten steps to implement the change, which constitutes

"considerable choice friction" for the user. Tr. 559:14–562:20 (Rangel (Pls. Expert)) (reviewing

UPXD101 at 21–38); Tr. 979:19–980:2 (Kolotouros (Google)) (explaining that DX0738 at 2–3

shows that replacing a search widget requires one swipe, two touch-and-holds, three taps, and a

selection); Tr. 2722:11–13 (Parakhin (Microsoft)) (requiring multiple clicks to change a search

engine default makes doing so proportionally more difficult).

896.    ██████████████████████████████████████████████

██████████ Des. Tr. 188:18–20, 188:23 (Baker (Mozilla) Dep.). Changing the default

search engine in other browsers is often even more difficult. *Id.* 49:16–23 (competing browsers'

preset default search engines are "often not nearly as easy to change the default as in Firefox");

Tr. 1958:15–1961:8 (Weinberg (DuckDuckGo)) (Getting people to switch defaults is difficult

because "it's all just way harder than it needs to be.").

897.    Consequently, changing the default search engine requires "mental effort" and is

not a "zero cost" action. Tr. 563:9–25 (Rangel (Pls. Expert)); Tr. 3491:23–3493:8 (Nadella

(Microsoft)) ("changing of defaults is hard"); Tr. 3796:5–3798:22 (Ramaswamy (Neeva))

(dismissing the "pious prose around 'competition being a click away'"). In contrast, controlling

defaults boosts Google by making it "very, very seamless and easy for users" to access Google.

Tr. 7661:1–11 (Pichai (Google)) ("[W]e know [making Google the default on Safari] would lead to increased usage of our products and services, particularly Google Search in this case. So there's clear value in that, and that's what we're looking to do."); Tr. 1537:9–12 (Roszak (Google)) (a benefit of Google's default distribution deals is reducing choice friction).

898.     Google has long recognized and even harnessed the effect of choice friction to protect its defaults. Tr. 554:17–558:19 (Rangel (Pls. Expert)) (discussing representative examples of Google recognizing and harnessing choice friction). For as long as the company has required it, Google's default exclusivity has ensured that a user cannot change the default search engine to a rival without going into the device's settings. Tr. 324:14–325:11 (Barton (Google)). This makes changing default search engines "difficult." *Id.* 338:18–24 (explaining that users would "have a difficult time finding or changing [the default search engine] to Google" were it not pre-set as the default search engine).

899.     Google's MADAs with OEMs ingrain the importance of choice friction. Tr. 556:12–557:9 (Rangel (Pls. Expert)). ████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████ *Id.*; UPX5358 at -004 (§ 2.5) (LG MADA (2020 amend.); JX0099 at -998 (§ 2.9) (Motorola MADA (2020 amend.)); UPX5511 at -987–88 (§ 2.9) (Samsung MADA (2020 amend.)); Tr. 799:14–801:21 (Kolotouros (Google)) (agreeing that MADA's amendments prohibited OEMs from instructing or encouraging a user to change default settings or placements).

900.     Google's new prohibition against instructing or even encouraging a user to make changes introduced choice friction by impairing users' awareness of the ability to change a

default. Tr. 556:12–557:9 (Rangel (Pls. Expert)) (analyzing new prohibitions in the context of a Samsung MADA amendment).

901.    Google has insisted on more default search friction, even when the partner preferred less. In 2018, Samsung changed the interface in its S Browser to add a drop-down menu in the address bar that would allow a consumer to easily and permanently change their default search engine. *Supra ¶¶* 296, 808; Tr. 856:2–857:17 (Kolotouros (Google)) (Samsung's S Browser included a dropdown in the address bar that permanently changed the S Browser default search engine). Google informed Samsung that this change breached the RSA and considered terminating Samsung's RSA. *Id.* 857:14–858:1; Tr. 557:11–558:18 (Rangel (Pls. Expert)); UPX0149 at -.001–.003; UPX1001 at -289 (Google considered terminating Samsung's RSA due to a potential fourth strike). Samsung acceded to Google's demands and threats, and users who might wish to change the search default must take additional steps to do so. Tr. 887:1–6, 887:24–888:13,890:3–9 (Kolotouros (Google)).

### c)    User Confusion And Unawareness

902.    Default bias in favor of Google is bolstered further by user confusion and unawareness about what a default search engine is or even that it can be changed. Tr. 547:16–549:3 (Rangel (Pls. Expert)) ("[M]any [users] are confused. They don't know that there is a default. They don't know what the default search engine is. They don't know they can be changed."); *id.* 552:15–553:25 ("[M]any people are not aware [that there is a default search engine], and people are confused, even about what's the default search engine that they have.").

903.    Many internet users do not pay attention to their search engine and instead simply use the default search engine in their browser. Tr. 3685:15–3686:19 (Ramaswamy (Neeva)) (testifying about UPX0940 at -492, ███████████████████████████████████████

███████████████████████████████. For example, one 2020 Google study found that more than ██

of Google's daily active users on Apple's iOS access Google through Apple's pre-set default browser, Safari, and were "often unaware they're using Google." UPX2051 at -519–20 (user unawareness of Google use in Safari "a risk for [Google]"). Google's expert Prof. Murphy agreed that some users are probably unaware that they even have alternatives for their default search engine. Tr. 9942:7–10 (Murphy (Def. Expert)).

904.     Often, even tech-savvy consumers do not know the difference between a browser and a search engine. Tr. 3685:15–3686:19 (Ramaswamy (Neeva)) (user feedback revealed that "many perfectly tech-savvy people could not tell the difference between a browser and a search engine"); Tr. 702:5–23 (Rangel (Pls. Expert)) (users "don't understand the difference between searching and browser"). Google interviewed Microsoft users in 2017 and found they were confused about the difference between browsers, search engines, and even email. UPX0066 at -073 ███████████████████████████████████████████████████████

███████████████████████     PSX00216 at -126 █████████████████████████████

████████████████████████████████████████████████████████████████████████

██████████████████████

### 4.     Market Evidence Confirms Default Effects In Search

905.     Because defaults "have a strong impact" with a "75% take rate," in 2007, Google leadership rejected Apple's request to amend the ISA to allow Apple to implement a search engine choice screen in Apple's forthcoming version of the Safari browser for Windows. UPX0137 at -688–89; Tr. 7691:19–7692:13 (Pichai (Google)); Tr. 4980:13–4983:8 (Braddi (Google)) (describing meeting). In 2010, Google found that it "will lose more than 50% of Google users (and more non-Google users) if the [Safari mobile] default search engine changes to something else." UPX0070 at -657.

906.    In 2012, Apple replaced Google Maps with Apple Maps as the default maps

application on iOS, which created an immediate, sizeable, and lasting change in usage.

Tr. 564:11–566:1 (Rangel (Pls. Expert)) (discussing reproduction of chart in UPX0097 at -.001,

showing a large and sudden drop in Google Maps usage on iOS when Apple changed the default

while, during the same period, usage of Google Maps on Android increased); Tr. 1558:3–5,

1560:4–20, 1563:25–1566:4 (Roszak (Google)) (Google Maps lost 60% of its usage vis-à-vis its

peak usage—when it was the default maps application on iOS).

907.    In 2012, Apple publicly apologized for Apple Maps' poor performance.

Tr. 565:11–566:1 (Rangel (Pls. Expert)); Tr. 1569:15–18 (Roszak (Google)). As Prof. Rangel

explained, the Apple Maps event illustrates that defaults are so powerful that they can generate

bias among users "even when the default is assigned to an inferior product." Tr. 565:11–566:1

(Rangel (Pls. Expert)). According to Mr. Nadella, the 2012 Apple Maps event demonstrated "the

power of defaults" and gave Microsoft confidence that winning the iOS default would be a "big

game-changer" in search competition. Tr. 3500:9–3502:2 (Nadella (Microsoft)) ("[Apple Maps

is] exhibit number one on anybody who wants to sort of know anything about sort of the power

of defaults, that case study is the best.").

908.    Mozilla's 2014 decision to switch the default search engine on its Firefox browser

from Google to Yahoo sharply and immediately shifted approximately ▉ of queries from

Google to Yahoo—a phenomenon that was reversed in 2017 when Mozilla reverted the Firefox

default to Google. Tr. 628:6–20, 630:8–631:14, 660:12–661:18 (Rangel (Pls. Expert))

(describing Firefox default change and referring to redacted query share shifts in UPXD101

at 55); Tr. 5729:25–5731:4 (Whinston (Pls. Expert)) (discussing redacted query share shifts in

UPXD104 at 23 and explaining, based on "jump[s]" in query shares for Yahoo and Google in

2014 and 2017, respectively, that "[i]f defaults didn't matter, all of this would have been a nice, smooth—maybe not line, but curve. You wouldn't have seen these jumps"); Des. Tr. 62:9–18 (Baker (Mozilla) Dep.) (describing Firefox default switch in 2014). Mozilla's default switch cost Google an estimated ███████ dollars in 2015 along with a ███ decline in traffic from Firefox and a ███ decline in revenues from Firefox. Tr. 1610:2–1611:14 (Roszak (Google)) (discussing UPX0066 at -071).

909.    As significant as these Firefox default effects were, they likely understate the power of the defaults controlled by the challenged agreements. First, because Firefox is not a pre-set default browser on any device in the United States, Firefox users are generally more tech savvy and therefore more likely than the average user to understand defaults and make a change. Tr. 628:6–20 (Rangel (Pls. Expert)). Second, Firefox is used almost exclusively on desktop, where defaults are less sticky than on mobile. Tr. 5731:6–21 (Whinston (Pls. Expert)) (lower switching is the result of Firefox being used primarily on desktop rather than mobile, which is more difficult to switch); Tr. 628:22–629:5 (Rangel (Pls. Expert)) (vast majority of Firefox queries come from desktops); *infra* ¶¶ 918–923.

910.    Choice screens implemented by Google on Android devices in Russia and Europe illustrate the default effect by showing the consequence of removing a default. Tr. 610:6–611:18 (Rangel (Pls. Expert)). In 2017, Russian competition authorities required Google to implement a choice screen on Android devices, which resulted in a consistent and continuing loss in Google's Android query share that was picked up by the Russian search engine Yandex. Tr. 2673:12–2674:25 (Parakhin (Microsoft)) (describing Google's settlement with Russian regulators and explaining that Yandex was not able to maintain market share on mobile before 2017 because "very few users change defaults"); Tr. 608:14–609:9, 609:15–610:9, 610:19–612:1 (Rangel (Pls.

Expert)) (discussing query share shifts with reference to redacted figures in UPXD101 at 44);
Tr. 10001:23–10002:10 (Murphy (Def. Expert)) (agreeing that the choice screen contributed to
Google's share decline in Russia); UPX0170 at -978 (depicting an approximate 19% search
share loss for Google between 2017 and 2019 that resulted in Yandex overtaking Google as the
leading search engine in Russia). Moreover, on Russian iPhones and desktops, where no choice
screen was implemented and Google's default persisted, query shares held constant,
demonstrating that the choice screen was in fact responsible for the Android share changes.
Tr. 612:4–613:5 (Rangel (Pls. Expert)) (referring to UPXD101 at 45); Tr. 5744:7–20 (Whinston
(Pls. Expert)) (referring to UPXD104 at 27). Google agreed that the choice screen was a "key"
cause for Google's loss in Russian query share. UPX0170 at -979; UPX0760 at -596 ██████

███████████████████████████████████████████████████████████

██████████

      911.    Similarly, the European choice screen implemented in 2021 following Google's
Android settlement with the European Commission shifted query shares and generated
competition that had not existed when Google was the default across Android devices. UPX0764
at -077 (Quality-enhancing efforts undertaken by Google as part of the "Go Big in Europe"
initiative in response to the choice screen included improving unique features, local content, and
trust). Tr. 620:22–624:4 (Rangel (Pls. Expert)) (referring to UPXD101 at 49); Tr. 5735:1–
5737:19 (Whinston (Pls. Expert)) (referring to UPXD104 at 25) (Google's selection on the
choice screen was lower than its market share before adoption of the choice screen).

      912.    A regression analysis using data from the European choice screen predicts that
Google's U.S. rivals would acquire about 10% market share were a choice screen implemented
in the United States. Tr. 5737:21–5738:10 (Whinston (Pls. Expert)). And although Google

important question" that had "billions of dollars on the line"); *infra* ¶ 935 ███████████

███████████

915.    For the negotiations, Google's finance team modeled the impact of losing Apple's Safari default, which Google considered a "Code Red" scenario. Tr. 1616:20–1618:15 (Roszak (Google)); Tr. 536:10–537:21 (Rangel (Pls. Expert)) (discussing UPX0171 at -169, -177); UPX0171 at -169, -177 ██████████████████████████████████ ████████████████ UPX0085 at -228, -230, -240 ██████████████████████ ███████████████████████████████████████

916.    To model the outcomes of losing the search default on Apple devices, Google applied the revenue shifts from the default losses on Firefox, *infra* ¶ 908, and Apple Maps, *infra* ¶ 906. UPX1050 at -828, -886 (January 2016 modelling relying on Firefox for desktop recovery and on Apple Maps for iPhone recovery); Tr. 1620:13–1631:18 (Roszak (Google)) (reviewing UPX1050 at –828, -886); UPX6024 at -440, -443 (written 30(b)(6) response: ████████████ ████████████████████████████████████████████████████████████████ ███████████████████).

917.    For desktop, Google based its modeling on the outcome of Mozilla's changing the Firefox default from Google to Yahoo in 2014 and concluded that Google would lose ████ of its revenue ████████████ if it lost the Safari default on desktop. UPX1050 at -828, -886; Tr. 1620:13–1621:25, 1626:13–1627:10 (Roszak (Google)) (reviewing UPX1050 at -828, -886).

918.    For mobile, Google based its modeling on the outcome of Apple's switching the iOS maps application default from Google Maps to Apple Maps in 2012 and concluded that it would lose ████ of its revenue ████████████ if it lost the Safari default on mobile. UPX1050 at -828, -886; Tr. 1622:1–1624:16, 1626:13–1627:10 (Roszak (Google)).

919.     In other words, Google predicted that its revenue loss on mobile ▮▮▮ would be
*more than double* its revenue loss on desktop ▮▮▮. UPX1050 at -886; Tr. 1629:14–18 (Roszak
(Google)).

920.     The disparity between the default effect on mobile and desktop arises from the
fact that "[d]efaults have more prominence in mobile due to screen size and UI [user interface]."
UPX1050 at -886; Tr. 1628:8–1629:3 (Roszak (Google)). As Google explained in a later
analysis, users "are much less likely to change default search engine on mobile." UPX0139 at
-119 (2018 Google presentation discussing the "[s]ignificant risk if [iPhone] default [search]
engine is changed"). Mobile and desktop user experiences have "salient difference[s]," including
the "very limited real state" on mobile devices. Tr. 6310:23–6311:16 (Nayak (Google)).

921.     These form factor differences between mobile and desktop, such as smaller screen
size, are an example of choice friction that enhances the power of defaults on mobile devices.
Tr. 523:14–24, 625:17–626:6 (Rangel (Pls. Expert)); UPX0084 at -728 ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Tr. 3498:5–19 (Nadella (Microsoft)) (changing defaults
is easier on desktop than on mobile because "there are many, many sort of friction points on
mobile operating systems").

922.     Mobile users do, in fact, query mostly through defaults. Tr. 1632:3–14 (Roszak
(Google)) (▮▮▮ of Google's queries from Apple iOS came through the Safari default);
Tr. 3102:11–3104:25 (Tinter (Microsoft)) (fewer users reach search engines directly on mobile
devices and instead rely on search access points with pre-set defaults); Tr. 3499:21–3500:8
(Nadella (Microsoft)) (although mobile devices have "multiple search access points, the one
access point that matters is the search default on the browser"); UPX0083 at -967 ▮▮▮▮

320

██████████████████████████████████████████████████████ UPX0115 at

-142 (Microsoft estimates that defaults are responsible for ████ of mobile search volume). In

2020, Google found that ████ of all of Google's daily active users accessed Google through

Safari, the browser preloaded on iPhones where Google is the default. Tr. 7512:23–7514:8

(Raghavan (Google)) (discussing UPX2051 at -519).

923.    The enhanced power of defaults on mobile is significant because the vast majority

of querying today occurs on mobile devices. Tr. 5798:17–5799:5 (Whinston (Pls. Expert)) ("it's

important to remember mobile is where the market is growing" and that desktop queries are "flat

and have been for a long time"); Tr. 2279:20–2280:9 (Giannandrea (Apple)) (in the last few

years more queries are being done on mobile than on desktop); Tr. 3098:6–3099:3 (Tinter

(Microsoft)) (the general search services market has changed from being "predominantly PC to

predominantly mobile").

924.    Consequently, weighting between mobile and desktop revenue mix on Apple

devices, Google projected a total revenue recovery that skewed heavily toward its mobile

prediction—████ total recovery (████ total loss). UPX1050 at -886; Tr. 1627:11–24 (Roszak

(Google)).

925.    The predictions derived from the Firefox and Apple Maps events were Google's

"best guess expectation" that were applied in multiple scenarios. Tr. 1622:21–1624:11, 1743:1–

1744:10 (Google (Roszak)). These findings were shared with Google CFO Ruth Porat.

*Id.* 1619:23–1620:12. Mr. Roszak, the leader of the Google finance team assessing default deals,

testified that he was unaware of any better data upon which to base revenue recovery

assumptions than the Firefox and Apple Maps events. *Id.* 1638:13–1639:20. █████████████

████████████████████████████████████████████████████████

UPX0148 at -826; Tr. 1633:16–21, 1635:21–1638:1 (Roszak (Google)).

926.    The Apple Maps event has also been an input to model recovery rates if Google

lost the default on Samsung's S Browser and if Chrome and the Google Search App were not

pre-installed on Android devices as well. Tr. 1640:19–1642:14 (Roszak (Google)) (discussing

UPX0323 at –540, which projected ▮ to ▮ recovery loss based in part on "iOS Maps

default change"); UPX0146 at -412 ("S Browser default changes and we clawback ▮▮"

based partly on "iOS Maps Recovery"); UPX6024 at -442–43 (written 30(b)(6) response: ▮▮



927.    Nor was Google alone in its analysis; both Microsoft and Apple independently

reached conclusions regarding query recovery that were similar to Google's. Tr. 10497:2–

10500:5 (Whinston (Pls. Expert)). ▮▮▮▮▮▮

▮▮▮▮▮▮ UPX0095 at -331. This is nearly identical to Google's

weighted ▮ revenue recovery (i.e., ▮ revenue loss) modelling. *Supra* ¶ 924. ▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮

▮▮▮▮▮▮ UPX0460 at -176; Des.

Tr. 211:4–24, 212:23–213:12 (Perica (Apple) Dep.) ▮▮▮▮

▮▮▮▮▮▮



928.     In 2016, Microsoft assumed that defaults are responsible for ▇ of mobile search volume. UPX0115 at -142; Tr. 3262:3–3263:25 (Tinter (Microsoft)) ▇▇▇▇▇ ▇▇▇▇▇▇ This too resembles Google's modelled ▇ mobile revenue loss attributable to a default switch. *Supra* ¶ 918. Also like Google, Microsoft assumed ▇ ▇ on desktop ▇▇▇▇▇▇▇▇▇▇▇▇ UPX0115 at -142 (estimating that Microsoft could capture significantly greater query share on mobile iPhones ▇ than desktop Macs ▇ ); Tr. 3264:23–3265:14 (Tinter (Microsoft)) ("Defaults matter less" on desktop). In fact, Microsoft even distinguishes "PC search" from "mobile search" because of differences in keyboards and screen sizes. *Id*. 3094:12–24. ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ Des. Tr. 143:7–23 (van der Kooi (Microsoft) Dep.).

929.     In a 2018 presentation to Apple, Microsoft projected that obtaining the Safari default could boost Microsoft's query share on iPhones by ▇ percentage points (or ▇ fold), from approximately ▇▇▇ UPX0116 at .028; Tr. 3278:10–3279:15 (Tinter (Microsoft)) ("This was the highest fidelity estimates that we had based on the best of our knowledge and our experience and our ability of what we thought was likely to happen"). ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇ *Id*. 3266:13–3268:3.

930.     In sum, these similar models across three sophisticated companies are significant—and more than "thought experiments"—because they were used in very detailed ways to make business decisions about enormous sums of money. Tr. 5717:1–7, 5719:20– 5721:25, 5751:1–5752:5 (Whinston (Pls. Expert); *supra* ¶¶ 925–927 ▇▇▇▇▇ ▇▇▇▇▇ *supra* ¶ 927 ▇▇▇

████████ *supra* ¶ 929 ████████

████████████ As Mr. Tinter explained, the accuracy of these models was important because they were being used as the basis for decisions about "very large financial investments" and as the basis for negotiations with partners. Tr. 3278:23–3279:15 (Tinter (Microsoft)).

931.    Drawing from market participants' estimates and real-world data, Prof. Whinston predicted that at least 33% of all U.S. queries—including ████ of all U.S. mobile queries—would shift from Google to its rivals if Google lost all the defaults controlled by the challenged contracts; this would quadruple rivals' total U.S. query share. Tr. 5749:17–5752:5 (Whinston (Pls. Expert)) (explaining analysis with reference to UPXD104 at 31); *id.* 10497:2–10499:15 (explaining analysis with reference to UPXD106 at 19).

### 6.    Google's Enormous Payments And Microsoft's Enormous Bids For Defaults Corroborate The Power Of Search Defaults

932.    Because of the effect of defaults on query share, control of defaults are "very valuable." Tr. 7684:18–20 (Pichai (Google)); *id.* 7666:19–24 (agreeing "Google pays for these exclusive defaults because they have value in distributing Google Search"); *id.* 7661:1–11 ("[T]here's clear value" in making Google Search the default search engine in Safari.); Tr. 830:22–23 (Kolotorous (Google)) (agreeing Google finds defaults "valuable"); Tr. 4935:11–18 (Braddi (Google)) (agreeing Apple's Safari default "is valuable to Google because it drives more queries to Google Search"); Tr. 154:20–21 (Varian (Google)) (Being the default has "some advantages."); Tr. 329:18–20 (Barton (Google)) (agreeing that he "view[ed] search defaults as "valuable").

933.    Because "the default is valuable," Google pays "tens of billions of dollars every year" to be the default search engine across search access points in the United States. Tr. 7669:4–

14 (Pichai (Google)). Asked by the Court, based on his experience at Google, for the business justification for Google's payments to search distributors, Dr. Ramaswamy explained that defaults are "enormously powerful because . . . pious prose around 'competition being a click away,' notwithstanding in practice, they [users] don't change." Tr. 3796:5–3798:22 (Ramaswamy (Neeva)). Mr. Roszak, Google vice president of finance with long-time responsibilities related to the default distribution deals, is not aware of any default distribution deal that Google has ever entered where the traffic acquisition cost exceeded the expected incremental return. Tr. 1534:24–1536:21, 1540:19–22 (Roszak (Google)).

934. The total TAC payments incurred by Google's search business (i.e., including payments to partners for default distribution of Google Search) more than tripled between 2014 and 2021—from $7.1 billion to $26.3 billion. Tr. 7521:2–16, 7576:16–21 (Raghavan (Google)) (testifying about UPX0453 and UPX7002.A); UPX7002.A at .001.

935.



Tr. 2492:22–2493:6 (Cue (Apple)).

Tr. 5727:5–5728:11 (Whinston (Pls. Expert)) (referring to UPXD104 at 19); UPX1110 at -41046

UPX0635 at -352

*compare* UPX8105 at -203

*with* Tr. 2491:1–2492:8 (Cue (Apple))

*Id.* 2489:23–



2490:25 ████████████████████████████████████████

████████████████████████████████████████

████████████████ UPX0460 at -149 ████████████

████████████████ UPX1109 at -026 ████████████

████████████████████████████████████████

████████ Tr. 2488:2–2489:6 (Cue (Apple)) ████████

██████████████████████ ████████████████

████████████████████████████████████████

████████████ UPX1109 at -036, -038 ████████████

████████████████ Tr. 2488:9–2492:21 (Cue (Apple)).

936.    Google has paid billions of dollars in revenue share to Android RSA partners over the years. Tr. 7667:12–15 (Pichai (Google)); Tr. 5727:5–5728:11 (Whinston (Pls. Expert)) (explaining UPXD104 at 19, Google has paid its RSA partners, including Android partners, "billions and billions and billions of dollars."). In 2020 alone, Google's payments to carriers and Android OEMs for U.S. searches totaled more than ████████ *Id.* 5727:5–5728:11 (referring to UPXD104 at 19). Google also gives away the "must-have" Play Store on Android at no monetary cost to Android OEMs. Tr. 9426:17–18 (Rosenberg (Google)) (There is no license fee for the MADA.); Tr. 5727:5–5728:11 (Whinston (Pls. Expert)).

937.    Google's revenue-share payments to Mozilla make up approximately ████ of Mozilla's revenue. Des. Tr. 41:18–24 (Baker (Mozilla) Dep.). In 2021, Google's revenue-share payments to Mozilla exceeded ████████████. Tr. 538:1–15 (Rangel (Pls. Expert)) (referring to UPXD101 at 10); Des. Tr. 190:12–17, 190:21–191:2, 191:5–10 (Baker (Mozilla) Dep.) (Google's revenue share to Mozilla "ends up in the hundreds of millions of dollars.").

938.     Google's payments to third-party browser partners—excluding Apple—totaled more than ▮▮▮▮▮▮ in 2020 for U.S. default search traffic. Tr. 5727:5–5728:11 (Whinston (Pls. Expert)) (referring to redacted figures in UPXD104 at 19).

939.     The massive size of Google's default revenue share payments confirms the value of these defaults; Google is a sophisticated, successful, for-profit corporation that would ensure these payments are worthwhile. Tr. 5727:5–5729:5 (Whinston (Pls. Expert)) ("[W]hen you see Google paying billions and billions and billions of dollars, there's got to be a reason. There has to be a reason it's worth doing it."); Tr. 538:1–15 (Rangel (Pls. Expert)). Google's willingness to invest billions of dollars to secure defaults shows that the default bias in search is "of sufficient magnitude" for "participants in the market [to] care about" and invest billions of dollars to influence them. Tr. 524:15–25, 538:1–15 (Rangel (Pls. Expert)).

940.     Consistent with his fiduciary obligation to shareholders, Mr. Pichai would not authorize contracts to pay billions of dollars every year for search defaults if they were not valuable. Tr. 7669:15–25, 7773:13–18 (Pichai (Google)); Des. Tr. 29:19–30:1 (Porat (Google) Dep.) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Tr. 3796:5–3798:22 (Ramaswamy (Neeva)) ("[S]earch is one of the most profitable businesses ever. And so defaults in search, therefore, have a very meaningful impact on . . . Google's top and bottom line.").

941.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ UPX1050 at -887; Tr. 1629:19–1631:18 (Roszak (Google)) (discussing UPX1050 at -887).

942.     The 36% gross revenue share that Google agreed to pay Apple in the 2016 amendment to the ISA, *supra* ¶ 226, offers an economic perspective of the magnitude of the default effect in search. Tr. 5728:12–5729:5 (Whinston (Pls. Expert)). For Google's revenue-share payments to make economic sense, the revenue Google expects it would lose if a rival won the default must exceed the traffic acquisition costs of obtaining the default. *Id.* As a result, Google must expect to lose *at least* 36% of Safari default traffic revenue if Apple were to switch the Safari default. *Id.* (discussing UPXD104 at 20); Des. Tr. 29:19–30:1 (Porat (Google) Dep.)

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████ *id.* 32:15–32:22 ████████████████

████████████████████████████████████████████████████████████

Tr. 1540:5–9 (Roszak (Google)) (defining incremental revenue).

943.     Ultimately, because defaults are the most potent method of distribution, Mr. Nadella was prepared for Microsoft to lose "billions of dollars" to secure the Apple's search defaults. Tr. 3502:21–3505:23 (Nadella (Microsoft)) ("[Microsoft was] always grounded in the fact that if [Apple] needed to switch, that [Microsoft] would have to pay, and [Microsoft] would have to pay and even subsidize the transfer . . . we were going to be negative for multiple years perhaps, and I was willing to do essentially a very long term and think perpetually."); Des. Tr. 111:20–112:20 (van der Kooi (Microsoft) Dep.) ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████

1088.   Following a July 2018 European Commission ruling, Google was forced to implement a choice screen in the European Union prompting users to select their default web browser and search app during initial device setup. UPX8091 at -504–05. The choice screen went into effect in early 2020, UPX8091 at -505, and the auction by which GSEs could seek to appear on the choice screen underwent several changes, most recently in September 2021. Tr. 10609:8–22 (Whinston (Pls. Expert)). With the rollout of the European choice screen, Google modeled projected revenue and market share loss. Tr. 8147:8–8148:12 (Gomes (Google)) (discussing UPX0749 at -081).

1089.   Google believed that the European choice screen ███████████████ UPX0779 at -276, and responded to the increased competition by launching its "Go Big in Europe" investments, which focused on driving daily active users. UPX0749 at -276 (describing Go Big in Europe and noting "choice screen revenue at risk"); Des. Tr. 204:17–205:17, 206:4–8 (Moxley (Google) Dep.) ████████████████████████████████████████████ ███████████████████████████████████████ UPX0761 at -748 ("Go Big in Europe" Google's "response to the coming EU choice screen launch in Jan 2020."). Google invested millions of dollars and assigned additional full-time engineers to launch new search features in certain European countries. Tr. 8152:12–25, 8154:1–15 (Gomes (Google)).

1090.   These Go Big in Europe investments were "***above and beyond***" business as usual and were meant to "make sure Google is top of mind for EU users." UPX1083 at -055 (emphasis in original). In response to the European choice screen, Google rolled out search improvements—including (a) "best-in-class or exclusive experiences," e.g., enhanced sports highlights, and (b) features showcasing local content. Tr. 8150:13–23; Tr. 8152:5–8 (Gomes (Google)) (discussing UPX0749 at -276); Des. Tr. 206:18–207:20 (Moxley (Google) Dep.)

distribute flagship, non-search applications that generate substantial revenue for the company, including YouTube, Google Maps, Gmail, and Google Drive. Tr. 9572:1–16 (Rosenberg (Google)) (agreeing that Google selects apps for the MADA bundle based in part on whether they "generate revenue for Google"); Tr. 7716:12–18, 7717:2–12 (Pichai (Google)) (Google generates revenue through distribution of core applications required by the MADA, including Gmail and Google Drive.); UPX0296A at -500 (listing "generate revenue for Google" as the first guiding principle for determining which new apps to include in the MADA bundle); UPX0286 at -211 ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████; UPX6059 at -034 (Google's 2021 10-K showing that YouTube ads revenue increased from roughly $20 billion in 2020 to more than $28 billion in 2021).

    1313.   Google's Play Store, which is only available on Android devices, is one of the core apps that generates revenue for Google. Tr. 9553:12–16, Tr. 9551:5–18 (Rosenberg (Google)) (Google generates revenue from the Play Store through transaction fees on payments for and within apps, in addition to revenue from displaying ads in the Play Store). ████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████ UPX2111 at -120; UPX0317 at -155 ████████████ ████████████████████████████████

    1314.   The more consumers buy Android phones the more money Google makes from Play Store sales. Tr. 9553:17–19 (Rosenberg (Google)). If consumers switch from an Android phone to an iPhone, Google loses all potential Play Store revenue from that user, although the ISA allows Google to retain those users' search queries on iOS. *Id*. 9553:20–23; UPX2111 at -099 ████████████████████████████████████████████████████████████

███████████ As Mr. Rosenberg explained, "[Google] certainly ha[s] commercial interest in seeing Android succeed because of Play." Tr. 9556:10–25 (Rosenberg (Google)).

1315.   Sales of Google-manufactured Pixel phones, which run on Android, generate substantial revenue for the company. UPX0317 at -159 ████████████████████ ████████████████ ; UPX6059 at -007 (Google 10-K noting, under the "Hardware" category, that Google generates revenues from Pixel phones). These products collectively make Android incredibly lucrative for Google, even exclusive of revenue Google earns from searches run on Android devices. UPX6059 at -031, -034 (Google's 2021 10-K showing that the "Google other" category—which includes Play Store revenues, Pixel phone sales, and YouTube non-advertising revenues—generated $28 billion).

1316.   Google has not shown that Android smartphone sales would suffer if Google could no longer exclude competing GSEs from those devices. The evidence indicates the opposite; after Google implemented a choice screen in Europe, Android's market share has declined less there than it has in the United States. Tr. 10593:2–10594:15 (Whinston (Pls. Expert)). Similarly, Android's market share in Russia has increased since Google implemented a choice screen there. *Id.*

1317.   Google's competition with Apple also provides Google an incentive to continue investing in Android. If Apple released its own GSE and set it as the default on all Apple devices, Google would make substantially less money from searches run by Apple users. Tr. 10538:5–10539:13 (Whinston (Pls. Expert)); *supra* ¶¶ 1093–1124 (§ VIII.B.3). That would drastically increase Google's incentive to invest in Android, because it makes more money on Android phones than on Apple devices. *Id.*

traffic on new devices if a user chooses Yandex . . . as default . . . and clicks on ads served by them.").

### 2. There Is No Compelling Evidence That MADAs And RSAs Benefit Consumers In The Search Market

1322.   Google has not shown that MADA and RSA terms that grant Google default search exclusivity on Android devices benefit consumers, including by improving the user experience and thus the competitiveness of Android devices. Even if Google had, those purported procompetitive justification do not justify harms to consumers in the general search services market.

### a) The MADA And RSA Do Not Benefit Consumers

#### i. The MADA's And RSA's Preinstallation, Placement, Default, And Exclusivity Terms Do Not Improve The Customer Experience On Android Devices

1323.   Google has not shown that its preload, placement, and default provisions improve the customer experience on Android devices.

1324.   To the contrary, Google's MADA and RSA terms lead to a poorer user experience in several ways. Both Android OEMs and Android users have complained about the placement of the Google Search Widget across the home screen of Android smartphones. UPX0128 at - 547 (email from Hiroshi Lockheimer stating, "1) Users generally are tired (visually) of our widget. It's in the middle of the screen, obscures your family picture, etc." and "2) OEMS are VERY tired (visually) of our widget, because of 1) and also because they feel like they don't get to differentiate."); Tr. 10099:2–23 (Murphy (Def. Expert)) (OEMs may not want to preinstall Google's widget but do so in exchange for the benefits gained under the MADA.); UPX0653 at -053 ("If removable, ███████ of users delete widget within 3 months of device activation.").

1325.   The MADAs and RSAs also frustrate distribution partners' ability to differentiate their products. Android OEMs, such as Samsung and Motorola, compete against each other by differentiating their devices, which can lead to innovative and compelling user experiences. Tr. 9574:22–9575:4 (Rosenberg (Google)) (Android manufacturers compete by differentiating their devices, and "innovation is one of the ways they can differentiate."); Tr. 10098:3–7 (Murphy (Def. Expert)) ("There certainly are dimension[s] in which [Android OEMs] benefit from differentiation."). For example, the foldable phones now offered by Samsung, Google, and Motorola are an innovation that resulted from OEMs competing through differentiation. Tr. 9574:22–9575:4 (Rosenberg (Google)).

1326.   Google's preinstallation, placement, default, and exclusivity terms thwart differentiation by standardizing features between devices. UPX0997 at -059 (discussing Google and AT&T's "philosophical differences on the UX on Android" and AT&T's desire to "differentiate the experiences so not all Android devices look the same"). Google's distribution partners routinely complain that MADAs and RSAs leave them with little control over the user experience on their devices. UPX0482 at -727 ███████████████████████████████████████████████████████████████████████████████████; UPX1036 at -835 ██████████████████████████████████████████████████████████████████.

1327.   ████████████████████████████████████████████████████████████████████████ Des. Tr. 181:4–183:15 (Giard (T-Mobile) Dep.). ████████████████████████████████████████████████████████████████████████ *Id.*

**EXHIBIT B**

# Direct Testimony of Prof. Michael D. Whinston

*U.S., et al. v. Google LLC*

United States District Court for the District of Columbia

October 16, 2023

**REDACTED FOR PUBLIC FILING**



Ex. No.
UPXD104
1:20-cv-03010-APM

➢ Determine, as a matter of economic principles, whether Google's conduct was or is likely to result in the creation, extension, or maintenance of monopoly power

➢ Determine whether any such conduct was or is anticompetitive and was or is likely to result in material harm to competition and consumers

## Opinion 3

Google's search distribution contracts give it exclusive defaults, which are a large driver of search traffic

4

# Microsoft also estimated that Google would lose significant traffic without the Safari default



## Safari Default on iPhone . . .
We estimate that Bing Share on iPhone will go up from Redacted today to Redacted post deal

2018

# Apple also estimated that Google would lose significant traffic without the Safari default



- Capture rate established at Redacted of forecast Google Safari queries (i.e., are assuming Redacted would change default search engine to Google or migrate to Chrome)

2016

# Google estimated that it would lose significant traffic on Android without the default





2017

# Google's US RSA payments for exclusive defaults are enormous



**Google payments under RSAs by partner type,** Redacted Redacted **(US)**

Apple ◼ MNOs & Android OEMs ◼ Browsers ◼

Payments (billions): $7, $6, $5, $4, $3, $2, $1, $0

Redacted

2014  2015  2016  2017  2018  2019  2020

- In FY2020, Google's total worldwide payments to Apple were Redacted of Apple's total operating income
- Google also gives away the "must-have" Play Store on Android for free

Google queries by access point data (DOJ RFP 2.10); Google RSA data (DOJ RFP 2.66); (Whinston Reply Report, Fig. 88, at D-2); Testimony of Eduardo Cue (Apple), Sept. 26, 2023, 2485:12-14, 2492:3-8.

19