John E. Schmidtlein (CA SBN 163520)
Stephen J. Fuzesi (admitted *pro hac vice*)
Benjamin M. Greenblum (admitted *pro hac vice*)
Youlin Yuan (admitted *pro hac vice*)
Daniel Whiteley (admitted *pro hac vice*)
Jesse T. Clay (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Telephone:     (202) 434-5000
Facsimile:     (202) 434-5029
Email:         jschmidtlein@wc.com
               sfuzesi@wc.com
               bgreenblum@wc.com
               yyuan@wc.com
               dwhiteley@wc.com
               jclay@wc.com

David H. Kramer (CA SBN 168452)
WILSON SONSINI GOODRICH &
ROSATI P.C.
650 Page Mill Road
Palo Alto, CA 94304
Telephone:     (650) 493-9300
Facsimile:     (650) 565-5100
Email:         dkramer@wsgr.com

*Attorneys for Defendant Google LLC*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

RUMBLE, INC.,

                    Plaintiff,

        v.

GOOGLE LLC,

                  Defendant.

Case No. 4:21-cv-00229-HSG

**DEFENDANT GOOGLE LLC'S NOTICE OF MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Hearing Date: January 23, 2025
Time:             2:00 p.m.
Place:            Courtroom 2
Judge:            Hon. Haywood S. Gilliam, Jr.

## NOTICE OF MOTION

**TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on January 23, 2025, at 2:00 p.m., or as soon thereafter as this matter may be heard, in Courtroom 2 of this Court, located on the 4th Floor of the United States Courthouse, 1301 Clay Street, Oakland, California, Defendant Google LLC will hereby move the Court for an order granting summary judgment and dismissing the case.

This Motion is made pursuant to Federal Rule of Civil Procedure 56 because Google is entitled to judgment as a matter of law on Plaintiff Rumble, Inc.'s claim. The Motion is based upon this Notice; the accompanying Memorandum of Points and Authorities; the Declaration of John E. Schmidtlein and the exhibits submitted herewith; any reply memorandum; the pleadings and files in this action; and such other matters Defendant may present at or before the hearing.

DATED: October 11, 2024

WILLIAMS & CONNOLLY LLP

By: *John E. Schmidtlein*

John E. Schmidtlein (CA State Bar No. 163520)
Stephen J. Fuzesi (admitted *pro hac vice*)
Benjamin M. Greenblum (admitted *pro hac vice*)
Youlin Yuan (admitted *pro hac vice*)
Daniel Whiteley (admitted *pro hac vice*)
Jesse T. Clay (admitted *pro hac vice*)

WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Telephone:    (202) 434-5000
Facsimile:    (202) 434-5029
Email:        jschmidtlein@wc.com
              sfuzesi@wc.com
              bgreenblum@wc.com
              yyuan@wc.com
              dwhiteley@wc.com
              jclay@wc.com

David H. Kramer (CA SBN 168452)
WILSON SONSINI GOODRICH & ROSATI P.C.
650 Page Mill Road
Palo Alto, CA 94304
Telephone:    (650) 493-9300
Facsimile:    (650) 565-5100
Email:        dkramer@wsgr.com

*Attorneys for Defendant Google LLC*

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

FACTS ..................................................................................................................................... 3

    A. Google Search ................................................................................................................ 3

    B. YouTube ......................................................................................................................... 5

    C. Rumble ........................................................................................................................... 6

    D. This Lawsuit .................................................................................................................. 8

LEGAL STANDARD ............................................................................................................. 9

    A. Summary Judgment ....................................................................................................... 9

    B. Section 2 of the Sherman Act ....................................................................................... 9

ARGUMENT ......................................................................................................................... 10

    I.     THERE IS NO TRIABLE ISSUE OF "SELF-PREFERENCING" ................................. 10

        A. The Evidence Contradicts Rumble's Assertion that Google Search is "Rigged" in Favor of YouTube ............................................................................................................. 10

        B. Antitrust Law Bars Rumble's Self-Preferencing Theory .................................. 13

            1. Rumble's Screenshots of Google Search Results Do Not Support Its Claim ............ 13

            2. Google's Use of User Interaction Data Does Not Support Rumble's Claim. ............ 17

            3. The Prevalence of YouTube in Google Search Results Does Not Support Rumble's Claim ........................................................................................................... 19

    II.    THERE IS NO TRIABLE ISSUE OF "EXCLUSIONARY" PREINSTALLATION OF THE YOUTUBE APP ....................................................................................... 20

        A. The Undisputed Evidence Demonstrates that None of Google's Android Agreements Requires Exclusivity with Respect to YouTube ............................................. 20

        B. Rumble Also Could Not Establish "De Facto" Exclusivity, to the Extent Such a Theory Is Even Cognizable in the Ninth Circuit. .......................................................... 23

    III.    RUMBLE CANNOT DEMONSTRATE ANTICOMPETITIVE EFFECTS ................. 25

A. Google Has Not Substantially Foreclosed Rumble from a Relevant Market....................25

   1. Rumble Cannot Meet Its Burden to Demonstrate Substantial Foreclosure As a Result of Preinstallation of the YouTube App on Android Mobile Devices.........................26

      a. *There Is No Substantial Foreclosure Because the Preinstallation of the YouTube App Is Not Exclusive*........................................................................................26

      b. *Even Assuming the Preinstallation of the YouTube App Is Exclusive, There Would Still Be No Substantial Foreclosure*.....................................................26

   2. Rumble Cannot Demonstrate Substantial Foreclosure Caused by the Alleged Self-Preferencing............................................................................................................28

B. Rumble Cannot Establish Harm to Competition ..............................................30

IV.    THE STATUTE OF LIMITATIONS BARS RUMBLE'S CLAIM ................................31

CONCLUSION .........................................................................................................33

# TABLE OF AUTHORITIES

Cases

*Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, 2008 WL 4830740

    (N.D. Cal. Nov. 6, 2008) ........................................................................27

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171 (9th Cir. 2016)......................20, 21, 24, 26

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991

    (9th Cir. 2010) ......................................................................9, 10, 15, 16, 18

*Anderson v. Liberty Lobby*, 477 U.S. at 242 (1986) ........................................................9

*Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689 (9th Cir. 1982) ...........................33

*Beneficial Std. Life Ins. Co. v. Madariaga*, 851 F.2d 271 (9th Cir. 1988) ........................31

*Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499 (9th Cir. 1988)........................................32

*Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130 (9th Cir. 2022) .................................9

*Eastman v. Quest Diagnostics Inc.*, 2015 WL 7566805 (N.D. Cal. Nov. 25, 2015)...........29

*Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556 ...............................................20

*Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534 (9th Cir. 1983) .............9, 10

*FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) ....................................2, 20, 25, 26

*Golden Boy Promotions LLC v. Haymon*, 2017 WL 460736 (C.D. Cal. Jan. 26, 2017)...................27

*Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019

    (9th Cir. 2013) ........................................................................31

*Hawthorne Hangar Ops., L.P. v. Hawthorne Airport, LLC*, 2022 WL 3102452

    (9th Cir. Aug. 4, 2022) ........................................................31, 32, 33

*ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F. Supp. 423 (N.D. Cal. 1978)...............15, 16, 18

*In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68 (9th Cir. 1979) ...............................33

*In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239 (9th Cir. 2020).....................2

*Invacare Corp. v. Respironics, Inc.*, 2008 WL 906112 (N.D. Ohio Mar. 31, 2008)...........................27

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997)...............................................................33

*LiveUniverse, Inc. v. MySpace, Inc.*, 304 Fed.Appx. 554 (9th Cir. 2008) ..........................29

*McDaniel v. Appraisal Inst.*, 117 F.3d 421 (9th Cir. 1997) ...............................................31

*MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095 (N.D. Cal. 2012) ..............33

*Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138 (D. Minn. 1999)..............29

*Oliver v. SD-3C LLC*, 751 F.3d 1081 (9th Cir. 2014) ........................................................31

*Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157 (9th Cir. 1997) ........................23, 26, 28, 29, 30

*Pace Indus., Inc. v. Three Phx. Co.*, 813 F.2d 234 (9th Cir. 1987) ...................................32

*Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145 (9th Cir. 2003) ...................24

*PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322 (N.D. Cal. July 2, 2014) ..............27

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, 2013 WL 5694452
    (N.D. Cal. Oct. 18, 2013) ..........................................................................................29

*Sandoz Inc. v. United Therapeutics Corp.*, 2022 WL 17335696 (D.N.J. Mar. 30, 2022)..................28

*SaurikIT, LLC v. Apple, Inc.*, 2023 WL 8946200 (9th Cir. Dec. 28, 2023) ................31, 33

*Sayre v. Google, Inc.*, 2019 WL 6036703 (N.D. Cal. Nov. 14, 2019) ...............................30

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ................................................9

*Staley v. Gilead Scis., Inc.*, 2021 WL 4972628 (N.D. Cal. Mar. 12, 2021) .......................31

*Teva Brands LLC v. Bayer HealthCare LLC*, 2024 WL 1909156 (N.D. Cal. May 1, 2024)..............24

*United States v. Google*, 2024 WL 3647498 (D.D.C. Aug. 5, 2024)..................................23

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ......................................................9

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001)...................................9, 25

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321 (1971) ...................................31

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254 (3d Cir. 2012) ........................................24

Statutes & Federal Rules

Fed. R. Civ. P. 56(a) ..........................................................................................................9

15 U.S.C. § 15b ........................................................................................................3, 31

**INTRODUCTION**

Rumble's antitrust lawsuit is premised on two specific allegations of "anticompetitive and exclusionary" conduct that Rumble maintains amount to unlawful monopolization or attempted monopolization in violation of Section 2 of the Sherman Act. After more than two years of discovery—including Google's production of over 650,000 pages of internal documents and testimony by both Google Search and YouTube personnel—the undisputed factual record in this case demonstrates that neither of the lawsuit's premises has any merit. Because there is no triable issue of fact, the Court should grant summary judgment and dismiss the case.

First, Rumble claims that Google purposefully "rig[s] its search algorithms" to rank videos hosted on YouTube higher than videos hosted on other platforms in Google search results. ECF No. 21 ("FAC") ¶¶ 3, 194. In particular, Rumble alleges that Google intentionally ensures that "YouTube videos will always be listed first in search results." *Id*. Because Google owns YouTube, Rumble calls this alleged practice "self-preferencing." *Id*. ¶ 9. The Ninth Circuit has never recognized "self-preferencing" as a legally cognizable theory under antitrust law. Regardless, no evidence supports Rumble's assertion that Google has "rigg[ed]" its search ranking to favor YouTube over other platforms. Indeed, the testimony of Google employees and the documentary record unequivocally show that Google does not artificially boost YouTube webpages over other webpages in Google search results. As the longtime head of Google Search ranking testified, he was one "hundred percent sure" that there is no "self-preferencing" of YouTube in Google Search. Ex. 1 (Nayak Dep.) 103:19–104:1. Rather, the evidence adduced in discovery demonstrates that Google applies its search algorithms equally and consistently across all webpages, including webpages hosted by video platforms like Rumble that compete with YouTube. Underscoring the point, a study conducted by an expert statistician establishes that Google Search does not rank YouTube videos higher or with more frequency than Google's largest general search engine competitor in the United States, Microsoft Bing. If anything, the study shows, Bing highly ranks YouTube videos more often than Google Search does in comparable search results.

Second, Rumble contends that Google has entered into "exclusionary" contracts that purportedly prevented Rumble from being preinstalled on certain Android mobile devices. But again, the evidence indisputably refutes this assertion. Far from barring the preinstallation of other video apps, the contracts that Rumble relies upon expressly state that they do "not restrict or limit [the mobile phone manufacturer] from preloading or determining the placement of its own or third party applications or services on its Android devices." *See, e.g.*, Ex. 2 (Samsung 2017 MADA) at -179 (Section 3.3). The undisputed evidence also shows that Rumble's failure to secure preinstallation of its mobile application on Android devices has no relationship to Google's contracts that distribute YouTube; in fact, there is no evidence that any third party that sells or manufactures Android devices has ever considered preloading Rumble on any Android device. And regardless, there is no dispute that users can easily download any apps they wish onto their devices—as millions of Americans have done with Facebook, TikTok, Instagram, or any number of competing apps on Android and other mobile devices. Strikingly, Rumble's damages expert does not calculate any specific damages based on the preinstallation of YouTube's app on Android devices. Ex. 3 (McClave Op. Rpt.) at 4; Ex. 4 (McClave Dep.) 14:5–21. And none of Rumble's other experts offer any opinion that in the absence of Google's agreements, Rumble would have been preinstalled on any Android device.

The record further demonstrates that Rumble's claim lacks merit for two additional and equally fundamentally reasons. First, an antitrust plaintiff has the burden to demonstrate that the defendant's practices produced "significant anti-competitive effects"—and, in particular, that they *substantially foreclosed* competition. *In re NCAA Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1256 (9th Cir. 2020); *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020). But Rumble does not even attempt to clear this hurdle. Instead, the undisputed evidence shows that Rumble's mobile app can be preinstalled on any Android mobile device if Rumble were only to convince the device manufacturer or carrier to do so. And users can download Rumble's app on mobile devices with only a few clicks. In fact, at certain points, Rumble's app has been one of the most-downloaded apps in the country. *See* Ex. 5; Ex. 6. Similarly, users routinely access and watch videos on YouTube, Rumble,

and other video platforms in any number of ways that have nothing to do with Google Search. The evidence demonstrates that less than 1% of the video views on both YouTube and Rumble, respectively, come from Google search results. Such evidence disproves that Google's alleged conduct has produced significant anti-competitive effects or substantially foreclosed competition in the market Rumble alleges is relevant here.[1]

Second, the applicable four-year statute of limitations bars Rumble's claim. *See* 15 U.S.C. § 15b. Rumble contends that Google's at-issue conduct began by 2014, if not earlier. Indeed, Rumble specifically seeks damages dating back to 2014. Yet Rumble did not file suit until 2021—at least three years after the statute of limitations expired under Rumble's own theory. As discussed further below, no exception applies that would toll or extend the statute of limitations.

For all these independent reasons, the Court should grant summary judgment in Google's favor.

## **FACTS**

### A. **Google Search**

Google was founded as a search engine by two Ph.D. students in 1998, with a mission that it still pursues today: To "organize the world's information and make it universally accessible and useful." Ex. 7, at -666–69. Google Search is the world's most popular online search engine, processing billions of queries per day—trillions of times per year—in a fraction of a second. Ex. 8, at -197.

When Google returns search results in response to a given user query, its aim is to provide the user with the most useful information that best satisfies the user's information needs, whether the user is seeking the latest sports score, the best chili recipe, medical advice, or how to repair a leaky sink. Ex. 7, at -669; Ex. 1 (Nayak Dep.) 116:1–10; Ex. 9 (Desikan Dep.) 59:1–12. To achieve that goal, Google considers hundreds (if not thousands) of pieces of data known as "signals" in ranking search results for every user query. Ex. 9 (Desikan Dep.) 59:1–12; Ex. 1 (Nayak Dep.) 99:1–6. Google then combines those signals (with different weighting, based on the query), in the blink of an eye, to produce the final ranking of search results that users see. Ex. 10 (Papachristou Dep.) 31:23–32:2; Ex. 9

---

[1] For purposes of this Motion alone, Google does not challenge the relevant market that Rumble alleges.

(Desikan Dep.) 68:20–69:12; *see* Ex. 11, at -174.  These final results might include text, videos, and/or images from any number of different sources.  Ex. 1 (Nayak Dep.) 213:12–214:1; Ex. 10 (Papachristou Dep.) 193:22–194:13.

Google's search ranking process does not favor any given video platform.  As every Google employee deposed in this case testified, there is no "self-preferencing" of YouTube in Google Search. Ex. 1 (Nayak Dep.) 100:22–101–8, 103:19–104:15, 173:14–24; Ex. 10 (Papachristou Dep.) 51:3–13, 64:13–21; Ex. 9 (Desikan Dep.) 258:6–17, 269:7–19; Ex. 12 (Marshak Dep.) 244:25–245:9, 246:11– 25, 251:17–252:8; Ex. 13 (Duncan Dep.) 101:25–102:11, 115:17–116:3, 176:5–15; Ex. 14 (Mueller Dep.) 74:6–75:4.   There are no YouTube-specific ranking signals; Google Search applies the same signals when it evaluates YouTube webpages for search ranking as it does for webpages from any other website hosting video content.  Ex. 1 (Nayak Dep.) 66:8–9; Ex. 15, at -380.  And there is no evidence that Google's Search engineers have incorporated search algorithms or signals with an intention to benefit YouTube in Google search results.  Instead, Google's singular goal is to "provide the most helpful result regardless of the source that it comes from."  Ex. 12 (Marshak Dep.) 245:24– 246:25; *see also* Ex. 9 (Desikan Dep.) 268:6–14 ("[M]y only objective is to find the best results, no matter where the results are located and have them rank appropriately so that users are able to find the information that they are looking for."); Ex. 13 (Duncan Dep.) 115:23–116:3 ("[W]e're really just trying to show the best results for the query").  That is a longstanding, foundational proposition of Google Search, reflected in its Honest Results Policy, which specifically forbids "favoritism," including "presenting Google products in a more favorable light."  Ex. 16, at -764.  Consistent with that policy, Google Search engineers are "very careful" about ensuring there is no bias.  Ex. 1 (Nayak Dep.) 100:22–101:8, 104:3–8.

Google Search is a product of constant innovation by thousands of engineers whose job is to continually refine and improve Google Search to provide the best information to its users.  Ex. 9 (Desikan Dep.) 268:6–14, 320:1–11; Ex. 10 (Papachristou Dep.) 126:6–22, 175:14–24; Ex. 7, at -609. Google performs thousands of tests and makes thousands of changes to its algorithms every year

(launching new signals and removing others), all with a goal of improving the quality of Google search results for users. Ex. 1 (Nayak Dep.) 111:23–112:8; Ex. 10 (Papachristou Dep.) 68:2–14; *see* Ex. 56.

**B.     YouTube**

YouTube is a highly popular platform that features a broad range of video content—everything from professional productions to user-generated amateur takes, from sports to music to do-it-yourself instructions. Ex. 17 (Petren-Moritz Dep.) 72:2–7; Ex. 18 (Gal Op. Rpt.) ¶ 50. Videos posted on YouTube range in length from mere seconds to full-length movies. Ex. 17 (Petren Moritz Dep.) 142:18–19, 208:2–7, 253:16–254:1. Users watch YouTube on an array of surfaces, including mobile phones, desktop computers, and, increasingly, in their living rooms on televisions. Ex. 19 (Silber Dep.) 62:15–23; Ex. 17 (Petren Moritz Dep.) 175:6–14.

The vast majority of users access YouTube directly—that is, they open the YouTube mobile or TV app, or they navigate directly to YouTube's website on their desktop and navigate to videos within the site itself. Ex. 20 (Murphy Op. Rpt.) ¶¶ 129–33. Less than one percent of the video views and watch time on YouTube are the result of users clicking on a link to a YouTube webpage in Google search results. *Id.* ¶ 130.

YouTube competes across a "highly dynamic competitive landscape." Ex. 21, at -401. Key competitors include TikTok, Facebook, Instagram, Snap, Twitch, Netflix, Amazon Prime Video, and many other services that compete for users' watch time. *Id.*; *see also id.* at -402; Ex. 22, at -045–50; Ex. 19 (Silber Dep.) 28:17–30:7; Ex. 17 (Petren-Moritz Dep.) 27:9–17. These competitors have grown and thrived in the very time period that Rumble claims Google engaged in anticompetitive conduct. Ex. 20 (Murphy Op. Rpt.) ¶ 37.

Google makes the YouTube mobile app available to Android device manufactures for preload via the free, non-exclusive Mobile Application Distribution Agreement (MADA). *See, e.g.*, Ex. 2 (Samsung 2017 MADA) at -177 (Section 2.1); Ex. 23 (Motorola 2018 MADA) at -639, -640 (Section 2.1). On Android devices that manufacturers choose to preload with Google apps, the MADA provides for the placement of the YouTube app within a Google-labeled folder on the device's home screen.

Ex. 2 (Samsung 2017 MADA), at -179–80 (Section 3.3); Ex. 23 (Motorola 2018 MADA), at -643–44 (Section 4.4). The MADA does not restrict in any way the preinstallation of any non-Google app, including video platform apps such as Rumble's. *See, e.g.*, Ex. 2 (Samsung 2017 MADA), at -179–80 (Section 3.3); Ex. 23 (Motorola 2018 MADA), at -636 (Background); Ex. 24 (Kolotouros Dep.) 24:11–18. Users also can easily download the Rumble app from the Google Play Store (as well as the Apple App Store) or navigate directly to rumble.com on any device. Indeed, users downloaded rival video platforms such as TikTok, Facebook, Instagram, and Snapchat more than 12 million times each in the U.S. in 2023 on Android devices via the Play Store. Ex. 25 (Murphy Reb. Rpt.) ¶ 251.

**C.      Rumble**

Rumble is an online video platform founded in 2013. Ex. 26 (Pavlovski Dep.) 27:8–9. From the beginning, Rumble "syndicated" its content—that is, rather than only featuring video content on its own site, Rumble placed it on other video platforms. *Id.* at 26:6–17, 27:8–16. This included posting content to a "Rumble Viral" channel that it created on YouTube, as well as on Facebook, Yahoo, MSN, and other platforms. Ex. 27, at -480; Ex. 26 (Pavlovski Dep.) 73:6–74:1.

Rumble has experienced considerable growth in recent years, including during the very period when it alleges Google engaged in anticompetitive conduct. Ex. 20 (Murphy Op. Rpt.) ¶¶ 187–93. Rumble's growth particularly dates to 2020, when the company began marketing itself as a champion of a "free and open" Internet to viewers and creators who desired less content moderation than found on YouTube and other sites. *Id.*; Ex. 28. As a result, Rumble attracted creators such as Dan Bongino, Andrew Tate, Russell Brand, and others who have garnered millions of views of the videos they uploaded to Rumble. *See* Ex. 57; Ex. 58; Ex. 59. At the same time, advertisers began to view Rumble as a "right-wing" and "conspiracy theory" site, which has severely impacted its ability to (among other things) generate advertising revenue. Ex. 26 (Pavlovski Dep.) 151:2–154:25; Ex. 29 (Alexandroff Dep.) 85:4–87:25; Ex. 60 ("Rumble Sends Viewers Tumbling Toward Misinformation"); Ex. 30 (Rumble 2022 10-K), at 14 (listing as a business risk "public perceptions about the predominance of certain political viewpoints on our platform"). Large companies have pulled their online ads or

declined to advertise on the platform. Ex. 31; Ex. 26 (Pavlovski Dep.) 152:9–18 (recalling at least ███ advertising agencies who refused to advertise on Rumble due to the content hosted on the platform); Ex. 32 ("Inspire Brands / Dunkin Donuts didn't want to advertise on Rumble because of 'right wing culture', and Diageo doesn't want to advertise when creators like Crowder are on Rumble."); Ex. 61 ("Firms pull ads from Rumble platform over Russell Brand videos"). Rumble disclosed that a single advertiser, ███, has accounted for nearly half of its advertising revenue in 2022 and 2023. Ex. 33 (Rumble 2023 10K), at 15; Ex. 29 (Alexandroff Dep.) 92:22–93:14. Rumble is now attempting to generate revenue from such ventures as launching its own brand of coffee because "[i]f large corporate advertisers are afraid to advertise with specific audiences, we will just build the product lines to take them on." Ex. 62.

Further, while Rumble has recognized that "content is king" and acknowledged the importance of diversifying its offerings, the site continues to lack both the breadth and depth of content offered by YouTube. Ex. 34, at -894; Ex. 35 (Cragg Op. Rpt.) ¶ 260; Ex. 18 (Gal Op. Rpt.) ¶ 50; Ex. 26 (Pavlovski Dep.) 129:19–130:9, 131:25–132:9. As of the third quarter of 2020, users were uploading only 86 hours of video content to Rumble per day. Ex. 36 (Rumble Q1 2024 10-Q), at 26; *see also* Ex. 34, at -893 ("Unlike YouTube, Rumble does not have sufficient content to keep viewers engaged on the platform"). While that volume has risen significantly in the years since, creators still upload to YouTube more than twice the number of videos *per hour* than creators upload to Rumble *in a given day*. *See* Ex. 36 (Rumble Q1 2024 10-Q), at 26 (users uploaded 12,429 hours of video per day to Rumble in Q1 2024); Ex. 21, at -393 (users upload 500 hours of video to YouTube every minute, or 30,000 hours per day).

Rumble additionally lacks high-quality technology to assist users in finding desired content on its platform—namely the kind of search and recommendation engine technologies offered by YouTube. That lack of functionality has generated user complaints. Ex. 26 (Pavlovski Dep.) 68:7–12. And, as of August 2023, Rumbles CEO Chris Pavlovski admitted that "our search [feature] needs a lot of work . . . our search is just not up to the standard it needs to be." Rumble Q2 Earnings

Discussion (35:30 to 37:30), available at https://rumble.com/v37hqcv-rumble-q2-earnings-recap-and-whats-coming-next-w-ceo-chrispavlovski.html. Mr. Pavlovski further testified that "[w]hen I compare [Rumble's] recommendation technology to … the large companies today, I would say that's not one of our strengths." Ex. 26 (Pavlovski Dep.) 66:21–25. And just two months ago, Mr. Pavlovski "agreed" publicly that "[t]here are frequent bugs and performance issues that hinder smooth navigation and content consumption on [Rumble]." Ex. 37.

Rumble also historically has offered limited mobile applications with poor user experiences. Rumble did not launch any mobile applications until 2020. Ex. 38 (Sterling Dep.) 45:11–46:1. And Mr. Pavlovski admitted that once Rumble launched these apps, it "got a lot of complaints about the functionality and bugs and things like that." Ex. 26 (Pavlovski Dep.) 144:12–15. As of 2022, Mr. Pavlovski recognized that "we have a lot of work to do," Ex. 39, at -449, yet Rumble had only one developer working on its Android app, who was "drowning in bugs." Ex. 40. In fact, users were not able to use Rumble's app to upload a video directly to the Rumble platform until "the last one to two years." Ex. 26 (Pavlovski Dep.) 146:24–147:12. Rumble "has just recently" begun to generate advertising revenues on its mobile app. Ex. 26 (Pavlovski Dep.) 107:9–19, 148:6–17; Ex. 3 (McClave Op. Rpt) at 15.

Notably, most users access Rumble directly as opposed to through search engines. Like YouTube, less than one percent of Rumble's traffic today is from Google Search. Ex. 20 (Murphy Op. Rpt.) ¶ 130. Rumble has relied on user downloads as the primary distribution method for its mobile app—and, in 2023, over 4.5 million users downloaded Rumble on mobile devices. *Id.* ¶ 34. There is no evidence that Rumble has undertaken any meaningful efforts to attempt to negotiate preinstallation agreements for its mobile app with device manufacturers or mobile carriers in the United States.

**D.     This Lawsuit**

Rumble filed this lawsuit in January 2021. ECF No. 1. Rumble asserts a single claim under Section 2 of the Sherman Act, alleging monopolization and attempted monopolization of an "online video platform market in the United States." FAC ¶¶ 193–94.

## LEGAL STANDARD

**A.     Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "[T]his standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby*, 477 U.S. at 242, 247–48 (1986).  A court may grant summary judgment on a "claim or defense" or "part of each claim or defense."  Fed. R. Civ. P. 56(a).

**B.     Section 2 of the Sherman Act**

"A Section 2 claim includes two elements: (1) the defendant has monopoly power in the relevant market, and (2) the defendant has willfully acquired or maintained monopoly power in that market."  *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1137 (9th Cir. 2022) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).  For the second element, a plaintiff must prove that the alleged conduct "is exclusionary, rather than merely a form of vigorous competition."  *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001) (en banc) (per curiam).  That is because the Sherman Act "directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  It is not enough for a plaintiff to show that it has been harmed by competition on the merits: "to be condemned as exclusionary" under Section 2, the conduct at issue therefore "must harm the competitive *process* and thereby harm consumers."  *Qualcomm*, 969 F.3d at 990 (citing *Microsoft*, 253 F.3d at 58).

Ultimately, it bears emphasis that "Section 2 of the Sherman Act proscribes 'monopolization'; it does not render unlawful all monopolies."  *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998 (9th Cir. 2010) (quoting *Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 543 (9th Cir. 1983)).  "A monopolist, no less than any other competitor, is permitted

and indeed encouraged to compete aggressively on the merits, and any success it may achieve solely through 'the process of invention and innovation' is necessarily tolerated by the antitrust laws." *Id.* (quoting *Foremost Pro Color*, 703 F.2d at 544–45).

## ARGUMENT

## I. THERE IS NO TRIABLE ISSUE OF "SELF-PREFERENCING"

The Ninth Circuit has never recognized "self-preferencing" as exclusionary conduct that violates Section 2 of the Sherman Act. Indeed, the leading antitrust treatise in the United States explains that "self-preferencing by default cannot be unlawful under existing law unless we have made an *a priori* decision that [the defendant] has a duty to include the rivals' choices. Absent that duty, [self-preferencing] is more likely to be procompetitive to the extent that it makes the products of rivals available at all."[2] Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* § 762b (5th ed. Sept. 2024). The Court need not reach the question of whether purported "self-preferencing" is a legally cognizable theory here, however, because there is no triable issue of fact as to whether Google anticompetitively "rigs" Google search results to preference YouTube. As explained below, the record demonstrates that Google does *not* intentionally boost YouTube in search results over rivals. And to the extent Rumble identifies any aspects of Google's search ranking processes that it claims purportedly "preference" YouTube, it is merely second-guessing Google's legitimate product design decisions in determining what factors to consider in ranking search results. But those design decisions are "necessarily tolerated by the antitrust laws" because courts do not "balance[e] the benefits or worth of a product improvement against its anticompetitive effects." *Allied Orthopedic*, 592 F.3d at 1000.

### A. The Evidence Contradicts Rumble's Assertion that Google Search is "Rigged" in Favor of YouTube

After nearly two years of discovery, during which Google produced over 685,000 pages of documents and Rumble took the depositions of numerous engineers who have worked on Google

---

[2] The record here establishes no "duty to deal" between Google and Rumble. And Rumble has not alleged otherwise.

Search for decades, Rumble adduced no evidence that Google has "rigg[ed]" its search algorithms to boost the ranking of YouTube webpages over those of other video platforms in Google search results. FAC ¶ 194. To the contrary, the undisputed evidence refutes that assertion.

To begin, there is no evidence to support Rumble's assertion that Google "rigg[ed] its search engine algorithms such that YouTube videos *will always be listed first in search results*." FAC ¶ 194 (emphasis added). An expert Rumble itself retained, Ian Lurie, agreed that "YouTube is not always ranked first before other video platforms for a query issued on Google Search." Ex. 41 (Lurie Dep.) 105:3–8. And the record is replete with examples of videos on Rumble's own platform ranking first in Google search results. *See* Ex. 42 (example queries discussed during Lurie deposition).

Likewise, there is no evidence that there is any "rigg[ing]" to artificially boost YouTube videos to *any* position in Google search results. Despite extensive discovery, Rumble cannot identify any aspect of Google's Search ranking process that operates to boost videos from YouTube, or demote videos from competing video platforms, based on the identity of the platform that hosts the video. Mr. Lurie conceded that he could not identify any such aspect of Google's Search ranking process. Ex. 41 (Lurie Dep.) 110:8–20 (acknowledging that he failed to "identify any specific Google Search ranking signal that has the purpose of boosting YouTube in Search results over videos from other platforms"). That alone should doom Rumble's claim.

In fact, the record evidence affirmatively shows that Google does not preference YouTube in Search ranking. The unanimous and unequivocal testimony of all Google employees who were deposed was that Google does *not* preference YouTube in Google Search ranking. Former head of Google Video Search Dimitra Papachristou was clear: "[W]e do not preference YouTube." Ex. 10 (Papachristou Dep.) 51:7–11, 64:17–25. Google's technical lead for ranking in Video Search, Pavan Desikan,[3] testified that he could "say very confidently that Google does not self-preference Search results." Ex. 9 (Desikan Dep.) 258:6–10, 269:7–19. Google's Chief Scientist for Search and longtime

---

[3] According to Rumble, Dr. Desikan "has the most knowledge regarding Google's processes for generating search results that include videos including ranking." Ex. 43 (Rumble Contention Interrogatory Responses), at 64. Rumble's own expert, Mr. Lurie, conceded that Dr. Desikan, as well as Dr. Nayak and Ms. Papachristou, have more expertise regarding the operation of Google Search's ranking processes than he does. Ex. 41 (Lurie Dep.) 80:13–21, 84:11–15, 86:21–15.

former overall head of Search ranking, Pandu Nayak, testified that he was one "hundred percent sure" that there is no self-preferencing of YouTube in Google Search. Ex. 1 (Nayak Dep.) 103:21–104:15, 117:16–24. When asked how he could be sure, Dr. Nayak explained: "I know all of the . . . algorithms, all the changes that we've launched, we make sure that we catch things like [any bias in favor of YouTube]. And that if anyone tries to propose things like this, they're stopped. . . . [I]t's a well-known fact here, we are very careful about it and I'm very confident that we don't do this." *Id.* at 104:2–8. Allie Duncan, a Senior Google Search Engineer who works on page quality signals that apply to videos, testified that, as a matter of policy, Google does not use any "YouTube-specific signals"; Google is "just trying to show the best results for the query"; and "there was no way that we would launch a signal that was just using YouTube signals." Ex. 13 (Duncan Dep.) 101:25–102:11, 115:17–116:3, 176:5–15. Google Search Liaison John Mueller testified that in his 17 years at Google he has "never seen anything that would have suggested that there's any kind of preferential treatment" for YouTube in Search. Ex. 14 (Mueller Dep.) 74:6–75:4. And Google Product Manager for Videos in Search Danielle Marshak testified: "from my experience working at Google, I have never seen any indication that YouTube is being prioritized in any way in search results." Ex. 12 (Marshak Dep.) 246:11–25. She explained that there is a "longstanding principle" at Google that it "is not favoring any particular platform and all video providers can be eligible for all of our features." *Id.* at 251:17–252:8.

In addition, Google maintains an official policy, called the "Honest Results Policy," that prohibits any "favoritism or impropriety" in Google Search, including actions taken to "[p]resent[] Google products in a more favorable light" and "fixing [Search] only for Google properties, or prioritizing a fix for Google properties over non-Google properties." Ex. 16. Indeed, Mr. Lurie conceded that he is not aware of *any* internal Google Search document saying that YouTube videos are given an artificial boost in search results over videos from other platforms. Ex. 41 (Lurie Dep.) 110:1–6.

**B.** **Antitrust Law Bars Rumble's Self-Preferencing Theory**

In the face of this undisputed record evidence, Rumble bases its "self-preferencing" theory on: (1) a handful of screenshots of Google search results where videos hosted on YouTube (primarily videos on Rumble's YouTube channel) outrank videos hosted on Rumble; (2) Google's use of user interaction data (how often users click on particular webpages) as one of many factors in Google Search ranking; and (3) the frequency with which YouTube videos appear in Google search results. Ex. 44 (Lurie Op. Rpt.) ¶¶ 18–79, 87–98; Ex. 43 (Rumble Contention Interrogatory Responses), at 71. None of these establishes any triable issue of "self-preferencing."

1.     Rumble's Screenshots of Google Search Results Do Not Support Its Claim.

Rumble relies principally on screenshots of Google search results for three queries for which Mr. Lurie opines he "cannot find a reason for" YouTube videos outranking Rumble videos "other than Google self-preferencing YouTube." Ex. 44 (Lurie Op. Rpt.) ¶¶ 1, 23, 50–52, 122. Search results for three search queries cannot, as a matter of law, provide evidence that Google "self-preferences" YouTube webpages in its search results. And nothing about these search results establishes that Google's Search ranking process is anticompetitive.

First, these screenshots show the search results for three queries on Google Search, but they do not explain why the results were ranked the way they were. Even Mr. Lurie agreed that it is not possible to simply take the results of a handful of search queries and conclude that Google must be improperly boosting the webpages from any given platform over another. Ex. 41 (Lurie Dep.) 109:9–14. After all, Google generates search results for *trillions* of queries each year and the results for any given user can vary for many different reasons. Ex. 8, at -197. In comparison to the handful of examples Rumble relies upon, Mr. Lurie found "more than 20" examples where he ran the same type of searches and saw that Rumble ranked in the first position ahead of YouTube in Google search results. Ex. 41 (Lurie Dep.) 102:18–104:14. Mr. Lurie saw so many such examples that he "got tired of looking at them." *Id.* at 104:16–105:1. Further, even as to the cherry-picked queries Mr. Lurie cites, Google Search rankings frequently change. When two of them were re-run on Google Search in

the months after he issued his opening report, the results ranked videos hosted on Rumble ahead of any video hosted on YouTube.   Ex. 45; Ex. 46 (Allan Reb. Rpt.), App'x 5; Ex. 47.   Moreover, Microsoft Bing, the leading general search engine competitor to Google, ranked YouTube videos in the first position for *all* of Mr. Lurie's queries.  Ex. 46 (Allan Reb. Rpt.), App'x 1, 2, & 3.  Microsoft, of course, has no incentive to rank YouTube videos first in Bing's results other than because its search engine algorithms predict that doing so is in the best interest of its users.

Second, the examples Mr. Lurie cited are particularly unavailing because Rumble actually ranks well in each of them.  Rumble alleges that Google "pushes links to Rumble Videos on the Rumble Platform to 'below the fold' on a Google search results first page (or off the first page altogether)." FAC ¶ 37.  Yet Mr. Lurie conceded that the Rumble results appear "above the fold" in each of his three queries.  Ex. 41 (Lurie Dep.) 95:9–13, 97:11–13.  And the YouTube videos that ranked first in each query were not from a random YouTube channel, but from Rumble's own official YouTube channel— where Rumble decided to post videos *on YouTube*.  *Id.* at 89:22–90:21, 95:1–4.  As Mr. Lurie acknowledged, if Rumble did not want Rumble videos on YouTube appearing in Google search results (either ahead of videos from its own platform, or elsewhere) it could have decided to not upload them to YouTube in the first place.  *Id.* at 91:6–13.

Third, each of his examples involved a search query for the exact title of a video that was first uploaded to Rumble and later to Rumble's YouTube channel (which Mr. Lurie refers to as Rumble being the "original source" of the video).  Mr. Lurie claims, without any support, that he "would expect the first site to publish original content to rank first in the organic [Google Search] results."  Ex. 44 (Lurie Op. Rpt.) ¶¶ 21–23, 25, 48–52, 122.   Because the Google search results in Mr. Lurie's screenshots do not match his "expectation," Mr. Lurie concludes that "Google self-preferencing YouTube" must be the reason.  *Id.* ¶ 122.[4]   But the undisputed evidence contradicts his key premise.

---

[4] Mr. Lurie also attempts to rule-out "several possible search algorithm-related explanations for why Rumble, even for its own content, might have struggled to rank versus YouTube."  Ex. 44 (Lurie Op. Rpt.) ¶¶ 30–79.  Notably, however, Mr. Lurie has never worked for a search engine, has no educational background in computer science, and no experience in search engine ranking processes.  *See* ECF No. 128-1 at 2–3, 8–9.  Mr. Lurie readily concedes that Google Search engineers who testified in this case have more expertise than he does regarding the operation of Google's search ranking processes.  Ex.

Google witnesses unanimously testified that the "original source" of a video is *not* a signal or factor that Google's Search algorithms use to rank video results. Ex. 9 (Desikan Dep.) 32:10–15; *see id.* at 33:15–21, 101:20–102:17; Ex. 10 (Papachristou Dep.) 43:2–10; Ex. 13 (Duncan Dep.) 90:8–21; Ex. 12 (Marshak Dep.) 203:17–204:18, 250:18–251:1. Nothing in the record contradicts this undisputed testimony.[5]

At most, then, Mr. Lurie's opinion is that Google *should* rank the "original source" of videos first in search results (instead of, for instance, Rumble's own YouTube channel). There is no evidence that consideration of "original source" as a search ranking signal would yield better Google search results for users. "Where there is a difference of opinion as to the advantages of two alternatives which can both be defended from an engineering standpoint" a court evaluating an antitrust claim should not "allow itself to be enmeshed in a technical inquiry into the justifiability of product innovations." *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F. Supp. 423, 439–41 (N.D. Cal. 1978) (granting judgment as a matter of law to defendant); *see Allied Orthopedic*, 592 F.3d at 998, 1000 ("Antitrust scholars have long recognized the undesirability of having courts oversee product design, and any dampening of technological innovation would be at cross-purposes with antitrust law." (citation omitted)); *see also* Areeda & Hovenkamp, *supra*, § 775c ("[C]ourts are poorly equipped to evaluate the motives, significance, usefulness, or competitive or other effects of innovation.").

There is ample support in the record explaining Google's decision to not use "original source" as a search engine ranking signal for video content. Google Search engineers testified that they do not use ranking signals that are "easily manipulated." Ex. 10 (Papachristou Dep.) 313:3–8; Ex. 9 (Desikan

---

41 (Lurie Dep.) 80:13–21, 84:11–15, 86:21–15. And in conducting his analysis of "possible search algorithm-related explanations" Mr. Lurie gets wrong many aspects of how Google's Search ranking processes operate. *See* ECF No. 128-1 at 11–13.

[5] Google asked Rumble in contention interrogatories to provide its basis for claiming that Google does consider the "original source" of a video in ranking search results. The only Google material that Rumble identified in response is a blog post that by its own terms is limited to the news context. *See* Ex. 63. Ms. Papachristou testified that the processes described in this blog post do not extend beyond the news context. Ex. 10 (Papachristou Dep.) 43:2–7. And, in any event, Rumble is not the original source of any video content—the content creator is and the content creator for the videos on Rumble and YouTube at issue in Mr. Lurie's three search queries are the same because the videos are the same.

Dep.) 299:5–22. As Google's information retrieval expert, Dr. James Allan explained,[6] taking as true metadata that website owners provide about whether they are the "original source" of content "is clearly a highly falsifiable (i.e. manipulatable) signal." Ex. 46 (Allan Reb. Rpt.) ¶ 56. Further, Ms. Marshak testified that, as a product manager for Video Search, she did not "see what the user benefit would be" of considering "original source" as a ranking factor. Ex. 12 (Marshak Dep.) 250:18–251:1. This is because "video hosting sites . . . don't produce the videos themselves. Different creators produce the videos." Ex. 1 (Nayak Dep.) 165:13–166:8; *see* Ex. 13 (Duncan Dep.) 90:8–21. So users are unlikely to care whether they view a video on the platform where the creator first uploaded it, as the platform did not contribute to the "originality" of the video. Indeed, Rumble's own expert, Dr. David Gal, opined that users tend to search for videos using general search engines "when they do not have a particular video platform or video in mind." Ex. 18 (Gal Op. Rpt.) ¶ 25. And Mr. Lurie himself testified that users may prefer to watch videos on a platform that is not the "original source" for multiple different reasons, including the technical performance of the platform and the other videos available to watch on the site. Ex. 41 (Lurie Dep.) 69:12–70:19. In short, whether Google should consider "original source" in search ranking is a classic product design choice that is protected under the antitrust laws. *See Allied Orthopedic*, 592 F.3d at 998; *ILC Peripherals*, 458 F. Supp. at 439–41.[7]

Further, there is no evidence that Google's decision not to prioritize the original platform on which a video is first posted even benefits YouTube. As Mr. Lurie conceded, users frequently post

---

[6] Dr. Allan is the former Dean of the University of Massachusetts College of Information and Computer Sciences who has taught and researched search engines for 35 years. *See* Ex. 46 (Allan Reb. Rpt.), Ex. B.

[7] For the same reason, the example query screenshots in Rumble's FAC do nothing to establish that Google's Search ranking processes are anticompetitive. Three of them are based on the same premise that the "original source" of a video should rank first in Google search results. *See* FAC ¶¶ 10–13, 72 & Fig. 1, 2, & 5. The two additional example screenshots involve broad, general queries. *See id.* ¶¶ 69–70 & Fig. 3 & 4. Even Mr. Lurie recognizes that "[w]here queries are complex, broad, or highly competitive, it's believable that some subtle component of the algorithm or a penalty explains why" YouTube videos may rank at the top of Google search results. Ex. 44 (Lurie Op. Rpt.) ¶ 119; *see also id.* ¶ 19. And as Dr. Gal testified, from a consumer perspective, there is no objectively "right" way to rank search results. Ex. 49 (Gal Dep.) 50:18–51:5. Moreover, for these examples, Rumble does not even attempt to explain why the Google Search rankings should have been any different, or how a different ranking would provide greater consumer utility.

videos first *to YouTube*. Ex. 41 (Lurie Dep.) 67:17–25. Thus, if anything, it is likely that Google's design decision disfavors YouTube in the aggregate because YouTube would be the "original source" of so many videos.

>    2.    Google's Use of User Interaction Data Does Not Support Rumble's Claim.

Rumble additionally points to Google's use of what are known as user interaction data in search ranking as evidence that Google favors YouTube in an anticompetitive way because YouTube is a popular platform. *See* Ex. 44 (Lurie Op. Rpt.) ¶¶ 87–95. But the undisputed evidence is that Google's use of this data is not specific to YouTube—and, indeed, can favor non-YouTube webpages over YouTube webpages. There is no evidence that Google's use of such data was motivated by a desire to favor YouTube in any way or that use of such signals does anything but yield better search results for users. All general search engines consider user interaction data to improve their search results because it helps indicate which webpages satisfy users' information needs.

The record shows that Google Search utilizes two types of user interaction data in its ranking process. *See* Ex. 46 (Allan Reb. Rpt.) ¶¶ 18–19. Specifically, Google collects data about which webpage links users click on and the time it takes users to return to Google search results after clicking on a particular search result (called "Navboost"). Ex. 9 (Desikan Dep.) 180:16–181:2, 247:9–248:20; Ex. 1 (Nayak Dep.) 52:5–9; Ex. 10 (Papachristou Dep.) 241:7–20; Ex. 11, at -192. Google then aggregates this data across the trillions of queries it processes each year to help identify the webpages that users are most interested in when they issue the same or similar queries. Ex. 9 (Desikan Dep.) 245:5–22; Ex. 1 (Nayak Dep.) 91:6–92:4; Ex. 11, at -192; Ex. 8, at -197. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

---

[8] Mr. Lurie also misstates how Google actually uses this user interaction data. ██████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

There is not a shred of evidence that these signals are deployed to uniquely benefit YouTube webpages. In fact, Google Search has used user interaction data for all webpages since before Google even acquired YouTube. Ex. 41 (Lurie Dep.) 268:24–269:7. Experiments show that these signals enhance the quality of Google search results. Ex. 41 (Lurie Dep.) 261:11–17; Ex. 50, at -525; *see* Ex. 1 (Nayak Dep.) 220:2–15 (describing user interaction signals as "quite useful" in ranking search results). Accordingly, such data is utilized across-the-board in Google Search ranking for all websites. Ex. 41 (Lurie Dep.) 261:7–10, 268:12–269:7. Indeed, it is undisputed that such user interaction signals are not specific to YouTube. As Mr. Lurie expressly acknowledged, for any given query, a non-YouTube video "absolutely" can outrank YouTube videos on the user interaction metric. *Id.* at 267:11–15.

Google's utilization of these signals is exactly the kind of product design decision that falls outside the domain of the antitrust laws. *See Allied Orthopedic*, 592 F.3d at 998; *ILC Peripherals*, 458 F. Supp. at 439–41. And Google Search is not the only search engine to utilize user interaction signals. As Dr. Allan explains, based on his decades of experience researching search engines, "it is widely understood that it is appropriate for a sophisticated search engine such as Google to take user feedback into consideration." Ex. 46 (Allan Reb. Rpt.) ¶ 69. Google's leading general search engine competitor, Microsoft Bing, also utilizes user interaction signals. Ex. 41 (Lurie Dep.) 269:21–24. As Microsoft has publicly explained: "Bing also considers how users interact with search results. To determine user engagement, Bing asks questions like: Did users click through to search results for a given query, and if so, which results? Did users spend time on these search results they clicked through or quickly return to Bing?" Ex. 51, at 4–5.

Underscoring all of this, Rumble's own expert, Mr. Lurie, does not contest that Google can and should take user interaction signals into account. He admits that it is "reasonable" for a search engine to consider such data when ranking search results. Ex. 41 (Lurie Dep.) 271:25–272:10. And he agrees

that these signals are "absolutely" something that "a search engine can decide to do when its engineers are designing how it's going to work." *Id.* at 272:12–15. Those admissions conclusively show that there is no evidence that Google's consideration of user interaction data in Google Search ranking is anticompetitive.

### 3. The Prevalence of YouTube in Google Search Results Does Not Support Rumble's Claim.

Finally, Rumble suggests that the mere prevalence of YouTube webpages in Google search results supports its claim of anticompetitive self-preferencing. But for many of the same reasons discussed above, simply showing that YouTube appears in Google search results does not establish intentional and artificial self-preferencing that is anticompetitive. Rather, the undisputed evidence shows that YouTube is a popular website featuring billions of videos on a wide range of topics. *See supra* pp. 5–6; Ex. 41 (Lurie Dep.) 281:10–22. In fact, "YouTube" has for years been among the most popular search queries on Google. Ex. 52; Ex. 64.

Given YouTube's popularity, it is not surprising that Microsoft Bing displays YouTube webpages *more prominently* than Google Search does in its search results. A statistical analysis of a randomized sample of video-seeking search queries across results generated by the two search engines demonstrates this. Ex. 53 (Stodden Op. Rpt.) ¶ 43. Far from contesting that finding, Mr. Lurie confirmed as much, arguing that YouTube results "dominate" on Bing. Ex. 41 (Lurie Dep.) 247:24–248:3. By Mr. Lurie's own admission, Google Search seeks to index and crawl video content from many *more* sites than Bing. *Id.* at 248:24–249:14. This is not evidence of anticompetitive conduct.

\*          \*          \*

In sum, there is no triable issue as to whether Google's Search ranking processes are anticompetitive, and the Court should grant summary judgment on Rumble's allegation of "self-preferencing."

## II. THERE IS NO TRIABLE ISSUE OF "EXCLUSIONARY" PREINSTALLATION OF THE YOUTUBE APP

Rumble also alleges, as the second premise of its Section 2 claim, that Google engaged in "exclusionary conduct" by "requiring pre-installation and prominent placement of Google's YouTube apps on all Android smartphones in the United States." FAC ¶ 194. But the undisputed factual record debunks this assertion: Google's MADAs with Android OEMs are *not* exclusive because they do not preclude any Android OEM from preinstalling any other video platform application (including Rumble) on their devices. The lack of "any exclusive requirements" with respect to YouTube also forecloses any "de facto" exclusive dealing theory (to the extent such theory is even cognizable in the Ninth Circuit). *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1182 (9th Cir. 2016) ("[W]e have not explicitly recognized a "de facto" exclusive dealing theory like that recognized in the Third Circuit and Eleventh Circuit."). In short, there is no triable issue of "exclusionary" preinstallation of the YouTube app.[9]

### A. The Undisputed Evidence Demonstrates that None of Google's Android Agreements Requires Exclusivity with Respect to YouTube

"Exclusive dealing involves an agreement between a vendor and a buyer that prevents the buyer from purchasing a given good from any other vendor." *Qualcomm*, 969 F.3d at 1003. To determine whether an exclusive dealing arrangement exists, courts are "require[d] [to] look at the actual terms of the agreements" and "typically focus on whether there are requirement terms (*i.e.*, terms requiring a buyer to purchase all the product or service it needs from one seller) . . . that prevent meaningful competition by taking potential purchasers off the market." *Aerotec*, 836 F.3d at 1181. Here, *none* of the "actual terms" of the MADAs—or any Google Android agreement—require the exclusive

---

[9] To the extent Rumble frames the same alleged anticompetitive conduct as "tying," that still is insufficient to survive summary judgment. *See Eastman v. Quest Diagnostics Inc.*, 724 F. App'x 556, 558 n.1 (9th Cir. 2018) (Plaintiffs' "allegations of 'tying' and 'exclusive dealing' . . . are essentially the same exclusionary practice for § 2 purposes, and therefore the analysis set forth for exclusive dealing also applies to the tying claim for purposes of § 2").

preloading of YouTube, and ***none*** prevent an Android OEM or carrier from preloading another video platform app, including Rumble. In short, the challenged agreements are plainly not exclusive.

In addition to the MADAs, Rumble cites four other categories of Google Android agreements as being exclusionary: Anti-Fragmentation (miscited as Anti-Forking) Agreements (AFAs), Android Compatibility Commitments (ACCs), Revenue Sharing Agreements (RSAs), and Mobile Service Incentive Agreements (MSIAs). *See* FAC ¶¶ 102–23; Ex. 43 (Rumble Contention Interrogatory Responses) at 8–51. But as Rumble's own lengthy recitation of the provisions in these agreements confirms, AFAs, ACCs, RSAs, and MSIAs do not contain any requirements relating to the YouTube mobile app. *Id.* at 8–16, 23–51; Ex. 20 (Murphy Op. Rpt.) ¶¶ 27–31.

The AFAs and ACCs concern certain commitments made by OEMs to ensure a baseline of technical compatibility across devices running the Android operating system, and have nothing to do with the preloading of any application. Ex. 24 (Kolotouros Dep.) 49:3–11. The RSAs and MSIAs primarily concern payments relating to the promotion of Google Search or the larger Android device ecosystem, and do not "have anything to do with the placement or preload of the YouTube app." *Id.* at 242:17–22.

As for the MADAs, which license YouTube for non-exclusive preinstallation on Android mobile devices, the only requirement relating to YouTube is that, to the extent OEMs choose to preload Google apps at all, they preload the YouTube app in a folder with other Google apps on the device default home screen. Ex. 43 (Rumble Contention Interrogatory Responses), at 17–18; Ex. 2 (Samsung 2017 MADA), at -179 (Section 3.3)); Ex. 24 (Kolotouros Dep.) 58:19–59:8.

The MADAs do not preclude Android OEMs or carriers from preloading another video platform app on any Android device. To the contrary, the MADAs expressly provide that "***this Agreement does not restrict or limit Company from preloading or determining the placement of its own or third party applications or services on its Android devices***." Ex. 2 (Samsung 2017 MADA), at -179 (Section 3.3) (emphasis added); *see also* Ex. 23 (Motorola 2018 MADA), at -636 (Background) ("Nothing in this Agreement is intended to restrict Company or end users from installing third-party

services on devices with Google's suite of mobile services, including services with similar functionality"). Thus, the MADAs do not preclude an Android OEM or carrier from preloading another video platform app, including with *superior* placement to YouTube, for example, as a standalone app icon on the default home screen or in the application dock ("hotseat") available at the bottom of every screen.

Rumble also alleges that the MADAs make certain apps, including YouTube, "undeletable." FAC ¶ 85. While OEMs who choose to preload the YouTube app are required to place its code— along with that of five other apps—in a device's system partition such that end users cannot remove that code from the device, it is undisputed that the YouTube app can be "disabled," which makes the YouTube app invisible to the user and prevents the YouTube app from consuming the device's resources. Ex. 24 (Kolotouros Dep.) 59:3–8, 135:7–20. In any event, the purported undeletability of the YouTube app does not "prevent[] the buyer from purchasing a given good from any other vendor." *Qualcomm*, 969 F.3d at 1003. As Rumble acknowledges, there is no technical reason that an Android OEM or carrier could not preload the Rumble app—in addition to the YouTube app—on its device. Ex. 49 (Gal Dep.) 101:24–102:12. Nor does the purported undeletability of the YouTube app prevent any user from downloading the Rumble app, or any other app, on their device.

Rumble also contends that Google's Android agreements require "pre-installation of the YouTube app . . . as the default online video app . . . ." FAC ¶ 27. But Rumble uses the word "default" as simply a synonym for "preinstalled," as its expert Dr. Gal confirms. Ex. 49 (Gal Dep.) 141:17–19 (Q. "And what do you mean by default?" A. "Well, a default in the sense that it's preinstalled . . . ."). There is no evidence that any Android OEM has ever configured a device to run or open the YouTube app in response to a user performing any action other than clicking on the YouTube application itself or a link to a YouTube webpage. Rather, on the Android platform, there is no system-wide "default" video platform app. Ex. 24 (Kolotouros Dep.) 234:3–5 ("I don't believe there is a default in system setting for . . . a video service like YouTube."); Ex. 49 (Gal Dep.) 142:8–13. Moreover, no provision of any Google Android agreement requires an Android OEM or carrier to set YouTube as the default

for any device function. Under these circumstances, there is no support for the notion that any Google Android agreement is exclusive with respect to the YouTube app—regardless of whether such agreements are characterized as "default" agreements.[10]

Google's Android agreements contain no restriction on the preinstallation of non-YouTube video platform apps, including in positions more prominent than the YouTube app. Because the Google Android agreements are not exclusive, the provisions in these agreements relating to the preinstallation of the YouTube app do not implicate "[t]he main antitrust objection to exclusive dealing," which "is its tendency to 'foreclose' existing competitors or new entrants from competition in the covered portion of the relevant market during the terms of the agreement." *Omega Env't, Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1162 (9th Cir. 1997).

**B.    Rumble Also Could Not Establish "De Facto" Exclusivity, to the Extent Such a Theory Is Even Cognizable in the Ninth Circuit.**

In the face of clear contractual language that does not require exclusivity for YouTube, Rumble asserts that YouTube has "practical exclusivity" on Android devices because (1) "the prominence of YouTube as a preinstalled application positioned prominently on Android devices . . . as a practical matter . . . strongly discourag[es] the use of alternative video platforms," and (2) the Android agreements "foreclos[e] rivals and potential rivals from the most important distribution channels." Ex. 43 (Rumble Contention Interrogatory Responses), at 5, 75. To the extent Rumble intends to invoke the Third Circuit's "de facto" exclusive dealing theory—which the Third Circuit imports from Section 3 of the Clayton Act to the Sherman Act Section 2 context, *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 282 (3d Cir. 2012)—Rumble's claim fails as well.

---

[10] To the extent Rumble cites *United States v. Google*, 2024 WL 3647498 (D.D.C. Aug. 5, 2024), in arguing that agreements providing for default settings can negatively impact competition, the facts of that case are distinguishable on numerous grounds, including that it involved agreement provisions that expressly provided for the setting of a search engine to perform defined functionalities on a device. These functionalities would automatically perform searches in the default search engine without the user actively choosing a particular search engine for that search. There is no comparable default setting for a video platform like YouTube or Rumble—no device functionality automatically invokes any video platform. Rather, the user must make an intentional decision to use a given platform to watch a video uploaded to that platform.

*First*, "de facto" exclusive dealing is not a valid—or at most, a very limited—theory in the Ninth Circuit. "The Ninth Circuit has not 'explicitly recognized a "de facto" exclusive dealing theory like that recognized in the Third Circuit and Eleventh Circuit.'" *Teva Brands LLC v. Bayer HealthCare LLC*, 2024 WL 1909156, at *7 (N.D. Cal. May 1, 2024) (citing *Aerotec*, 836 F.3d at 1182). Instead, the Ninth Circuit only recognizes that "[i]n certain limited situations, discounts and rebates *conditioned on a promise of exclusivity* may be understood as 'de facto' exclusive dealing contracts." *Aerotec*, 836 F.3d at 1182 (emphasis added). "[I]n the absence of any exclusive requirements on which the discount is conditioned, the sale remains nonexclusive." *Id.* As discussed above, none of the Google Android agreements condition anything on "a promise of exclusivity" for YouTube—therefore, as a matter of law, the Android agreements "remain[] nonexclusive." *Id.*

*Second*, even a "de facto" exclusive dealing theory does not save Rumble's case. As the Ninth Circuit has recognized, even under a "de facto" exclusive dealing theory, "a plaintiff must still show that the contracts that were induced were exclusive . . . contracts, which inevitably foreclose or exclude alternative sellers from some portion of the market." *Id.* For example, "a 15 percent discount on a single sale . . . may be enticing enough to 'coerce' a purchase in that instance, but in the absence of any exclusive requirements on which the discount is conditioned, the sale remains nonexclusive." *Id.* Again, no "features of the [Android agreements] required exclusivity" for YouTube; therefore, Rumble's theory fails under the "de facto" exclusive dealing standard as well.

*Third*, Rumble's "practical exclusivity" argument has no support in the record. There is no evidence that any Android OEM or carrier did not want to preload the YouTube app on any Android device, or was prevented as a practical matter from preloading Rumble in addition to YouTube.[11] Indeed, Rumble did not have an Android application until 2020. Ex. 38 (Sterling Dep.) 45:11–46:1.

---

[11] This lack of evidence is similarly fatal to any tying claim that Rumble may choose to pursue. *See Paladin Assocs., Inc. v. Mont. Power Co.*, 328 F.3d 1145, 1159 (9th Cir. 2003) (granting summary judgment on tying claim because "[a] plaintiff must present evidence that the defendant went beyond persuasion and coerced or forced its customer to buy the tied product in order to obtain the tying product").

Finally, it is indisputable that users can and do readily download applications, including specifically video applications, on Android devices. The Google Play Store ensures that Android device users can easily download any apps they wish. In 2023, users in the U.S. downloaded video platform apps over *268 million times*. Ex. 20 (Murphy Op. Rpt.) ¶¶ 140, 142. Indeed, users have downloaded Rumble's mobile app over 4.5 million times. *Id.* ¶ 142. This contradicts any notion that YouTube has achieved "practical exclusivity" on Android devices.

For all these reasons, the Court should grant summary judgment with respect to Rumble's "exclusive" preinstallation theory.

## III.  RUMBLE CANNOT DEMONSTRATE ANTICOMPETITIVE EFFECTS

It is settled law that "to be condemned as exclusionary [under § 2], a monopolist's act must have an anticompetitive effect—that is, it must harm the competitive process and thereby harm consumers. In contrast, harm to one or more competitors will not suffice." *Qualcomm*, 969 F.3d at 990 (cleaned up) (quoting *United States v. Microsoft Corp.*, 253 F.3d 34, 58 (D.C. Cir. 2001)); *see also supra* pp. 9–10. All aspects of Rumble's claim fail for the independent reason that Rumble cannot meet its burden to demonstrate anti-competitive effects in any relevant market.

### A.  Google Has Not Substantially Foreclosed Rumble from a Relevant Market

Rumble cannot show that Google's alleged conduct foreclosed a substantial share of Rumble's alleged relevant market. First, Rumble has adduced no evidence of *any* foreclosure resulting from the preinstallation of the YouTube app on Android mobile devices for the simple reason that those agreements are not exclusive: OEMs, carriers, and other partners are free to preinstall competing video apps, including Rumble, on Android devices. *See supra* Section II. Moreover, even if the MADAs are deemed "exclusive" with respect to the preload of online video platform apps, there are significant alternative distribution channels—users can access Rumble and other online video platforms on Apple iPhones, iPads, and Mac computers, myriad other desktop and laptop computers, and living room devices like smart TVs and gaming consoles. And even on Android devices with the YouTube app preloaded, users can both access Rumble and other online video platforms via browsers and freely

download the apps of those platforms.  Second, Rumble's self-preferencing allegations fare no better. The undisputed evidence is that Google Search provides an immaterial share of total video viewing traffic to both YouTube and Rumble.  Because Rumble cannot demonstrate that Google's alleged conduct has substantially foreclosed consumers from accessing Rumble or any competing video platform, the Court should grant summary judgment on Rumble's claim.

      1.     <u>Rumble Cannot Meet Its Burden to Demonstrate Substantial Foreclosure As a Result of Preinstallation of the YouTube App on Android Mobile Devices</u>

It is settled law that "an exclusive dealing arrangement is not per se illegal" and only violates the Sherman Act "if its effect is to foreclose competition in a substantial share of the line of commerce affected."  *Qualcomm*, 969 F.3d at 1003 (internal quotation marks and citation omitted).  Rumble cannot demonstrate substantial foreclosure, so summary judgment is warranted on its preinstallation theory even if Google's agreements were "exclusive."

      a.     *There Is No Substantial Foreclosure Because the Preinstallation of the YouTube App Is Not Exclusive*

The aspect of Rumble's claim that is based on preinstallation of the YouTube app on Android mobile devices fails because the contracts that provide for that preinstallation are not exclusive and therefore cannot foreclose Rumble from any portion of the alleged relevant market.  Nothing in any of the at-issue Google Android contracts restricts an OEM or carrier from preinstalling competing video apps.  Rumble thus cannot show that these agreements "in fact substantially foreclosed [an Android OEM or carrier from] dealing with a competitor" online video platform.  *Aerotec*, 836 F.3d at 1181.

      b.     *Even Assuming the Preinstallation of the YouTube App Is Exclusive, There Would Still Be No Substantial Foreclosure*

Even if the MADAs were exclusive, these agreements would be "less cause for anticompetitive concern" because they are "imposed on distributors rather than end-users."  *See Omega*, 127 F.3d at 1162.  Many courts have found as a matter of law that exclusive dealing arrangements with distributors do not cause substantial foreclosure where alternative distribution channels exist.  *See Golden Boy*

*Promotions LLC v. Haymon*, 2017 WL 460736, at *15 (C.D. Cal. Jan. 26, 2017) (granting summary judgment where exclusive deals between television networks and boxing promoter defendants to air only defendants' matches did not substantially foreclose competition given "existing and potential alternative channels of distribution" to plaintiff boxing promoters); *PNY Techs., Inc. v. SanDisk Corp.*, 2014 WL 2987322, at *9 (N.D. Cal. July 2, 2014) (finding party failed to adequately allege substantial foreclosure where alternative channels of distribution (online sales) were not subject to exclusive deal "amounted to nearly a fifth of the market"); *Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, 2008 WL 4830740, at *2 (N.D. Cal. Nov. 6, 2008) (granting motion to dismiss Section 2 exclusive dealing claim where plaintiff was excluded from selling its software products through certain retailers but had "direct sales and licensing agreements" available as "alternative distribution channels"); *Invacare Corp. v. Respironics, Inc.*, 2008 WL 906112, at *10 (N.D. Ohio Mar. 31, 2008) (granting summary judgment on Sherman Act Section 1 claim because plaintiff "has not shown that consumers are unable to purchase [sleep apnea products] from other channels" as a result of exclusive dealing agreement between rival manufacturer and distributor).

Here, the undisputed evidence demonstrates that there are multiple alternative channels for Android users to access Rumble and other online video platforms: they can visit online video platform websites directly using a browser, navigate to platforms via links sent by other users (or posted on other websites or social media platforms), or download apps directly to their Android device. *See* Ex. 38 (Sterling Dep.) 35:19–39:9; Ex. 41 (Lurie Dep.) 152:17–154:18. Users can do all this in a manner of seconds. Indeed, millions of users have downloaded the Rumble application to their mobile phones from the Google Play Store. Because Rumble and other online video platforms can easily "reach the ultimate consumers" of their products who use Android devices through "alternative channels of distribution," it cannot be said that Google's Android agreements "foreclose[d] from competition *any* part of the relevant market." *Omega*, 127 F.3d at 1163; *see also* Herbert Hovenkamp, Federal Antitrust Policy § 10.8 at 391 (1994) (foreclosure of even "a large percentage of one mode of distribution will have little anticompetitive effect if another mode is available"). Further, Android devices comprise a

minority of the devices on which users access online video platforms. The contracts that Rumble challenges do not apply to Apple mobile devices or tablets, desktop or laptop computers running Windows or MacOS, or living room devices such as smart TVs and gaming consoles. Google's Android agreements, covering a minority of mobile devices sold in the United States, cannot have substantially foreclosed Rumble's access to users.

Tellingly, Rumble has failed to put forth evidence that Google's Android agreements foreclosed it from a substantial portion of the purported market. None of Rumble's experts has calculated a foreclosure percentage. Nor did it provide any analysis to show that Rumble would have been preloaded on any device or that users would have viewed more videos on Rumble absent the preinstallation of the YouTube app on Android devices that occurs pursuant to the challenged agreements. Because Rumble has failed to carry its burden on this point to prove substantial foreclosure, summary judgment is warranted. *Microsoft*, 253 F.3d at 69 ("[I]n all cases the plaintiff must both define the relevant market and prove the degree of foreclosure."); *cf. Sandoz Inc. v. United Therapeutics Corp.*, 2022 WL 17335696, at *15–17 (D.N.J. Mar. 30, 2022) (granting summary judgment because plaintiff could not show substantial foreclosure).

> ### 2. Rumble Cannot Demonstrate Substantial Foreclosure Caused by the Alleged Self-Preferencing

The undisputed record demonstrates that Google does not "self-preference" YouTube in Google search results. *See supra* Section I. However, assuming *arguendo* that the alleged self-preferencing occurred, no substantial foreclosure resulted.

By Rumble's own admission, it is not excluded from Google Search. Rumble alleges only that some YouTube videos (primarily videos on Rumble's YouTube channel) are listed *higher* in Google search results than Rumble would like, and some videos on Rumble's website are listed *lower* in Google search results than Rumble would like. FAC ¶ 27; Ex. 44 (Lurie Op. Rpt.) ¶ 23. Because Google does not foreclose consumers from accessing Rumble in Google search results, Google's ranking of search results does not foreclose Rumble from any part of the alleged market. Indeed, as

discussed above, in the three example searches highlighted by Rumble's expert, rumble.com webpages appeared "above the fold" (meaning they were visible to the user without any scrolling) in Google search results. *See* Ex. 44 (Lurie Op. Rpt.) ¶¶ 23, 50, 52.

Further, video views that result from users clicking on Google search results are a miniscule percent of overall video views on online video platforms. Non-navigational searches on Google[12] account for ***less than one percent of total traffic to both YouTube and Rumble***. Ex. 20 (Murphy Op. Rpt.) ¶ 130. No court has ever endorsed such a low level of foreclosure as "substantial" enough to prevail on a Section 2 claim. *See Eastman v. Quest Diagnostics Inc.*, 2015 WL 7566805, at *12 (N.D. Cal. Nov. 25, 2015) (dismissing Section 2 claim because "[t]en percent is far less than the 30 to 50 percent that is generally required to plead an exclusive dealing claim"); *Omega*, 127 F.3d at 1162–63 (potential foreclosure of 38% did not violate antitrust laws); *Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, 2013 WL 5694452, at *12 (N.D. Cal. Oct. 18, 2013) (granting motion to dismiss Section 1 claim where the at-issue agreement could foreclose at most only nine percent of the market); *Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.*, 35 F. Supp. 2d 1138, 1143 (D. Minn. 1999) (finding "judicial decisions have established a virtual safe harbor for market foreclosure of 20 percent or less" (quotation marks omitted)).

Finally, as discussed above, significant alternative distribution channels exist for Rumble and other online video platforms. Now more than ever, users seeking to watch videos online have abundant options. The same is true for creators looking for places to upload their videos. Rumble and other video platforms can easily reach users and creators through channels other than Google Search. *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 Fed.Appx. 554, 557 (9th Cir. 2008) (dismissing case because allegation that MySpace disabled on its site links to other platforms did not plausibly show antitrust injury where there was no allegation that defendant had prevented consumers from accessing other

---

[12] A navigational search refers to a search query such as "YouTube" or "Rumble" where a user is using a search engine to navigate to a specific web page (instead of typing a URL directly into the browser) and includes the name of the entity they are seeking to navigate to in their search query. Rumble has not alleged any anticompetitive conduct by Google arising from navigational search queries entered by users trying to navigate to Rumble's website.

websites and "any consumer desiring such access need only type [the competitor's website] into the address bar . . . or into a search engine").

* * *

In an online video platform market, "[c]ompetitors are free to sell directly, to develop alternative distributors, or to compete for the services of the existing distributors. Antitrust laws require no more." *Omega*, 127 F.3d at 1163. Summary judgment on Rumble's claim is thus appropriate.

### B. Rumble Cannot Establish Harm to Competition

Rumble claims various injuries that it purportedly suffered, but it fails to show harm to *competition*. That alone is grounds to grant summary judgment on Rumble's claim.

In *Sayre v. Google, Inc.*, for instance, the court dismissed a claim based on allegations that Google "limited" or "hid" the plaintiff's messaging platform in Google search results, concluding that the plaintiff did "not allege that Google's conduct harmed competition or consumers, but instead that it only harmed [plaintiff's product]." 2019 WL 6036703, at *2 (N.D. Cal. Nov. 14, 2019).

Here, Rumble has not established the required harm to competition or consumers. The price of YouTube has not increased; it has always been free. There is no evidence that users have seen reduced quality in terms of the content or user experience available in an online video platform market. In fact, the breadth and quality of content on YouTube is greater than it has ever been, as is the ability of users to find and enjoy that content on the platform. *See* Ex. 54, at -552 (daily watch hours on YouTube increased from 15 million in 2007 to ***3.5 billion in 2020***). Nor has Rumble established that Google harmed users by causing creators to produce less content. Rumble and its experts do not provide *any* quantitative or qualitative evidence that total compensation to content creators has decreased during the relevant time period, or provide any proof that content creators have produced less content for users.

Because Rumble cannot prove harm to competition, the Court should grant summary judgment for Google. *Gorlick Distrib. Ctrs., LLC v. Car Sound Exhaust Sys., Inc.*, 723 F.3d 1019, 1026 (9th

- 30 -

Cir. 2013) (per curiam) (granting summary judgment where plaintiff failed to show harm to competition); *McDaniel v. Appraisal Inst.*, 117 F.3d 421, 423 (9th Cir. 1997) (same), *opinion amended on denial of reh'g*, 127 F.3d 1135 (9th Cir. 1997).

## IV. THE STATUTE OF LIMITATIONS BARS RUMBLE'S CLAIM

Section 2 claims like the one Rumble asserts here are "forever barred unless commenced within four years after the cause of action accrued." 15 U.S.C. § 15b; *see Hawthorne Hangar Ops., L.P. v. Hawthorne Airport, LLC*, 2022 WL 3102452, at *2 (9th Cir. Aug. 4, 2022) (affirming summary judgment on Section 2 claim because the statute of limitations had run); *SaurikIT, LLC v. Apple, Inc.*, 2023 WL 8946200, at *1 (9th Cir. Dec. 28, 2023) (affirming dismissal of Section 2 claim on same grounds). For antitrust claims, "a cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). What matters is when the alleged conduct first took place, not when the plaintiff learned of it. *See Beneficial Std. Life Ins. Co. v. Madariaga*, 851 F.2d 271, 274–75 (9th Cir. 1988) (in "actions governed by 15 U.S.C. § 15b, the plaintiff's knowledge is generally irrelevant to accrual"); *Staley v. Gilead Scis., Inc.*, 2021 WL 4972628, at *15 (N.D. Cal. Mar. 12, 2021) ("antitrust claims are not subject to the discovery rule").[13]

Under Rumble's own theory of the case, Rumble's filed its complaint more than four years after its cause of action allegedly accrued. Rumble is claiming damages from Google's allegedly anticompetitive conduct dating back to *April 2014, shortly after Rumble was created*. *See* Ex. 3 (McClave Op. Rpt.) at 3 n.4, 5, Table 6, Table 7. By that measure, the deadline for Rumble to have brought its claim was *April 2018*. *See* 15 U.S.C. § 15b. But Rumble did not file its complaint until almost *three years later*. ECF No. 1. Indeed, Rumble testimony dates the start of Google's purportedly anticompetitive conduct even earlier. Rumble's CEO, Mr. Pavlovski testified that "[b]y 2007 Google bought YouTube. . . . And then basically all the search traffic stopped coming to all the different

---

[13] To the extent Rumble is pursuing injunctive relief, the equitable defense of laches likewise bars Rumble's claim. *See Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085–86 (9th Cir. 2014) ("[I]n applying laches, we look to the same legal rules that animate the four-year statute of limitations.").

websites of my friends that I know, including me[.]"  Ex. 26 (Pavlovski Dep.) 26:23–27:7.  And that "[b]y 2013, [when he] started Rumble," "immediately the same issue appeared."  *Id*. at 27:8–16.  Google further produced in this litigation MADAs dating back as early as January 1, 2011 that license the YouTube app to Android OEMs for preload as part of a bundle of Google applications, and that provide for placement of the YouTube app.  *See, e.g.*, Ex. 55 (Samsung 2011 MADA).  That OEMs have preloaded YouTube on Android devices with other Google applications has been a publicly known fact for over a decade as well.

Rumble cannot meet its burden of establishing any basis for tolling the limitations period here.  *See Hawthorne Hangar Ops.*, 2022 WL 3102452, at *2 ("The party seeking relief [from the statute of limitations] bears the burden of satisfying [the] elements" for excepting compliance.).  Rumble never pled any facts in its complaint to support an exception to the statute of limitations or any basis for tolling the statute of limitations.  It did not plead fraudulent concealment, for instance, which bars any assertion by Rumble of tolling on that ground now.  *See Conmar Corp. v. Mitsui & Co.*, 858 F.2d 499, 502 (9th Cir. 1988) (reviewing grant of summary judgment and explaining that the plaintiff "carries the burden of *pleading* and proving fraudulent concealment; it must *plead* facts showing that [defendant] affirmatively misled it, and that [plaintiff] had neither actual nor constructive knowledge of the facts giving rise to its claim despite its diligence in trying to uncover those facts." (emphasis added)).

Likewise, the so-called "continuing violation" doctrine does not apply here.  That doctrine recognizes that "an overt act by the defendant is required to restart the statute of limitations."  *Pace Indus., Inc. v. Three Phx. Co.*, 813 F.2d 234, 237 (9th Cir. 1987).  An "overt act" "must be a new and independent act that is not merely a reaffirmation of a previous act . . . [i]t must inflict new and accumulating injury on the plaintiff."  *Id*. at 238.  But again, under Rumble's own theory of the case, Google has been artificially boosting YouTube in Google search results since no later than 2014, and potentially as early as 2006.  Rumble points to no "new and independent act" during the limitations period that caused it "harm over and above the harm" caused by the "self-preferencing" that Rumble

alleges began many years before. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 190 (1997) ("any new act [must] have caused [plaintiff] harm over and above the harm that the earlier acts caused"); *see MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1107 (N.D. Cal. 2012) (product releases involving the same practices as prior releases were "simply reaffirmations of a previous act insufficient to restart the statute of limitations" (cleaned up)); *In re Multidistrict Vehicle Air Pollution*, 591 F.2d 68, 70–72 (9th Cir. 1979) (rejecting argument that "each day" defendant refused to deal with plaintiff "constituted a new cause of action" that restarted the limitations period).

Similarly, under Rumble's theory of the case, Google has had an unbroken policy of contracting for preinstallation of a bundle of Google apps that includes the YouTube app on Android devices since at least 2011. Rumble can point to no "new and independent act" relating to Google's distribution practices regarding the YouTube app during the limitations period that restarted the statute of limitations. *See, e.g.*, *Aurora Enters., Inc. v. Nat'l Broad. Co.*, 688 F.2d 689, 695 (9th Cir. 1982) ("[T]he mere fact that defendants receive a benefit today as a result of a contract executed [during the limitations period] is not enough to restart the statute of limitations."); *SaurikIT, LLC*, 2023 WL 8946200, at *1 ("[P]ermitting new unchanged . . . agreements to establish continuing violations would vitiate the purpose of the statute of limitations.").

Because Rumble filed its complaint after the statute of limitations expired, the Court should grant summary judgment for Google. *See Hawthorne Hangar Ops*, 2022 WL 3102452, at *2; *SaurikIT, LLC*, 2023 WL 8946200, at *1.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment and dismiss the case.

DATED: October 11, 2024

WILLIAMS & CONNOLLY LLP

By: _John E. Schmidtlein_

John E. Schmidtlein (CA State Bar No. 163520)
Stephen J. Fuzesi (admitted _pro hac vice_)
Benjamin M. Greenblum (admitted _pro hac vice_)
Youlin Yuan (admitted _pro hac vice_)
Daniel Whiteley (admitted _pro hac vice_)
Jesse T. Clay (admitted _pro hac vice_)

WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Telephone:     (202) 434-5000
Facsimile:     (202) 434-5029
Email:          jschmidtlein@wc.com
                sfuzesi@wc.com
                bgreenblum@wc.com
                yyuan@wc.com
                dwhiteley@wc.com
                jclay@wc.com

David H. Kramer (CA SBN 168452)
WILSON SONSINI GOODRICH & ROSATI P.C.
650 Page Mill Road
Palo Alto, CA 94304
Telephone:     (650) 493-9300
Facsimile:     (650) 565-5100
Email:          dkramer@wsgr.com

_Attorneys for Defendant Google LLC_

- 34 -

**CERTIFICATE OF SERVICE**

I, John E. Schmidtlein, hereby certify that, on October 11, 2024, I caused a true and correct copy of the foregoing to be served on all counsel of record by email.

*John E. Schmidtlein*
John E. Schmidtlein