Robert W. Dickerson, Jr. (SBN 89367)
E-mail: rdickerson@comp-techlaw.com
Allan W. Jansen (SBN 81992)
E-mail: ajansen@comp-techlaw.com
Ehab M. Samuel (SBN 228296)
E-mail: esamuel@comp-techlaw.com
COMPETITION & TECHNOLOGY LAW GROUP LLP
11400 West Olympic, Blvd., Suite 200
Los Angeles, CA 90064
Tel:  (310) 774-2337
Fax: (213) 799-3642

Nicholas A. Gravante, *Admitted Pro Hac Vice*
Email:  nicholas.gravante@cwt.com
Philip J. Iovieno, *Admitted Pro Hac Vice*
Email: philip.iovieno@cwt.com
Jack G. Stern, *Admitted Pro Hac Vice*
Email: jack.stern@cwt.com
Kristen J. McAhren, *Admitted Pro Hac Vice*
Email: kristen.mcahren@cwt.com
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Tel: (212) 504-6000
Fax: (212) 504-6666

*Attorneys for Rumble Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| RUMBLE INC.,<br><br>                    Plaintiff,<br><br>     v.<br><br><br>GOOGLE LLC,<br><br>                    Defendant. | Case No. 21-cv-00229-HSG (LJC)<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE OPINIONS OF DR. JAMES MCCLAVE**<br><br>Hearing Date:  January 23, 2025<br>Time:          2 p.m.<br>Place:         Courtroom 2<br>Judge:         Hon. Haywood S. Gilliam, Jr. |

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ........................................................................................ 1

II.   LEGAL STANDARD ................................................................................. 1

III.  DR. MCCLAVE'S DAMAGES OPINION IS RELIABLE AND RELEVANT ......... 2

    A.   Dr. McClave's Damages Methodology Uses Generally Accepted Steps and Data Sources That Are Undisputed ................................................ 2

    B.   Google's Arguments Rely on Unsupported Factual Assumptions Directed to the Correctness of Dr. McClave's Damages Estimate .................. 6

        1.   Google's Arguments Regarding Incremental Video Views Rely on Unsupported and Premature Liability Assumptions .................................. 7

        2.   Google Challenges the Weight but Not the Choice of Dr. McClave's Benchmark ............................................................................. 10

        3.   Google Does Not Challenge Dr. McClave's Estimate of Costs but Instead Offers Unsupported Assumptions of Additional Costs ............... 12

IV.   DR. MCCLAVE'S OPINION REGARDING THE RUMBLE APP IS ADMISSIBLE BECAUSE A DAMAGES EXPERT NEED NOT PROVE ALL PREDICATE CAUSATION ................................................................ 13

V.    DR. MCCLAVE'S DAMAGES ARE CONSERVATIVE ......................... 14

VI.   CONCLUSION .......................................................................................... 15

1

2

## TABLE OF AUTHORITIES

3

4

### CASES

*Alaska Rent-A-Car v. Avis Budget Corp.*, 738 F.3d 960 (9th Cir. 2013) ............................... passim

*Bakst v. Community Mem. Health System, Inc.*, No. CV 09-08241 MMM (FFMx),

    2011 WL 13214315 (March 7, 2011) ............................................................. 8, 14, 15

*Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288 (N.D. Cal. 2020) ........................................ 6, 8

*Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251 (1946) ............................................... 9

*Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993) .................................................. passim

*Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359 (1927) ................................ 2

*In re Capacitors Antitrust Litigation (No. III)*, No. 17-md-02801-JD,

    2018 U.S. WL 5980139 (N.D. Cal. Nov. 14, 2018) ............................................. 5

*In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO,

    2017 WL 679367 (N.D. Cal. Feb. 21, 2017) ............................................. 6, 8, 12, 13

*In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014) ........................................ 10

*Kim v. Benihana*, No. 5:19-cv-02196-JWH-DTBx,

    2024 WL 3550390 (C.D. Cal. May 20, 2024) ........................................ 9

*Montgomery County v. Microvote Corp.*, 320 F.3d 440 (3d Cir. 2003) ..................................... 11

*Obrey v. Johnson*, 400 F.3d 691 (9th Cir. 2005) ........................................................ 5

*Primiano v. Cook*, 598 F.3d 558 (9th Cir. 2010) ...................................................... 1

*Rodriguez v. Google, LLC*, 2024 U.S. Dist. LEXIS 1290 (N.D. Cal. Jan. 3, 2024) ..................... 7

*San Francisco Baykeeper v. City of Sunnyvale*, 627 F. Supp. 3d 1085 (N.D. Cal. 2022) ............. 1

*Stiner v. Brookdale Senior Living*, 665 F. Supp. 3d 1150 (N.D. Cal. 2023) ................................ 8

*Story Parchment Paper Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555 (1931) ................. 9

*Unknown Party v. Arizona Bd. of Regents*, 641 F. Supp. 3d 702 (D. Ariz. 2022) ......................... 2

### RULES

Fed. R. Evid. 702 ............................................................................................... 2

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## I.    INTRODUCTION

Google offers nearly a dozen criticisms of Dr. McClave's calculation of damages, not one of which challenges Dr. McClave's damages methodology. Google, instead, largely parrots the unattributed factual assumptions of its own expert, Dr. Kevin Murphy, who disagrees with certain inputs that affect the amount of damages estimated by Dr. McClave's model, but not the model itself. Like Dr. Murphy, Google even goes so far as to argue that Dr. McClave's analysis is "flawed" because he never should have assumed Rumble would be harmed by Google's conduct in terms of video views or revenue, at all. These criticisms, as well as others in Google's motion, rely on disputed facts or differing assumptions and are by their own terms directed to the weight and not the admissibility of Dr. McClave's opinions.

The appropriate question for a *Daubert* motion is not the correctness of a damages opinion (which in an antitrust case is necessarily imprecise), but whether there exists a reliable methodology supported by relevant triable issues sufficient to reach the finder of fact. Dr. McClave's testimony satisfies these and all other *Daubert* requirements. Google's motion should be denied.

## II.    LEGAL STANDARD

The district court's role under *Daubert* is as "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010). The focus is on the appropriateness of the expert's methodologies and whether they are relevant to the case, without regard to their correctness. *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579, 592-93 (1993); *Alaska Rent-A-Car v. Avis Budget Corp.*, 738 F.3d 960, 969-70 (9th Cir. 2013) (under *Daubert,* the judge is "supposed to screen the jury from unreliable nonsense opinion, but not exclude opinions merely because they are impeachable"). Disputes about facts, non-speculative assumptions or inferences from facts, or even hypothetical facts and/or assumptions provided by counsel go to the weight and not the admissibility of the opinion. *Primiano*, 598 F.3d at 565; *San Francisco Baykeeper v. City of Sunnyvale*, 627 F. Supp. 3d 1085, 1095-96 (N.D. Cal. 2022) (relative weakness of factual

1    underpinnings goes to the weight and not admissibility of opinion) (citations omitted); *Unknown*

2    *Party v. Arizona Bd. of Regents*, 641 F. Supp. 3d 702, 727 (D. Ariz. 2022) ("Generally, a

3    disagreement with an expert's assumptions does not provide a basis for excluding this

4    testimony."). The Court has considerable discretion to admit expert testimony based on the

5    circumstances of a particular case. *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998,

6    1005 (9th Cir. 2004).

7         The recent amendments to Rule 702 seek to clarify the Rule's preponderance standard:

8    "[N]othing in the amendment requires the court to nitpick an expert's opinion in order to reach a

9    perfect expression of what the basis and methodology can support." *See* Fed. R. Evid. 702

10   Advisory Cmt. Note 2023; *see also id.* ("Nothing in the amendment imposes any new, specific

11   procedures . . . .").  "Shaky but admissible evidence is to be attacked by cross-examination,

12   contrary evidence, and attention to the burden of proof, not exclusion."  *Primiano*, 598 F.3d at 565

13   (quoting *Daubert*, 509 U.S. at 597).

14   **III.    DR. MCCLAVE'S DAMAGES OPINION IS RELIABLE AND RELEVANT**

15   **A.    Dr. McClave's Damages Methodology Uses Generally Accepted Steps and Data
16           Sources That Are Undisputed**

17        Preliminarily, Google does not challenge Dr. McClave's methodology for calculating

18   damages. The typical task of an economic damages expert in an antitrust case is to construct a

19   hypothetical "but-for" world that models what sales would have been in a competitive market

20   without the defendant's anticompetitive conduct, and to then compare that "but-for" world to the

21   actual world affected by that conduct.  *Eastman Kodak Co. v. Southern Photo Materials Co*., 273

22   U.S. 359,  379 (1927) (explaining that the but-for exercise of antitrust damages is necessarily

23   predicated upon circumstantial evidence and reasonable inference). In this case, Dr. McClave

24   calculated Rumble's lost profit damages using the widely-recognized "benchmark" methodology.

25   The benchmark methodology for calculating antitrust lost profit damages entails selecting a metric

26                                           2                    PLAINTIFF'S OPPOSITION TO MOTION
                                                                 TO EXCLUDE OPINIONS OF DR. JAMES MCCLAVE
27                                                               4:21-cv-00229-HSG

1   believed to be free of anticompetitive conduct as a proxy for profits in the but-for world. *See, e.g.,*

2   *Image Tech. Servs. v. Eastman Kodak*, 125 F.3d 1195, 1222 (9th Cir. 1997); *see also Alaska*, 738

3   F.3d at 968 (discussing use of a comparator benchmark for but-for damages).

4          As a benchmark to what Rumble could have earned on Rumble.com from views un-affected

5   by Google's self-preferencing, Dr. McClave used Rumble's actual advertising revenue on

6   Rumble.com, as generated by user traffic originating from sources unrelated to Google or YouTube

7   in 2017-2018. *See* Declaration of John E. Schmidtlein in Support of Google's Motion to Exclude

8   the Opinion of Plaintiff's Proffered Expert James McClave ("Schmiedtlein Decl."), Ex. 1

9   ("McClave Rpt."), 8-9 & n.16;  Declaration of Robert W. Dickerson, Jr. ("Dickerson Decl."), Ex. D

10  ("Supp. McClave Depo. Excerpt"), 122:07-124:09 (describing the 2017-2018 benchmark as chosen

11  because traffic from social media is "relatively free of the alleged self-preferencing by Google" and

12  because the majority of that traffic occurred during those years).  To reflect evidence that it is likely

13  that traffic from the third-party sites had on average less video engagement, Dr. McClave

14  alternatively presents his benchmark with an adjustment to reflect that greater engagement as

15  discussed by Plaintiff's expert, Dr. David Gal. McClave Rpt. 8-9.

16         Mechanically, Dr. McClave's damages model takes an estimated percentage of the Rumble

17  traffic on YouTube that would have shifted to Rumble.com "but-for" Google's anticompetitive

18  conduct (as determined by the trier of fact), multiplies it by the "but-for" incremental revenue from

19  Rumble.com based on the benchmark, then subtracts the costs that Rumble would likely have

20  incurred from the additional traffic.  *Id.* 9-13.

21         For the first step, the model uses real-world data of Rumble exclusive video views on

22  YouTube, minus traffic originating from non-Google third-party sources like Facebook. McClave

23  Rpt. 4, 6. The remaining views are those  potentially affected by Google's anticompetitive conduct,

24  including views directly linked from Google search, potential subsequent additional views of videos

25  on YouTube by those users, and users who over time may have self-diverted to YouTube instead of

26

27

1   Google search. McClave Rpt. 6 & n.10; McClave Rebuttal Rpt. 4-7.  Dr. McClave explains that this

2   starting point is justified because i) many video views on YouTube begin with Google search and

3   lead to additional YouTube views; and ii) Google's long history of self-preferencing has diverted

4   users toward YouTube, as substantiated by numerous Google documents, as well as Plaintiff's

5   expert, Dr. Gal. McClave Rpt. 6 & n.10 ("Users realize that most video results in Google search

6   take them to YouTube, so starting on YouTube is more direct[.]"); McClave Rebuttal Rpt. 4-7

7   (discussing a Google study finding that 45% of the YouTube views begin with a Google search).

8   The model itself, however, does not assume all, or even any, views are impacted. To estimate the

9   added costs of additional but-for users to Rumble.com, Dr. McClave used Rumble financial

10  documents discussing those costs, which consisted primarily of bandwidth and hosting expenses.

11  McClave Rpt. 11-12.

12      Dr. McClave presents damages under "different scenarios" of unadjusted and adjusted

13  benchmarks and using different assumptions of lost traffic at 10% increments.  *Id.* 4, 13, Appx. A

14  ("Rumble's Total Unadjusted and Adjusted Lost Profits at Different Levels of Shifted Views").  He

15  also presents a result reflective of the opinion of Plaintiff's expert, Ian Lurie, who provided an

16  estimated range of diverted views from Google search.  *Id.* 12-13, Table 6, Table 7 (noting that Mr.

17  Lurie's estimate of the 40-60% range falls within his calculation of damages in 10% increments).

18  When applying Mr. Lurie's range, Dr. McClave used a 50% input, explaining that in his opinion, it

19  was statistically appropriate to go to the mean point of the range.  *Id.*; McClave Depo. 64:11-15

20  ("It's my opinion, based on my statistical expertise, that should the trier of fact accept Mr. Lurie's

21  opinion about the range, then, statistically, I would go to the midpoint.  And that's what I did.").

22      Dr. McClave thereby presents a reliable damages model, grounded in well-accepted

23  econometric techniques and supported by relevant data at each step. *See, e.g.*, *Alaska Rent-a-Car*,

24  738 F.3d at 969.

25

26                                        4                    PLAINTIFF'S OPPOSITION TO MOTION
                                                             TO EXCLUDE OPINIONS OF DR. JAMES MCCLAVE
27                                                            4:21-cv-00229-HSG

1      Google does not argue to the contrary. Despite its rhetoric, Google's motion is as notable for

2   what it does not say as for what it does say. It does not—and cannot —argue that a benchmark

3   methodology is an inappropriate way to measure but-for lost profits. It does not argue that

4   Rumble's revenue, as generated from social media traffic, is inappropriate as a benchmark or that

5   any other benchmark was available or could have been used. It does not argue that any step in Dr.

6   McClave's modeling uses methods or techniques which lack general acceptance in the field of

7   econometrics. It does not argue that there exist additional steps that Dr. McClave could have or

8   should have taken. It does not argue that the data sources used by Dr. McClave are fictional,

9   random, or not what they purport to be.  It does not argue that "lost views" is an inappropriate

10   measure of harm or lacks relevance to this case.

11      Dr. McClave's methodology is indisputably reliable and Google's arguments necessarily go

12   to the weight of certain calculations and not their admissibility. *See, e.g., In re Capacitors Antitrust*

13   *Litigation (No. III)*, No. 17-md-02801-JD, 2018 U.S. 5980139, at *6-7 (N.D. Cal. Nov. 14, 2018)

14   (attacks to a damages model where the methodology and the reliability of underlying data used by

15   the expert are not disputed necessarily go to the weight and not the reliability of the opinion

16   (citations omitted)); *Obrey v. Johnson*, 400 F.3d 691, 695-96 (9th Cir. 2005) (observations about

17   the quality of data or even whether other facts or variables should go into a damages model are for

18   the finder of fact).

19      Any argument directed to the soundness of Dr. McClave's methodology is further belied by

20   Google's own expert, Dr. Murphy, who Google tellingly does not cite in its motion.  Dr. Murphy

21   **accepted** Dr. McClave's methodology in all respects but contended that three of Dr. McClave's

22   factual inputs caused the model to "overstate" the quantity of damages.  *See* McClave Rebuttal Rpt.

23   2 (addressing Dr. Murphy as to viewership, revenue, and cost).  Dr. Murphy in turn adjusted these

24   inputs (including adjusting the input of Mr. Lurie) and used Dr. McClave's model to present an

25   alternate calculation of lesser damages.  Dickerson Decl., Ex. A ("Murphy Depo"), 132:24-133:12

26                                                    PLAINTIFF'S OPPOSITION TO MOTION
                                                   TO EXCLUDE OPINIONS OF DR. JAMES MCCLAVE
27                                                  4:21-cv-00229-HSG

("Q. . . . So you don't present your own damages model?  A. I do not.  Q. Instead, you make adjustments to Dr. McClave's model?  A. Yes. You could call them adjustments, but I think they are pretty fundamental adjustments.  So yes.").

That Dr. Murphy adopted both Dr. McClave's methodology to calculate lost profits and his data sources further establishes the reliability and relevance of that methodology.  It is for the jury to decide such a "battle of the experts" as to competing assumptions and calculations from the same methodology.  *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *12 (N.D. Cal. Feb. 21, 2017) ("[T]hat the experts dispute what the appropriate inputs should be does not undermine the approach or the reliability of [the] model.").

**B.      Google's Arguments Rely on Unsupported Factual Assumptions Directed to the Correctness of Dr. McClave's Damages Estimate**

As addressed in Dr. McClave's Rebuttal, Google's expert Dr. Murphy made "three primary criticisms of [Dr. McClave's] estimate of lost profits," asserting that any estimate was "vastly overstated" on account of assumptions and inputs as to the number of diverted views, as to the level of but-for revenue, and as to costs. McClave Rebuttal Rpt. 2-3, 12-13. Dr. McClave in turn asserts that Dr. Murphy's criticisms are "internally inconsistent" and unreliable because Dr. Murphy uses a framework which "in effect, assumed that even if the trier-of-fact determines that Google's self-preferencing of its YouTube property was illegal, it had essentially no economic impact on Rumble." *Id.* 12-13.

Google now parrots Dr. Murphy's three primary criticisms and other opinions, re-posturing them as substantiated "facts" which Dr. McClave "failed to consider." These arguments on their own terms are directed to  "inputs" and not methodology and are therefore not a basis to exclude the opinion. *In re Lidoderm*, 2017 WL 679367, at *12; *Bally v. State Farm Life Ins. Co.*, 335 F.R.D. 288, 299 (N.D. Cal. 2020) (factual disputes about inputs into a model do not go to issues of reliability).  Google, moreover, cannot simply posture away a battle of the experts about disputed

facts and assumptions. *See, e.g., Rodriguez v. Google, LLC*, 2024 U.S. Dist. LEXIS 1290, at *9 (N.D. Cal. Jan. 3, 2024) (rejecting Google's motion to exclude damages expert noting that "[t]he court's task is not to 'decid[e] whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to the jury.'" (quoting *Alaska Rent-a-Car*, 738 F.3d at 969-70)).

     **1.    Google's Arguments Regarding Incremental Video Views Rely on Unsupported and Premature Liability Assumptions**

Google argues that that any "estimate" of damages from Dr. McClave's damages model is "vastly inflated" because he "did not restrict himself to views on YouTube stemming from Google search" (which it defines as 0.3% of views for the year 2021) as the universe of views from which a jury could find damages. Mot. at 8. Google thereby asks the Court to adopt the unsupported, unexplained, and disputed premise that as a matter of liability, Rumble's potentially diverted views in the but-for world could not have exceeded the views that directly came from Google search in the real world at that time. Dr. McClave, however, supported his decision to include not only direct from Google traffic, but also potential follow-on traffic or traffic diverted to YouTube, as based on expert testimony and Google documents, and Google does not even try to argue that these additional views could not be impacted.

Google moreover ignores that for purposes of the model, Dr. McClave included all Google property originating views as "potentially" impacted, but did not specify the model to require that the jury agree that all such views were impacted. As demonstrated by Dr. McClave in his report and by Google's expert's use of the model, the model can handle all of Google's proffered criticisms, including if the jury should agree with Google's assertions that damages should be limited to a certain type or percentage of views or different benchmark revenue. *See* McClave Rebuttal Rpt. 7, n.30 ("[M]y methodology can easily adapt to calculate different percentages of diversion and Dr. Murphy does not assert otherwise[.]"). Google's own authority establishes that a

1  damages model need not be constructed to adopt a singular "independently verified" causation

2  input. *Bakst v. Community Mem. Health System, Inc.*, No. CV 09-08241 MMM (FFMx), 2011 WL

3  13214315, at *17 (March 7, 2011) (explaining that an expert may testify as to damages

4  quantification predicated upon a jury separately determining the issue of causation).[1]

5        Google offers various arguments to the effect that Mr. Lurie's input is imperfect or

6  misapplied when it is used in Dr. McClave's damages model. The criticism to an input to a model

7  is, however, a factual dispute that does not undermine the reliability of the model, even when that

8  input takes the form of another expert's opinion. *Stiner v. Brookdale Senior Living*, 665 F. Supp.

9  3d 1150, 1178 (N.D. Cal. 2023) (Gilliam, J.) (assertions that an expert's flawed input is used in

10  another expert's reliable model goes to weight and not admissibility); *Bally*, 335 F.R.D. at 299

11  (N.D. Cal. 2020) (where "arguments largely turn on factual disputes over which inputs [an expert]

12  should use in his model, rather than flaws in the model itself, [they] thus do little to undermine the

13  reliability of the model . . . ."); *In re Lidoderm*, 2017 WL 679367, at *12) (same).

14        Google's analogy to the sushi rolls in *Kim v. Benihana*, No. 5:19-cv-02196-JWH-DTBx,

---

16  [1] Google moreover misconstrues Dr. McClave as blindly relying on Mr. Lurie's input without

17  ever reading Mr. Lurie's report. Mot. at 7. Google cites only to portions of Dr. McClave's

18  testimony where he indicated that he had not reviewed Mr. Lurie's opinions unrelated to the

19  explanation of the percentages he estimated that could be used as an input or to where Dr.

20  McClave said that he had not seen the signed version of Mr. Lurie's report before issuing his

21  own. Google ignores Dr. McClave's testimony indicating that he was indeed aware of that part

22  of Mr. Lurie's opinion which addressed a percentage of diverted views. McClave Depo. 65:12-

23  18 ("Q. Okay. You reviewed Mr. Lurie's opinion in preparing your report." A. I took into

24  account what I understood would be his opinion in his report. Yes."); *id.* 65:24-66:02 ("Q: Dr.

25  McClave did you review [Mr. Lurie's] entire report or only select paragraphs? A. I relied on

26  only those parts that I have referred to in my two reports.").

2024 WL 3550390 (C.D. Cal. May 20, 2024), is inapposite. Although Dr. McClave uses Mr. Lurie's estimate as an input to the damages model in his report, the model does not depend on Mr. Lurie because it can easily be adapted to different percentages of diversion. In contrast, the class certification expert in *Benihana,* a consumer fraud case, designed his common-impact model and conclusions to rely on his own estimate as derived from a consumer perception survey. Moreover, the survey (and thus the calculation) included a product for which the named plaintiff had already been determined to lack standing (i.e. the California Roll), and the resulting opinion was found insufficient to support a finding of class-wide liability impact under Rule 23 for that and numerous other reasons. *See id.* *1-2, *6-7. Here, the scope of causation has not yet been determined, and Google does not argue that Rumble lacks standing to assert the universe of potential causation in Dr. McClave's model.

Additionally, the level of precision or proof for Rule 23 common-impact liability is not commensurate to that of antitrust damages. *See Story Parchment Paper Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (1931) ("The rule which precludes recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount."). In an antitrust case, a jury need only make a "just and reasonable estimate" of damages, and "probable and inferential data" is sufficient. *Bigelow v. RKO Pictures, Inc.*, 327 U.S. 251, 266 (1946) (a jury is to make "such reasonable and probable estimate as, in the exercise of good sense and sound judgment, they shall think will produce adequate compensation."). The defendant carries the "risk of uncertainty" in a damages model because to hold otherwise would allow the defendant to escape liability merely because the nature of their wrongdoing renders damages uncertain. *Id.* at 264. *Daubert* is fully in in accord. *See, e.g., Alaska Rent-a-Car*, 738 F.3d at 972 (where the law does not require damages to be measured with precision but by reasonable inference, it is for the jury to be "persuaded by the impeachment" of gaps in damages assumptions, inferences, and calculations).

1    That Google and/or its expert may believe that any particular causation input that is or

2    could be used is not directly supported or imprecise, over-inflated, or based on a "plain

3    misreading" of evidence, is no basis to exclude a damages estimate under any authority. *See, e.g.,*

4    *Daubert*, 509 U.S. at 597 ("Shaky but admissible evidence is to be attacked by cross-examination,

5    contrary evidence, and attention to the burden of proof, not exclusion").

### 2.  Google Challenges the Weight but Not the Choice of Dr. McClave's Benchmark

Google does not challenge Dr. McClave's methodological choice of using RPM data

generated from non-Google traffic for a benchmark, but instead asserts that he should not have

adopted only the years 2017-2018 for that purpose. Mot. at 10. Dr. McClave explained that he used

those years because that is when most of Rumble's third-party traffic occurred and because it

shows that Rumble as a platform is "capable of reaching those levels of RPM" when additional

traffic exists. Schmidlein Ex. 3 ("McClave Depo.") 163:08-164:19. Google's argument moreover

disingenuously postures the "benchmark" (which is meant to be representative of Rumble's but-for

revenues) as an issue of the representativeness of the 2017-2018 sample in relation to other years

as a matter of data sampling (which is not the technique used here). *See* Mot. as 12-13. This

argument is directed to the weight of an otherwise undisputed benchmark and not its underlying

(and undisputed) comparability. *See, e.g., In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1262-63

(10th Cir. 2014) (district court did not err in admitting testimony where defendant argued that the

expert used an inappropriate benchmark). As elsewhere, Google parrots its expert to assert that the

only acceptable but-for world is one that presupposes Google's conduct had no effect on Rumble,

such that its but-for RPM should be no higher than its actual average RPM for all years. *See*

McClave Rebuttal Rpt. 9; Murphy Depo. 135:11-136:17 (agreeing that his adjustment as to Dr.

McClave's RPM assumes "that in the but-for world, Rumble would have earned exactly the same

average RPM that it earned in the actual world").

Google claims that Dr. McClave at his deposition did not fully understand or recall all of the details of the ads underlying the benchmark revenues or all of the fields in the RPM spreadsheet. Mot. at 13. Tellingly, Google does not assert that the fields upon which Dr. McClave relied were not known to him, unknowable to Google, or that the details of the ads even matter. Google's own authority states that an expert should know the "where" and "what" of his "data sources," which Dr. McClave indisputably did here. *See Montgomery County v. Microvote Corp.*, 320 F.3d 440, 448-49 (3d Cir. 2003); McClave Depo. 113:18-21 (as to the document: "Q: Is the 2017 to 2018 Facebook data Rumble's RPM in the actual world for that time period and for that specific traffic? A. That's my understanding yes."). And Dr. McClave did not testify that he was unfamiliar with the source. McClave Depo. 134:13-148:17 (explaining that "there was a significant amount of interaction in understanding this data" as produced by Rumble, that relevant fields were extracted into a separately produced calculation and identified in the backup, and that Dr. McClave would need to see the backup to recall all of the details as "it's been quite a while since I looked at these.").[2] Equally, Dr. Murphy used this same spreadsheet as a basis for his own calculations. *See* Dickerson Decl., Ex. B ("Murphy Rebuttal Rpt."), Table 6.

Google similarly mischaracterizes Dr. McClave's testimony regarding his use of RPM revenue generated from third-party "clicks" as a benchmark into a purported admission that his

---

[2] Google asserts in a footnote that "it raised questions about the interpretation of certain fields in the spreadsheet after receiving Dr. McClave's report," Mot. 13, n.6, but tellingly does not attach its own outreach, which related to a problem in the FTP transfer of Dr. McClave's backup calculation on June 21, 2024, such that it was unclear which columns in the spreadsheet were used in the calculation. This problem was rectified by the re-production of those files in the June 28, 2024 email attached by Google, and Google does not here, and has never, asserted to the contrary. *See* Schmidtlein Decl., Ex. 6. As discussed above, Google's expert used the same source to adjust RPM without issue.

model uses the "wrong" data for purposes of estimating revenue from diverted "views." Mot. at 11-12. Google's own expert made no such assertion and Dr. McClave made no such admission, as such an admission would require Dr. McClave to inherently mischaracterize his own use of the data as a benchmark. As he explained, Dr. McClave used the <u>revenue</u> generated on the Rumble.com platform attributable to untainted third-party sources (accomplished when a user "clicks" on a Rumble video on the third-party site) as a benchmark for the <u>revenue</u> Rumble could have earned from additional views in the but-for world, such that the model is measuring against the benchmark for purposes of damages 1:1. McClave Rpt. 8-9.

Google's unsupported assertion that Dr. McClave would have had a lower benchmark if he had instead based it on a different metric of revenue based on "views" rather than "clicks" does not challenge Dr. McClave's explanation for including follow-on views that might come from clicks in the benchmark in the first instance. Google also ignores Dr. McClave's explanation that his decision likely lessened damages, because there is evidence that a social media "click" leads to less follow-on views than a "click" on Google or YouTube. *Id.* 9.  Google does not even identify a data source or means by which the calculation it argues should have been done could have been done.  These arguments go to weight and not admissibility of the opinion.  *In re Lidoderm*, 2017 WL 679367, at *28 ("disputes about the degree of relevance or accuracy may go to the testimony's weight, but not its admissibility").

### 3.    Google Does Not Challenge Dr. McClave's Estimate of Costs but Instead Offers Unsupported Assumptions of Additional Costs

Google asserts that Dr. McClave erred in not deducting certain promotional costs Rumble incurred in 2017-2018 that helped generate the benchmark revenue from the damages but fails to explain why costs unique to generating traffic from <u>Facebook</u>, which is excluded from the damages, should apply to but-for traffic from <u>Google.</u>  *See* Mot. at 13-15. This argument, like others, is premised on the unspoken and unsupported assumption that Rumble would not have been

able to generate more revenue in a but-for world, such that similar promotion would be necessary. Neither Google nor its expert Dr. Murphy argue that Dr. McClave's methodology in calculating the incremental costs primarily associated with bandwidth or hosting was flawed. Google's argument that Dr. McClave should have made an additional but-for assumption as to costs is directed to the weight and correctness of the calculation and not its admissibility.  *In re Lidoderm*, 2017 WL 679367, at*28.

## IV.    DR. MCCLAVE'S OPINION REGARDING THE RUMBLE APP IS ADMISSIBLE BECAUSE A DAMAGES EXPERT NEED NOT PROVE ALL PREDICATE CAUSATION

Rumble alleges that Google wrongly diverted viewers from Rumble's app, a harm the nature of which Google does not dispute in its motion. Dr. McClave estimated that if Rumble earned no greater revenue on its app than it reported in the real world, but had the means to monetize it earlier in the but-for world (within a year after launching its current version), that alone would signify additional revenue of approximately $1.3 million.  McClave Rpt. 15. Google argues, without explanation, that this revenue, defined as ARPU, is inappropriate because there is no basis for assuming that Rumble's programmatic ARPU in the actual world would have equated to its ARPU on the Rumble app in the "but-for" world of earlier monetization. Mot. at 15-16. Dr. McClave used ARPU because that is the standard metric used by Rumble to report programmatic revenue on the app, it reflects what Rumble could actually monetize, and Rumble had not monetized its app during the damages period. McClave Depo. 187:09-10. Moreover, Dr. McClave explained that his benchmark was conservative because it did not include any metric of additional views, which according to Dr. Gal would be likely because apps tend to be more frequently and intensively used compared to web browser-based services. McClave Rpt. 15. Neither Dr. Murphy or Google argue that ARPU is inappropriate as a metric or that Dr. McClave had available or should have used a different metric other than what Rumble maintained in the ordinary course of business.

1    Google argues that Dr. McClave has "no support for his assumption that in the absence of

2   Google's alleged anticompetitive conduct, Rumble would have begun to monetize its app in

3   January 2021," Mot. 16, but this ignores that Dr. McClave relied on interviews with Rumble

4   personnel, who also testified in this case. McClave Rpt. 15 n.31. Evidence in the record, including

5   from Rumble personnel and as discussed at length by Google's expert in his own opening report,

6   shows that the app was launched in January 2020, and that "while Rumble had developed the

7   functionality for mid-stream advertising, this had not been deployed on its mobile application."

8   Dickerson Decl., Ex. C ("Murphy Rpt."), at ¶218 (discussing testimony of Rumble CEO Chris

9   Pavlovski). Rumble's challenge to the basis of Dr. McClave's "one year" assumption is premature,

10  as Dr. McClave identified the evidence he relied on and he is not further required to establish the

11  entire factual predicate before trial, as established in Google's own authority. *See Bakst*, 2011 WL

12  13214315, at *17.

13  ## V.    DR. MCCLAVE'S DAMAGES ARE CONSERVATIVE

14    Dr. McClave in his report gave various reasons why he believed certain of his assumptions

15  and calculations were "conservative." It is common for a damages expert to explain why, in their

16  opinion, their damages are conservative based on the facts of the case. Indeed, Google's expert Dr.

17  Murphy, similarly does so. *See, e.g.*, Murphy Rpt. ¶130 n.211 ("This estimate conservatively

18  assumes . . ."). Google does not challenge any of Dr. McClave's characterizations of the choices he

19  made for purposes of the damages model as not, in fact, "conservative." See Mot. at 18 (arguing

20  such conservatism cannot replace the Daubert requirements). Instead, it challenges whether

21  damages are conservative with reference to those categories of additional lost profits, which Dr.

22  McClave explained he lacked data to quantify. *See* Mot. at 17. Google does not challenge these

23  categories on the merits, and its assertion that Dr. McClave did not "empirically" calculate them

24  misses the point—it is their very absence that makes the damages as calculated a necessarily

25  conservative measure of the economic harm.

26                                                          14                    PLAINTIFF'S OPPOSITION TO MOTION
                                                                                 TO EXCLUDE OPINIONS OF DR. JAMES MCCLAVE
27                                                                                              4:21-cv-00229-HSG

1    Similarly, Google cannot seriously challenge Dr. McClave's assertion that his app estimate

2 is "conservative" because he did not attempt to account for the additional use of apps as discussed

3 by Plaintiff's expert Dr. Gal. *See* Mot. 17-18. Nor can Google challenge Dr. McClave's

4 demonstration of how a trier of fact could attempt to account for that, using his framework. *See id.*

5 Google's arguments that "evidence" of these harms are at this point unproven or not conclusively

6 established by Dr. McClave are necessarily premature and misplaced at this stage of the case. *See,*

7 *e.g., Bakst*, 2011 WL 13214315, at *17.

8 **VI.    CONCLUSION**

9    Google's nitpicking of Dr. McClave's opinions fails to raise any challenge to the reliability

10 or relevance of his opinions.  Google's motion should be denied.

11

12 DATED: November 20, 2024        Respectfully submitted,

13                COMPETITION & TECHNOLOGY LAW GROUP LLP
                 Robert W. Dickerson, Jr.
14                Allan W. Jansen
                 Ehab M. Samuel
15

16                CADWALADER, WICKERSHAM & TAFT, LLP
                 Nicolas A. Gravante
17                Philip J. Iovieno
                 Jack Stern
18                Kristen J. McAhren

19                By:    */s/ Robert W. Dickerson, Jr.*
20                       Attorneys for Plaintiff Rumble Inc.

21

22

23

24

25

26                     15                PLAINTIFF'S OPPOSITION TO MOTION
                                         TO EXCLUDE OPINIONS OF DR. JAMES MCCLAVE
27                                       4:21-cv-00229-HSG

**PROOF OF SERVICE**

*Rumble Inc. v. Google LLC et al, Case No. 4:21-cv-00229-HSG (LJC)*

I, Robert W. Dickerson, Jr., declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 11400 West Olympic Blvd., Suite 200, Los Angeles, CA 90064.

On November 20, 2024 I served a copy of the forgoing document on counsel for Google LLC by transmitting or causing to be transmitted via e-mail attachment to the persons at the e-mail address(es) set forth on the attached Service List pursuant to agreement of counsel regarding email service of documents in this matter.

I declare that I am a member of the bar of this Court, and that I have completed service by email on this day to the persons on the attached Service List.

Executed on November 20, 2024 at Los Angeles, California.

　　　　　　　　　　/Robert W. Dickerson, Jr./　

Robert W. Dickerson, Jr.

1
2

## SERVICE LIST

*Rumble Inc. v. Google LLC et al, Case No. 4:21-cv-00229-HSG (LJC)*

3
4

| *Attorneys for Defendant*<br>*GOOGLE LLC* | |
|---|---|
| Schmidtlein, John<br>JSchmidtlein@wc.com | |
| Greenblum, Benjamin<br>BGreenblum@wc.com | |
| Fuzesi, Stephen<br>SFuzesi@wc.com | |
| Clay, Jesse<br>JClay@WC.com | |
| Whiteley, Daniel<br>DWhiteley@wc.com> | |
| Kramer, David<br>DKramer@wsgr.com | |
| Youlin, Yuan<br>YYin@WC.com | |
| GoogleRumble@wc.com | |

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27