Robert W. Dickerson, Jr. (SBN 89367)
E-mail: rdickerson@comp-techlaw.com
Allan W. Jansen (SBN 81992)
E-mail: ajansen@comp-techlaw.com
Ehab M. Samuel (SBN 228296)
esamuel@comp-techlaw.com
COMPETITION & TECHNOLOGY LAW GROUP LLP
11400 West Olympic, Blvd., Suite 200
Los Angeles, CA 90064
Tel: (310) 774-2337
Fax: (213) 799-3642

Nicholas A. Gravante, *Admitted Pro Hac Vice*
Email: nicholas.gravante@cwt.com
Philip J. Iovieno, *Admitted Pro Hac Vice*
Email: philip.iovieno@cwt.com
Jack G. Stern, *Admitted Pro Hac Vice*
Email: jack.stern@cwt.com
Kristen J. McAhren, *Admitted Pro Hac Vice*
Email: kristen.mcahren@cwt.com
CADWALADER, WICKERSHAM & TAFT LLP
200 Liberty Street
New York, NY 10281
Tel: (212) 504-6000
Fax: (212) 504-6666

*Attorneys for Rumble Inc.*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| RUMBLE INC.,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 21-cv-00229-HSG (LJC)<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: January 23, 2025<br>Time: 2 p.m.<br>Place: Courtroom 2<br>Judge: Hon. Haywood S. Gilliam, Jr. |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

I.    THERE IS SUFFICIENT EVIDENCE OF SELF-PREFERENCING FOR A
      JURY TO REASONABLY CONCLUDE THAT GOOGLE ENGAGED IN
      THAT ANTI-COMPETITIVE CONDUCT ...................................................... 1

      A.    There is Direct and Circumstantial Evidence of Self-Preferencing
            and Well-Founded Expert Analysis Demonstrating Google's Self-
            Preferencing Conduct ..................................................................... 1

      B.    Google Fails to Explain the Purported Neutral Operation of Its
            Search Mechanisms and Has Concealed Them ......................... 10

      C.    Google Seeks to Impose on Plaintiff an Unwarranted Burden to
            Prove Details Concerning the Operation of Search Mechanisms
            That Google Has Concealed ........................................................ 15

      D.    Google's Reliance on the "Bing Comparison" is Misleading and
            Inconclusive .................................................................................. 17

      E.    Google's Efforts to Avoid Creating and Retaining Direct Evidence
            of Anti-Competitive Conduct and Intent ................................... 18

      F.    There Is Considerable Evidence That Google Has Long Pursued a
            Strategy of Favoring Its Own Specialized Vertical Platforms and
            Demoting Competing Verticals .................................................... 19

II.   THERE IS SUFFICIENT EVIDENCE FOR A JURY TO REASONABLY
      CONCLUDE THAT GOOGLE'S SELF-PREFERENCING CONDUCT
      HAD AN ANTI-COMPETITIVE EFFECT ...................................................... 21

      A.    Google's Denials of the Anti-Competitive Effects of Self-
            Preferencing Are Based Primarily on Specious and Disputed
            Expert Opinions ............................................................................ 21

      B.    Google's Denials of the Anti-Competitive Effects of Its Android
            Distribution Agreements Are Misleading and Ignore the Effect of
            Those Agreements in Exacerbating the Self-Preferencing of
            YouTube ........................................................................................ 24

III.  THERE IS NO LEGAL OR FACTUAL BASIS FOR GOOGLE'S
      STATUTE OF LIMITATIONS DEFENSE .................................................... 31

IV.   GOOGLE'S DISPARAGEMENT OF RUMBLE IS MISINFORMED AND
      IRRELEVANT, AND AT MOST GIVES RISE TO A FACTUAL DISPUTE ......... 32

CONCLUSION ................................................................................................ 34

1

2

## TABLE OF AUTHORITIES

3

<u>CASES</u>

*Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991 (9th Cir. 2010) 17

*Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690 (1962).......................... 21

*In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 8669891 (C.D. Cal. August 22, 2016)
.................................................................................................................................................. 31

*Lucas Auto Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762 (9th Cir. 2001).................. 1

*Matsushita Elec Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)..................................... 18

*Nissan Fire & Marine Ins. Co. v. Fritz. Cos.*, 201 F.3d 1099 (9th Cir. 2000) ............................ 32

*Oliver v. SD-3C LLC*, 751 F.3d 1081 (9th Cir. 2014) ................................................................ 32

*Pac. Sunwear of California, Inc. v. Olaes Enterprises, Inc.*, 167 Cal. App. 4th 466 (2008)........ 15

*Pacific Steel Group v. Commercial Metals Company*, No. 20-cv-07683, 2024 WL 3236705 (N.D.
Cal. June 28, 2024) ................................................................................................................ 1, 23

*Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292 (9th Cir. 1983) ......................... 21

*Sidibe v. Sutter Health*, 103 F.4th 675 (9th Cir. 2024) ............................................................... 21

*Tevra Brands LLC v. Bayer HealthCare LLC*, No. 19-CV-04312-BLF, 2024 WL 1909156 (N.D.
Cal. May 1, 2024) .................................................................................................................. 1, 26

*U.S. v. Google*, No. 20-cv-3010 (APM), 2024 WL 3647498 (D.D.C. Aug. 5, 2024) ........... passim

*U.S. v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001)..................................................... 16, 17, 18, 30

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

**INTRODUCTION**

Because there are disputed factual issues concerning Google's anticompetitive conduct and the effects of that conduct on competition, the Court should deny Google's motion for summary judgment. Further, there is no basis for Google's statute of limitations argument and its disparagement of plaintiff Rumble merely raises additional factual issues.

This Court has previously described the principles governing a summary judgment motion. *See Pacific Steel Group v. Commercial Metals Company*, No. 20-cv-07683, 2024 WL 3236705, at *3 (N.D. Cal. June 28, 2024). To defeat summary judgment, a plaintiff need not "definitively prove" its claim, but "only needs to present enough evidence to reasonably raise a dispute of material fact." *Id.* at *15 (citing *Lucas Auto Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 275 F.3d 762 (9th Cir. 2001)). When deciding if a dispute is genuine, the court must review the record in the light most favorable to the nonmoving party and may not weigh the evidence or make credibility determinations. *Id.* *3 (citing cases). Unresolved issues of fact based on expert analyses—and dueling expert testimony—preclude summary judgment. *Id.* *17 (citing *Tevra Brands LLC v. Bayer HealthCare LLC*, No. 19-CV-04312-BLF, 2024 WL 1909156, at *10 (N.D. Cal. May 1, 2024)).

**ARGUMENT**

**I.     THERE IS SUFFICIENT EVIDENCE OF SELF-PREFERENCING FOR A JURY TO REASONABLY CONCLUDE THAT GOOGLE ENGAGED IN THAT ANTI-COMPETITIVE CONDUCT**

   **A. There is Direct and Circumstantial Evidence of Self-Preferencing and Well-Founded Expert Analysis Demonstrating Google's Self-Preferencing Conduct**

Despite Google's evasiveness concerning its search mechanisms, there is considerable direct evidence of self-preferencing in this case. There is also extensive circumstantial or indirect evidence and economic analysis from which a jury can reasonably determine liability and damages. Google has not produced source code for Google Search in this case. Moreover, Google's Senior Director of Engineering for Search**,** and others**,** testified that Google does not maintain a list or collection of all search signals and that no one person had knowledge of all its

workings. Ex. A (Papachristou Dep. Tr.**)** at 145:19-146:12**,** 154:16-20**,** 278:21-279:02; Ex. B (Desikan Dep. Tr.**)** at 109:21-24**,** 110:06-11.[1]

As an example of Google's evasiveness, Google redacted and withheld as privileged a document described as "***all the touch points between search and YouTube***." Ex. C (Marshak Dep. Tr.) at 236:09-238:10 (emphasis added); Ex. D (Plaintiff Dep. Ex. 194, Bates 00052746). To appreciate the significance of "touch points" and the sourcing of video content, it is important to note that Google's search mechanisms involve three basic elements: (1) crawling the Web for video content that has been published by content creators or Web Sites; (2) indexing and storing the video content, so that it can be quickly located in response to a search query; and (3) retrieving the indexed video content from storage, scoring the video content, and ranking that video content in response to a search query. If video content on the Web cannot be crawled, it cannot be indexed, stored, scored, and importantly it cannot be ranked, or served, to a User in response to a search query.

Despite Google's evasiveness, internal Google documents and testimony, including the following examples, nonetheless provide direct evidence that Google can and does self-preference YouTube:

### 1. Google Acknowledges that Numerous Algorithmic Signals Work to Favor YouTube

In response to internal inquiries following a 2020 *Wall Street Journal* investigative report finding that Google self-preferenced YouTube, Pavan Desikan, who oversees video rankings in Google Search, responds to a request from Google's communications department in June 2020 about what "***we might be able to say to explain what's happening here.***" Ex. E (Plaintiff Dep. Ex. 41, Bates 00440998) at -1000 (emphasis added). Mr. Desikan identifies certain signals that YouTube employs in ranking video content and confirms that those signals all favor YouTube, including "***User Clicks***" and "***Page Popularity***." *Id.* He then acknowledges that "***Most of the***

---

[1] Exhibits attached to the Declaration of Robert Dickerson shall be cited as "Ex." or "Exs." and paragraphs of that Declaration shall be cited as "Decl. ¶."

*other ranking signals (like ▮▮▮) also prefer the youtube result*." *Id.* ▮▮▮▮▮▮ are subjective quality scores made by Google based on its view of the webpage content. Ex. F (Duncan Dep. Tr.) at 20:22-32:17, 34:18-35:01, 106:09-15; *see also* Ex. A (Papachristou Dep. Tr.) at 316:02-21, 320:02-12; Ex. G (Nayak Dep. Tr.) at 223:20-233:16; Ex. H (Bates 00646236) (Dec. 9, 2016 email from Google Search engineer: "YT [YouTube] was overly preferred by ▮▮▮▮▮▮" a quality signal that boosts a website's ranking).

### 2.    Google Recognizes That It Overwhelmingly Preferences YouTube

By at least 2016, Google had identified a problem with the preferencing of YouTube in video search. Ex. I (Marshak Dep. Ex. 177, Bates 00596786). The document notes that Google does not crawl non-YouTube videos well and "*95% of videos on search are from YT*" and "*less than ▮▮▮ of non-YT video pages are classified/crawled correctly*." *Id.* (emphasis added). Internal documents concerning "Project ViSEO"—a project Google initiated after this litigation was commenced—confirm the extremely high prevalence of links to YouTube videos in search results and ways in which Google could address that self-preferencing. Ex. J (Papachristou Dep. Ex. 3, Bates 00011523). In other internal documents, Google explicitly confirms that 80% of video impressions in search results are from YouTube, and reports on user and content creator confirmation that Google Search prioritizes YouTube on rankings and that relatively few non-YouTube videos appear in search results. *Id.* at -531; Ex. K (Mueller Dep. Ex. 103, Bates 00634859) at -862. Project ViSEO concluded that it would be necessary to "*improve ranking signal & feature coverage for videos beyond YouTube….*" Ex. K (Mueller Dep. Ex. 103, Bates 00634859) at -865. Project ViSEO also acknowledges the industry's generally-held view that "*Video Search = YouTube*" and "*Search prioritizes YouTube on rankings*." Ex. J (Papachristou Dep. Ex. 3, Bates 00011523) at -531 (emphasis added); Ex. K (Mueller Dep. Ex. 103, Bates 00634859) at -865 (emphasis added).

### 3.    Google Gives YouTube a Technological Advantage in Google Search

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████. Ex. L (Marshak Dep. Ex. 192, Bates 00662542). Other potential advantages in the form of "***touch points***" to YouTube were withheld on the basis of privilege. Non-YouTube video platforms must work to ensure they are recognized by Google Search in form and content and are disadvantaged in terms of speed and classification, if they are even indexed to become a search result at all. Ex. C (Marshak Dep. Tr.) at 108:02-11, 233:21-235:02). An April 2021 internal Google document addresses the problem of "***crawling gaps***": where Google might have indexed a non-YouTube video (is aware the video is present) but not downloaded the file (crawled the byte). Ex. M (Marshak Dep. Ex. 179, Bates 00467323); Ex. C (Marshak Dep. Tr.) at 108:02-11.

### 4. YouTube's Advantage in Relation to Indexing and Crawling Affects Search Ranking

Better indexing and recognition of video content affects search results. Ex. A (Papachristou Dep. Tr.) at 210:11-16 (explaining that indexing issues also affect search ranking). In a 2021 email chain, Google executives discuss complaints they've received from an entertainment company that older YouTube content was ranked higher than the "fresh content updated on their website rtl.de (which has a high crawl rate) that could answer the same queries. ***I mentioned that this might be due to the algorithm, but they're skeptical and still believe that we're deliberately prioritizing YouTube***." Ex. N (Marshak Dep. Ex. 191, Bates 00470802) at -805 (emphasis added). Similarly, in Exhibit O, a 2022 email chain, Google executives discuss Google "***Search's video treatment on 3P sites vs. YouTube***." Ex. O (Marshak Dep. Ex. 193, Bates 00125065) at -068 (emphasis added). One Google executive writes, "My hypothesis: There are ***two major blockers affecting third party videos during indexing*** - 1) ██████████

████████████████████████████████████████████████████████████████

████████ 2) ████████████████████████████████████████████████████

██ . ***Both would affect the corpus entering the ranking phase - which even if we treat all things equally - results in >80% of video impressions coming from YouTube today***." *Id.* (emphasis added). In responding, another Google executive states, ████████████████████

████████████████████████████████ ██████████  ██████ and that one strategy is

to onboard third parties to "improve[] their feature parity with YT on Search, **which helps de-risk Google legally**." *Id.* at -067 (emphasis added).

### 5. Google Works to Favor YouTube in Search Results

In 2006, after Google acquired YouTube, Google initially made YouTube video results viewable directly on Google's Search page in order to increase the use and popularity of YouTube (a preference not afforded to other video platforms or websites). Ex. P (Harrison Dep. Ex. 108, Bates 00265299) ("By making YouTube content available (and viewable) on Google search, we're effectively enlarging the pie of potential new YouTube users by using Search to expose them to YouTube.") (emphasis added); Ex. Q (Harrison Dep. Tr.) at 62:07-25. Google internal documents reveal that Google has since made sure that videos on the YouTube Platform have a high "quality score" (a score important to ranking) associated with them. In an e-mail (Subject: NSR for YouTube channels) from Pandu Nayak (VP of Search at Google), he states: "I just wanted to suggest that going forward, we should have a strong focus on the quality score ▮▮▮ of videos, and YouTube videos in particular. ***Having a strong, reliable signal there is key to helping YouTube address some of the challenges they are facing.***" Ex. R (Duncan Dep. Ex. 101, Bates 00365619) (emphasis added).

### 6. YouTube Lightbox Play

Beginning in approximately 2020, despite concerns raised externally and internally about the prevalence of YouTube in Google Search results, Google made YouTube videos available directly on the Google Search page and monetized those videos to YouTube without a user having to leave Google for the YouTube platform. Ex. M (Marshak Dep. Ex. 179, Bates 00467323); Ex. C (Marshak Dep. Tr.) at 182:14-183:23.[2]

* * * * *

The July 2020 *Wall Street Journal* investigative report on Google's manipulation of

---

[2] Decl. ¶¶ 20-23 list additional examples of internal Google documents bearing on Google's self-preferencing conduct.

search results and Google's self-preferencing in search sets forth a further confirmation that Google self-preferences links to videos on YouTube in SERP. Ex. V (Papachristou Dep. Ex. 12). Notably, Google never offered any public denial of that investigative report and never refuted its conclusions, despite having been given an opportunity to do so by the *WSJ*. Similarly, when a Congressional Committee investigated competition in digital markets, the Committee Report noted the *WSJ* investigative report of Google Search preferencing YouTube and Google was unable to, and did not, provide any evidence to the contrary, despite having been given an opportunity to do so. *See* Ex. W (Murphy Dep. Ex. 6, relevant excerpts of the Committee Report). The Committee Report also found that Google engaged in unlawful anti-competitive self-preferencing of YouTube, and gave Google the opportunity to provide rebuttal evidence, which Google never did. That Google, when faced with evidence of its illegal activity and given the opportunity to provide exculpatory evidence, did not do so, is a tacit admission that Google cannot provide such exculpatory evidence.

When Google asserts that there are "no YouTube-specific ranking signals," that is a meaningless and misleading assertion. *See* Google Br. 4. Self-preferencing is occurring not because any signal, algorithm, or indexing methodology explicitly favors YouTube or explicitly demotes other platforms. Rather, what is determinative is Google's use of search mechanisms (including crawling and indexing) that have that effect. After Google acquired YouTube in 2006, Google has systematically increased the dominance of YouTube so that current search mechanisms based, for example, on "popularity" ███████████ necessarily favor YouTube. The search mechanisms that Google has employed over the years since acquiring YouTube may have taken different approaches to crawling and indexing, and used signals and algorithms with different names, but they have all had the same effect—plainly directing users to YouTube when more relevant and responsive content was offered by competing video platforms.

The expert analysis of Ian Lurie explains the critical facts supporting Plaintiff's claim that Google Search favors YouTube and disfavors YouTube's online video platform rivals. In addition to the direct and indirect (or circumstantial) evidence, Mr. Lurie's analysis provides a

sophisticated, logical, and highly credible explanation of Google's conduct that provides a sound

basis for a jury to reasonably conclude that Google engaged in the alleged anti-competitive

conduct. In the area of general search platform mechanisms—how search works and how a

specialized vertical platform or publisher may optimize its content to achieve favorable search

results—Mr. Lurie is one of the leading experts in the United States and globally. Significantly, he

served as a consulting expert for Kelkoo in the shopping platform self-preferencing case that

Kelkoo brought in the EU. In that case, the EU tribunal found that Google engaged in

self-preferencing and, as a result, the EU included in the Digital Markets Act a prohibition on

self-preferencing in the EU. Case AT.39740—Google Search (Shopping), 2017 O.J. (C 4444),

213; Council Regulation No. 2022/1925, 2022 O.J. (L 265) 1, ¶ 52 ("the gatekeeper should not

engage in any form of differentiated or preferential treatment in ranking on the core platform

service, and related indexing and crawling, whether through legal, commercial or technical means,

in favour of products or services it offers itself or through a business user which it controls").

      Mr. Lurie's analysis in this case involved extensive review of a variety of search results

involving video content, and extensive analysis of factors that could bear on the ranking of search

results. At the outset Mr. Lurie stresses the complexity of search mechanisms. Declaration of John

E. Schmidtlein in Support of Defendant Google LLC's Notice of Motion for Summary Judgment

and Memorandum of Points and Authorities in Support Thereof ("Schmidtlein Dec."), Ex. 44

("Lurie Report") at ¶ 18. Because of the complexity of the search process—involving multiple

algorithms, signals, indexing and other elements—Mr. Lurie explains that it would be wrong to

expect that a single algorithm or signal might explain particular search results, or that even

Google engineers could say definitively why a particular result occurred. *Id.* With that important

context in mind, Mr. Lurie then methodically analyzes particular categories of searches for video

content that logically should rank particular non-YouTube videos highly on the Search Engine

Results Page (SERP). Most critically, he analyzes searches for (1) specific video titles and exact

phrases associated with the video description, and (2) videos that were first published on a

particular site (where that site is the original publisher of the videos). *Id.* at ¶¶ 19-21. Mr. Lurie

explains that, when focusing on those specific defining characteristics, search results should rank that content highly and that, if that does not occur, "something is fundamentally wrong with the search results." *Id.* at ¶ 22. Mr. Lurie then identifies specific and dramatic examples of Rumble content meeting the narrow defining characteristics and that were, nonetheless, not ranked highly in Google Search results. *Id.* at ¶¶ 23-25. Significantly, Mr. Lurie notes that, after this litigation was commenced, Google started to rank Rumble exact title content more highly but that previously Rumble exact title content was ranked below YouTube. *Id.* at ¶ 27 n.2.

Mr. Lurie then methodically examines the reasons that may explain those anomalous results. He first summarizes those possible explanations (*id.* at ¶¶ 30-38) and then addresses each in turn: low-quality link profile and/or internal link structure (*id.* at ¶¶ 39-42), technical SEO issues (*id.* at ¶¶ 43-45), content relevance/topicality (*id.* at ¶¶ 46-54), content and page quality (*id.* at ¶¶ 55-62), user behavior and engagement (*id.* at ¶¶ 63-68), controversial content (*id.* at ¶¶ 69-75), and black hat SEO issues (*id.* at ¶¶ 76-79).

Having excluded those possible causes for the observable results disfavoring content that should have been ranked highly, Mr. Lurie then provides two explanations for the results favoring YouTube: an internal communications feedback loop within the Google Search team (*id.* at ¶¶ 80-86) and, most critically, the ranking signals feedback loop (*id.* at ¶¶ 87-96). Mr. Lurie explains why Google's use of specific signals and algorithms necessarily favor YouTube, including

███████████████████████████████████████████████████████████████. *Id.* at ¶¶ 87-96.

In his August 2, 2024, Rebuttal Report, Mr. Lurie explains methodically why Google's citation to Bing search results in a short period in 2024 provides no meaningful insight into, and does not exonerate, Google's search results going back many years favoring YouTube. Ex. X ("Lurie Rebuttal Report") at ¶¶ 25-37. Google's experts have no knowledge and provide no information concerning how Bing searches video content. Mr. Lurie explains, for example, that Bing (unlike Google search) likely does not crawl and index video content, but instead likely defaults to YouTube. *Id.* at ¶¶ 30-33. He explains further that even if Bing crawls non-YouTube content, it would do so more slowly. *Id.* at ¶¶ 34-37. Mr. Lurie also addresses Dr. Murphy's

misleading use of percentages and limited 2023 data in an effort to support Google's broad and counter-intuitive contention that Google Search has not been an important sources of views on video platforms since Google acquired YouTube in 2006. *Id.* at ¶¶ 12-24. Mr. Lurie explains that the data that Dr. Murphy relies upon is limited both in scope and timeframe, and that a small percentage of views on YouTube in 2023 translates into a massive number of views for a competing online video platform. *Id.*

Mr. Lurie's analysis and his opinions are based on years of experience in the area of search and search optimization and his detailed review of facts and data. At a minimum, those opinions provide a basis for a jury to reasonably conclude that Google has engaged in self-preferencing conduct over a period of many years.[3]

Google's own expert, Dr. Allan, agreed with a statement from the founders of Google (Sergey Brin and Larry Page) that "Since it is very difficult even for experts to evaluate search engines, search engine bias is particularly insidious....***This type of bias is very difficult to detect***, but could still have a significant effect on the market." Ex. UU (Allan Dep. Tr.) at 245:08-22 (emphasis added); *see* Ex. VV ("The Anatomy of a Large-Scale Hypertextual Web Search Engine") (article co-authored by Google co-founder Sergey Brin that states "[S]ince it is very difficult even for experts to evaluate search engines, search engine bias is particularly insidious . . . . For example, a search engine could add a small factor to search results from "friendly" companies, and subtract a factor from results from competitors. This type of bias is very difficult to detect but could still have a significant effect on the market.") and Ex. WW ("Anticompetitive Organic Search Manipulation").

---

[3] Google suggests that self-preferencing conduct is lawful in the Ninth Circuit, but explicitly states that its motion is not premised on such an argument. Google Br. 1, 10. That, of course, is an argument that Google could have raised in a motion to dismiss at the outset of this litigation, but it did not do so, and Google explicitly does not seek a determination of that issue on summary judgment. Accordingly, any suggestion that a claim based on self-preferencing that harms competition is not legally cognizable is not presented, and for purposes of this motion, the Court may assume the claim is legally cognizable.

**B.  Google Fails to Explain the Purported Neutral Operation of Its Search Mechanisms and Has Concealed Them**

Google's own experts do not provide any direct evidence concerning the operation of Google search mechanisms throughout the relevant periods (since 2013, when Rumble was founded, and since 2006, when Google acquired YouTube). Given Google's complete access to its own algorithms, signals, crawling, and indexing functions, Google should be able to present a systematic description of how it has actually crawled, indexed, and ranked video content since it acquired YouTube in 2006. Google had an opportunity to do that in response to the July 2020 *Wall Street Journal* investigation reporting on Google's self-preferencing of YouTube, but provided no exculpatory explanation. In response to the subsequent Congressional Committee Investigation of Competition in Digital Markets in 2020, Google again had an opportunity to present a systematic description of how it has actually indexed and ranked video content since it acquired YouTube in 2006. As the Congressional Committee Report stressed, Google failed to take advantage of that opportunity despite the Congressional Committee's direct requests. As the Congressional Committee Report emphasized:

> "When asked whether it was true that less than 50% of all searches on Google resulted in clicks to non-Google websites, Google responded that it "has long sent large amounts of traffic to other sites." In response to the Subcommittee's request for query metrics that would document the underlying trends, however, Google did not produce the relevant data."

Ex. W (Murphy Dep. Ex. 6, relevant excerpts of the Committee Report).

Google suggests erroneously that it has been fully forthcoming in providing complete information to Plaintiff concerning the operation of Google Search mechanisms. That is entirely misleading. Notwithstanding Plaintiff's diligent efforts during discovery (interrogatories, requests for production, and depositions), Google and its deposed employees supposedly having expertise in Google Search and Search Engine Optimization ("SEO") have stuck to the story that they cannot explain (or provide documents that explain) how any particular Search Engine Results Page ("SERP") is generated. For example, they are unable to explain how the SERPs depicted in the First Amended Complaint ("FAC") were generated, what source code was used to generate those SERPs, what algorithms were used to generate those SERPs, what "signals" were used, how

much weight was assigned to any signal that would have been involved in generating those SERPs, what "twiddlers" were involved in generating those SERPs, or how much weight was given to the twiddlers used. Google's evasiveness is described in further detail in Decl. ¶ 27 and Exs. Y and Z.

Plaintiff deposed the Google employees who are supposedly experts in Google Search, SERP, and SEO in an effort to understand how Google search results are achieved. Not one of those individuals was able to explain how the search results included in the FAC were achieved or, indeed, how <u>any</u> individual search results are achieved.

**Dimitra Papachristou**. A witness proffered by Google as highly knowledgeable of how Google Search selects and ranks video content, was not able to explain or refute the July 14, 2020 Wall Street Journal investigative report confirming that Google Search preferences YouTube in ranking search results for video content. Ex. A (Papachristou Dep. Tr.) at 302:04-305:01; Ex. V (Papachristou Dep. Ex. 12). Ms. Papachristou could not explain or refute the conclusion that Google Search prominently displays YouTube videos in ranking video content at least 80% of the time. Ex. A (Papachristou Dep. Tr.) at 67:10-23; Ex. J (Papachristou Dep. Ex. 3, Bates 00011523) at -531.

**John Mueller**. The witness proffered by Google as most knowledgeable of SEO, Mr. Mueller testified that notwithstanding his various public statements on how Google generates SERP, and how a website can improve their ranking in SERP, he purports to know very little about how Google Search works and generates SERP. Ex. TT (Mueller Dep. Tr.) at 17:05-18:22.

**Pavan Desikan**. Identified by Google as an individual with substantial knowledge of the ranking of videos in Google Search results, Mr. Desikan was unable to describe how the Google Search results identified in the FAC were obtained and what signals and algorithms were used in producing Google Search results. Ex. B (Desikan Dep. Tr.) at 109:17-112:17. Mr. Desikan testified that Google Search is "a fairly complicated algorithm" and there are "like thousands of signals that go into Google Search" such that "it's impossible for any one person to completely understand what's going on [in] any given query or like on the results page." *Id.* at 15:17-16:11.

He testified that he does not think it is possible for anyone to determine what signals or algorithms or Twiddlers were used to arrive at the results shown in Figures 1-5 of the FAC, or the weight given to any signals to arrive at those results, and he would not be able to identify the source code, algorithms, signals or Twiddlers that were used to produce the Google Search results. *Id.* at 109:17-112:17. ███████████████  ████████████████████████

████████████████████████████████████████████████████████████████

████████████████ *Id.* 234:25-235:07; Ex. A (Papachristou Dep. Tr.) at 30:01-06, 43:02-04, 34:03-08, 34:25-35:02, 35:13-17, 55:10-11, 233:01-07.

**Dr. Pandu Nayak.** Identified by Google as an individual with substantial knowledge of the ranking of videos in Google Search results, Mr. Nayak was also unable to describe how the Google Search results identified in the FAC were generated or what signals and algorithms were used in producing Google Search results. Ex G (Nayak Dep. Tr.) at 34:06-36:21.

Google witnesses also did not attempt to disprove self-preferencing. Mr. Desikan claimed to have never run tests or experiments to determine whether Google self-preferences YouTube, does not know of anyone else at Google having done so, and believes it is not possible. Ex. B (Desikan Dep. Tr.) at 109:10-15, 109:21-24, 110:06-11, 111:08-13, 266:10-17, 269:22-270:21. Significantly, however, Mr. Desikan did acknowledge that he had been contacted by counsel about the search results favoring YouTube that are shown in the Rumble complaint. *Id.* at 113:02-114:10. But Google's counsel instructed Mr. Desikan not to testify about that communication or any analysis that Mr. Desikan may have conducted. *Id.* at 113:02-114:24. It is reasonable to infer that Google would have presented the results of that analysis if it had in any way supported Google's denial of self-preferencing. At the very least, Google should not be entitled to summary judgment when it effectively has concealed the results of its internal analysis. Exhibit D presents a similar concealment issue. *See* Ex. D (Marshak Dep. Ex. 194, Bates 00052746). That exhibit contains a link to a working file that "documents" the "***touch points***" between Google Search and YouTube. *Id.* Google has taken the position that the working file is privileged and has refused to produce it.

Remarkably, Google claims that it does not record or list its search algorithms. Ex. A (Papachristou Dep. Tr.) at 146:02-12 ("There's no list.); *id.* at 154:16-20 (no "written record"); *id.* at 182:01-05. There is no system for naming or numbering Search algorithms within Google. *Id.* at 152:09-15. Google only has a repository of source code maintained on Google servers around the world. *Id.* at 159:16-25. It is impossible to track down which of multiple signals contributed to particular Search results. *Id.* at 147:4-15, 151:14-19. Google does not keep any record of which engineers have worked on a particular search algorithm. *Id.* at 144:16-19. There is no concrete number of Google search algorithms. *Id.* at 145:19-25. Papachristou, Duncan, and Nayak confirmed that there's never a complete, currently up-to-date list of signals/algorithms. *Id.* at 327:08-14; Ex. F (Duncan Dep. Tr.) at 12:11-15; Ex. G (Nayak Dep. Tr.) at 99:01-17, 118:19-119:06.

While Google witnesses generally denied any self-preferencing of YouTube by Google, they also identified certain signals such as "popularity" ▮▮▮▮▮▮▮▮▮▮ that would account for such self-preferencing of YouTube. Ex. B (Desikan Dep. Tr.) at 186:01-22, 187:05-18 ("popularity" includes many signals, including clicks ▮▮▮▮▮▮▮▮▮▮); Schmidtlein Decl., Ex. 48 (Papachristou Dep. Ex. 14, Bates 00440996); Ex. A (Papachristou Dep. Tr.) at 316:02-21, 320:03-12 (Google considers clicks ▮▮▮▮▮▮▮▮▮ for the popularity signal in ranking videos); Ex. G (Nayak Dep. Tr.) at 223:11-233:16 (Google uses ▮▮▮▮ for purposes of following user activity to identify popularity signals and other signals). In line with that, Ms. Papachristou testified about the results favoring YouTube by stating that "YouTube is actually basically a big platform that has lots and lots of video content as you know" and that the results may favor YouTube because "YouTube actually is a big provider of video content … actually a very big provider of video content" and "there are multiple factors that go into it." Ex. A (Papachristou Dep. Tr.) 53:08-20, 67:10-22, 89:02-22.

In sum, the depositions of key Google employees who were identified by Google to be most knowledgeable of how the Google Search Engine works to provide Google Search results were unable to identify the signals, algorithms, or Twiddlers that were used to return any specific

Google Search result. Rather, they vaguely testified that hundreds and hundreds of signals, numerous algorithms, and over ██ Twiddlers may have been used, or only some of them may have been used, to produce Google Search results. A jury should have an opportunity to assess the credibility of the Google fact witnesses.

One of Google's experts, Dr. Murphy, opined that the dominance of Google Search and YouTube in their respective markets was a function of their "quality" and "value" rather than their scale and exclusionary conduct. Dr. Murphy also opined that self-preferencing would impact the "quality" of general search results. Ex. AA (Murphy Report) at ¶¶ 177-181; Ex. BB (Murphy Rebuttal) at ¶¶ 182-187). Those "quality" and "value" opinions necessarily opened up questions concerning the operation of Google Search and the "quality" of its ranking of search results. Dr. Murphy, despite his lack of expertise concerning general search mechanisms, nonetheless ventured into that area by opining that Google did not have the incentive and ability to self-preference YouTube and that it had not done so. Ex. AA (Murphy Report) at ¶¶ 135-137; Ex. BB (Murphy Rebuttal) at ¶¶ 176-187). Having explicitly expressed those opinions, his deposition testimony revealed that they were baseless.

In relation to the "quality" of Google Search, Dr. Murphy offered testimony as to how Google search achieves such "quality" results:

1. Dr. Murphy testified that Google achieves "quality" results by demoting platforms that Google believes consumers would consider low quality (though he does not know precisely how Google does that). Ex. CC (Murphy Dep. Tr.) at 17:03-20:02.

2. Dr. Murphy testified that Google will send consumers to Google platforms if Google platforms have the highest "quality." Ex. CC (Murphy Dep. Tr.) at 20:16-21:07.

3. Dr. Murphy testified to the virtues of self-preferencing by asserting that self-preferencing on the basis of "quality" would benefit Google and consumers and draw consumers to Google. Ex. CC (Murphy Dep. Tr.) at 22:10-23:16.

In relation to Exhibit DD, a series of emails concerning Google's response to the July 2020 *WSJ* investigation report that Google self-preferenced YouTube video content, Dr. Murphy

acknowledged that the type of signals listed in Exhibit DD as favoring YouTube are "the kinds of signals I understand Google uses." Ex. DD (Murphy Dep. Ex. 7, Bates 00440998); Ex. CC (Murphy Dep. Tr.) at 92:03-18.

### C. Google Seeks to Impose on Plaintiff an Unwarranted Burden to Prove Details Concerning the Operation of Search Mechanisms That Google Has Concealed

 Google's motion is based largely on the erroneous premise that Rumble must prove definitively that a specific signal or algorithm intentionally caused the readily observable self-preferencing of YouTube. Google posits that only direct evidence of an algorithmic signal specifically and intentionally designed to preference YouTube is sufficient for the claim to reach the jury. Google Br. 11. There is no legal basis for such a high evidentiary hurdle on summary judgment given Google's observable self-preferencing of YouTube, the other indicia of self-preferencing in Google's own documents, and expert analysis. *Pac. Sunwear of California, Inc. v. Olaes Enterprises, Inc.*, 167 Cal. App. 4th 466, 484 (2008) (holding that a question of fact must be submitted to the jury when more than one reasonable conclusion can be drawn from the facts). In any event, as detailed above, the record does include direct and circumstantial evidence and expert analysis demonstrating Google's use of various mechanisms that have the effect of favoring YouTube. The record also includes evidence of Google's plan to favor its own vertical platforms and its pattern of having done so. The record further confirms that Google refused to do anything to correct such self-preferencing after publicly reported investigations confirmed the practice, even though Google knew that the self-preferencing degraded the quality of its own search results. For years Google has portrayed its search processes to the public as neutral and unweighted and therefore of the highest quality. The record in this case (including evidence from other cases and investigations) confirms that Google's portrayal of its search process as neutral and purely objective was false.

Further, as a legal matter, it is not necessary for Rumble to present evidence that Google purposely (or intentionally) designed a signal to preference YouTube. As Judge Mehta noted in *U.S. v. Google*:

"A finding of anticompetitive intent is not an element of a Section 2 violation. *See Microsoft*, 253 F.3d at 59 (stating that in determining whether conduct is deemed exclusionary 'our focus is upon the effect of that conduct, not upon the intent behind it'). 'Evidence of intent behind the conduct of a monopolist is relevant only to the extent it helps [a court] understand the likely effect of the monopolist's conduct.' *Id.* (citation omitted)."

*U.S. v. Google*, No. 20-cv-3010 (APM), 2024 WL 3647498 at *134 (D.D.C. Aug. 5, 2024). There is no legal basis for Google's argument that Rumble must prove that a "specific signal" explicitly favors YouTube, particularly when Google itself controls all the information concerning its signals and other search mechanisms and asserts that they are too complex to identify specific reasons for particular search results.

Google fails to identify undisputed material facts supporting many of the vague and elusive arguments that it advances concerning its own search mechanisms. For example, Google asserts at that: "When Google returns search results in response to a given user query, its aim is to provide the user with the most useful information that best satisfies the user's information needs . . . ." Google Br. 3. However, that elides the issue of how Google search mechanisms actually and effectively favor YouTube video content. It ignores the evidence from Project ViSEO documents confirming that Google search does not crawl the majority of the video content on non-YouTube video sites. It also ignores the impact of Google's use of ▮▮▮▮▮▮ data to favor YouTube. Instead, Google labels that as a function of "popularity" and describes that function in a way that misleadingly suggests it is neutral and does not unduly favor YouTube, stating: "Additionally, Google collects anonymized ▮▮▮▮▮ data ▮▮▮▮▮▮▮▮▮ and aggregates that data over time and across many users to calculate a notion of the relative popularity of the webpages across the internet." *Id.* 17.

Google asserts that "Google's search ranking process does not favor any given video platforms." *Id.* 4. But that self-serving and disputed assertion fails to consider that Google did not produce or reveal its search ranking "process" even to its own experts in this case. Further, deposition testimony of the individuals Google claimed were most knowledgeable about its "search ranking process" could not explain how that process generated particular search results

because they claim that Google does not keep records of its algorithms and signals, and those mechanisms are so numerous and complex and ever-changing that Google search executives themselves cannot specifically identify the reasons for particular search results.

Google's attempt to seek blanket antitrust immunity for the mechanisms of Google Search as a matter of "product design" fails for the same reason. *See* Google Br. 16-18. Rumble does not bring a product design claim, and the Ninth Circuit recognizes that "changes in product design are not immune from antitrust scrutiny and in certain cases may constitute an unlawful means of maintaining a monopoly under Section 2." *Allied Orthopedic Appliances, Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998-99 (9th Cir. 2010). Cases that Google cites actually support Rumble's position and explain that the question of whether a design change improves a product or is otherwise not "unreasonably restrictive of competition" is a fact issue as to which Google bears the burden of proof. *Id.* (citing *inter alia U.S. v. Microsoft*, 253 F.3d 34, 65-66 (D.C. Cir. 2001) (describing Microsoft's failure to justify that it did not harm competition "by integrating its Web browser, Internet Explorer, into the Windows 98 operating system.")).

### D. Google's Reliance on the "Bing Comparison" is Misleading and Inconclusive

Aside from Google's general and unsupported denials of self-preferencing, Google relies on a highly misleading comparison to Bing search results in one month in 2024. Most fundamentally, that comparison is misleading because the Google expert who offers that comparison (Dr. Stodden) has no knowledge of and offers no information concerning how Bing generates its search results and how it crawls for video content. As noted above, Plaintiff's search expert, Mr. Lurie, explains methodically in his rebuttal report why Google's citation to Bing search results in a short period in 2024 provides no meaningful insight into, and does not exonerate, Google's search results going back many years favoring YouTube. Ex. X (Lurie Rebuttal Report) at ¶¶ 25-37. Mr. Lurie explains, for example, that Bing (unlike Google search) likely does not crawl and index a wide range of video content, but instead likely defaults to YouTube. *Id.* at ¶¶ 30-33. He explains further that even if Bing crawls non-YouTube content, it

would do so more slowly. *Id.* at ¶¶ 34-37. Dr. Stodden presents no contrary factual basis for her

opinions, rendering them inherently unreliable and irrelevant.



To

the extent that the extremely limited Bing comparison can even be admitted, it at best raises only

a genuine issue of material fact. *See Matsushita Elec Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587-88 (1986) (in the summary judgment context, the court should draw all inferences in

favor of the non-moving party and not weigh the evidence).

### E. Google's Efforts to Avoid Creating and Retaining Direct Evidence of Anti-Competitive Conduct and Intent

Google is notorious for "document creation and retention rules" that consciously avoid the

creation and retention of documents reflecting anti-competitive conduct or intent. *See* Ex. XX

("How Google Spent 15 Years Creating a Culture of Concealment"). Judge Mehta, in *U.S. v.*

*Google*, 2024 WL 3647498 at *133-134, summarizes those practices quite effectively. After

describing how Google coaches employees to avoid creating documents containing antitrust

buzzwords (markets, network effects, dominance, market share) and how Google instructs

employees to structure communications as privileged, Judge Mehta emphasizes how Google's

document creation and retention practices explain the paucity of direct evidence in that case:

> "…the court is taken aback by the lengths to which Google goes to avoid creating
> a paper trail for regulators and litigants. It is no wonder then that this case has
> lacked the kind of nakedly anticompetitive communications seen in *Microsoft* and
> other Section 2 cases. … Google clearly took to heart the lessons from these
> cases. It trained its employees, rather effectively, not to create "bad" evidence."

*Id.* at *134. Google's extensive efforts to avoid the creation and retention of such direct evidence did not prevent Judge Mehta from finding Google liable based on circumstantial evidence and expert analysis of the relevant market (and harm to competition and competitors) in that case.

### F. There Is Considerable Evidence That Google Has Long Pursued a Strategy of Favoring Its Own Specialized Vertical Platforms and Demoting Competing Verticals

The jury should be allowed to assess the credibility of Google's positions in the context of a long history of Google pursuing a strategy of self-preferencing its own verticals. That history includes Google's early recognition in the 2000s that specialized vertical platforms threatened its growing dominance in general search. Based on that recognition Google executives debated internally whether Google should develop its own vertical platforms in order to undercut that competitive threat. Ultimately Google chose that path and a senior Google executive made clear Google's intent to favor its own recently developed Google Finance platform in search results. In 2007, in one of the rare public glimpses into Google's overall strategy in relation to competing verticals, Google senior executive Marissa Mayer stated publicly that when Google rolled out its Google Finance vertical in competition with Yahoo Finance, Google Search listed the Google Finance vertical first—"When we rolled out Google Finance, we did put the Google link first. It seems only fair, right? We do all the work for the search page and all these other things, so we do put it first." Ex. HH ("Google Gets Grief From Senators, Mimes, And An Ice Cream Truck"). She also stated that Google did the same thing when Google rolled out Google Maps, and "***that's actually been a [Google] policy.***" *See id.* Google did not produce this in discovery—it was found by Plaintiff's counsel through searches in the course of the litigation.

Citing specific internal Google documents, the 2020 Congressional Report on an Investigation of Competition in Digital Markets, described Google's strategy in relation to vertical platforms:

> According to internal documents, Google executives recognized as early as 2005 that specialized—or "vertical"—search engines could pose a threat to Google's long-term dominance. … Google's apprehension about vertical search providers persisted. For example, a 2006 strategy memo identifying challenges asked, "How do we deal with the problem of 'proliferating verticals?'" Another message noted,

"Vertical search is of tremendous strategic importance to Google. Otherwise, the risk is that Google is the go-to place for finding information only in the cases where there is sufficiently low monetization potential that no niche vertical search competitor has filled the space with a better alternative." In short, Google executives feared that vertical search providers would build direct relationships with users, thereby bypassing Google Search and diverting traffic, valuable data, and ad revenue. While vertical search providers were complements to Google in the short term, Google recognized their potential for disintermediating Google and therefore viewed them as a major competitive threat. The fact that several of these verticals specialized in commercial queries that were among the most valuable for Google further raised the stakes. Documents show that Google developed a multi-pronged strategy to thwart the threat. Two of these tactics included: (1) misappropriating third-party content; and (2) privileging Google's own services while demoting those of third parties. Through these practices, Google exploited its dominance to weaken potential rivals and boost its search advertising revenue."

Exhibit W (Murphy Dep. Ex. 6) at 183.

In subsequent years, Google acted on its stated intent to favor its own vertical platforms. That has been proven conclusively, for example, in the European Union ("EU") case against Google involving comparison shopping platforms. The European Commission found that Google had illegally self-preferenced its own comparison shopping service and levied a €2.4 billion ($2.8 billion) fine against Google. Case AT.39740—Google Search (Shopping), 2017 O.J. (C 4444), 213. On appeal the EU's General Court upheld the fine. C-48/22 P, *Google LLC and Alphabet Inc. v. European Commission (Google Shopping)* (ECLI:EU:C:2024:726) at ¶¶ 260-271. As a result, the EU Digital Markets Act ("DMA") contains an express prohibition on Google self-preferencing its own vertical platforms. Council Regulation No. 2022/1925, 2022 O.J. (L 265) 1, ¶ 52 ("the gatekeeper should not engage in any form of differentiated or preferential treatment in ranking on the core platform service, and related indexing and crawling, whether through legal, commercial or technical means, in favour of products or services it offers itself or through a business user which it controls"). The jury should be permitted to consider the extensive evidence of Google's overarching intent and plan to favor Google vertical platforms in general search results.

Accordingly, there is substantial direct and indirect evidence of Google's overarching strategy of favoring Google verticals in order to quash competition from non-Google verticals.

*See* Decl. ¶ 36 and Exs. II-LL (listing and describing the internal Google documents that the Congressional Committee cited). That evidence should be admissible under FRE 404(b)(2) and considered by a jury as indicative of intent, preparation, and an overarching anticompetitive plan. As the Ninth Circuit held in *Sidibe v. Sutter Health*, 103 F.4th 675, 694-699 (9th Cir. 2024), such historic evidence of anticompetitive intent, planning, and conduct should be considered by the jury. The Ninth Circuit has long recognized that "a plaintiff may introduce background evidence to establish a continuing course of conduct or to cast light on the character of an existing conspiracy. *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1305 (9th Cir. 1983). (citations omitted). Background evidence, even background evidence predating an antitrust plaintiff's entry into the market, may nevertheless be "clearly material" to a plaintiff's allegations of monopolization where such background evidence is essential to understanding and contextualizing the defendant's subsequent conduct. *See Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 709-10, 710 n.15 (1962).

## II.    THERE IS SUFFICIENT EVIDENCE FOR A JURY TO REASONABLY CONCLUDE THAT GOOGLE'S SELF-PREFERENCING CONDUCT HAD AN ANTI-COMPETITIVE EFFECT

### A.  Google's Denials of the Anti-Competitive Effects of Self-Preferencing Are Based Primarily on Specious and Disputed Expert Opinions

In order to deny that its self-preferencing had any anti-competitive effect, Google relies primarily on an assertion that YouTube referrals from Google Search account for an insubstantial amount of YouTube views (roughly 1%) and that Google Search referrals are generally not a significant source of views. Google Br. 29.

In an effort to minimize the anti-competitive effect of Google's self-preferencing, Google's expert economist, Dr. Murphy, presents a highly misleading argument that Google Search accounts for only a minor amount of views on video platforms. He does that based on flawed and limited data for a period in 2023 only. And he ignores that a small percentage of views on an enormous platform such as YouTube translates into a huge number of views for a smaller platform. At his deposition, Dr. Murphy acknowledged that his "Similarweb data" analysis of

YouTube views referred through Google search was limited to the 2023 period and he did not conduct the same analysis for the 2006 to 2019 and 2019 to 2022 time periods. Ex. CC (Murphy Dep. Tr.) at 106:19-109:07.

Ironically, Dr. Murphy also tried to make the same argument based on the limited number of referrals from Google Search to Rumble. But he necessarily admitted that if Google Search favored YouTube, that would affect the extent of Rumble views through Google Search. Ex. CC (Murphy Dep. Tr.) 102:13-103:20, 104:23-105:20). Further, in response to Judge Mehta's finding in *U.S. v Google* (Murphy Dep. Ex. 4) that Specialized Vertical Platforms rely on Google Search for traffic, Dr. Murphy testified that he has no opinion on the extent to which Specialized Vertical Platforms generally depend on Google Search for traffic. Ex. CC (Murphy Dep. Tr.) at 169:01-22.

Plaintiff's experts Professor Gal and Ian Lurie explain in their rebuttal reports that Dr. Murphy's assertions are based on a flawed and highly limited analysis. Ex. NN (Gal Rebuttal Report) at ¶¶ 16-26; Ex. X (Lurie Rebuttal Report) at ¶¶ 5-9, 15-24. As they explain, the primary reasons why Dr. Murphy's analysis is misleading are:

1. Dr. Murphy's analysis only covers a limited recent period in 2023, well after YouTube had already established its extraordinary dominance of the online video platform market. It is not surprising that, after a platform establishes that type of dominance, users may go directly to that platform. The analysis tells us nothing about the extent of Google Search referrals in early periods at issue in this case, going back to at least 2013.

2. Dr. Murphy uses small percentages of YouTube views to make his argument, but ignores that a small percentage of an enormous number of views would be very significant to a smaller competing platform.

3. The data Dr. Murphy used was very limited—focusing on primarily desktop data and only limited mobile application data and counting views in an idiosyncratic way.

4. Google also attempts to refute the alleged anti-competitive effect of its self-preferencing by claiming that Rumble also receives limited referrals from Google Search. In asserting that Rumble itself did not itself receive significant views from Google Search, Dr.

1    Murphy is merely confirming what Rumble has alleged: Google's self-preferencing of

2    YouTube deprived Rumble of views that it would have received absent that

3    anticompetitive conduct. If anything, Dr. Murphy's assertion merely confirms that

4    Rumble videos are often not shown or ranked highly in Google Search results, even when

5    Rumble is the original publisher of the video content and even when the search

6    specifically references the name of a Rumble video and includes the term "Rumble."

7    Google presumptuously asks the Court to determine as a matter of law that there was no

8    foreclosure of competitors due to self-preferencing (Google Br. 28-30) and that there was no harm

9    to competition due to self-preferencing (Google Br. 30-31). The fact record in this case, as

10   analyzed by Plaintiff's experts and as reflected in their expert opinions, demonstrates that there is

11   substantial evidence of foreclosure and harm to competition.

12        Dr. Cragg's expert report details how Google's conduct forecloses or hobbles competition.

13   Ex. OO (Cragg Report) at ¶¶ 397-450. Dr. Cragg examines the economic framework for assessing

14   anticompetitive effects, including the consumer welfare standard, how Google makes it harder for

15   users to discover rival online video platforms, and the anticompetitive impact on rivals, creators

16   and users. Professor Gal's expert report examines the same issues from a consumer behavior

17   perspective, addressing the importance of distribution in competing for user attention (Ex. PP

18   (Gal Report) at ¶¶ 25-32), and how Google's conduct forecloses competition for user attention

19   (*id.* at ¶¶ 41-54). Professor Gal's rebuttal report also addresses the significant anticompetitive

20   effect of Google's mandatory non-deletable app preinstallation terms. Ex. NN (Gal Rebuttal

21   Report) at ¶¶ 27-37.

22        Such disputed factual issues and matters that are the subject of disputed expert analysis are

23   issues that should be decided by a jury after a full presentation of the evidence. *Pacific Steel*, 2024

24   WL 3236705, at *17. The evidence and expert testimony establishing the anticompetitive effects

25   of Google's self-preferencing conduct is substantial and, at the very least, present genuine issues

26   of material fact.

27

28

**B. Google's Denials of the Anti-Competitive Effects of Its Android Distribution Agreements Are Misleading and Ignore the Effect of Those Agreements in Exacerbating the Self-Preferencing of YouTube**

Google's approach to the anticompetitive effects of its Android Agreements seeks to reframe Rumble's contentions and ignores the scope of the evidence, instead focusing only on the impact of the non-deletable preinstallation of YouTube on Android phones. Google's reframing ignores the ways that the Android Agreements cement Google's monopoly power in General Search, thereby exacerbating the impact and extent of self-preferencing. It also ignores the impact of the monopoly power of Google Search and YouTube in their respective markets. Given that monopoly power in the search market and the online video market, competing video platforms are effectively excluded from obtaining preinstallation of their apps on Android phones, with consequent anticompetitive effects. As described below, Rumble has set forth these positions and the supporting evidence in extensive contention interrogatory responses and the detailed expert reports of Dr. Cragg and Professor Gal.

Google's Android Agreements are anticompetitive because they have the practical and intended effect of making it harder for users to discover online video platforms that attempt to compete with YouTube. Those contentions are described in detail and explained in the Expert Report of Dr. Michael Cragg. Ex. OO (Cragg Report) at ¶¶ 406-422. Google's Android Agreements exacerbate its anticompetitive self-preferencing conduct. Those contentions also are described in detail and explained in Dr. Cragg's Report. *Id.* at ¶¶ 426-436. Rumble contends that the express default positioning of Google Search allows Google to use that default to favor YouTube in search results for video content. Rumble also contends that the mandatory non-deletable preinstallation of YouTube on Android mobile devices effectively creates a default positioning for YouTube even if that default positioning is not contractually labeled as a default. Those contentions are described in detail and explained in the Professor Gal's Report and Rebuttal Report. Ex. PP (Gal Report) at ¶¶ 33-40 and 62; Ex. NN (Gal Rebuttal Report) at ¶¶ 27-37. Because Google ignores these contentions demonstrating that Google's Android

Agreements are anticompetitive, it does not (and cannot) dispute them, and that precludes summary judgment.

The non-deletable, landing page location preinstallation of YouTube on Android devices creates an insurmountable barrier for competing video platforms seeking a preinstallation agreement. Google mocks Rumble's app but that disparagement ignores two important antitrust concerns. First, the Android Agreements created obstacles and practical exclusivity that skewed the economic incentives for developing an app and inhibited OEMs and mobile phone service providers from adopting preinstallation of such an app. Second, Google ignores an essential question in all antitrust cases: What would have occurred in the absence of (or "but-for") the alleged anticompetitive conduct? In that hypothetical but-for world, as Rumble's experts explain, Rumble could have achieved far greater scale and could have greatly improved the quality of its platform. In that but-for world, a competing video app would have much greater appeal to OEMs and mobile phone service providers.

Judge Mehta's decision after trial in *U.S. v. Google* includes a number of findings and holdings that also describe the anti-competitive effects of the Android Agreements. For example, Judge Mehta found that:

1. 77% of Windows desktop searches are on a general search engine ("GSE") and a lower percentage of mobile searches are through GSEs. 2024 WL 3647498 at *10, ¶ 35.

2. Defaults have a powerful impact on consumer decisions and such default bias enhances the use of Google Search when it has default placement on Android devices. *Id.* at *14-16, ¶¶ 65-75.

3. Specialized Vertical Platforms ("SVPs") are often reliant on GSEs for traffic. *Id.* at *29, ¶ 155.

4. Google's Android Agreements (MADAs and RSAs) secure default status for Google Search and non-deletable preinstallation for YouTube (¶ 351) and are essential to Google securing query traffic on Android devices to the exclusion of rivals (¶ 365). *Id.* at *58-60, ¶¶ 348-365.

5. "Exclusivity need be neither express nor complete to render an agreement 'exclusive' for Section 2 purposes: *De facto* and partial exclusivity may suffice…." *Id.* at *98.

6. MADAs are exclusive in practice. *Id.* at *101.

7. The RSAs formalize the practical exclusivity of MADAs. *Id.* at *102.

Contrary to Google's assertion (Google Br. 20, n. 9), the Ninth Circuit recognizes that in certain circumstances a combination of factors may result in a finding of *de facto* or practical exclusivity. *See Tevra Brands*, 2024 WL 1909156, at *7 (emphasizing that the Ninth Circuit recognizes "'de facto' exclusive dealing contracts"). There is no basis for Google's assertion that the Ninth Circuit would take a different view than the trial judge in *U.S. v Google* when he held that, "The RSAs between Google and Android device distributors formalize the practical exclusivity of the MADAs. That has been their purpose from the outset." *U.S. v. Google*, 2024 WL 3647498 at *102. Even if the liability findings in *U.S. v. Google* are not conclusive in this case, and even if there is not yet any collateral estoppel effect (given Google's stated intention of appealing after a remedies determination), those findings and holdings at the very least establish a genuine issue of material fact.

With respect to the anticompetitive effect of Google's Android Agreements, Rumble's contentions parallel and are in line with those that the DOJ stated in DOJ's Proposed Findings of Fact in *U.S. v. Google* ("DOJ PFOF"). *See* Ex. QQ (attaching DOJ PFOF paragraphs cited below). Numerous paragraphs in the DOJ PFOF describe very specifically the anticompetitive effect of the Android Agreements in relation to both Google Search and YouTube specifically. Rumble contends that the default placement of Google Search on mobile devices and related restrictions that cement the Google Search monopoly have the anticompetitive effect of strongly reinforcing Google's self-preferencing of YouTube on mobile devices, on which many searches for video content were done in the relevant period (2013 to present). The evidence supporting Rumble's contentions and demonstrating the terms and anticompetitive effects of the Android Agreements are stated in DOJ PFOF ¶¶ 234-256 (as to MADAs and YouTube specifically in ¶ 246) and ¶¶ 253-318 (as to RSAs and MSIAs). DOJ PFOF ¶¶ 779-821 further describe and

explain in detail the evidence that the Android Agreements are exclusive.

Finally, Google's attempt to distinguish Judge Mehta's decision in *United States v. Google* is unavailing. The decision was not limited to the inconsequential facts that Google claims. To the contrary, the Court thoroughly analyzed the Android Agreements and observed that "[a]t summary judgment, the court concluded that 'although, by its terms, the MADA is not an exclusive contract, there is a dispute of fact as to whether market realities make it one.' With the benefit of a full trial, the court can now conclude that the MADA is exclusive in practice." 2024 WL 3647498, at *101 (internal citation omitted).

In a 54-page response to Google's contention interrogatory 6, Rumble sets forth in detail the evidence and prior judicial findings establishing the anticompetitive effects of Google's Android Agreements. Ex. RR (Plaintiff Rumble Inc's Amended Further Responses to Defendant Google LLC's Interrogatory Nos. 6-9, 11 and 13-17 ("Rumble Interrogatory Responses")). Rumble's response cited evidence obtained in discovery, as well as the factual findings in the DOJ case and the EU Android case (the "EC Decision"). *Id.* For example, Rumble identified a web of interrelated Google agreements that, independently and/or collectively, have harmed competition in the marketplace:



*Id.* at 8.

For each agreement, Rumble identified provisions with exclusionary effect and explained how such provisions have harmed competition. *See, e.g., id.* at 8-13 (for AFAs), 13-16 (for ACCs), 16-22 (for MADAs), 23-32 (for RSAs), 33-51 (for MSIA and MIAs).

Eligibility for an RSA, MIA or MSIA is conditioned on compliance with a MADA, which is conditioned on compliance with an AFA or ACC. While Google would like to focus only on the various Android Agreements in stand-alone fashion, the agreements are all part and parcel of Google's entire anti-competitive scheme. These agreements collectively expand the prominence of the YouTube video platform both by magnifying Google's preferencing of YouTube in general search results and by effectively cementing YouTube's prominent position on Android devices. Google's "carrot-and-stick" scheme is summed up in its own 2010 presentation slide:



*Id.* at 31.

As detailed in Rumble's response to Google's contention interrogatory 6, the RSAs, MSIAs and MIAs are exclusionary because they provide for revenue share <u>conditional</u> on: (i) <u>not</u> implementing, pre-loading or post-loading a third party Alternative Search Service,[4] (ii) compliance with MADA agreement, (iii) pre-installation of Google Search as the Default Search Engine; (iv) pre-installation of YouTube and other Google applications on the non-deletable system partition; and (v) display of the Google Search icon and the suite of preloaded Google applications on the Default Home Screen when the mobile device is launched. *Id.* at 23-51. The vague and discretionary definition of Alternative Search Service in Google's exclusionary provision encroaches on any potential vertical search functionalities on any app, including Rumble's app. Compliance with MADA is conditioned on: (1) bundling of YouTube, Google Search and other "Core" and "Flexible" apps with the Play Store;[5] (2) adhering to Google's placement restrictions; and (3) complying with an AFA or ACC agreement, which as the EC Decision concluded, constitutes an abuse of Google's dominance in the market for Android app stores. Meanwhile, compliance with an AFA or ACC is conditioned on expressly precluding OEMs from forking, modifying, or distributing Android operating systems that compete with Google's Android operating system, and thus, depriving OEMs of the flexibility to pre-install products that compete with Google's products.

By prohibiting competing applications with search functionalities through RSAs, MSIAs, and MIAs, Google ensures that its applications (including YouTube), bundled under the MADA and provided on its Android operating system via the AFA or ACC, are rendered exclusive in

---

[4] The definition of "Alternative Search Service" has morphed over time but remained vague ███████. For example, it is defined in T-Mobile's RSA as ████████████ ████████████████████████. Ex. ZZ (Bates 00001060) at -061. Samsung's 2020 RSA defines the term as ████████ ██████████████████████████████████. Ex. YY (Bates 00440995) at -979.

[5] Google Play Store is the app store on the Android operating system and is viewed by OEMs and carriers as essential to the Android customer experience. *U.S. v. Google*, 2024 WL 3647498, *59, *101. It is the carrot that Google dangles to bundle YouTube and other Google apps.

exchange for promised revenue sharing. In other words, revenue sharing is conditioned on the exclusivity of YouTube and other Google applications. While the agreements are functionally and practically linked, internal Google communications reveal that they were prepared as separate agreements to obscure their collective anti-competitive effect. *Id.* at 56 (citing Kolotouros-Raja-Thevenon email communication).

Rumble's response to Google's contention interrogatory 6 further quotes and cites to the opinions from the EC Decision, the *U.S. v. Google* (D.D.C.) case, and the *Epic Games v. Google* (N.D. Cal.) case—all finding that the Android Agreements had anti-competitive effects. *Id. In Epic Games*, the jury unanimously found, among other things, that Google's "agreements with OEMs that sell mobile devices (including MADA and RSA agreements) were unreasonable restraints of trade in accordance with the instructions given to you." *Id.* at 56. And because YouTube is bundled among the Google applications that were at issue in those cases, their findings on Google's exclusionary conduct equally apply to YouTube.

Google's remaining contentions are based on disputed factual issues and competing expert opinions. Google contends that its MADAs are not exclusive because they do not preclude any OEM from preinstalling any other video platform application, including with superior placement to YouTube. Google Br. 20-23. Google further claims that although YouTube is undeletable from the system partition, it can be disabled. As Judge Mehta observed, "the mere availability of less efficient and less prominent channels of distribution does not make the MADA non-exclusive." *U.S. v. Google*, 2024 WL 3647498, *102 (citing *Microsoft*, 253 F.3d at 61).

Google also ignores the reality that "the industry-wide practice is to avoid excessive preloading of applications, or 'bloatware.'" *Id.*, at *101-02 ("But market realities make such configuration unrealistic. The industry is concerned with app 'bloat,' that is, excessive preinstallation of out-of-the-box applications.") Google's expert, Dr. Murphy, acknowledged that defaults have an impact on consumer choice and that choice screens, when offered as an alternative to a default, impact peoples' choices. Ex. CC (Murphy Dep. Tr.) at 142:07-145:05. He

also acknowledged that preinstallation has "value" to OEMs and consumers because it offers "convenient access" to YouTube. *Id.* at 156:16-157:15. Further, Google's President of Global Partnerships and Corporate Development, Mr. Donald Harrison, admitted that he is unaware of any device that any of Google's top three OEMs distribute in the United States that has a video sharing platform other than the YouTube platform preinstalled onto the device. Ex. Q (Harrison Dep. Tr.) at 222:05-11. His testimony confirms that market realities are such that once Google occupies the preinstalled video sharing platform space, a rival cannot realistically hope to compete for another place on an Android device's home screen. Thus, as Judge Mehta emphasized, the mere fact that the MADA does not expressly prohibit an OEM from engaging with other platforms does not make the MADA non-exclusive as a practical matter.

Because Google ignores or disputes record evidence demonstrating the anticompetitive effect of its Android Agreements, summary judgment is inappropriate.

## III. THERE IS NO LEGAL OR FACTUAL BASIS FOR GOOGLE'S STATUTE OF LIMITATIONS DEFENSE

When Google made its motion to dismiss in this case, it could then have argued that the claims were time-barred as a matter of law. Google never made that argument in its motions to dismiss, and its statute of limitations argument has no basis at the summary judgment stage. Rumble first became aware of a factual basis to claim that Google's search results for video content were actually the product of self-preferencing when the *Wall Street Journal* published the results of its investigation on July 14, 2020. *See* Ex. SS (Pavlovski Dep. Tr.) at 32:06-33:08, 89:21-90:18 ("it was like a light bulb went off when that happened"). Rumble commenced this lawsuit roughly six months later, on January 11, 2021.

As the moving party, Google bears the burden of proving that Rumble had actual or constructive knowledge of Google's manipulation of search results for video content and the anti-competitive effect of Google's private Android Agreements before the four-year limitations period began. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 8669891, at *14 (C.D. Cal. August 22, 2016) (citing *Nissan Fire & Marine Ins. Co. v. Fritz. Cos.*, 201 F.3d 1099,

1102 (9th Cir. 2000)). Google cannot meet that burden because there is no evidence that Rumble had such specific knowledge. Even if Google could meet that burden, its continuing self-preferencing of YouTube and continued monopolization via the Android Agreements over a number of years constitute continuing violations that, as a matter of law, restart the limitations period. *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014).

The evidence in this case confirms that Google has always claimed publicly that its search results were intended to provide the most responsive, relevant, and high-quality results, thereby concealing its conduct from the public. *See* Schmidtlein Decl., Ex. 16 (Bates 00000763) (Google's "Honest User Policy" cited at Google Br. 12, a public representation of no favoritism in Google Search); Rumble's April 30, 2021 First Amended Complaint (ECF No. 21) at ¶¶ 30-31, 72(f), 77, 109-110 (describing Google's public statements concerning Google Search and Android). Indeed, Google's expert economist, Dr. Murphy, stresses that image of Google Search that the company has promulgated. Ex. AA (Murphy Report) at ¶¶ 135-137, 177-181; Ex. BB (Murphy Rebuttal) at ¶¶ 176-187. In these circumstances, where Google effectively concealed from the public the true operation of its search mechanisms and where the truth was first revealed by the July 2020 *Wall Street Journal* investigative report, the limitations period is tolled as a matter of law and Rumble may seek relief for conduct going back years—from the time that Rumble was formed in 2013 and based on continuing conduct from the time that Google acquired YouTube in 2006.

## IV.   GOOGLE'S DISPARAGEMENT OF RUMBLE IS MISINFORMED AND IRRELEVANT, AND AT MOST GIVES RISE TO A FACTUAL DISPUTE

Google attacks Rumble for a shift in content uploaded to Rumble.com after 2020. That attack ignores a number of important points.

First, it's irrelevant to Google's motion for summary judgment. Whether Google, YouTube (or others) consider recent content on Rumble.com to be "controversial" has no bearing on the evidence of Google self-preferencing YouTube over many years, especially given that Google claims that its search mechanisms do not demote particular platforms.

Second, the claims asserted in this case apply to Google's conduct before 2020, as well as after 2020. From 2013-2020, Rumble's content was entirely non-controversial, by any definition of that word. *See* Ex. AAA (Bates GG001140) (Listing of most viewed videos on rumble.com annually from 2013-2023). Even if Google deliberately demoted both controversial and non-controversial Rumble content after 2020, that would not explain the low rankings of Rumble content from 2013 to 2020, and Google does not attempt such explanation.

Beginning in 2020, content creators migrated to Rumble's neutral platform, as did users looking for a platform that promoted free speech and did not censor political commentary.[6] Rumble recognized an opportunity for expansion, and a strategic opportunity to survive in a market dominated by YouTube—a market in which Google's preferencing of YouTube had for years threatened Rumble's survival. That strategy—one grounded upon freedom of expression, consistent with the UN Declaration of Human Rights, Article 19—was a reaction to the actions (primarily censorship, banishment, and de-monetization strategies) undertaken by Google and YouTube. Ex. OO (Cragg Report) at ¶¶ 46-49; Ex. SS (Pavlovski Dep. Tr.) at 117:07-21, 126:08-15).[7]

Google notably fails to cite to the testimony of Rumble's CEO that "content moderation" is by far the "biggest division" of Rumble, and that Rumble has banned and permanently

---

[6] While YouTube criticizes certain content on Rumble, YouTube itself has distributed massive amounts of controversial and misleading content in recent years. *See, e.g.*, https://www.nytimes.com/2024/10/31/technology/youtube-election-conspiracy-theories-misinformation.html?unlocked_article_code=1.WU4.RB99.zCF_mblrb2kB&smid=em-share; https://www.nytimes.com/2017/03/23/business/media/youtube-advertisers-offensive-content.html

[7] By providing a "neutral" free-speech platform when other platforms were aggressively censoring content and demonetizing content creators on the basis of political and other commentary, Rumble.com has not only expanded its user base, but has also attracted a diverse audience to its platform. For example, Comscore data for Rumble.com has shown that its users comprise approximately equal percentages of those identifying as Democrat, Independent, and Republican, and users who are also diverse in terms of age-groups and gender. Ex. BBB (Bates GG001137).

1    suspended far more than "thousands" of accounts from Rumble.com due to enforcement of its

2    content moderation policy . Ex. SS (Pavlovski Dep. Tr.) at 112:21-115:05.

3           Rumble has, since its founding in 2013, faced and continues to face certain disadvantages

4    in attempting to compete and grow in both users and revenue precisely because it lacks the

5    massive scale that YouTube has achieved with a major assist from Google Search over the years.

6    Ex. OO (Cragg Report) at ¶¶ 262-273 (describing importance of scale). Rumble's honest self-

7    assessments of areas requiring improvement are not, as Google contends, an indication that

8    Rumble was not harmed by Google's conduct. Rather, those honest self-assessments merely

9    reflect an ongoing effort to improve its product, and the goal of competing as aggressively as

10   possible in a market dominated so dramatically by YouTube, and where Google preferences

11   YouTube so dramatically.

12          Google's attempt to denigrate Rumble and present a distorted perspective on Rumble's

13   overall content is not a basis for summary judgment.

14                                        **CONCLUSION**

15          Given the extensive disputed factual issues concerning Google's anticompetitive conduct

16   and the effects of that conduct on competition, Plaintiff respectfully requests that the Court deny

17   Google's motion for summary judgment and allow a jury to resolve those factual disputes.

18

19   DATED: November 20, 2024          Respectfully submitted,

20                                      COMPETITION & TECHNOLOGY LAW GROUP LLP
                                        Robert W. Dickerson, Jr.
21                                      Allan W. Jansen
                                        Ehab M. Samuel
22

23                                      CADWALADER, WICKERSHAM & TAFT, LLP
                                        Nicholas A. Gravante
24                                      Philip J. Iovieno
                                        Jack G. Stern
25                                      Kristen J. McAhren

26
                                        By:    */s/ Robert W. Dickerson, Jr.*
27                                             Attorneys for Plaintiff Rumble Inc.

28

**PROOF OF SERVICE**

*Rumble Inc. v. Google LLC et al, Case No. 4:21-cv-00229-HSG (LJC)*

I, Robert W. Dickerson, Jr., declare:

I am a citizen of the United States and employed in Los Angeles County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 11400 West Olympic Blvd., Suite 200, Los Angeles, CA 90064.

On November 20, 2024 I served a copy of the forgoing document entitled:

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

on counsel for Google LLC by transmitting or causing to be transmitted via e-mail or electronic transmission the document listed above to the person(s) at the e-mail address(es) set forth on the attached Service List pursuant to agreement of counsel regarding email service of documents in this matter.

I declare that I am a member of the bar of this Court, and that I have completed service by email on this day to the persons on the attached Service List.

Executed on November 20, 2024at Los Angeles, California.

 /Robert W. Dickerson, Jr./

Robert W. Dickerson, Jr.

SERVICE LIST

*Rumble Inc. v. Google LLC et al, Case No. 4:21-cv-00229-HSG (LJC)*

| | |
|---|---|
| *Attorneys for Defendant*<br>*GOOGLE LLC* | |
| Schmidtlein, John<br>JSchmidtlein@wc.com<br><br>Greenblum, Benjamin<br>BGreenblum@wc.com<br><br>Fuzesi, Stephen<br>SFuzesi@wc.com<br><br>Clay, Jesse<br>JClay@WC.com<br><br>Whiteley, Daniel<br>DWhiteley@wc.com><br><br>Kramer, David<br>DKramer@wsgr.com<br><br>Youlin, Yuan<br>YYin@WC.com<br><br>GoogleRumble@wc.com | |