John E. Schmidtlein (CA SBN 163520)
Stephen J. Fuzesi (admitted *pro hac vice*)
Benjamin M. Greenblum (admitted *pro hac vice*)
Youlin Yuan (admitted *pro hac vice*)
Daniel Whiteley (admitted *pro hac vice*)
Jesse T. Clay (admitted *pro hac vice*)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.
Washington, D.C. 20024
Telephone:    (202) 434-5000
Facsimile:    (202) 434-5029
Email:    jschmidtlein@wc.com
    sfuzesi@wc.com
    bgreenblum@wc.com
    yyuan@wc.com
    dwhiteley@wc.com
    jclay@wc.com

David H. Kramer (CA SBN 168452)
WILSON SONSINI GOODRICH & ROSATI P.C.
650 Page Mill Road
Palo Alto, CA 94304
Telephone:    (650) 493-9300
Facsimile:    (650) 565-5100
Email:    dkramer@wsgr.com

*Attorneys for Defendant Google LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| RUMBLE, INC.,<br><br>     Plaintiff,<br><br>   v.<br><br>GOOGLE LLC,<br><br>     Defendant. | Case No. 4:21-cv-00229-HSG<br><br>**DEFENDANT GOOGLE LLC'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: January 23, 2025<br>Time:   2:00 p.m.<br>Place:   Courtroom 2<br>Judge:   Hon. Haywood S. Gilliam, Jr. |

1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................... 1

ARGUMENT ......................................................................................................................... 2

I.    THERE IS NO TRIABLE ISSUE OF "SELF-PREFERENCING" ................................... 2

     A.    The Evidence Regarding Google Search Refutes Any Alleged "Self-Preferencing" ................................................................................................ 3

     B.    Rumble's Purported "Direct Evidence" Is Meritless ................................. 4

     C.    Rumble Cannot Rely on an Unspecified "Effect" .................................... 7

     D.    Rumble's Remaining Bids to Create a Fact Issue Are Groundless ......................... 9

         1.    Rumble's Citation to Hearsay Is Inadmissible and Unfounded ................. 9

         2.    Rumble's Continuing Reliance on Select Screenshots Is Unavailing ....... 10

         3.    Rumble's Arguments as to Different Products Are Irrelevant ................. 10

II.    THERE IS NO TRIABLE ISSUE OF "EXCLUSIONARY" PREINSTALLATION OF THE YOUTUBE APP ....................................................................................... 11

     A.    None of Google's Android Agreements Require YouTube Exclusivity .............. 11

     B.    Rumble's Reliance on a "De Facto" Exclusivity Theory Fails ............................. 12

     C.    Rumble Relies on Rulings that Are Inapplicable to the YouTube App ............... 13

III.    RUMBLE CANNOT DEMONSTRATE ANTICOMPETITIVE EFFECTS ................... 15

     A.    Google Has Not Substantially Foreclosed Rumble from a Relevant Market as a Result of Preinstallation of the YouTube App on Android Mobile Devices ................................................................................................... 15

     B.    Google Has Not Substantially Foreclosed Rumble from a Relevant Market as a Result of Alleged "Self-Preferencing" ................................................... 16

     C.    Rumble Has Not Otherwise Established Harm to Competition ........................... 18

IV.    THE STATUTE OF LIMITATIONS BARS RUMBLE'S CLAIM ................................. 18

CONCLUSION ..................................................................................................................... 20

- i -

1

## TABLE OF AUTHORITIES

2

Cases

3    *Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, 2008 WL 4830740

4       (N.D. Cal. Nov. 6, 2008) ...................................................................................................... 16

5    *Aerotec Int'l v. Honeywell Int'l*, 836 F.3d 1171 (9th Cir. 2016) ...........................................passim

6    *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991

7       (9th Cir. 2010) ...................................................................................................................... 8

8    *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................................................. 2, 7

9    *Asetek Danmark A/S v. CMI USA, Inc.*, 2014 WL 12644295 (N.D. Cal. Nov. 19, 2014) ............. 9

10   *Baker v. Firestone Tire & Rubber Co.*, 793 F.2d 1196 (11th Cir. 1986) ...................................... 9

11   *Beneficial Std. Life Ins. Co. v. Madariaga*, 851 F.2d 271 (9th Cir. 1988) ................................. 19

12   *Bergdale v. Countrywide Bank FSB*, 2014 WL 2885473 (D. Ariz. June 25, 2014) ..................... 18

13   *Cal. Comput. Prods., Inc. v. IBM Corp.*, 613 F.2d 727 (9th Cir. 1979) ........................................ 8

14   *Cypress Semiconductor Sec. Litig.*, 891 F. Supp. 1369 (N.D. Cal. 1995) ..................................... 9

15   *Eastman v. Quest Diagnostics Inc.*, 2015 WL 7566805 (N.D. Cal. Nov. 25, 2015) .................... 17

16   *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946 (9th Cir. 2023) ..................................................... 2

17   *Epic Games v. Google*, No. 3:20-cv-05671-JD, ECF No. 606 (N.D. Cal. Dec. 11, 2023) .......... 14

18   *FTC v. Qualcomm Inc.*, 969 F.3d 974 (9th Cir. 2020) ............................................................... 15

19   *Golden Boy Promotions LLC v. Haymon*, 2017 WL 460736 (C.D. Cal. Jan. 26, 2017) .............. 16

20   *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055 (9th Cir. 2012) ........................................ 19

21   *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F. Supp. 423 (N.D. Cal. 1978) ....................... 8

22   *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 8669891

23       (N.D. Cal. Aug. 22, 2016) .............................................................................................. 19, 20

24   *Jablon v. Dean Witter & Co.*, 614 F.2d 677 (9th Cir. 1980) ...................................................... 18

25   *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711 (9th Cir. 2024) ................. 2

26   *Oliver v. SD-3C LLC*, 751 F.3d 1081 (9th Cir. 2014) ................................................................ 20

27

28

*Pace Indus., Inc. v. Three Phx. Co.*, 813 F.2d 234 (9th Cir. 1987) ................................. 20

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, 2013 WL 5694452 (N.D. Cal. Oct. 18, 2013) ............................................................................................................................. 17

*Richmond Med. Ctr. v. Hicks*, 301 F.Supp.2d 499 (E.D. Va. 2004) ................................. 9

*Rumble Inc. v. Bonta*, No. 24-cv-03315 (E.D. Cal. Nov. 27, 2024) ................................. 15

*Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868 (N.D. Cal. 2015) ................................. 20

*Sandoz Inc. v. United Therapeutics Corp.*, 2022 WL 17335696 (D.N.J. Mar. 30, 2022) ............. 16

*Staley v. Gilead Scis., Inc.*, 2021 WL 4972628 (N.D. Cal. Mar. 12, 2021) ................................. 19

*Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852 (9th Cir. 2019) ................................. 10

*Sullivan v. Nat'l Football League*, 34 F.3d 1091 (1st Cir. 1994) ................................. 11

*Tevra Brands LLC v. Bayer Healthcare LLC*, 2024 WL 1909156 (N.D. Cal. May 1, 2024) ................................................................................... 12, 13

*United States v. Google*, 2024 WL 3647498 (D.D.C. Aug. 5, 2024) ................................. 14

*United States v. Microsoft Corp.*, 253 F.3d 34 (D.C. Cir. 2001) ................................. 16

*Vitale v. Wells Fargo Bank Nat'l Ass'n*, 2024 WL 3012810 (N.D. Cal. June 14, 2024) ............. 20

*Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989 (9th Cir. 2006) ................................. 19

*Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993 (9th Cir. 2019) ................................. 9, 11

*Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321 (1971) ................................. 19

Statutes, Federal and Local Rules, and Treatises

15 U.S.C. § 15b ................................................................................................... 1, 19

Fed. R. Civ. P. 12(b)(6) ................................................................................... 18

Fed. R. Evid. 404(b) ........................................................................................... 11

N.D. Cal. Civ. L.R. 37-3 ................................................................................... 7

11 Areeda & Hovenkamp, Antitrust Law, ¶ 1821(c) (5th ed. 2024) ................................. 16

1

### INTRODUCTION

2   For all of Rumble's protestations, its Opposition fails to identify a *genuine* issue of *material*

3 fact necessitating a trial. As set out in Google's opening brief, Rumble's claim relies on two specific

4 allegations: (1) that Google purportedly "self-preferences" YouTube in Google search results,

5 intentionally boosting YouTube webpages over those of competitors, and (2) that Google entered into

6 purportedly "exclusionary" contracts that bar the preinstallation of Rumble on Android mobile devices.

7 But as to the first assertion, Rumble concedes that it cannot identify *any* aspect of the Google Search

8 ranking process that actually boosts YouTube webpages or demotes those of Rumble. And as to the

9 second, Rumble does not identify *any* contractual provision that actually prevents the preinstallation

10 of any video application, be it Rumble's or any other competitor's. In short, "[t]his case serves as a

11 reminder that anecdotal speculation and supposition are not a substitute for evidence." *Aerotec Int'l*

12 *v. Honeywell Int'l*, 836 F.3d 1171, 1174 (9th Cir. 2016). After two years of extensive discovery,

13 Rumble has failed to carry its burden of creating a triable issue sufficient to defeat summary judgment.

14   Indeed, summary judgment may be entered here on multiple grounds. Rumble independently

15 fails to meet its burden of demonstrating anti-competitive effects, including its burden to show the

16 substantial foreclosure of a relevant market. Rumble does not argue that it is excluded from Google

17 search results. It does not dispute the multitude of ways in which users can access Rumble content.

18 And it does not dispute that Google Search accounts for an insignificant percentage of both YouTube

19 and Rumble's user traffic.

20   Further, Rumble barely contests that its claim is barred under the applicable statute of

21 limitations. Section 2 claims are "forever barred unless commenced within four years after the cause

22 of action accrued." 15 U.S.C. § 15b. But Rumble's Opposition only confirms that, under its own

23 theory of the case, its claim accrued well over four years prior to when it brought suit. Rumble dates

24 the alleged conduct back to "the time that Rumble was formed in *2013*" and even further back to "the

25 time that Google acquired YouTube in *2006*." Opp. 32 (emphases added). This is fatal to its claim.

26   For these reasons, the Court should enter summary judgment for Google.

27

28

1

## ARGUMENT

2

## I.    THERE IS NO TRIABLE ISSUE OF "SELF-PREFERENCING"

3

Rumble bears the burden of proving that Google engaged in the purported anti-competitive

4

conduct that it alleges—that Google "rig[s] its search algorithms" to rank videos on YouTube higher

5

than videos on Rumble.  ECF No. 21 ("FAC") ¶¶ 2, 194; *see, e.g.*, *Epic Games, Inc. v. Apple, Inc.*, 67

6

F.4th 946, 998 (9th Cir. 2023) (In a Section 2 case, "the plaintiff must show that the defendant acquired

7

or maintained its monopoly through 'anticompetitive conduct.'").  Yet Rumble now expressly

8

concedes that ***it cannot identify "any signal, algorithm, or indexing methodology [that] explicitly***

9

***favors YouTube or explicitly demotes other platforms*.**"  Opp. 6 (emphasis added).  This is a striking

10

admission.  With it, Rumble acknowledges that it cannot demonstrate there is any aspect of Google

11

Search designed to intentionally and artificially boost YouTube webpages in Google search results.  It

12

is not, as Rumble suggests, Google's burden to somehow prove a negative—"to disprove self-

13

preferencing."  Opp. 12.  It is Rumble's burden in opposing summary judgment to come forth with

14

"affirmative evidence" sufficient to prove its theory—"concrete evidence from which a reasonable

15

juror could return a verdict."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–57 (1986); *Lerner*

16

*& Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 717–18 (9th Cir. 2024) (where "the

17

moving party does not have the burden of proof on an issue at trial, it can prevail merely by pointing

18

out that there is an absence of evidence to support the nonmoving party's case").

19

Rumble may not rely on "speculation," "conclusory statements," or "stitch[ed] together

20

disparate facts."  *Aerotec Int'l*, 836 F.3d at 1182 (affirming summary judgment in antitrust case).  Yet,

21

as explained below, that is exactly what Rumble attempts to do here.  Nor can Rumble rest on vague

22

assertions of "evasiveness."  Opp. 2.  Google produced more than 685,000 pages of documents, and

23

Google Search and YouTube witnesses testified at length.  Mot. 1, 10–11.  If Rumble had complaints

24

about discovery, it had ample opportunity to raise them.  But such grievances (or regrets) cannot defeat

25

a motion for summary judgment.  *See Anderson*, 477 U.S. at 257 (plaintiff must present "affirmative

26

evidence" "even where the evidence is likely to be within the possession of the defendant, as long as

27

28

the plaintiff has had a full opportunity to conduct discovery").  Rumble may not like what the record in this case shows, but that is only because the record does not support its claim.

The remainder of Rumble's argument is based on distractions and misrepresentations rather than any evidence that demonstrates a genuine issue of material fact.

**A.      The Evidence Regarding Google Search Refutes Any Alleged "Self-Preferencing"**

Rumble all but ignores the unanimous and unequivocal testimony that there is no favoritism of YouTube in Google search ranking.  As Pandu Nayak, the longtime overall head of search ranking testified, he was one "hundred percent sure" there was no such "self-preferencing."  Mot. 11–12. Google's opening brief recounted the testimony from other engineers, with decades of experience, that similarly refutes Rumble's claim.  *See id.*  Yet Rumble barely acknowledges this evidence.

Instead, Rumble misconstrues the testimony that it cites.  To begin, Rumble repeatedly asserts that Google witnesses "could not explain" how particular search results were generated.  Opp. 11–14, 16–17.  But Rumble wrenches this testimony out of context.  Google's engineers answered hours upon hours of questions relating to how Google Search operates.  When Rumble's counsel placed before them print-outs of specific search results from years ago, they simply noted that they could not explain based *only on looking at those screenshots* exactly why a particular search query triggered specific results.  *See, e.g.*, Ex. 65 (Papachristou Dep.) 29:10–30:5, 32:4–17 ("[S]o just looking at the screenshots you can't really tell the reason."); Ex. 66 (Desikan Dep.) 61:1–64:10 ("[L]ooking at a screenshot I cannot identify why these results are ordered in this particular way."); Ex. 67 (Nayak Dep.) 23:21–24:2 ("[W]ithout actually seeing all of the signals that went into it, it is hard . . . to determine exactly what's happening.").  Again, each of these witnesses was clear that whatever the results, they were not the result of any "self-preferencing" of YouTube.  *See* Mot. 11–12; *see also*, *e.g.*, Ex. 65 (Papachristou Dep.) 29:10–30:5; Ex. 66 (Desikan Dep.) 49:23–50:24.

Rumble asserts that Google witnesses "identified certain signals . . . that would account for . . . self-preferencing of YouTube."  Opp. 13.  But in the cited testimony and document, the witnesses simply explained how certain Google search ranking signals operate, not that they "account for self-

- 3 -

preferencing of YouTube." *See* Ex. 66 (Desikan Dep.) 185:21–189:12 (explaining a "popularity" score); Opp. Ex. A (Papachristou Dep.) 316:2–21, 320:3–12 (same); Opp. Ex. G (Nayak Dep.) 223:11–233:16 (explaining how various components operate); Mot. Ex. 48 (explaining notions of "popularity" in search ranking, noting that "[b]oth these signals treat [YouTube] and other platforms the same").

Rumble similarly misrepresents other testimony throughout its Opposition.  Contrary to Rumble's claim, Opp. 11, for example, Ms. Papachristou refuted allegations in a Wall Street Journal article relating to the ranking of YouTube videos.  Ex. 65 (Papachristou Dep.) 301:7–23 ("[T]he claims are not true.  We don't push YouTube over rivals.  We don't do that.").  She did not testify about Google search "results favoring YouTube."  Opp. 13.  She explained why YouTube webpages may be appearing in search results for given queries.  *See* Opp. Ex. A (Papachristou Dep.) 89:2–22 (because YouTube is "a very big provider of video content," it is not surprising that YouTube would often appear in Google search results); 53:8–20 (similar), 67:10–22 (search ranking "depends really on the query" and that there are "multiple factors that go into it").[1]  Likewise, it is meritless for Rumble to suggest that Dr. Desikan supported Rumble's claim by referring to ██████████████████ ███████████████  Opp. 12.  Dr. Desikan was clear that Google Search does not preference any platform.  *See* Mot. 11–12.  And like other witnesses, he noted that ████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

## B. Rumble's Purported "Direct Evidence" Is Meritless

Rumble's list of supposed "direct evidence" of "self-preferencing," Opp. 2–5, amounts to no evidence at all, let alone evidence creating a triable issue:

---

[1] This testimony belies Rumble's claim that Ms. Papachristou "could not explain" the prominence of YouTube webpages in Google search results.  Opp. 11.  Moreover, Ms. Papachristou testified that it is a "misconception" to believe that such prominence means that Google Search ranks videos unequally.  Ex. 65 (Papachristou Dep.) 82:25–84:11; *see also* Ex. 69 (Marshak Dep.) 95:8–99:15, 227:19–228:23.

● Dr. Desikan never "confirm[ed]" that any ranking signal "favors YouTube." Opp. 2. This misrepresents the document at issue and ignores his testimony. In that email, Dr. Desikan summarized an analysis of certain queries, explaining that for those queries, the "individual component scores" generated by certain signals for "the YouTube result w[ere] higher than on the other results," leading the YouTube result to be ranked higher for that query. Ex. 66 (Desikan Dep.) 317:4–318:3; *see id.* at 308:16–20 (the signals showed "in that particular case [that] an individual YouTube result for that query was more likely to be useful for the user than any other result we could show for that query"); 317:25–318:3 ("A lot of those [signals] pointed to the fact that this particular YouTube result would better satisfy the user's intent on the query that the user was issuing.").[2]

● Rumble cites internal Google documents relating to "Project ViSEO," Opp. 3, but turns this initiative on its head. As the undisputed record reflects, Google initiated Project ViSEO to educate third-party website owners about the technical steps *they* needed to take *on their own websites* so that Google could properly crawl and index their video content, such that it could appear in Google search results. Ex. 69 (Marshak Dep.) 80:12–19 ("Project ViSEO was an initiative that aimed to raise awareness among the web ecosystem of what is needed in order to make their content, their video content specifically visible and understandable to Google."). In other words, the "problem" that Project ViSEO was trying to solve was that website owners "didn't understand that they needed to do things on their site to make their videos available to Google." *Id.* at 95:8–99:15.[3] Google's outreach to those third-parties—to *expand* the amount of third-party video content eligible to appear in Google Search—is the opposite of "self-preferencing." Rumble ignores that documents relating to this initiative expressly recognized that Google's search ranking processes treat all platforms equally. Opp. Ex. K at -864, -865; Ex. 69 (Marshak Dep.) 251:17–252:8 (Google's policy of not favoring any

---

[2] Rumble also cites another email thread. Opp. 3 (citing Opp. Ex. H). It observes that the search ranking change being discussed had the effect of "demot[ing] the hell out of YT" webpages—which Rumble cannot possibly complain about.

[3] *See also* Ex. 69 (Marshak Dep.) 115:21–126:8 ("[O]ur goal was really to empower website owners . . . to assess and understand whether there were issues that they needed to fix on their side in order to make their videos eligible for indexing.").

particular platform in search ranking is a "longstanding principle" and "Google operated a level playing field both before [Project ViSEO] and since"). Rumble is further incorrect to assert that this project was somehow a response to Rumble's lawsuit; the record shows that Google initiated the project long before this litigation. Ex. 69 (Marshak Dep.) 81:14–83:24 ("early 2020").[4]

● Rumble falsely claims that "Google gives YouTube a technological advantage" in its indexing and crawling processes that "affects search ranking." Opp. 3–5. Rumble appears to be referencing how Google Search obtains YouTube content through a feed to "reduc[e] wasteful re-processing or copying," since the YouTube data is already housed within Google. Opp. Ex. D; Ex. 69 (Marshak Dep.) 240:25–241:25. The data that Google obtains is "no different than any other public data available for Google to index," Opp. Ex. D, and third-parties "can arrange to have just as strong indexing/crawling as YouTube." Opp. Ex. L at -542; *see also* Ex. 69 (Marshak Dep.) 240:25–241:25. In short, "this difference doesn't give YouTube any preference to rank higher." Opp. Ex. L at -542; Ex. 69 (Marshak Dep.) 234:4–235:2 ("any website is able to configure their site in order to be indexed just as effectively as YouTube" and "there is no preference to YouTube in any ranking systems"); *see also* Ex. 70 (Nayak Decl.) ¶ 8. Indeed, Rumble elsewhere concedes that there is no "indexing methodology [that] explicitly favors YouTube or explicitly demotes other platforms." Opp. 6.[5]

● Rumble mischaracterizes an email involving Dr. Nayak to claim that Google "made sure that videos on the YouTube Platform have a high 'quality score.'" Opp. 5. Rumble never asked Dr. Nayak about this document during his deposition. The email expresses concern about "challenges" with low-quality videos, including those featuring misinformation and hate speech, showing up in searches on

---

[4] Rumble also cites what the documents and testimony explain are hearsay "misconceptions" about Google Search; those cannot support Rumble's claim. *See supra* at 4 n.1; *see also* Opp. Ex. K at -862; Ex. 69 (Marshak Dep.) 95:8–99:15 ("[T]he problem was that there was a misconception among website owners who saw that and didn't understand that they needed to do things on their site to make their videos available to Google."), 227:19–228:23 (testifying about Opp. Ex. N).

[5] Rumble cites Ms. Papachristou's testimony as supposedly acknowledging that "indexing issues . . . affect search ranking." Opp. 4. But she testified that "[n]ot necessarily how [a video] is indexed" will impact search ranking but "the information in that index will have the impact." Opp. Ex. A (Papachristou Dep.) 210:2–16. In other words, the information in Google's index is what is used to generate rankings. Rumble also cites speculation from non-engineers that Ms. Marshak testified was incorrect. *See* Ex. 69 (Marshak Dep.) 238:23–241:25 (testifying about Opp. Ex. O).

1    YouTube and more broadly on Google Search.  Ex. 70 (Nayak Decl.) ¶¶ 2–6.  As a result, Dr. Nayak

2    suggests that "going forward, we have a strong focus on the quality score" and have a "strong, reliable

3    signal there" to *demote* these videos—not to boost the ranking of YouTube videos in Google Search

4    by increasing their quality score.  *Id.*; Opp. Ex. R.

5    ● Finally, Rumble's reference to the "Lightbox Play" feature is misguided.  Opp. 5.  This feature

6    has nothing to do with search ranking and is irrelevant to Rumble's claim.  It allows users to watch

7    videos—from YouTube and certain other platforms that permit the feature to be utilized for their

8    content—"directly on the Google Search page." *Id.*; *see* Ex. 69 (Marshak Dep.) 126:9–18.  This feature

9    does not affect what content surfaces in search results, but instead just whether a user can view it

10   without clicking out of Google Search.  For that reason, many websites do not want that feature enabled

11   because they want traffic to go to their websites.  *See* Ex. 69 (Marshak Dep.) 118:19–119:10.[6]

12   **C.    Rumble Cannot Rely on an Unspecified "Effect"**

13   Rumble attempts to fall back on the assertion that unspecified aspects of Google Search have

14   the "*effect*" of "preferencing" YouTube because YouTube webpages are highly ranked in search results

15   for some search queries.  Opp. 6 (emphasis added).  If Rumble is asserting that this case must go to a

16   jury just because webpages from an indisputably popular website are frequently found in Google

17   search results, that is patently insufficient.  It does not come close to being "concrete," "affirmative

18   evidence" of Rumble's claim: that Google boosts YouTube in its search results by rigging its

19   algorithms to favor YouTube.  *Anderson*, 477 U.S. at 256–57; *Aerotec*, 836 F.3d at 1182.

20   Likewise, to the extent Rumble is now seeking to base its claim on Google's consideration of

21   user interaction data as a search-ranking factor, *see* Opp. 6, there is no evidence this is somehow

22   designed to boost YouTube webpages over those of competitors.  Rumble does not point to *any*

23   evidence of that.  And it does not dispute that (1) these signals are not specific to YouTube; (2) for any

24

25   ───────────────
     [6] Rumble also baselessly speculates about what may be contained in privileged communications and
26   claims that "Google should not be entitled to summary judgment when it effectively has concealed"
     these privileged materials.  Opp. 12.  But Rumble never challenged Google's privilege assertions, and
27   the time for doing so has long expired.  *See* N.D. Cal. Civ. L.R. 37-3.  In any event, Rumble was free
     to ask Google's witnesses about supposed "touch points" between Google Search and YouTube.  *See*
28   Ex. 67 (Nayak Dep.) 69:1–75:12.  The testimony shows there is nothing to support Rumble's claim.

given query, they can favor non-YouTube webpages; (3) Google Search has evaluated user interaction data since before Google even acquired YouTube; and (4) all general search engines, such as Microsoft Bing, consider user interaction data because it helps improve their search results.  Mot. 17–19. Rumble ignores that its own expert, Mr. Lurie, conceded that it is "reasonable" for a search engine to consider such user interaction data—and that these signals are "absolutely" something "a search engine can decide to do when its engineers are designing how it's going to work."  Mot. 18–19.

Rumble argues that a Section 2 claim can succeed without proof of "anticompetitive intent." Opp. 15–16.  But that misses the point.  To the extent "self-preferencing" is cognizable as an antitrust theory,[7] Rumble must show that Google in fact rigged its search algorithms to rank inferior YouTube videos higher than videos on Rumble that were more responsive to the user's query and/or of superior quality.  In the absence of that proof, Rumble is just complaining about its subjective views of Google search results.  "Where there is a difference of opinion as to the advantages of two alternatives which can both be defended from an engineering standpoint," it is not the role of a court to intervene.  *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F. Supp. 423, 439–41 (N.D. Cal. 1978); *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 1000 (9th Cir. 2010) (noting the "undesirability of having courts oversee product design").

The Ninth Circuit has rejected the argument that Rumble makes here—that a product design with the purported "effect" of harming a competitor is enough for a Section 2 claim.  *See Cal. Comput. Prods., Inc. v. IBM Corp.*, 613 F.2d 727, 744 (9th Cir. 1979) (monopolist need not "have constricted its product development so as to facilitate [the success] of rival products"); *Allied Orthopedic*, 592 F.3d at 999–1000 ("product improvement by itself does not violate Section 2, even if it is performed by a monopolist and harms competitors as a result").  Accepting Rumble's argument would require the Court to make the very kind of product design choices—untethered to *any* evidence Google actually "rig[s] its search algorithms," FAC ¶ 2—that the Ninth Circuit has warned are "at cross-purposes with antitrust law."  *Allied Orthopedic*, 592 F.3d at 1000.

---

[7] As Google explained in its opening brief, the Ninth Circuit has never recognized it as a cognizable theory, and the leading antitrust treatise in the United States explains that it is not.  Mot. 10.

1

**D.    Rumble's Remaining Bids to Create a Fact Issue Are Groundless**

2      Finally, Rumble grasps at a series of irrelevant and often inadmissible straws in an attempt to

3   create a triable issue.  None do.

4           1.    Rumble's Citation to Hearsay Is Inadmissible and Unfounded

5      Rumble cites a Wall Street Journal article and a congressional subcommittee majority staff

6   report in an attempt to prop up its "self-preferencing" allegations.  Opp. 6.  Neither moves the ball.

7      To the extent Rumble would have the Court consider as evidence the contents of those two

8   documents, they are inadmissible hearsay.  A court "may only consider admissible evidence when

9   reviewing a motion for summary judgment[.]"  *Weil v. Citizens Telecom Servs. Co.*, 922 F.3d 993, 998

10  (9th Cir. 2019).  It is well-established that "[s]tatements reported in magazine articles and newspapers

11  are hearsay if offered to prove the truth of the matter asserted."  *Asetek Danmark A/S v. CMI USA,*

12  *Inc.*, 2014 WL 12644295, at *2 (N.D. Cal. Nov. 19, 2014) (collecting cases); *see also Cypress*

13  *Semiconductor Sec. Litig.*, 891 F. Supp. 1369, 1374 (N.D. Cal. 1995) (articles could not be considered

14  at summary judgment).    Courts also "have consistently excluded congressional reports" as

15  inadmissible hearsay.  *Richmond Med. Ctr. v. Hicks*, 301 F.Supp.2d 499, 512 (E.D. Va. 2004)

16  (collecting cases), *rev'd on other grounds*, 570 F.3d 165 (4th Cir. 2009); *see also Baker v. Firestone*

17  *Tire & Rubber Co.*, 793 F.2d 1196, 1199 (11th Cir. 1986) (excluding House subcommittee report).[8]

18      As for Rumble's assertion that Google "never offered any public denial" to the article or the

19  staff report, Opp. 6, that is wrong.  Both contain Google's clear denials of any "self-preferencing."

20  Opp. Ex. V at 2 ("A Google spokeswoman, Lara Levin, said there is no preference given to YouTube

21  or any other video provider in Google Search."); Opp. Ex. W at 191 ("the company denied that Google

22  Search is designed to favor YouTube").  Rumble simply ignores them.[9]

23  _____

24  [8] Moreover, the report's allegations of Google "self-preferencing" YouTube principally quote the Wall Street Journal article, and thus present additional hearsay-within-hearsay.  The report otherwise

25  addresses issues related to different products (not video platforms).  *See* Opp. Ex. W; Opp. 19–20.

26  [9] Testimony and documents also show that the Journal's approach to evaluating "self-preferencing" was misguided.  For example, the article alleged that the fact that non-YouTube videos with more

27  reported "views" and "comments" ranked lower in Google search results than similar YouTube videos

28  was somehow evidence of "self-preferencing."  *See* Opp. Ex. V at 1, 4–5, 8–9.  ██████████

- 9 -

2.    Rumble's Continuing Reliance on Select Screenshots Is Unavailing

Rumble continues to rely on the handful of queries generated by Mr. Lurie.  Opp. 7–8.  But Rumble ignores everything in Google's opening brief explaining why those results—merely showing a YouTube webpage ranking first for those given queries at that time—are unavailing.  Mot. 13–14.  "A party's own speculation is insufficient to create a genuine issue of material fact, and a party cannot make it sufficient simply by finding an expert who is willing to assume its correctness."  *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856–57 (9th Cir. 2019).  Mr. Lurie himself has conceded that a handful of search queries is insufficient to make any conclusions about whether Google is boosting the webpages from any given platform over another.  Mot. 13.

3.    Rumble's Arguments as to Different Products Are Irrelevant

Rumble finally points to what it refers to as "background evidence" concerning products and features unrelated to YouTube or the ranking of YouTube webpages in Google search results.  Opp. 19–21.  This purported evidence has no bearing on this case and does not create a triable issue here.

The video of former Google executive Marissa Mayer, Opp. 19, is irrelevant.  The video, publicly available on YouTube since 2007,[10] discusses Google Finance and Google Maps "OneBoxes" that appeared on the Google Search results page many years ago.  Her comments have nothing to do with search ranking, let alone ranking for videos.  She merely noted that these OneBoxes contain links to the source of the information displayed—e.g., Google Finance and Google Maps—ahead of links to other webpages.  Earlier in the video, she explained that Google Search ranking is "agnostic" to video platform when displaying video results (at 43:03–44:51).  *See also* Ex. 75 at -002–005, -020.

The European Commission *Google Search (Shopping)* case is also irrelevant.  Opp. 20.  At issue there was Google's display of its own comparison shopping product in a dedicated space on the search results page while restricting the display of third-party comparison shopping websites in that space.  AT.39740, C(2017) 4444, ¶ 344.  The case did not involve claims relating to search ranking

█████████████████████████████████████████████████████████████████████████████ .

[10] *See* https://www.youtube.com/watch?v=LT1UFZSbcxE.

more generally, let alone the ranking of video results.  In fact, the EC explained that it did "not object to the design of Google's generic search algorithms."[11]

Rumble cannot manufacture an "overarching strategy," Opp. 20, out of these disparate and unrelated matters.  Indeed, all this purported evidence is impermissible "other acts" propensity evidence that Rule 404(b) prohibits.  The Court should not consider it at all.  *Weil*, 922 F.3d at 998.[12]

In sum, Rumble has not adduced any evidence creating a triable issue of "self-preferencing."

## II.    THERE IS NO TRIABLE ISSUE OF "EXCLUSIONARY" PREINSTALLATION OF THE YOUTUBE APP

Rumble's jumbled response with respect to purported "exclusionary" preinstallation of the YouTube app on Android mobile devices underscores that there is likewise no triable issue with respect to that theory.  Rumble does not—and cannot—show that Google's YouTube licensing agreements for Android devices are "exclusive."

### A.    None of Google's Android Agreements Require YouTube Exclusivity

Rumble ignores that, to determine whether an exclusive dealing arrangement exists, the Ninth Circuit has emphasized that courts are "require[d] [to] look at the actual terms of the agreements." *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1181 (9th Cir. 2016).  No Android agreement provides for *any* exclusivity with respect to the preinstallation of the YouTube app.  And Rumble does not point to any such provision.  To the contrary, the MADAs expressly provide that "this Agreement *does not restrict or limit Company from preloading or determining the placement of its own or third party applications or services on its Android devices*."  Mot. Ex. 2 at -180.

Nor does Rumble claim that any of the four other categories of Android agreements—AFAs, ACCs, RSAs, and MSIAs—contain requirements relating to the YouTube app or any other video platform app.  *See* Mot. 21.  At most, Rumble asserts that the "definition of Alternative Search Service"

---

[11] *See* https://ec.europa.eu/commission/presscorner/detail/en/memo_17_1785.

[12] *See Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1113 (1st Cir. 1994) ("Because none of the cases . . . concerned the NFL's ownership policy at issue here, evidence of those prior cases is not relevant," requiring "a direct, logical relationship to the conduct at issue in the present case").  None of the cases Rumble cites, Opp. 20, are on point—all involved the *same* conduct.

1    in Google's RSAs "encroaches on any potential vertical search functionalities on any app, including

2    Rumble's app."  Opp. 29.  Rumble appears to be arguing that this provision restricts OEMs from

3    preloading Rumble's app because it has a functionality that allows users to search for videos within

4    the Rumble platform.  That is meritless.  As Google explained in its opening brief, the exclusivity

5    provisions in the RSAs concern promotion of Google Search, not anything related to the placement or

6    preload of the YouTube app or any app like Rumble's that has internal search capabilities unrelated to

7    Internet search.  Mot. 21.  "Alternative Search Service" is defined in the RSAs to be ████████████

8    ███████████████████████████████████████████  Opp. 29 n.4.  Rumble cannot reasonably suggest that

9    the Rumble app is ███████████████████████████████████████  in the same way

10   the New York Times app is not ████████████████████████████████

11   merely because it allows users to search for articles within its own website.

12        Rumble further asserts that, rather than examining the Android agreements "in a stand-alone

13   fashion," the agreements must be viewed as "part and parcel of Google's entire anti-competitive

14   scheme."  Opp. 28.  Regardless of whether the Court examines the Android agreements "stand-alone"

15   or collectively, their terms do not restrict preinstallation of Rumble or any other video platform app.

16        **B.     Rumble's Reliance on a "De Facto" Exclusivity Theory Fails**

17        In the absence of any "actual terms of the agreements," *Aerotec*, 836 F.3d at 1181, that require

18   exclusivity, Rumble relies on the notion of "*de facto* or practical exclusivity."  Opp. 26.  Rumble's

19   argument is wrong as a matter of law and finds no support in the record evidence.

20        *First*, to the extent cognizable in the Ninth Circuit, the "de facto" exclusive dealing theory is

21   limited and still requires a contract that contains "exclusive requirements."  Mot. 24.  As noted in

22   Google's opening brief, "[t]he Ninth Circuit has not 'explicitly recognized a "de facto" exclusive

23   dealing theory like that recognized in the Third Circuit and Eleventh Circuit.'"  *Tevra Brands LLC v.*

24   *Bayer Healthcare LLC*, 2024 WL 1909156, at *7 (N.D. Cal. May 1, 2024); Mot. 24.  Rumble does not

25   dispute that.  Yet Rumble characterizes *Tevra Brands* as "emphasizing that the Ninth Circuit

26   recognizes '"de facto" exclusive dealing contracts.'"  Opp. 26.  This is misleading.  Rumble quotes

27

28

from a sentence stating that "in *certain limited situations*, discounts and rebates *conditioned on a promise of exclusivity* . . . may be understood as 'de facto' exclusive dealing contracts."  2024 WL 1909156, at \*7 (emphases added).  Such a "limited situation" does not exist here because no Android agreement entails any "promise of exclusivity" for YouTube, much less any "discounts and rebates."

*Second*, Rumble fails to adduce any evidence in support of "de facto" exclusivity, no matter the standard.  There is *no* evidence that the Android agreements precluded *any* video platform app from being preloaded on *any* Android device.  Mot. 24.  Rumble further does not dispute that the Google Play Store allows users to easily download any apps they wish—including Rumble.  Mot. 25.

*Third*, Rumble cannot conjure up "de facto" exclusivity by merely asserting that YouTube is preloaded in a "prominent position" or in a manner that is "undeletable."  Opp. 28, 30.  With respect to the former, Rumble does not dispute that the MADA only requires OEMs to preload the YouTube app in a folder with other Google apps on the default home screen.  Mot. 21.  Rumble cites no evidence that the icon's position within a folder practically prevents the preloading of other video platform apps, especially given that *more prominent* locations remain available.[13]  Mot. 23.  With respect to the latter, Rumble does not dispute that the YouTube app can be "disabled," which makes the YouTube app invisible to the user and prevents the YouTube app from consuming the device's resources.  Mot. 22.

### C.   Rumble Relies on Rulings that Are Inapplicable to the YouTube App

Ultimately, Rumble is left to rely on rulings from other cases that did not address preinstallation of the YouTube app.  These are inapplicable here.

Rumble relies on the recent district court decision in *United States v. Google*—a case alleging Google's monopolization of "general search services" and search advertising markets, and not concerning YouTube or any other video platform.  Rumble's cherry-picking of Judge Mehta's findings is misleading.  For example, Rumble asserts a purported finding that "MADAs are exclusive in practice."  Opp. 26.  But Judge Mehta was clear that his finding "arises from two contractual requirements" *concerning Google Search*: "that all MADA signatories must:  (1) feature the Google

---

[13] Likewise, there is no merit to Rumble's continued reference to YouTube as a "default."  *E.g.*, Opp. 24.  As explained in Google's opening brief, there is no "default" video platform app on any Android device.  Mot. 22.

Search Widget in the center of the home screen and (2) place Chrome on the home screen with Google as the default G[eneral] S[earch] E[ngine]."  *United States v. Google*, 2024 WL 3647498, at *101 (D.D.C. Aug. 5, 2024).  The MADAs do not contain any such provisions relating to YouTube.

Similarly, Rumble quotes Judge Mehta's statement that "the industry-wide practice is to avoid excessive preloading of applications, or 'bloatware,'" and asserts that YouTube's preinstallation therefore prevents the preloading of other video platform apps.  Opp. 30–31.  But Judge Mehta discussed the avoidance of bloatware in "combination" with the contractual provisions discussed above that are inapplicable to YouTube.  2024 WL 3647498, at *101.  And there is *no* evidence here that any Android OEM declined to preload a video platform app because of "bloatware" concerns. Further, the ruling depicted "a typical Android phone" with the Google Search Widget taking up an entire row on the home screen.  *Id.* at *59.  The YouTube app is merely in a folder with other Google apps.  Mot. 21.  Judge Mehta's opinion, which Google disagrees with, cannot be grafted onto this case.

Rumble's attempt to rely on the verdict in another unrelated case, *Epic Games v. Google*, also fails.  Rumble asserts that the jury found that "Google's agreements with OEMs that sell mobile devices (including MADA and RSA agreements) were unreasonable restraints of trade."  Opp. 30. Rumble ignores that the jury verdict form asked whether the agreements "unreasonably restrained trade *in a relevant antitrust market*," to which the jury answered that the relevant product markets for its finding are the "Android app distribution market" (i.e. app stores) and "Android in-app billing services for digital goods and services transactions" market.  *Epic Games v. Google*, No. 3:20-cv-05671-JD, ECF No. 606 (N.D. Cal. Dec. 11, 2023).  Like *United States v. Google*, the *Epic Games* case was not about YouTube.  *Epic Games* involved contractual requirements relating to the Google Play Store.[14]

In short, there is no triable issue on Rumble's theory of "exclusionary" preinstallation of the YouTube app.[15]

---

[14] Rumble's reference to "the EC Decision" (Opp. 30)—which Google interprets to mean the European Commission's decision in AT.40099 (Google Android)—is similarly inapposite.  It too concerns contractual requirements relating to Google Search and the Play Store—not YouTube.  *See* C(2018) 4761, ¶ 4.

[15] While Rumble's primary theory with respect to the Android agreements relates to the preloading of *YouTube*, Rumble also suggests that "Google's Android agreements exacerbate its anticompetitive

## III.    RUMBLE CANNOT DEMONSTRATE ANTICOMPETITIVE EFFECTS

Rumble does not dispute that to prevail on either its theory of "self-preferencing" or its theory of preinstallation "exclusivity," it must prove that Rumble was substantially foreclosed from a relevant market and there was harm to the competitive process.  But Rumble's Opposition shows that it cannot meet this burden as to either theory.

### A.    Google Has Not Substantially Foreclosed Rumble from a Relevant Market as a Result of Preinstallation of the YouTube App on Android Mobile Devices

As discussed above, Google's Android agreements do not require the exclusive preloading of the YouTube app—and that alone is grounds for granting summary judgment as to Rumble's theory of preinstallation "exclusivity."  *See supra* Section II.A.  But even if they did contain that requirement, Rumble does not dispute that it must *additionally* demonstrate it was *substantially foreclosed* from the market.  *See, e.g.*, *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1003 (9th Cir. 2020) ("[A]n exclusive dealing arrangement is not per se illegal" and only violates the Sherman Act "if its effect is to foreclose competition in a substantial share of the line of commerce affected.").

It is thus dispositive that there are multiple alternative channels of distribution readily and freely available to users seeking to access Rumble's platform.  Rumble recently pleaded in another lawsuit that "*[a]nyone with an internet connection can view videos on Rumble's platform*."[16]  Indeed, Rumble's argument here does not even apply to any Apple devices (iPhones, Mac computers, and iPads), nor the myriad of other laptops, home computers, and smart TVs where users can access Rumble—and on Android devices, users can easily download the Rumble app from the Google Play Store and access Rumble through a browser.  Rumble further does not address, let alone dispute, the

---

self-preferencing conduct" because "the express default positioning *of Google Search* allows Google to use the default to favor YouTube in search results for video content."  Opp. 24 (emphasis added). Rumble's assertion is premised on its allegation that Google actually "self-preferences" YouTube in its search results; therefore, if the Court grants summary judgment with respect to the "self-preferencing" allegations, this theory also fails.  In any event, Rumble provides no evidence that the default position of Google Search on certain Android devices has anything to do with Google Search's purported "self-preferencing" of YouTube in terms of the search results that Google displays to users.

[16] Compl., *Rumble Inc. v. Bonta*, 24-cv-03315 (E.D. Cal. Nov. 27, 2024), ¶ 19 (emphasis added).

series of cases cited by Google holding that such significant alternative channels of distribution defeat a Section 2 claim. Mot. 26–27; *see, e.g.*, *Golden Boy Promotions LLC v. Haymon*, 2017 WL 460736, at *15 (C.D. Cal. Jan. 26, 2017) (granting summary judgment given "existing and potential alternative channels of distribution" of boxing matches for viewership); *Abbyy USA Software House, Inc. v. Nuance Commc'ns Inc.*, 2008 WL 4830740, at *2 (N.D. Cal. Nov. 6, 2008) (dismissing Section 2 claim where plaintiff had "direct sales and licensing agreements" available as "alternative distribution channels").

Instead, Rumble's Opposition once again relies on conclusory generalizations and speculation, *see, e.g.*, Opp. 23–24, ignoring that it is Rumble's obligation to demonstrate, with record evidence, that it can meet its burden of proving substantial foreclosure in a relevant market. *See, e.g.*, *Aerotec*, 836 F.3d at 1174. Here, Rumble does not posit *any* percentage of the market that it claims is foreclosed, let alone a percentage that the law would recognize as substantial. *See United States v. Microsoft Corp.*, 253 F.3d 34, 69 (D.C. Cir. 2001) ("[I]n all cases the plaintiff must both define the relevant market and prove the degree of foreclosure."); 11 Areeda & Hovenkamp, Antitrust Law, ¶ 1821(c) (5th ed. 2024) (plaintiff "must also show a foreclosure coverage sufficient to warrant an inference of injury to competition"); *Sandoz Inc. v. United Therapeutics Corp.*, 2022 WL 17335696, at *15–17 (D.N.J. Mar. 30, 2022) (granting summary judgment because plaintiff could not show substantial foreclosure). Rumble has failed to demonstrate a triable issue.

### B. Google Has Not Substantially Foreclosed Rumble from a Relevant Market as a Result of Alleged "Self-Preferencing"

Likewise, Rumble fails to establish that there is a triable issue of substantial foreclosure due to any alleged "self-preferencing" in search results. Rumble does not contest the fundamental point that, even under its theory of the case, it is not excluded from Google Search. Mot. 28. Users can and do access Rumble via Google Search. Rumble's argument is only that links to its platform should be ranked *higher* in response to some undefined set of user queries. It is not *foreclosed*.

Rumble also does not dispute that only a small fraction of either YouTube or Rumble traffic

- 16 -

comes from users clicking links on the Google Search results page.  Mot. 28–29.  Rumble argues that Professor Murphy's calculation that less than 1% of YouTube views are referrals from Google Search was for "2023 only."  Opp. 21.  But Rumble does not genuinely contest the calculation.  It does not propose any alternative fraction for 2023 or any other year.  And Rumble ignores evidence showing the insignificant percentage of referral traffic in other years.  Included with Professor Murphy's report, for instance, is data indicating that referral traffic from Google Search to the YouTube website accounted for approximately 1% or less of YouTube views for every year from 2017 to 2024.  *See* Ex. 71.[17]  Plaintiff's expert, Mr. Lurie, cites flawed data purporting to show a somewhat higher share of traffic to YouTube from Google Search, ranging from 5.5% in 2017 to 17.4% in 2019 to 8.6% in 2024. *See* ECF No. 144-7 (Lurie Rebuttal Report) ¶¶ 15–18.  Not only are there obvious problems with that data—for example, it does not account for videos viewed by users of the YouTube mobile app, the most popular way to access the platform[18]—but even those percentages, averaging just 10%, do not come close to what is required by law to establish substantial foreclosure.[19]

Rumble does not cite a single case saying this degree of foreclosure would be recognized as substantial—because it is not substantial as a matter of law.  *See, e.g.*, *Eastman v. Quest Diagnostics Inc.*, 2015 WL 7566805, at *12 (N.D. Cal. Nov. 25, 2015) (dismissing Section 2 claim because "[t]en percent [of potential foreclosure] is far less than the 30 to 50 percent that is generally required to plead

---

[17] Another produced document shows that in 2007, only 5% of YouTube traffic came from "External" sources (which includes, but is not limited to, Google Search).  Ex. 72 at -584.

[18] *See* Ex. 73 (Lurie Dep.) 242:10–17. ████████████████████████
███████████████████. *See* Ex. 74.  Mr. Lurie's data also includes navigational searches, such as "youtube." Ex. 73 (Lurie Dep.) 245:18–246:5.  There is no serious argument that a link to Rumble should be ranked above YouTube for searches for "youtube."

[19] While not cited in Rumble's Opposition, Rumble's counsel submitted a declaration purporting to quote a Google document as stating that a third of user sessions on YouTube started with Google Search.  *See* ECF No. 166-2 ¶ 20.  But counsel misquotes the document, which only states that sessions started in "search," not "Google Search."  Opp. Ex. S at -212.  The document is referring to users utilizing YouTube's own internal search functionality, as explained during the deposition of Ms. Papachristou, who confirmed that another version of this document containing the same language was discussing YouTube Search, not Google Search.  Ex. 65 (Papachristou Dep.) 260:14–24.  Accordingly, the document does not show any significant YouTube views from Google search results.

an exclusive dealing claim"); *Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, 2013 WL 5694452, at \*12 (N.D. Cal. Oct. 18, 2013) (dismissing Section 1 claim where agreement could foreclose at most only nine percent of the market); 11 Areeda & Hovenkamp, *supra*, ¶ 1821(c) ("[S]ingle-firm foreclosure percentages of less than 30 percent in a properly defined market would seem presumptively harmless to competition."); Mot. 29.  Because Rumble cannot establish that any foreclosure resulting from the alleged "self-preferencing" is substantial, its claim fails.

## C.    Rumble Has Not Otherwise Established Harm to Competition

Rumble also does not dispute that it is required to show harm to *competition*, not just Rumble. *See* Opp. 23; Mot. 30–31.  Yet it again relies only on conclusory allegations.  Rumble does not address Google's arguments that Rumble has not established any harm to competition or consumers—Rumble does not dispute that YouTube is and always has been free for users, nor does it point to evidence of reduced availability or quality of content for users.  Mot. 30.  Likewise Rumble does not address, let alone distinguish, the authority Google cites that illustrates the burden on a plaintiff to demonstrate harm to competition.  *Id*.  In addition to all the other grounds, Rumble has failed to show a triable issue on harm to competition (i.e., higher prices or reduced output).

## IV.    THE STATUTE OF LIMITATIONS BARS RUMBLE'S CLAIM

Finally, Rumble's Opposition confirms that summary judgment should be granted for the additional independent reason that the statute of limitations bars Rumble's claim.  Apart from conclusory assertions, Rumble's response is principally based on misstatements of law.

To begin, it is meritless for Rumble to suggest that because Google did not raise the statute of limitations in a Rule 12(b)(6) motion, this argument "has no basis at the summary judgment stage." Opp. 31.  Rumble cites no authority for that proposition, and it is not the law.  *See Jablon v. Dean Witter & Co.*, 614 F.2d 677, 682 (9th Cir. 1980) (statute of limitations defense "may be raised by a motion for dismissal *or* by summary judgment motion" (emphasis added)).  Google included statute of limitations as a defense in its Answer, ECF No. 63 at 36, and may now raise that defense on summary judgment.  *See Bergdale v. Countrywide Bank FSB*, 2014 WL 2885473, at \*5 (D. Ariz. June 25, 2014)

- 18 -

(defendant "did not waive its opportunity to raise a statute of limitations defense . . . by raising it for the first time in its answer and not in its previous motions to dismiss").

Further, it is incorrect that the timing of Rumble's purported "actual or constructive knowledge" matters here. Opp. 31. As the undisputed authority Google cited in its opening brief holds, "antitrust claims are not subject to the discovery rule." *Staley v. Gilead Scis., Inc.*, 2021 WL 4972628, at *15 (N.D. Cal. Mar. 12, 2021); *see also Beneficial Std. Life Ins. Co. v. Madariaga*, 851 F.2d 271, 274–75 (9th Cir. 1988) (in "actions governed by 15 U.S.C. § 15b, the plaintiff's knowledge is generally irrelevant to accrual"). Instead, an antitrust claim "accrues and the statute begins to run *when a defendant commits an act* that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971) (emphasis added); Mot. 31. Rumble's Opposition confirms that, according to its own theory, Google's alleged conduct began no later than "the time that Rumble was formed *in 2013*"—and even earlier, "from the time that Google acquired YouTube *in 2006*." Opp. 32 (emphases added).[20] In short, the four-year statute of limitations expired years before Rumble sued.

The lone case Rumble cites on this point is inapposite, as it involved allegations of fraudulent concealment. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 8669891, at *4–5 (N.D. Cal. Aug. 22, 2016). But as explained in Google's opening brief, Rumble did not plead fraudulent concealment in its Complaint, and so may not assert it now. Mot. 32; *see Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 991 (9th Cir. 2006) ("[F]ederal courts have repeatedly held that plaintiffs seeking to toll the statute of limitations on various grounds must have included the allegation in their pleadings; this rule applies even where the tolling argument is raised in opposition to summary judgment."). Rumble does not argue that it did plead fraudulent concealment. And, tellingly, Rumble does not mention "fraudulent concealment" at all in its Opposition—let alone establish that its elements would be satisfied. *See Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012)

---

[20]  ████████████████████████████████████████████████████

Mot. Ex. 43 at 18 (Rumble contention interrogatory response asserting that provisions in Google's Android agreements Rumble alleges are anti-competitive have been in place "[s]ince at least 2011").

("The plaintiff carries the burden of pleading and proving fraudulent concealment.") (cleaned up).[21]

Rumble additionally asserts in a single sentence that Google's "continuing self-preferencing of YouTube and continued monopolization via the Android Agreements over a number of years constitute continuing violations," tolling the statute of limitations. Opp. 32. But—once again—this conclusory statement is insufficient to stave off summary judgment. *See Aerotec*, 836 F.3d at 1174. Rumble bears the burden here. *See Vitale v. Wells Fargo Bank Nat'l Ass'n*, 2024 WL 3012810, at *3 (N.D. Cal. June 14, 2024) ("For the continuing violation doctrine to apply, the plaintiff bears the burden . . . ."); Mot. 32. Yet Rumble provides no explanation as to how Google's alleged conduct satisfies the standard for the continuing violation doctrine, which demands a "new and independent act that is not merely a reaffirmation of a previous act." *Pace Indus., Inc. v. Three Phx. Co.*, 813 F.2d 234, 238 (9th Cir. 1987). Rumble does not respond to any of the cases Google cited or contest any of the arguments Google made in its opening brief that show the doctrine is inapplicable here. Mot. 32–33.[22]

There is no basis for tolling the statute of limitations, and the Court should accordingly grant summary judgment for Google.

## **CONCLUSION**

For these reasons and those explained in Google's opening brief, the Court should grant summary judgment in Google's favor.

---

[21] As the case Rumble cites makes clear, "a plaintiff must do more than show that it was ignorant of its cause of action. It must prove that the defendant fraudulently concealed the existence of the cause of action so that the plaintiff, acting as a reasonable person, did not know of its existence." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 WL 8669891, at *4. "[P]assive concealment is not enough"; Rumble must establish that "its failure to have notice of its claim was the result of affirmative conduct by the defendant." *Id*. The most Rumble does is vaguely refer to public statements by Google that "its search results were intended to provide the most responsive, relevant, and high-quality results." Opp. 32. That falls well short. *See also Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 891–93 (N.D. Cal. 2015) ("Absent any evidence of specific efforts to provide pretextual justifications . . . or to actively prevent disclosure . . . Plaintiffs' remaining allegation that Microsoft represented in public filings that it abides by antitrust laws is inadequate on its own to satisfy Plaintiffs' burden that Microsoft took affirmative acts to fraudulently conceal the alleged conspiracy.").

[22] The only case Rumble cites, *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014), involved a finding of a continuing violation where the plaintiff purchased during the limitations period a product from the defendant that was subject to the defendant's alleged price-fixing scheme. This is not a price-fixing case and that holding has no bearing here.

- 20 -

1   DATED: December 21, 2024

2                                          **WILLIAMS & CONNOLLY LLP**

3                                     By: _John E. Schmidtlein_

4                                     John E. Schmidtlein (CA State Bar No. 163520)

5                                     Stephen J. Fuzesi (admitted *pro hac vice*)
Benjamin M. Greenblum (admitted *pro hac vice*)

6                                     Youlin Yuan (admitted *pro hac vice*)
Daniel Whiteley (admitted *pro hac vice*)

7                                     Jesse T. Clay (admitted *pro hac vice*)

8                                     WILLIAMS & CONNOLLY LLP
680 Maine Avenue, S.W.

9                                     Washington, D.C. 20024
Telephone:   (202) 434-5000

10                                    Facsimile:    (202) 434-5029
Email:         jschmidtlein@wc.com

11                                            sfuzesi@wc.com

12                                            bgreenblum@wc.com
yyuan@wc.com

13                                            dwhiteley@wc.com
jclay@wc.com

14                                     David H. Kramer (CA SBN 168452)
WILSON SONSINI GOODRICH & ROSATI P.C.

15                                     650 Page Mill Road
Palo Alto, CA 94304

16                                     Telephone:   (650) 493-9300
Facsimile:    (650) 565-5100

17                                     Email:        dkramer@wsgr.com

18                                     *Attorneys for Defendant Google LLC*

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I, John E. Schmidtlein, hereby certify that, on December 21, 2024, I caused a true and correct copy of the foregoing to be served on all counsel of record by email.

*John E. Schmidtlein*
John E. Schmidtlein