Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Haywood S. Gilliam, Jr., Judge

RUMBLE, INC.,                     )
                                  )
          Plaintiff,              )
                                  )
   VS.                            )    NO. 21-CV-00229-HSG
                                  )
GOOGLE LLC, et al.,               )
                                  )
          Defendant.              )
_____    )

Oakland, California
Thursday, February 6, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                    CADWALADER WICKERSHAM & TAFT LLP
                    200 Liberty Street
                    New York, NY 10281
              BY:   **JACK G. STERN, ATTORNEY AT LAW**

                    CADWALADER, WICKERSHAM & TAFT LLP
                    1919 Pennsylvania Avenue, NW
                    Washington, DC  20006
              BY:   **KRISTEN J. MCAHREN, ATTORNEY AT LAW**

                    COMPETITION & TECHNOLOGY LAW GROUP
                    11400 West Olympic Boulevard, Suite 200
                    Los Angeles, CA 90064
              BY:   **ROBERT W. DICKERSON, JR., ATTORNEY AT LAW**
                    **EHAB M. SAMUEL, ATTORNEY AT LAW**

          **(APPEARANCES CONTINUED ON THE NEXT PAGE.)**

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                       Official United States Reporter

**<u>APPEARANCES:</u>**  (Continued)

      COMPETITION & TECHNOLOGY LAW GROUP LLP
      1101.5 North Bay Front
      Newport Beach, CA 92662
    BY:  **ALLAN W. JANSEN, ATTORNEY AT LAW**

For Defendant:

      WILLIAMS & CONNOLLY LLP
      680 Maine Avenue, SW
      Washington, DC  20024
    BY:  **JOHN E. SCHMIDTLEIN, ATTORNEY AT LAW**
      **DANIEL WHITELEY, ATTORNEY AT LAW**
      **JESSE T. CLAY, ATTORNEY AT LAW**
      **STEPHEN J. FUZESI, ATTORNEY AT LAW**

```
 1   Thursday - February 6, 2025                    2:09 p.m.

 2                      P R O C E E D I N G S

 3                          ---oOo---

 4        THE COURTROOM DEPUTY:  Your Honor, we're calling

 5   CV-21-00229, Rumble, Inc. v. Google LLC, et al.

 6        Please step forward and state your appearances for the

 7   record, please.

 8        MR. DICKERSON:  Good afternoon, Your Honor.  Robert

 9   Dickerson for plaintiff, Rumble.

10        THE COURT:  Good afternoon.

11        MR. STERN:  Good afternoon, Your Honor.  Also Jack

12   Stern from Cadwalader for plaintiff.

13        MS. MCAHREN:  Kristen McAhren, also of Cadwalader, for

14   plaintiff, Rumble.

15        MR. SCHMIDTLEIN:  Good afternoon, Your Honor.  John

16   Schmidtlein from Williams & Connolly for defendant, Google.

17   With me here today are my colleagues from Williams & Connolly,

18   Mr. Jesse Clay, Mr. Steve Fuzesi, Mr. --

19        THE COURTROOM DEPUTY:  I'll just ask you just to

20   remember, you need to be in front of the mic.  So when you

21   turn, that prevents the court reporter from hearing you

22   clearly.

23        MR. SCHMIDTLEIN:  And Mr. Daniel Whiteley.  Thank you,

24   Your Honor.

25        THE COURT:  All right.  Good afternoon.
```

1          **MR. DICKERSON:**  Your Honor, I was remiss in not

2    introducing to you additional members of our team: Ehab Samuel,

3    Allan Jansen.

4          **THE COURT:**  All right.  Good afternoon.

5          Okay.  So what's on for today is a hearing for motion for

6    summary judgment and then some other *Dauberts* and other things.

7    I want to focus on the motion for summary judgment.  So

8    whoever's lead for each side, just come to the podium.

9          All right.  And the way that I find this to be most

10   effective -- especially in this kind of case with a voluminous

11   record -- I do not want to spend time factually plowing through

12   the record.  I need to do that and will do it.  But what I use

13   this for is to make sure I understand the parties' positions as

14   to the cross-cutting sort of foundational legal issues that

15   I'll then need to apply as I assess the record.  So have that

16   in mind.

17         And I want to start with the statute of limitations

18   argument, which seemed like it was sort of a sideline.  But I'm

19   not sure why, given that it's the threshold gating issue to

20   whether any of this goes forward.

21         And I can easily set aside the argument that the plaintiff

22   made about this not being raised at the motion-to-dismiss

23   stage, because they don't have to, and there's a different

24   standard.  At the motion-to-dismiss stage, I could only grant

25   that on statute of limitations grounds if the problem was

1    obvious from the face of the complaint and unfixable.  So it's

2    neither here nor there that they didn't raise it then.  They're

3    raising it now, and it's a significant argument.  And I think

4    there are really three pieces of it, potentially.

5         First, it seemed to be that the plaintiff was arguing or

6    suggesting that the discovery rule applies to an antitrust

7    claim.  And it just seems to me that the Ninth Circuit lies

8    clear on that.  Are you disagreeing that the antitrust law

9    doesn't involve a discovery rule to trigger the running of the

10   statute of limitations?

11        **MR. STERN:**  No, Your Honor.  We're not disagreeing

12   with that.  I think the confusion arose because we were focused

13   on the basic elements of fraudulent concealment, which

14   sometimes can be confused with the discovery rule.

15        I think with respect to the statute of limitations,

16   however, the continuing violation doctrine should be

17   dispositive.

18        **THE COURT:**  All right.  So let's -- but that -- so I

19   said there are three pieces.  One I think we just dealt with.

20        Second, to the extent you're, you know, hinting at

21   fraudulent concealment, did you plead that?

22        **MR. STERN:**  No.  We're not obligated to plead that,

23   Your Honor.  We may establish that at trial.  We believe there

24   is substantial evidence of fraudulent concealment.

25        **THE COURT:**  I'm not sure that's true.  I think -- I

1  don't think you get to sit on it in your complaint, not raise

2  it, and then spring it.  Don't you have to have a Rule 11 basis

3  for pleading it and then prove it?

4         **MR. STERN:**  Your Honor, I don't believe it is the

5  plaintiff's burden to plead fraudulent concealment.  I do have

6  a case on that.  I believe it's *Staley v. Gilead Sciences*,

7  Ninth Circuit, 735 F.3d 892, which stands for the proposition

8  that the plaintiff has no affirmative pleading burden.  And

9  with respect to fraudulent concealment --

10        **THE COURT:**  What page do you say that *Staley* says

11  that?

12        **MR. STERN:**  902.  It's *Rivera v. Peri & Sons Farms*.

13        **THE COURT:**  All right.  Well, I will see if I agree

14  with that premise.  But I take it that your position is not

15  that you sufficiently pled it.  You're just saying you didn't

16  have to plead it.

17        **MR. STERN:**  Correct.  And that we would be able to

18  prove it at trial, if necessary; however, the Ninth Circuit law

19  on continuing violation should be enough to reject Google's

20  statute of limitations argument.  If we needed to establish

21  fraudulent concealment at trial, we could demonstrate that, for

22  many years, Google misrepresented the nature of its search

23  mechanisms, and that those search mechanisms really first came

24  to light with The Wall Street Journal investigative report in

25  July of 2020.

```
 1        But, as I said, I don't think we need to get there because
 2   of the Ninth Circuit's decision on the continuing violation
 3   doctrine in Samsung v. Panasonic, which is 747 F.3d 1199.  I
 4   have copies of that decision for the Court if you would like.
 5   But --
 6             THE COURT:  Did you cite it?
 7             MR. STERN:  No.  This is -- this is a point -- the
 8   continuing violation point was raised by Google in its reply
 9   brief, making the assertion that the anticompetitive conduct
10   that we allege was merely a reaffirmation of earlier conduct.
11   And so after getting their reply brief --
12             THE COURT:  Well, Counsel, hold on.  I'm looking at
13   their motion.  And, on page 32, it says, "The so-called
14   continuing violation doctrine does not apply here."  So --
15             MR. STERN:  However --
16             THE COURT:  -- to say that it only came up in the
17   reply seems a little weaselly to me.
18             MR. STERN:  I'm sorry if I -- if I was unclear.  The
19   argument that came up on reply was an argument that their
20   conduct was merely a reaffirmation and not continuing
21   violations.  Now, the Ninth Circuit, in Samsung, made clear
22   that reaffirmation does not apply to a series of separate
23   anticompetitive acts over time.  For example, even in a price
24   fixing case, where defendants reach a price fixing agreement
25   before the limitation period, ongoing sales of the product at
```

1    fixed prices constitute continuing and repeated overt acts, not

2    an affirmation or reaffirmation of the earlier conspiracy

3    agreement.  And that is also described in the Ninth Circuit's

4    *Oliver* decision, 751 F.3d 1081.

5            **THE COURT:**  Which is what you did cite.

6            **MR. STERN:**  I did cite that.

7        Now, *Samsung* says --

8            **THE COURT:**  Why don't you hand me *Samsung*, since

9    nobody has known you were going to be relying on *Samsung* until

10   this very minute.

11           **THE COURTROOM DEPUTY:**  If you have an extra, I'll take

12   it for the law clerk.

13           **MR. STERN:**  Sure.

14           **THE COURTROOM DEPUTY:**  Thank you.

15           **MR. STERN:**  And what we've done in red blocking is to

16   indicate the language that we think is most relevant.  And what

17   *Samsung* says -- if I can just quote from it, Your Honor -- "To

18   state a continuing violation of the antitrust laws in the Ninth

19   Circuit, a plaintiff must allege that a defendant completed an

20   overt act during the limitations period that meets two

21   criteria.  One, it must be a new and independent act that is

22   not merely a reaffirmation of a previous act, and, two, it must

23   inflict new and accumulating injury on the plaintiff."

24       Then the Ninth Circuit goes on to say that this standard

25   distilled in *Pace Industries* is meant to differentiate those

 1   cases where a continuing violation is ongoing and an antitrust

 2   suit can therefore be maintained from those where all of the

 3   harm occurred at the time of the initial violation where a

 4   defendant makes an irrevocable, immutable, permanent, and final

 5   decision that violates the antitrust laws and is the source of

 6   all damages.  A statute of limitations begins to run from that

 7   date.  But where the defendant takes subsequent unlawful

 8   action, even pursuant to a preexisting policy agreement or

 9   decision, it restarts the statute of limitations.  The key to

10   this analysis is whether the defendant had the ability not to

11   take the challenged action at later junctions.

12           THE COURT:  Where are you getting that principle?  Is

13   that in *Samsung*?  I'm not seeing it.

14           MR. STERN:  Well, the last sentence that I -- I

15   believe maybe it's from *Oliver*.  But I thought that was from

16   *Samsung*.

17           THE COURT:  But what I was referring to is this idea

18   of immutable decision-making being the touchstone.  Was that

19   something you're quoting from the case or is that your

20   argument?

21           MR. STERN:  It is under page -- page 1203.  The Court

22   cites *AMF*.  And then it refers to an initial refusal to deal

23   that was irrevocable, immutable, permanent, and final.

24           THE COURT:  All right.  I see --

25           MR. STERN:  So --

1        THE COURT:  I see.

2        MR. STERN:  So the concept that the Court is -- the

3   Ninth Circuit is describing is one where the defendant is bound

4   to act in a certain way.

5        Now, here, in this case, the various acts of

6   self-preferencing and the exclusionary contracts take place

7   over time and are all new, overt acts.  This is not a case in

8   which --

9        THE COURT:  Well, let's examine that.  How are they

10  new, overt acts?

11       MR. STERN:  They are new, overt acts because the

12  self-preferencing -- the search mechanisms -- are implemented

13  over time and over the years, and the search mechanisms change.

14  The algorithms change.  Google's approach to the process

15  changes.  It is not a situation where, prior to the limitations

16  period, Google was bound to do things in a certain way and it

17  was immutable.

18       Similarly, with respect to the exclusionary contracts,

19  there are new exclusionary contracts entered into by Google

20  throughout the time frame.  And it's not a situation where

21  Google was in an immutable situation of having to adhere to

22  preexisting contracts.  This is something that they continued

23  to do over time.  And these are new, overt acts.

24       THE COURT:  Well, as *Oliver* put it -- the Ninth

25  Circuit put it in *Oliver* -- "In order to restart the statute of

1  limitations, there must be a new, overt act that is, one, new

2  and independent and not merely a reaffirmation of a previous

3  act, and, two, inflicts new and accumulating injury."

4      How is this something other than a reaffirmation of the

5  overall scheme that you've pled?

6      **MR. STERN:**  Under the *Panasonic* decision,

7  "reaffirmation" has a very particular meaning.  And what it

8  means is that the defendant is bound to a certain course of

9  conduct prior to the limitations period.

10     So let's say, for example, prior to the limitations

11 period, the defendant enters into a contract with a competitor

12 that's anticompetitive.  And they are bound by that contract.

13 And then they act pursuant to that contract.  That -- those

14 acts would be reaffirmations.

15     This is a very different situation where the defendant is

16 implementing new, overt acts into the future.  And it's not

17 bound to do so.  So they are independent, overt acts.  And

18 even -- and *Oliver* says, even in a price fixing case, where

19 there is a price fixing agreement between competitors, and

20 those competitors go on over time to charge fixed prices, those

21 additional sales are considered new, overt acts. because the

22 defendants are not bound to do that.

23     **THE COURT:**  All right.

24     So why don't I hear from the defendant.  Obviously, the

25 case that's now the linchpin is one that you just got handed.

1    But what is your read as to this question of whether there are

2    cognizable, new, overt acts that do fall within the statute of

3    limitations period, understanding that -- I think it can't be

4    disputed -- that the original genesis of the scheme as alleged

5    and as presented was way outside the statute of limitations?

6         **MR. SCHMIDTLEIN:**  Thank you, Your Honor.  John

7    Schmidtlein for Google.

8         You are correct; we did make this argument in our opening

9    brief.  And I'm looking at page 32.  We did say an overt act

10   must be new and independent -- act that is not merely a

11   reaffirmation of a previous act.  It must inflict new and

12   accumulating industry.  So they should have -- if they wanted

13   to rely on this case, they should have done so in their

14   opposition brief.

15        What I think the case law distinguishes here -- and I

16   disagree, even based on the quick skim of *Samsung* -- I disagree

17   with the idea that there is some distinction between being

18   bound or not being bound.  If -- if it is the case -- and this

19   case is a -- it's not a classic refusal to deal case, which is

20   oftentimes a flavor of Section 2 Sherman Act case.  It's a --

21   it's almost like a lesser version of it.  It's you didn't deal

22   with us in the way we'd prefer to be dealt with.  But it is a

23   flavor of refusal to deal.

24        And in those types of cases, if I refused to deal with

25   you, and that's the act that causes the harm, the fact that the

 1   harm continues on and on for a period of time doesn't restart

 2   the statute of limitations.  It -- that is sort of the original

 3   overt act and sort of, you know, if you come back and knock on

 4   my door and say, "I'm back five years later.  Will you deal

 5   with me now?"  And I say, "No, I already told you, I refuse to

 6   deal with you," that doesn't start the limitations period --

 7   the period.

 8        That's -- that's what they've alleged.  That's what

 9   Mr. Pavlovski, their CEO, sort of testified.  He testified he

10   thought this had been going on for -- back to 2014.  They've --

11   they've not presented any evidence that this supposed mechanism

12   of this has sort of changed.  They've claimed we've rigged our

13   algorithms to boost YouTube over their web pages.

14        They haven't said that there was some new mechanism.  The

15   algorithms themselves change and whatever, but the mechanism

16   that they're complaining about, they haven't presented new

17   evidence that some new version of it occurred during the

18   limitations period.  So I don't agree that there is legally

19   this notion of contractual obligation in a case where the

20   allegations are of the type that we're dealing with here.

21        In terms of the price fixing cases, the price fixing

22   cases, candidly, like, typically are resolved with fraudulent

23   concealment, is how most of the price fixing cases escape this.

24   But to the extent that the continuing violation gets brought

25   into price fixing cases, there is a recognized element of

1    conspiracy law, that of new, overt acts in furtherance of a

2    conspiracy.  That's different than the unilateral conduct that

3    we're dealing with in a Section 2 case.

4         And I know Your Honor is very familiar with conspiracy law

5    and new, overt acts and coconspirators taking additional acts

6    and selling products and refining the -- you know -- the

7    conspiracy as you go and setting the prices.  That's been

8    recognized as a -- as very, very different under the case law

9    than this -- what I would refer to as more of this unilateral

10   refusal to deal, which I would suggest to Your Honor is what

11   we're dealing with here, with this algorithmic rigging

12   allegation.

13        **THE COURT:**  And understanding that this circumstance

14   may be, in some ways, unique or unusual, what do you think of

15   as your best case on this question of the statute of

16   limitations applying in the way that you're suggesting at the

17   summary judgment stage?  What I'm most interested in is, are

18   there cases that you would point to where -- ideally, the Ninth

19   Circuit -- but feeling that other courts of appeal or district

20   courts as persuasive authority have entered summary judgment in

21   circumstances that you think are analogous to yours?

22        **MR. SCHMIDTLEIN:**  I think the -- probably the oldest

23   and, like, the leading case on this is the *Pace* case -- *Pace*

24   *Industries*, I believe it is -- that -- that sort of recognized

25   this notion of, you know, if the original act is really what

caused the harm, the fact that there could be accumulating

damages if there's no really new act that is inflicting

different types of harm or different types of damages, I think

that is -- I think that's probably the leading Ninth Circuit

case that analyzes and speaks to this issue.

The other case -- I think that's -- I think that's

probably the one that is probably most important from the Ninth

Circuit -- I guess the Ninth Circuit, I would say.  We've

obviously cited a variety of other cases in our papers trying

to deal with all the various topics here.  But I think that one

is probably the -- is probably the leading case from the Ninth

Circuit.

**THE COURT:**  All right.  Fair enough.

So just on the statute of limitations, before we move on

to other things, I'll let you respond briefly.

**MR. STERN:**  Sure.

Well, having read Google's papers very closely, it is

really in the reply brief that they stress the reaffirmation

point.  And, therefore, I think it's totally acceptable for us

to now present the Court with the *Samsung* decisions.

The events here -- the repeated acts of

self-preferencing -- took place over time.  Google -- Google

was not bound to continue those overt acts.  Nonetheless, it

did continue.  Similarly, the exclusionary agreements changed

over time and Google continued to implement those.  It wasn't

 1   bound to do that.  And, therefore, under *Panasonic*, this is not

 2   reaffirmation conduct.  These are new, overt acts.

 3       To try to address your question about summary judgment,

 4   there is a Ninth Circuit case -- and I have to admit, I haven't

 5   read it closely -- *Edwards v. Occidental Chemical Corp*.  It's

 6   892 F.2d 1142, which deals with the issue of statute of

 7   limitations in the context of a motion for summary judgment.

 8       And I think, in that circumstance, the issue was whether

 9   the court would take the material presented on summary judgment

10   and allow leave to amend.  As I said at the outset, I don't

11   think that's necessary here, because I think the continuing

12   violation doctrine alone tolls the statute of limitations.

13           **THE COURT:**  And what's your response to *Pace*?

14           **MR. STERN:**  Well, our response to *Pace* is that *Samsung*

15   itself discusses the *Pace* standard and explains it.

16           **THE COURT:**  Okay.  Fair enough on statute of

17   limitations.

18       Then with respect to substantive questions -- and I have,

19   again, some fairly targeted places to focus.  And one is really

20   with respect to the anticompetitive effects requirement.  And

21   what I'm trying to be sure I understand from the plaintiff's

22   perspective is what exactly is your theory of market

23   disclosure, and are you even willing to commit to a percentage

24   in terms of the degree of the foreclosure at this point?

25       You know, 10 percent is a number that was floated based on

 1  the defendant's characterization of your expert reports.  But

 2  I'm interested in knowing in a way that is targeted -- you

 3  know, a few sentences -- it seems like something like your

 4  theory ought to be able to distill down.  What is the basis of

 5  your claim that you were substantially foreclosed?

 6        MR. STERN:  Well, the foreclosure evidence relates to

 7  foreclosure of competition, not only foreclosure of the

 8  plaintiff.  And what we've presented, particularly through

 9  Dr. Cragg's expert report, is a detailed analysis of how

10  Google's conduct forecloses competition.  That's at

11  declaration -- Mr. Dickerson's declaration, Exhibit OO, at

12  paragraphs 397 to 450.

13        And Dr. Cragg examines the economic framework for

14  assessing anticompetitive effects, including a consumer welfare

15  standard, how Google makes it harder for users to discover

16  rival online video platforms, and the anticompetitive impact on

17  rivals, creators, and users.

18        In addition, our consumer behavior expert, Professor Gal,

19  examines the same issues from a consumer behavior perspective

20  and addresses the importance of distribution in competing for

21  user attention.

22        In terms of a percentage of foreclosure, our search expert

23  has expressed an opinion concerning the percentage of views

24  that Rumble, as plaintiff, would have received but for the

25  alleged anticompetitive conduct.  And that percentage has also

1  been used by our damages expert in his analysis.  And those are

2  the subject of separate *Daubert* motions.

3        **THE COURT:**  All right.

4      And so as on this point, response from defendants, really

5  understanding that I'm bound by the standard at the summary

6  judgment stage.  To the extent you think their argument is

7  unconvincing or the jury won't buy it or it's not -- you

8  know -- more likely than not, we know that that's not the

9  standard.  And so, in your view, what is it about their

10  anticompetitive effects evidence in this regard that we just

11  heard about that flunks even at the summary judgment stage,

12  respecting all of the inferences I have to draw in their favor

13  at this point?

14        **MR. SCHMIDTLEIN:**  The antitrust laws -- as Your Honor

15  acknowledged as recognized -- there is this notion of

16  anticompetitive effects.  And it's not just any effect.  It has

17  to be a substantial anticompetitive effect.

18      And so the courts have tried to give guidance in trying to

19  give meaning and definition to that notion of substantial

20  anticompetitive effect.  And, in this type of case, it's our

21  position that you have to come forward with a foreclosure

22  analysis.  You have to put some qualitative assessment around

23  this.  This can't just be -- and I took Professor --

24  Dr. Cragg's deposition and I took Mr. -- or Professor Gal's

25  deposition and asked them.  And they didn't do a foreclosure

1   analysis.  They did sort of qualitative stuff and, you know,

2   sort of said, gee, this hurts them.  But it -- they didn't

3   quantify it or qualify, what does this allege rigging of search

4   results mean in the context of how people actually consume,

5   discover, and interact with online videos?

6       And we submitted evidence on our end as to, okay, how

7   much -- how much search traffic does YouTube get from, you

8   know, search engines as opposed to other ways that people get

9   there?  Because this is the way you would get at this question

10   of foreclosure.  And they -- they, at the summary judgment

11   stage, have to come forward with evidence of what -- what

12   degree or amount of foreclosure we're talking about here.

13       And the law's pretty clear on that.  And there's -- courts

14   have disagreed, as I'm sure you saw in some of the cases,

15   around -- in a Section 2 case or a Section 1 case, what's

16   exactly the right cutoff?  But I don't think there's any

17   disagreement in that, in a case like this, you have to put some

18   quantitive calculation around it; otherwise, we're just sort

19   of, you know, waving at thin air as to what substantial

20   anticompetitive effects means.

21       And we've put forth evidence that's undisputed in the

22   sense of they don't take issue with the source or the

23   calculations or anything else.  But roughly one percent or less

24   of views on YouTube come from people who clicked on a link to a

25   YouTube video in a search result.  And we -- and we did a

1    similar analysis and looked at Rumble, and they were roughly in

2    the -- they were in the same.

3        Now, Your Honor -- Your Honor's correct that, in our

4    reply, we sort of pointed out -- they still haven't come

5    forward with this -- they had one of their experts sort of try

6    to calculate what they thought was slightly different

7    percentages of the YouTube traffic number over a couple of

8    different years that, if you average it out, was about

9    10 percent.

10       We've pointed out that that calculation is flawed for a

11   number of very, very obvious reasons.  For example, like that

12   calculation included people who go to Google search and just

13   type in YouTube.  YouTube is actually the number one --

14   number two most popular search query on Google search.  So just

15   getting directed to YouTube -- that's not what this case is

16   about.

17       If you go into Google search and type in "Rumble," Google

18   sends you to Rumble.  There's no allegations by the plaintiff

19   that we've cut off that traffic.

20       So -- but even -- even if you credit these incorrect in

21   erroneously calculated numbers that the plaintiffs put

22   together, there's no court out there that says the 10 percent

23   foreclosure is substantial or equates with anticompetitive

24   effects -- like, market-wide anticompetitive effects.

25       And so I think the law is clear, you can't come in and

 1    just say, I was cut off from some amount of traffic and not

 2    quantify it in this type of a case.

 3        **THE COURT:**  And it sounds like what you're saying is

 4    that that is true, in your view, even if I deny the *Daubert*

 5    motion.  So you're saying that their approach is flawed.  They

 6    did -- they did it wrong.  All these types of things.  But I'm

 7    assuming that, for these purposes, your position is that even

 8    if they're considered, they don't defeat summary judgment.

 9        **MR. SCHMIDTLEIN:**  Absolutely.  As I said, the

10    calculation their expert did doesn't actually match up with the

11    theory of their case.  Because, as I noted, these navigational

12    queries that are included as 10 percent -- that's not what the

13    case is about.  He also -- he also failed to take into

14    consideration, in this case, the amount of views of YouTube by

15    people going to an online app and other non -- other ways

16    outside of -- of search.  That's also another popular way that

17    people interact with these -- with these online products and

18    services.

19        So his calculation is, we would submit, unquestionably

20    flawed.  But 10 percent, however you slice it, doesn't amount

21    to substantial foreclosure under any of the cases, even the

22    ones that sort of disagree and talk about, you know, what's the

23    threshold based on Section 1 versus Section 2?

24        **THE COURT:**  All right.  So -- and then I'll let you

25    lead on one point and then I'll come back to you for a response

```
 1    on that.  And then we can start talking about the next topic.

 2    But on the --

 3              MR. STERN:  And I do have a response to what was just

 4    discussed.

 5              THE COURT:  I'll let you do it when I come back to

 6    you.

 7         But with respect to -- what I'm thinking of is the

 8    pre-installation contract component of this.  There seems to be

 9    some -- I don't know if it was sparring -- but some ambiguity

10    about whether -- what the Ninth Circuit's precedent on this de

11    facto exclusivity doctrine means.  I think it's clear that it

12    hasn't been unequivocally formally adopted in the way that it

13    has been in some other circuits.  But, you know, really, for my

14    purposes, I'll figure out how I think it applies.  But I just

15    want to understand the parties' positions.  Are you saying that

16    there's no such thing?  Are you saying that, in the Ninth

17    Circuit, to the extent it's been recognized, it's limited in

18    some way?  What's the legal lay of the land, as far as you're

19    concerned?

20              MR. SCHMIDTLEIN:  So I agree with Your Honor that the

21    Ninth Circuit has not, I think, definitively indicated one way

22    or the other whether the Circuit would embrace it.

23         But in the cases where it's been sort of wrestled with or

24    it's been sort of discussed, I think the issue that gets raised

25    is whether -- in sort of the typical case where it is
```

 1    presented, it's a case where the contracts does not say, thou

 2    shall buy all of, you know, your products from me exclusively.

 3    But what it says is, if you buy either all or a substantial

 4    percentage of your products from me, let's say, I'll give you a

 5    huge discount on the sales.

 6         And I think -- I think some of the courts have wrestled

 7    with, is that -- is that de facto exclusive?  Are you -- are

 8    you engaging in some economic behavior that, depending on where

 9    you sit, could be viewed as coercing your customer into

10    buying -- basically agreeing to, effectively, an exclusive

11    contract.

12         And, candidly, Your Honor, I think different courts have

13    viewed those -- even those types of contracts differently.  I

14    think some courts say, well, what's wrong with that?  That's

15    competition on the merits.  They're not forcing you to buy the

16    product exclusively.  They're offering you sort of competitive

17    terms if you'll buy more.  We think that's good, and we don't

18    have a problem with that.

19         I think some other courts, depending on the market

20    position of the defendant, have wrestled more with that and

21    whether that could be viewed as sufficiently coercive that

22    we're going to find that to be de facto exclusive.

23         I -- the good news for Your Honor is, is you don't have to

24    deal with any of the niceties or I think some of the

25    interesting and challenging economic questions there, because

the contracts that are at issue in this case don't involve any
of those types of economic incentives or coercion, depending on
which way you want to look at it.

The contracts that we're dealing with here that deal with
YouTube don't require exclusivity at all.  The contracts are --
provide for the nonexclusive pre-installation on various
devices.  And Google has entered into various contracts with
manufacturers of smartphone devices and others that provide for
YouTube being preloaded on those devices.

But none of those agreements say you get some payment or
you get some consideration if you make us the only video
platform preloaded on 90 percent of your devices or make us --
you know -- we give you some benefit if we're 100 percent.  The
agreements are explicitly nonexclusive, full stop.

And so, for that reason, whether they want to talk about
de facto or what have you, the agreements just aren't
exclusive.  And the *Aerotek* case, I think, is probably the
leading case that says, if we're talking about exclusive
dealing, there's got to be something that leads to exclusivity.
And that's just absent here.

**THE COURT:**  All right.

So you can respond on that and then the prior point.

**MR. STERN:**  Sure.

In terms of the anticompetitive effects of the Android
agreements, at page 26 of our opposition, we noted that the

1 Northern District of California decision, *Tevra Brands*,

2 emphasizes that the Ninth Circuit does recognize de facto

3 exclusive dealing contracts.  And we believe the record here

4 shows that, as a result of these contracts, the market

5 realities are such that once Google occupies the pre-installed

6 video-sharing platform space, a rival cannot realistically hope

7 to compete for another place on an Android device's home

8 screen.

9        Counsel says the agreements are not exclusive, but they

10 have the effect of being exclusive.  The mobile application

11 distribution agreements are conditioned on bundling of YouTube,

12 Google search, and other core and flexible applications with

13 Play Store; requires adhering to Google's placement

14 restrictions; and requires complying with other agreements that

15 effectively prevent phone manufacturers from pre-installing

16 products that compete with Google's products.

17        **THE COURT:**  Right.  But just in -- just looking at

18 *Tevra*, which I think frames this, more or less, in the way that

19 opposing counsel just did, the way that the de facto exclusive

20 dealing theory is framed is what the case says.  "In certain

21 limited situations, discounts and rebates conditioned on a

22 promise of exclusivity or on purchase of a specified quantity

23 or market share of the seller's goods or services may be

24 understood as de facto exclusive dealing contracts because they

25 coerce buyers into purchasing a substantial amount of their

 1   needs from the seller."

 2        Why are these agreements analogous to that, even assuming

 3   that that's a theory the Ninth Circuit would ratify?

 4        **MR. STERN:**  Well, I think the agreements are

 5   effectively coercive.  And we have a very extensive analysis by

 6   Judge Mehta in the *U.S. v. Google* case after trial.  And even

 7   though that case focused on monopoly power in the general

 8   search market, it applies here for a few different reasons.

 9        One, the cementing of monopoly power in the general search

10   market exacerbates Google's self-preferencing of YouTube.

11        Second, Judge Mehta did find that the Android

12   agreements -- the Google/Android agreements -- secured default

13   status effectively for Google's search and non-deletable

14   pre-installation for YouTube and are essential to Google

15   securing query traffic on Android devices to the exclusion of

16   rivals.

17        And, as he found, exclusivity need be neither expressed

18   nor complete to render an agreement exclusive for Section 2

19   purposes.  There's nothing in the Ninth Circuit law suggesting

20   that the Ninth Circuit would reach a different conclusion here.

21        Now, going back to the point about the anticompetitive

22   effects of self-preferencing YouTube, one of the foundations of

23   Google's motion with respect to anticompetitive effects was

24   this expert opinion by Dr. Murphy that only one percent of

25   YouTube views come through Google search referrals.  It's -- it

1  really -- it defies credibility to say that that is not

2  disputed by the plaintiff here.

3       Our experts -- Professor Gal and Ian Lurie -- explained

4  why that analysis is flawed and highly limited.  For one thing,

5  it is a snapshot of a recent period in 2023, well after YouTube

6  had already established its extraordinary dominance of the

7  online video market.

8       **THE COURT:**  Right.  But I get -- but what -- what

9  they're asking him I'm trying to understand from you -- and I

10  think I asked you this before -- is setting aside why you think

11  their quantification is wrong, is your expert trying to

12  quantify the market exclusion in any way?

13       **MR. STERN:**  Well, I don't believe there's a Ninth

14  Circuit requirement that says that you have to have a specific

15  percentage of foreclosure.  And if you --

16       **THE COURT:**  But it has to be substantial; right?

17       **MR. STERN:**  It has to be substantial.  And --

18       **THE COURT:**  So how do courts in the Ninth Circuit

19  measure whether it rises to the level of creating a genuine

20  issue of material fact as to substantiality?

21       **MR. STERN:**  I don't believe there's any threshold

22  percentage with respect to market share or other -- some other

23  metric.  I'm not sure what the metric would be here.

24       What we have done, through our expert reports, expert

25  opinions, is to explain the anticompetitive effects and the

foreclosure of competition in this market and how it affects

consumers, creators, and competitors in the market.

    With respect to Rumble specifically, we have evidence and

expert testimony concerning the extent to which Google's

conduct has prevented Rumble from getting additional views.  So

we have quantified that.

    The point about what Dr. Murphy did in this one percent

idea is that it is contradicted explicitly by one of the

documents that we attach to our declaration in opposition to

summary judgment, Exhibit S, S as in Sam.  It's a 2013

document.  And it notes that YouTube, at the time, was getting

4 billion views, 33 percent of which -- one-third of which --

started with Google search.

    So the notion that only a small percentage of views come

from Google search is contradicted by that.  And, in addition,

as our experts point out, a small percentage of YouTube views

in today's market, as dominated by YouTube, translates to a

huge number of views for a small competitor.

        **THE COURT:**  Okay.  And I think you -- there was

some -- there was one other point you wanted to respond on.  Or

was there?  Did you cover them all?

        **MR. STERN:**  I think -- I think I did.

        **THE COURT:**  All right.

        **MR. SCHMIDTLEIN:**  Your Honor, can I just respond

briefly?

1      **THE COURT:**  Very briefly.

2      **MR. SCHMIDTLEIN:**  Okay.

3      The Exhibit S that counsel just cited to you and read

4  from -- and it's in the declaration -- he read a sentence that

5  said more than 4 billion videos are watched on YouTube daily,

6  and about a third of the user sessions start with -- and he

7  said "Google search."  And they quote it in their brief.

8      The document said -- does not say "Google search."  The

9  document reads "user sessions start with search."  And a

10  witness testified this -- about this document -- who was

11  knowledgeable about it and explained that what the document

12  meant was a third of the user sessions start with search on

13  YouTube.

14      YouTube is the second largest search engine in the world.

15  It gets more traffic than Bing or Yahoo get.  They have

16  misstated the document in their brief and Counsel has just done

17  it again here in open court.  So I would ask you to look

18  carefully at Exhibit S.

19      **MR. STERN:**  We would encourage that, as well.

20  Exhibit S is -- it is a document that is important.  It

21  reflects the 2013 One Tree Project, which is a project that

22  essentially made all Google search algorithms and all YouTube

23  algorithms available to YouTube.  And the effect of that was to

24  give YouTube a massive advantage in terms of how Google search

25  crawls and indexes content.

 1         As to what the witness testified and as to what the

 2    document says, we have a fundamental disagreement.  When you

 3    read hundreds and hundreds of Google documents, as I have,

 4    often you see references to search.  Sometimes you see

 5    references to video search.  Sometimes you see references to

 6    YouTube search.  In the context of this document, we believe

 7    that the jury should be allowed to assess the credibility of

 8    the witness and make a determination as to what this is

 9    referring to.  We believe it's referring to Google search.

10         **THE COURT:**  All right.  Those are the questions that I

11    have.  We'll take it under submission, and I'll aim to issue

12    something as soon as I can.

13         Now, when is our trial date?

14         **MR. SCHMIDTLEIN:**  So, Your Honor, our trial date is, I

15    believe, May the 19th.  And the parties have a variety of

16    events and actions that are -- I think start -- start to get

17    triggered in early April around that.

18         Obviously, we know and want you to take the time that you

19    need.  These are very, very serious motions.  We think the

20    Ninth Circuit law is clear on these foreclosure issues.  We

21    believe they're very clear on the other -- the statute of

22    limitations and the other issues and the case should be --

23    should be dismissed.

24         I am lead counsel for Google in the *U.S. v. Google* case

25    where Judge Mehta has scheduled the remedy proceedings in that

1    case to begin on April the 21st.  And our scheduled -- we're

2    taking a little bit of a break in the middle.  This is

3    obviously a case that he is hearing.  It's not a jury trial.

4    And that case is due to conclude -- at least the closing

5    arguments are on May 29th -- or May 30th.  He has told us we've

6    basically got three weeks of trial starting in late April and

7    going through the middle of May.  And that case was filed

8    before this one.  And he didn't give me a whole lot of options

9    when he announced what those dates were going to be.

10         **THE COURT:**  I'll have to talk to my friend Judge Mehta

11   about that.

12         **MR. SCHMIDTLEIN:**  Yes.  However you all would like to

13   resolve that, I'd be pleased.  But that's the predicament I

14   find myself in if there are further proceedings in this matter.

15         **THE COURT:**  Right.  Well, it's fair.  What I would

16   suggest you do is meet-and-confer and figure out -- I can't

17   tell you, right now, what the outcome of the motions will be.

18   I need to go back and decide that.  But, you know, if the

19   thought is that a trial on the current schedule would just be

20   impossible given the other matter, then you should at least

21   start to think about when you would propose that it be.

22         And if you are able to come to some agreement on that, and

23   it's a timing that is, A, not too far out, and, B, available

24   for me, I'd consider it.  But it's probably worth starting to

25   have the discussion now, given the conflict that you already

1   are foreseeing.

2          MR. STERN:  Your Honor, I'll just say that despite our

3   many discovery and other disputes, we've always tried to

4   accommodate each other and will do the same here.

5          THE COURT:  All right.  Well, fair enough.  Why don't

6   you start to have at least those preliminary discussions.  And

7   then if you -- you know, frankly, if you -- if you come to a

8   place where you're proposing -- whatever it would be -- June,

9   for example, as a potential time that would work for you all,

10  if it goes forward, let me know that.  And then, you know, I

11  can -- obviously, if summary judgment is granted, the case is

12  over.  But, if not, I think -- I'd like to continue to keep the

13  trial -- a trial date set, even if it's not our -- exactly our

14  current date.

15         And so why don't you start to have those discussions and

16  see -- if you were to assume -- without me saying that that's

17  where it's headed -- but if you were to assume that the case

18  goes forward, when could you do it, given the proceedings that

19  are going on in Washington?

20         MR. SCHMIDTLEIN:  Okay.  Thank you, Your Honor.

21         MR. STERN:  There's just one -- I hate to press my

22  luck.  But there is just one other point that came up in their

23  reply brief that I wanted to briefly respond to.  And that is

24  that they argued that The Wall Street Journal report and the

25  congressional committee investigative report were hearsay.  The

 1   case I wanted to cite to Your Honor on that is a case involving

 2   the concept of adoptive admissions under Federal Rule

 3   801(d)(2)(B).  And that is *United States v. Gise* -- G-I-S-E --

 4   597 F.2d 1170, Ninth Circuit, 1979, that's been cited by the

 5   Ninth Circuit, repeatedly.

 6         **THE COURT:**  All right.  I agree, you probably are

 7   reaching.  If you get to the point where you need me to find a

 8   newspaper article to be an adopted admission, you're going to

 9   be rolling the dice.

10         **MR. STERN:**  No, it's not that, Your Honor.  It's that

11   they claim that these reports are inadmissible.  I think the

12   way it would work at trial is that they would be admitted not

13   for the truth, but the fact that these accusations were made

14   and that Google did not respond.  And then it would be for the

15   jury --

16         **THE COURT:**  Eh --

17         **MR. STERN:**  Well --

18         **THE COURT:**  Okay.

19         **MR. STERN:**  -- I'd refer Your Honor to *U.S. v. Gise*.

20         **THE COURT:**  I will look at the criminal case of

21   *U.S. v. Gise* and see if it supports what you're saying.

22         **MR. STERN:**  Thank you.

23         **THE COURT:**  All right.  Thanks.

24         **MR. SCHMIDTLEIN:**  Thank you, Your Honor.

25             (Proceedings adjourned at 3:04 p.m.)

---oOo---

## <u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Saturday, February 8, 2025



_____

Kendra A. Steppler, RPR, CRR

Official Reporter, U.S. District Court